IN THE UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

RIVERS UNLIMITED
515 Wyoming Avenue
Cincinnati, OH 45215

LITTLE MIAMI, INC
6040 Price Road
Milford, OH 45150-1429

SIERRA CLUB
85 Second St.
San Francisco, CA 94104

and MARILYN WALL
816 Van Nes Drive
Cincinnati, Ohio 45246

               Plaintiffs,

       v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION
400 Seventh Street, S.W.
Washington, D.C. 20590

MARIA CINO
In her official capacity as Acting Secretary
United States Department of Transportation
400 Seventh Street, S.W.
Washington, D.C. 20590

FEDERAL HIGHWAY ADMINISTRATION

400 Seventh Street, S.W.
Washington, D.C. 20590

**Case No.:_____**

**Complaint for Declaratory and
Injunctive Relief -** 1

J. RICHARD CAPKA

In his official capacity as Administrator
Federal Highway Administration
400 Seventh Street, S.W.
Washington, D.C. 20590

                Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      This action challenges defendants' violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, et seq., the Department of Transportation Act, 23 U.S.C. § 138 and 49 U.S.C. § 303 ("Transportation Act"), and the Administrative Procedure Act, 5 U.S.C. § 706(2) ("APA"), in connection with the proposed construction of a new bridge across the Little Miami National Wild and Scenic River.

2.      The Eastern Corridor Multi-Modal Project ("Eastern Corridor") is a highway construction project, which currently includes plans to construct a new large elevated, multi-lane bridge (where there previously was not one) crossing the Little Miami River, a nationally designated Wild and Scenic River, and will impact the scenic, aesthetic, peaceful and recreational attributes associated with the River and cause for its inclusion in the National Wild and Scenic Rivers System.

3.      Defendants' Eastern Corridor project and the corresponding Tier 1 Final Environmental Impact State ("FEIS") violates the National Environmental Policy Act and the Transportation Act because Defendants have: (1) failed to consider all reasonable alternatives in

**Complaint for Declaratory and
Injunctive Relief -** 2

the Tier 1 analysis; (2) failed to consider significant new information; (3) failed to adequately

consider mitigation measures; (4) failed to base its EIS analysis on current data; and (5) made a

4(f) determination inconsistent with the Transportation Act.

4.      Plaintiffs request that this Court issue: (1) a declaratory judgment that defendants

are in violation of NEPA and the Transportation Act; (2) a mandatory injunction directing

Defendants to comply with the provisions of NEPA and Section 4(f) of the Transportation Act;

(3) an order vacating the June 6, 2006 Record of Decision approving the FEIS and consequential

approval of the construction of a new bridge crossing the Little Miami National Wild and Scenic

River; and (4) an injunction prohibiting defendants from proceeding with site preparation,

construction, the issuance of revenue bonds, right-of-way acquisitions or any other irrevocable

actions related to the building of the proposed bridge across the Little Miami National Wild and

Scenic River until the violations of NEPA and Section 4(f) of the Transportation Act have been

corrected.  Plaintiffs also seek costs, attorneys' and expert witness fees.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal

question jurisdiction), 28 U.S.C. § 1361 (mandamus), and 5 U.S.C. § 702 (Administrative

Procedure Act); and may issue a declaratory judgment, 28 U.S.C. § 2201, and further injunctive

relief pursuant to 28 U.S.C. § 2202.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).  Defendants, U.S.

Dept. of Transportation, Acting Secretary Maria Cino, the Federal Highway Administration, and

Administrator Richard Capka, reside, in their official capacity, in the District of Columbia.

Additionally, a substantial part of the events and omissions giving rise to the claims in this case,

**Complaint for Declaratory and
Injunctive Relief -**  3

occurred in the District of Columbia.

## PARTIES

7.    Plaintiff RIVERS UNLIMITED sues on behalf of itself and its members.  Rivers

Unlimited is a not-for-profit membership organization with 1000 members.  Rivers Unlimited's

objective and purpose is to restore, maintain and improve Ohio's rivers and streams, their water

quality, scenic beauty, their multiple economic uses and their effect upon Ohio's quality of life.

In pursuit of this goal, Rivers Unlimited and its members participate in public decisions

involving the current and future management of the Little Miami River.  Rivers Unlimited

attempts to increase public participation in the decisions of the Department of Transportation and

to promote adoption of state regulations requiring Defendants to comply with environmental

standards and regulations which meet or exceed federal regulations.  Rivers Unlimited promotes

the choice of the least environmentally destructive alternative in highway planning taking into

account the impact on both biological and human populations.

8.    River Unlimited's staff and members reside in and use, and will continue to do so

on a regular basis, the areas that will be affected by the construction and existence of the

proposed bridge across the Little Miami National Wild and Scenic River.  Members and staff of

Rivers Unlimited participated in administrative proceedings concerning the violations of law at

issue herein. Members and staff of Rivers Unlimited use and enjoy the Little Miami River and its

surrounding riparian habitat, including the areas proposed for the highway/bridge, for outdoor

recreation and scientific study of various kinds, including nature study, wildlife viewing,

canoeing, photography, hiking, camping, solitude, and a variety of other activities.  The above-

**Complaint for Declaratory and
Injunctive Relief -**  4

described recreational, vocational, scientific, conservation, aesthetic, spiritual and educational

interests of Rivers Unlimited, its staff, and its members have been, are being, and unless this

Court grants the requested relief, will continue to be adversely affected and irreparably impaired

if the Eastern Corridor project is allowed to proceed without compliance with our federal laws.

These are actual, concrete injuries caused by the Defendant's failure to comply with mandatory

duties under federal law.  Rivers Unlimited has no adequate remedy at law.  The injuries would

be redressed by the relief sought.

9.       Plaintiff LITTLE MIAMI, INC. sues on behalf of itself and its members.  Little

Miami, Inc. is a membership organization with over 500 members.  Little Miami, Inc. (LMI) is a

non-profit 501(c)(3) river conservation organization dedicated to the conservation of the Little

Miami National & State Scenic River.  In pursuit of this goal, Little Miami, Inc. and its

members, amongst other things, participate in public decisions involving the current and future

management of the Little Miami River.

10.       LMI's staff and members reside in and use, and will continue to do so on a

regular basis, the areas that will be affected by the construction and existence of the proposed

bridge across the Little Miami National Wild and Scenic River.  In addition, Little Miami, Inc.

owns land and holds conservation easements in order to provide permanent protection for the

Little Miami National Wild and Scenic River and the riparian forests along the river that will be

affected by the construction and existence of the proposed bridge across the Little Miami

National Wild and Scenic River.  Members and staff of Little Miami, Inc. participated in

administrative proceedings concerning the violations of law at issue herein.  Members of Little

Miami, Inc. use and enjoy the Little Miami National Wild and Scenic River and its surrounding

**Complaint for Declaratory and
Injunctive Relief -**  5

riparian habitat, including the areas proposed for the highway/bridge, for outdoor recreation and scientific study of various kinds, including nature study, wildlife viewing, canoeing, photography, hiking, camping, solitude, and a variety of other activities.  The above-described recreational, vocational, scientific, conservation, aesthetic, and educational interests of LMI, its staff, and its members have been, are being, and unless this Court grants the requested relief, will continue to be adversely affected and irreparably impaired if the Eastern Corridor project is allowed to proceed without compliance with our federal laws.  These are actual, concrete injuries caused by the Defendants' failure to comply with federal law.  LMI has no adequate remedy at law.  The injuries would be redressed by the relief sought.

11.    Plaintiff SIERRA CLUB sues on behalf if itself and its members.  The Sierra Club was founded in 1892 and is the nation's oldest grass-roots environmental organization. The Sierra Club has more than 750,000 members nationwide, including over 20,000 members in Ohio.  The Sierra Club is dedicated to the protection and preservation of the natural and human environment.  The Sierra Club's purpose is to explore, enjoy and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments.  One of the Sierra Club's national priorities is the protection of our nation's wild legacy, including protecting "wild and scenic" rivers.

12.    The Sierra Club's staff and members reside in and use, and will continue to do so on a regular basis, the areas that will be affected by the construction and existence of the proposed bridge across the Little Miami National Wild and Scenic River.  Members and staff of the Sierra Club participated in administrative proceedings concerning the violations of law at

**Complaint for Declaratory and Injunctive Relief -**  6

issue herein.  Members of the Sierra Club use and enjoy the Little Miami National Wild and Scenic River and its surrounding riparian habitat, including the areas proposed for the highway/bridge, for outdoor recreation and scientific study of various kinds, including nature study, wildlife viewing, canoeing, photography, hiking, camping, solitude, and a variety of other activities.  The Sierra Club members have an aesthetic interest in protecting the Little Miami National Wild and Scenic River and its surrounding habitat because members enjoy participating in the above described recreational activities.  The above-described recreational, vocational, scientific, conservation, aesthetic, spiritual and educational interests of the Sierra Club, its staff, and its members have been, are being, and unless this Court grants the requested relief, will continue to be adversely affected and irreparably impaired if the Eastern Corridor project is allowed to proceed without compliance with our federal laws.  These are actual, concrete injuries caused by the Defendant's failure to comply with mandatory duties under federal law.  The Sierra Club has no adequate remedy at law.  The injuries would be redressed by the relief sought.

13.    Plaintiff MARILYN WALL uses, on a regular basis, the area affected by the construction and existence of the proposed bridge across the Little Miami National Wild and Scenic River.  Ms. Wall has participated in the Eastern Corridor Study and Tier One NEPA processes on behalf of both herself, as an individual, as well as on behalf of the Sierra Club.  Ms Wall canoes, trains as a canoe racer, hikes along, conducts water monitoring and birdwatching, photographs, works on cleanups, enjoys both quiet, peaceful, solitude and group recreation on the river, and leads efforts to educate the public and protect the river.  The above-described recreational, professional, aesthetic, educational, and conservation interest of Ms. Wall have been, are being, and unless this Court grants the requested relief, will continue to be adversely

**Complaint for Declaratory and Injunctive Relief -** 7

affected and irreparably impaired if the Eastern Corridor project is allowed to proceed without compliance with our federal laws.  These are actual, concrete injuries caused by the Defendants' failure to comply with mandatory duties under federal law.  Ms. Wall has no adequate remedy at law.  The injuries would be redressed by the relief sought.

14.     Defendant UNITED STATES DEPARTMENT OF TRANSPORTATION ("DOT") is an executive department of the United States Government.   DOT will be providing funding for the Eastern Corridor and the proposed bridge across the Little Miami National Wild and Scenic River.

15.     Defendant MARIA CINO is the Acting Secretary of DOT.  Acting Secretary Cino oversees the activities of DOT and its agencies, including the Federal Highway Administration.  Acting Secretary Cino is sued in her official capacity.

16.     Defendant FEDERAL HIGHWAY ADMINISTRATION ("FHWA") is the agency primarily responsible for federal highway planning and funding.  FHWA is an agency within DOT.  FHWA is responsible for ensuring that highways are developed in compliance with various federal statutes including NEPA and the Department of Transportation Act.  Defendant FHWA serves as the lead agency in the NEPA and 4(f) process and issued the FEIS/ROD challenged in this action and will also be providing funding for the Eastern Corridor and the proposed bridge across the Little Miami National Wild and Scenic River.

17.     Defendant J. RICHARD CAPKA is the Administrator of FHWA.  Administrator Capka oversees the activities of FHWA and its various divisions.  Administrator Capka is sued in his official capacity.

//
**Complaint for Declaratory and
Injunctive Relief -** 8

## LEGAL FRAMEWORK AND FACTS

## RELEVANT STATUTES

**A.**    **The National Environmental Policy Act**

18.    NEPA is the "basic national charter for protection of the environment." 40 C.F.R.

1500.1.  Congress enacted the NEPA "[t]o declare a national policy which will encourage

productive and enjoyable harmony between man and his environment; to promote efforts which

will prevent or eliminate damage to the environment and biosphere and stimulate the health and

welfare of man; [and] to enrich the understanding of the ecological systems and natural resources

important to the Nation." 42 U.S.C. § 4321.

19.    To accomplish these purposes, NEPA requires all agencies of the federal

government to prepare a "detailed statement" that discusses the environmental impacts of, and

reasonable alternatives to, all "major Federal actions significantly affecting the quality of the

human environment." 42 U.S.C. § 4332(2)(C). This statement is commonly known as an

environmental impact statement ("EIS"). The EIS must describe the adverse environmental

effects of the proposed action and alternatives to the proposed action. Id.

20.    NEPA's regulations require agencies to "integrate the NEPA process with other

planning at the earliest possible time to insure that planning and decisions reflect environmental

values, to avoid delays later in the process, and to head off potential conflicts."  40 C.F.R. §

1501.2.

21.    The Council on Environmental Quality ("CEQ") has promulgated regulations

implementing NEPA, which are binding on all federal agencies. 40 C.F.R. § 1507.1. The CEQ

**Complaint for Declaratory and
Injunctive Relief -**  9

regulations establish additional requirements for environmental impact statements. 40 C.F.R. § 1508.9.

22.    The EIS process is intended "to help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment" and to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b)-(c). The EIS must "provide full and fair discussion of significant environmental impacts and shall inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

23.    An EIS must be clear and supported by evidence that the agency has made the necessary environmental analyses. 40 C.F.R. § 1502.1.

24.    NEPA requires that an EIS properly define the proposed action and describe the existing environment affected by the proposed action. 40 C.F.R. §§ 1502.4, 1502.15.

25.    An EIS must evaluate the significance of the direct and indirect environmental effects of the proposed action.  40 C.F.R. § 1502.16.

26.    EISs must "serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made." 40 C.F.R. § 1502.2(g); see also id. § 1502.5.

27.    Section 102(2)(E) of NEPA requires that every agency must also "study, develop, and describe alternatives to recommended courses of action ...." 42 U.S.C. § 4332(2)(E).  The EIS must "rigorously explore and objectively evaluate all reasonable alternatives," including

**Complaint for Declaratory and
Injunctive Relief -** 10

"the alternative of no action." 40 C.F.R. 1502.14. The examination of alternatives "is the heart of the environmental impact statement." 40 C.F.R. 502.14.

28.    This requires an agency to "[r]igorously explore and objectively evaluate all reasonable alternatives," 40 C.F.R. § 1502.14(a), as well as describe the "underlying purpose and need to which the Agency is responding in proposing the alternatives, including the proposed action." Id. § 1502.13.

29.    Among the alternatives that must be considered is the alternative of "No-Action." This "No-Action" or "No-Build" analysis provides a critical "benchmark, enabling decision makers to compare the magnitude of environmental effects of the action alternative." Council on Environmental Quality, Forty Most Asked Questions Concerning the CEQ's NEPA Regulations, 46 Fed. Reg. 18,026, 18027 (March 23, 1981). An agency which is preparing an EIS must contrast the environmental and other impacts of each alternative action with the state of the environment that would exist if no action were taken. Predictable actions by others that would result if the "No-Build" alternative were chosen should be included in the analysis of the "No-Build" alternative. Id.

30.    In addition to alternatives and impacts, NEPA requires agencies to consider mitigation measures to minimize the environmental impacts of the proposed action. 40 C.F.R. § 1502.14 (alternatives and mitigation measures); 40 C.F.R. § 1502.16 (environmental consequences and mitigation measures).

31.    NEPA requires an agency to prepare a supplemental NEPA document if there "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii).

**Complaint for Declaratory and Injunctive Relief -** 11

**B.**    **Section 4(f) of The Department of Transportation Act**

32.    It is the policy of the United States Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites.  49 U.S.C. § 303(a).  Section 4(f) of the Department of Transportation Act was created to provide protection to these resources.

33.    In expressing the purpose of section 4(f) Congress noted that section 4(f) is "designed to insure that in planning highways … and other transportation facilities, care will be taken … not to interfere with or disturb established recreational facilities and refuges."  S. Rep. No. 1659, 89th Cong., 2d Sess. 5-6 (1966).

34.    Section 4(f) mandates that the Secretary of Transportation may approve a transportation program or project that uses any of the protected resources only if: (1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the resource resulting from the use.  49 U.S.C § 303(c).

35.    The Section 4(f) regulations definition of "use" includes (1) when land is permanently incorporated into a transportation facility; or (2) when there is a "constructive use." 23 C.F.R. § 771.135(p).  "Constructive use occurs when the project does not physically incorporate land from a Section 4(f) resource, but the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify a resource for protection under Section 4(f) are substantially impaired."  Id. § 771.135(p)(2).

36.    The FHWA March 1, 2005 Section 4(f) Policy Paper ("Policy Paper") notes that a constructive use occurs when the value of the resource in terms of its Section 4(f) significance

**Complaint for Declaratory and
Injunctive Relief -** 12

will be meaningfully reduced or lost. The Policy Paper also notes that the degree of impact and impairment should be determined in consultation with the officials having jurisdiction over the resource.

37.    The Policy Paper identifies traffic noise resulting from the project which substantially interferes with the use and enjoyment of the noise-sensitive resources as an example of a constructive use.

38.    The FHWA identifies noise study procedures and abatement measures at 23 C.F.R. Part 772.  Section 772.9 requires the FHWA to determine and analyze expected traffic noise impacts and alternative noise abatement measures to mitigate these impacts, giving weight to the benefits and cost of abatement, and to the overall social, economic and environmental effects. 23 C.F.R. § 772.9(a).  The traffic noise analysis shall include the following for each alternative under detailed study: (1) Identification of existing activities, developed lands, and undeveloped lands for which development is planned, designed and programmed, which may be affected by noise from the highway; (2) Prediction of traffic noise levels; (3) Determination of existing noise levels; (4) Determination of traffic noise impacts; and (5) Examination and evaluation of alternative noise abatement measures for reducing or eliminating the noise impacts. 23 C.F.R. § 772.9(b).  The noise analysis must be of sufficient scope to provide information needed to make the determination required by § 772.13(a).  23 C.F.R. § 772.9(c).

39.    The FHWA is required to (a) identify land uses or activities which may be affected by noise from construction of the project. The identification is to be performed during the project development studies; (b) determine the measures which are needed in the plans and specifications to minimize or eliminate adverse construction noise impacts to the community.

**Complaint for Declaratory and
Injunctive Relief -**  13

This determination shall include a weighing of the benefits achieved and the overall adverse social, economic and environmental effects and the costs of the abatement measures; and (c) incorporate the needed abatement measures in the plans and specifications. 23 C.F.R. § 772.19.

40.     The FHWA defines transportation noise impact as "[i]mpacts which occur when the predicted traffic noise levels approach or exceed the noise abatement criteria (Table 1), or when the predicted traffic noise levels substantially exceed the existing noise levels." 23 C.F.R. § 772.5(g). Table 1 identifies noise criteria by category. Category A defines the noise level as 57-60 decibels. Category A includes lands on which serenity and quiet are of extraordinary important public need and where the preservation of those qualities is essential if the area is to continue to serve its intended purpose. Category B defines the noise level as 67-70 decibels. Category B includes areas where serenity and quiet are not of extraordinary importance and includes such areas as the following: picnic areas, recreation areas, playgrounds, active sports areas, parks, residences, hotels, schools, churches, libraries, and hospitals.

41.     The Policy Paper recognizes that Wild and Scenic Rivers are subject to Section 4(f) and specifically identifies recreationally designated rivers as a 4(f) resource.

42.     The FHWA has set out in its regulations that a constructive use occurs when:

(i) The projected noise level increase attributable to the project substantially interferes with the use and enjoyment of a noise-sensitive facility of a resource protected by section 4(f), such as hearing the performances at an outdoor amphitheater, sleeping in the sleeping area of a campground, enjoyment of a historic site where a quiet setting is a generally recognized feature or attribute of the site's significance, or enjoyment of an urban park where serenity and quiet are significant attributes;

(ii) The proximity of the proposed project substantially impairs esthetic features or attributes of a resource protected by section 4(f), where such features or

attributes are considered important contributing elements to the value of the resource. Examples of substantial impairment to visual or esthetic qualities would be the location of a proposed transportation facility in such proximity that it obstructs or eliminates the primary views of an architecturally significant historical building, or substantially detracts from the setting of a park or historic site which derives its value in substantial part due to its setting; …

(iv) The vibration impact from operation of the project substantially impairs the use of a section 4(f) resource, such as projected vibration levels from a rail transit project that are great enough to affect the structural integrity of a historic building or substantially diminish the utility of the building; or

(v) The ecological intrusion of the project substantially diminishes the value of wildlife habitat in a wildlife or waterfowl refuge adjacent to the project or substantially interferes with the access to a wildlife or waterfowl refuge, when such access is necessary for established wildlife migration or critical life cycle processes.

23 C.F.R. § 771.135(p)(4).

43.    FHWA has also set out in its regulations that a constructive use does not occur

when:

(ii) The projected traffic noise levels of the proposed highway project do not exceed the FHWA noise abatement criteria as contained in Table 1, 23 CFR part 772 or the projected operational noise levels of the proposed transit project do not exceed the noise impact criteria in the FTA guidelines;

(iii) The projected noise levels exceed the relevant threshold in paragraph (p)(5)(ii) of this section because of high existing noise, but the increase in the projected noise levels if the proposed project is constructed, when compared with the projected noise levels if the project is not built, is barely perceptible (3 dBA or less); …

(vi) Overall (combined) proximity impacts caused by a proposed project do not substantially impair the activities, features, or attributes that qualify a resource for protection under section 4(f); …

(ix) Vibration levels from project construction activities are mitigated, through advance planning and monitoring of the activities, to levels that do not cause a substantial impairment of the section 4(f) resource.

**Complaint for Declaratory and Injunctive Relief -** 15

23 C.F.R. § 771.135(p)(5).

44.     Section 771.135(b) directs that "any use of lands from a section 4(f) property shall be evaluated early in the development of the action when alternatives to the proposed action are under study."  23 C.F.R. § 771.135(b).

45.     Section 771.135(l) provides that in cases requiring the preparation of an EIS, the agency "will make the section 4(f) approval either in its approval of the final EIS or in the ROD."  23 C.F.R. § 771.135(l).

**C.**     **Little Miami National Wild and Scenic River**

46.     The Little Miami River was designated as a National Wild & Scenic River under the Wild & Scenic Rivers Act ("WSRA") over a quarter century ago.  The Littlie Miami was specifically recognized for its recreational and scenic values.  At the time of its designation it was recognized for its contribution of "vital open space for the use and enjoyment of present and future generations in an increasingly urbanized area."  When evaluating the State's petition for inclusion, the Secretary of Interior stated: "Considering the close proximity of the river to the large urban metropolis of Cincinnati, it is indeed one of our Nation's most valuable recreation resources."  The outstanding opportunities for serenity and quiet were also recognized as important attributes that contributed to the river's recreational and scenic/aesthetic outstanding and remarkable values and were cited as such in the Study report evaluating the river for designation.  Because of this natural setting, despite the surrounding urban environment, the lower Little Miami River's designation was hailed as a vitally important step toward protecting the area from incompatible or unplanned development.

47.     The Little Miami National Wild and Scenic River is a rare river amongst those

**Complaint for Declaratory and
Injunctive Relief -** 16

designated under the Wild and Scenic Rivers Act in that it is only one of two Wild and Scenic Rivers that flows through a major metropolitan area.

48.     The Eastern Corridor proposes a new bridge across the Little Miami National Wild and Scenic River.  The Eastern Corridor includes four potential crossings in or near Horseshoe Bend.  All crossing locations are over a stretch of the Little Miami National Wild and Scenic River, pose similar impacts to recreational activities and would disrupt the scenic and solitude attributes found through this stretch of the River.

49.     Principle activities on the this segment of the Little Miami National Wild and Scenic River include canoeing, kayaking, fishing, bird/wildlife viewing, hiking, and biking. Canoeists, kayakers, and outdoor enthusiasts, including Plaintiffs and their members, come to this segment to enjoy the natural river setting with its scenic wooded banks, high bluffs, broad river floodplain, sandy beaches, islands, meandering channel, wildlife, fish, solitude, peace, serenity and quiet.

50.     The diversity and harmonic nature of the river setting is critical to the scenic quality of the Little Miami National Wild and Scenic River.  Opportunities for solitude, serenity and quiet available in this segment also provide for increased opportunities for birding and viewing of associated riparian wildlife.  Wildlife viewing in this segment continues to be of considerable value.  The Horseshoe Bend has an exceptionally high diversity of birds and other wildlife.  It is one of the few spots in Ohio that supports a breeding population of the prothonotary warbler, and perhaps, the hooded merganser.  Great blue herons, wood ducks and cormorants feed in this segment, as do multiple other birds and mammal species.  Of special interest to river users is the presence of beavers.  The Horseshoe Bend, including its

**Complaint for Declaratory and Injunctive Relief -** 17

upstream/downstream and floodplain environs is likely one of the best regional locations to view

birds, mammals and other wildlife within the greater Cincinnati area.

51.     The Little Miami State Scenic River Management Plan states that "[p]rotection of

natural, scenic and environmental values of the Little Miami Scenic River should be the major

consideration in reviewing and approving or disapproving projects which may have an adverse

effect upon the River."  June 1985 Ohio Scenic Rivers Program Little Miami State Scenic River

Management Plan.  CEQ guidance for interagency consultation regarding impacts to the

National Wild and Scenic Rivers System recognizes that roads and bridges are examples of types

of developments which would generally require consultation and that major highways are an

example of types of development that "appear most likely to cause serious adverse effects if they

are constructed adjacent to or in close proximity to an Inventory River."  CEQ Memorandum for

Heads of Agencies, August 10, 1980.

**D.     The Eastern Corridor Multi-Modal Project and Its Impacts on the Little Miami National Wild and Scenic River**

52.     The Eastern Corridor study area covers approximately 14 square miles and

extends from the Cincinnati Central Business District and Riverfront redevelopment area in

Hamilton County, east to the I-275 outerbelt corridor in Clermont County.

53.     An Eastern Corridor Major Investment Study ("MIS") was first completed in

April 2000.  The MIS is a separate analysis formerly required by the National Federal Aid

Highway Act, 23 U.S.C. 101 *et seq.*  Major Investment Studies was supposed to evaluate the

effectiveness and cost-effectiveness of alternative investments or strategies in attaining local,

State and national goals and objectives.  The MIS considered two viable conceptual alternatives

**Complaint for Declaratory and
Injunctive Relief -** 18

for carrying traffic over the Little Miami National Wild and Scenic River, referred to as Option 1 and Option 2. The MIS recommended Option 1 as the comprehensive multi-modal strategy for addressing current and projected transportation problems in the area. The MIS Recommended Plan (Option 1) established the framework for the Tier 1 and Tier 2 NEPA analysis of the Eastern Corridor by identifying the Option 1 Corridor as the sole Corridor to be reviewed in the NEPA process. Option 1 included a new bridge over the LMR in a new transit corridor. Public involvement through such processes as public notice and comment as that required under NEPA is not a mandatory process required for MISs.

54.    Option 2 would have crossed the LMR on a widened existing crossing, rather than creating a new corridor crossing. Option 2 was collaboratively developed specifically to avoid impacts to the LMR and to retain an alternative that would ensure consistency with the State's policy regarding designated rivers.

55.    The main objective of Tier 1 was to identify a set of feasible multi-modal alternatives for further evaluation.

56.    The removal of Option 2 in the MIS plan improperly eliminated a "feasible alternative" before the NEPA process ever began.

57.    The MIS process, which removed Option 2, was conducted without the participation of the National Park Service ("NPS"), a critical stakeholder and cooperating agency. Furthermore, by removing Option 2 in the MIS process, the DOT circumvented the purposes of NEPA and excluded not only critical agency stakeholders but the public as well from a critical decision concerning the overall strategy and impacts of the Eastern Corridor.

58.    Option 2 was also not considered in the Preliminary Draft EIS ("PDEIS"), despite

**Complaint for Declaratory and Injunctive Relief -** 19

the fact that information in the PDEIS suggested that Option 2 should still be evaluated in the upcoming DEIS. For example, the PDEIS states that "both options provide travel benefits, but Option 1 performed more efficiently." However, the basis for this statement is not present in the PDEIS and no evidence is provided to support that Option 2 is not feasible.

59.    EPA commented on the PDEIS in a May 6, 2004 letter and alerted the Ohio Department of Transportation that the DEIS should retain feasible options, that the PDEIS does not demonstrate that Option 2 is not feasible, and that without a full discussion of both Options, EPA remains unable to determine how the Options compare or why Option 2 is eliminated from review prior to preparation and issuance of the DEIS. NPS also submitted comments on the PDEIS in a letter dated May 27, 2004 and expressed similar concerns to those presented by the EPA.

60.    The Eastern Corridor Multi-Modal Project has been subdivided into a two-tier NEPA process. Tier 1, which was just concluded, was intended to present information on: (1) transportation needs; (2) key environmental resources; (3) the development and evaluation of feasible alternatives; (4) a preliminary assessment of expected impacts; and (5) the identification of a recommended transportation plan (set of feasible alternatives) to be carried through into more detailed study during Tier 2.

61.    Feasible alternatives in Tier 1 are not specific alignment locations, but rather alternative corridors that will be further developed during Tier 2.

62.    Tier 2, to be conducted after the completion of the Tier 1 EIS and ROD, will involve more detailed engineering and environmental analyses and a selection of a preferred alternative from the "feasible alternatives" identified in Tier 1.

**Complaint for Declaratory and Injunctive Relief -** 20

63.     The Tier 1 process was broken down into modes (e.g. bus, rail, highway, bikeway).  The highway mode is the focus of this complaint.  Tier 1 broke "New Highway capacity" into four distinct segments.  Segment II concerns the construction of a new bridge across the Little Miami National Wild and Scenic River.  The alternatives recommended for further evaluation in Tier 2 include: (1) 4 basic multi-lane mainline location alternatives for approaches to and crossing of the Little Miami National Wild and Scenic River; and (2) six basic multi-lane mainline alternatives for traversing the Little Miami National Wild and Scenic River floodplain east of the River main channel and Clear Creek.  Basically, the alternatives for review include construction of either a four-lane or six-lane bridge across the Little Miami National Wild and Scenic River.

64.     The Tier 1 DEIS was issued on November 8, 2004.

65.     Comments were received by the several agencies including the National Park Service ("NPS"), Environmental Protection Agency ("EPA"), as well as from environmental organizations, including plaintiffs, and the public.

66.     The EPA provided comments on the DEIS in a letter dated December 30, 2004.  EPA noted that decisions made at the Tier 1 stage affect whether certain impacts can or cannot be avoided in the later Tier 2 projects.  EPA voiced concerns with respect to the proposed new bridge across the Little Miami National Wild and Scenic River.  EPA also noted that the project traverses several 4(f) and 6(f) resources and that mitigation of impacts may be unavoidable absent consultation with the State historic Preservation Office and the NPS.  Finally, EPA rated the DEIS an "EC-2."  This means that the EPA has identified environmental impacts that should be avoided in order to fully protect the environment and suggest corrective measures which may

**Complaint for Declaratory and
Injunctive Relief -** 21

require changes to the preferred alternative or mitigation measures that can reduce impacts.  The rating also means that the DEIS does not contain sufficient information to fully assess environmental impacts of the preferred alternative or other alternatives that are reasonably available to the project.

67.     EPA also strongly recommended that the impacts from the bridge be described as fully as possible in the Tier 1 EIS because the existence and placement of a new bridge is central to the overall Tier 1 plan.  EPA also requested that the Final EIS discuss the impacts associated with the Horseshoe Bend alignment, which is very likely an active meandering part of the channel.  Furthermore, another potential alignment appears to cross the River where there is an island or a side channel. EPA noted that it is unclear how a clear span bridge will address this particular physiographic feature.  EPA's suggestions regarding this area included: (1) describing what stretches of the River are or may be active channels; (2) discuss the fate of a clear span bridge in the Horseshoe region or other potentially active channel regions; (3) discuss the potential future impacts from a bridge placed in a potentially active channel of the Little Miami, given the River's future development within the floodplain, that is, is the channel likely to meander and necessitate bridge maintenance that would impact the River beyond what is contemplated in the DEIS; (4) discuss the visual impacts and mitigation in Area #2 where scenic values are likely to be impacted by a new bridge; and (5) **include a discussion of why Option 2 is not feasible** (the MIS did not explain its decision and it is not the appropriate place for such a decision).

68.     In NPS's comments submitted on December 7, 2004, regarding the DEIS, NPS identified significant concern over the proposed bridge crossing and the removal of Option 2

**Complaint for Declaratory and Injunctive Relief -** 22

from the reasonable alternatives. It also expressed concerns over the incompatibility of the "new

bridge" alternative with the State of Ohio's management plan for protecting the Little Miami

National Wild and Scenic River.

69.    In the U.S. Fish and Wildlife Service's (FWS) February 3, 2005 memorandum to

the NPS, FWS concurred with the NPS comments set out in its December 7, 2005 letter to

ODOT. FWS noted that "[it] fully supports the NPS's concerns regarding the decision of ODOT

to drop the 'no new bridge' option and **recommends that Option 2 be analyzed in detail in a**

**supplemental draft EIS or in the final EIS**." (emphasis added). The FWS also outlined its

concerns regarding the project and its concurrence with NPS comments in a January 11, 2005

memorandum from the Ohio Field Supervisor to the Regional Director.

70.    The U.S. Department of the Interior ("DOI"), Office of Environmental Policy and

Compliance, provided comments on the DEIS in a letter dated April 18, 2005. In those

comments, DOI disagreed with several conclusions in the DEIS and found it to be inadequate in

several respects. It found that removal of Option 2 from review in the EIS process failed to meet

the goals of NEPA. It also found that the proposed bridge crossing would have a significant and

substantial impact due to the visual intrusion, noise impacts, and disruption of the natural setting

and feeling of the LMR in that reach of the River. DOI stated that it believed FHWA's 4(f)

determination that no use is occurring was invalid. It went on to state:

> "Although a specific design is not known at this time, the proposed bridge will consist of
> multiple travel lanes, and will be elevated enough to span the river and the floodplain. A
> four-lane bridge cannot be hidden from view. The large mass of the proposed bridge
> (length, width, height, and multiple piers) in combination with its location in an
> unobstructed corridor with relatively few man-made intrusions would make it the most
> visibly dominate feature in this segment of the river.  Placing a massive bridge where
> there previously was not one results in a **fundamental change in the scenic qualities in**

**Complaint for Declaratory and**
**Injunctive Relief -** 23

**this portion of the LMR at the time of designation.** Opportunities to mitigate the visual impacts are very limited. A new multi-lane bridge crossing the river in a relatively natural and unspoiled corridor **would significantly and substantially impact** the scenic values of the LMR." (emphasis added).

Furthermore, DOI noted that:

"The proposed new bridge crossing would degrade the recreational experience on the LMR in two primary ways: creating a major new visual intrusion on the natural scene and by generating noise. Canoeist and hikers enjoy the natural quite and solitude offered in the project area, which increases opportunities for viewing of birds and other wildlife. Currently, the sight of birds and other wildlife provides a unique recreational experience, particularly in such close proximity to a major metropolitan area. Substantial noise would be produced during construction, and once in place, the bridge would be a significant source of constant noise from both traffic and vehicle-induced vibration of the bridge and commuter rail. **Recreational opportunities to enjoy solitude, or the areas scenery and to view wildlife would thus be substantially and significantly impaired.** The severity and magnitude of the visual and recreational impacts to the LMR associated with a new bridge corridor crossing are so great that they can not be significantly mitigated. The proposal would also have substantial direct and indirect impacts to associated fish and wildlife resources and values." (emphasis added).

71.     Rivers Unlimited submitted comments on the DEIS in a letter dated January 6, 2005. Little Miami, Inc. and the Sierra Club individually submitted comments on the DEIS in letters dated January 10, 2005. Plaintiffs' comments highlighted several concerns about the Eastern Corridor DEIS including but not limited to the following: DOT and FHWA's failure to consider all reasonable alternatives, including Option 2; DOT and FHWA's failure to comply with Section 4(f) of the Transportation Act; and the inability to mitigate impacts after DOT and FHWA have committed the Eastern Corridor to Option 1.

72.     Tier 1 was completed with the issuance of the Tier 1 Final Environmental Impact Statement ("FEIS") for the Eastern Corridor Multi-Modal Projects-Hamilton and Clermont Counties, Ohio PID 22970.

73.     Again, several agencies including the NPS and EPA provided comments, as well

**Complaint for Declaratory and Injunctive Relief -** 24

as environmental organizations and members of the public.

74.    The U.S. Department of the Interior, Office of Environmental Policy and
Compliance, submitted comments on the FEIS in a November 28, 2005 letter.  DOI first noted
that the project affects the Little Miami National Wild and Scenic River, a component of the
Wild and Scenic Rivers System and a 4(f) resource pursuant to the Department of Transportation
Act.  DOI was "troubled" by the removal of Option 2 from review in the EIS.  It also found that
the comparison made between Option 1 and 2 in the final EIS uses vague and qualitative terms
and that a "more rigorous analysis is warranted."  DOI disagreed with the FEIS conclusion that
scenic impacts to the LMR would not be substantial.  DOI noted that scenic resources were
identified as outstandingly remarkable values and remain a protected value under the Wild and
Scenic Rivers Act.  DOI found that the final EIS fails to demonstrate how the proposed bridge is
compatible with the Wild & Scenic Rivers Act for scenic and recreational values of the river.
Furthermore, the final EIS does not identify what mitigation measures will be used to avoid or
minimize impacts to the scenic or other values of the LMR. DOI noted that it was improper to
postpone such analysis to Tier 2, when, by then, the decision to impact the river will already
have been made without consideration of any avoidance alternatives.

75.    Because of the lacking discussion concerning Option 2, DOI requested that a
supplemental EIS be prepared which included an alternative with no new river crossings, such as
Option 2 from the MIS.

76.    DOI also disagreed with the Defendants' determination that the proposed project
did not constitute a constructive use under Section 4(f) of the Transportation Act.  DOI noted
that as an agency with jurisdiction over the section 4(f) resource, it has determined that the

**Complaint for Declaratory and
Injunctive Relief -** 25

project may significantly and substantially diminish the attributes which qualify for protection, and that therefore a constructive use does occur.

77.     Little Miami, Inc. submitted comments on the FEIS in a letter dated November 28, 2005.  The Sierra Club submitted comments on the FEIS in a letter dated November 27, 2005.  Plaintiffs' comments again expressed their concerns about the failure to consider Option 2 as a reasonable alternative; the failure to comply with Section 4(f) of the Transportation Act; the inability to mitigate impacts after committing to Option 1 prior to an analysis of what mitigation measures may be available; and reliance upon an economic analysis that was based on clearly outdated gas price data.

78.     The NPS submitted comments to the Federal Highway Administration on June 28, 2006 concerning the FEIS/ROD process and the FHWA noise analysis report.  The comments noted NPS's frustration with the lack of cooperation on the part of FHWA.  NPS noted that it was disappointed that it was not contacted before FHWA released the ROD so that it could address unresolved issues related to the data analysis and mitigation measures associated with the project.  NPS stated that it was unable to agree with conclusions pertaining to Section 4(f) impacts and concluded, again, that the scenic and noise impacts will lead to a significant and substantial impact to the Little Miami River's recreational outstandingly remarkable value and that "[t]hese proximity impacts, despite the proposed mitigation, are severe enough to substantially diminish (impair) the activities, features, and attributes that qualified the LMR for inclusion into the National Wild and Scenic Rivers System."  NPS letter to Mr. Denis A. Decker, June 28, 2006 at page 2. NPS concluded that a constructive use exists and requested that FHWA prepare a supplemental EIS containing a section 4(f) statement and addressing new noise data.

**Complaint for Declaratory and
Injunctive Relief -** 26

According to NPS, "[t]he supplemental EIS should evaluate and compare noise and visual impacts to the [Little Miami River's Outstanding and Remarkable Values] as well as the transportation benefits associated with Option 1 and Option 2, as compared to the environmental baseline." Id.

79.    NPS attached to its June 28, 2006 comments a detailed report entitled *Analysis of Eastern Corridor Noise Readings*¸ where NPS identified several concerns and problems regarding the August 2, 2005 Noise Analysis conducted by ODOT's Office of Environmental Services ("OES").  ODOT's noise analysis was a critical part of the 4(f) determination because FHWA claims that there is no constructive use of a 4(f) resource because the noise impacts are not significant enough to create a constructive use.  NPS specifically raised the following concerns: (1) Details of the equipment setup and operation suggest potential operational errors that compromised the accuracy of the measurements; (2) Data was collected at inappropriate sites: two of four sites were much closer to the busy roadways than to the river itself; one site was further from roads, however adjacent to a farm pump.  Despite noise being raised as a concern, and the most dramatic alteration occurring within the "interior" sites of the river, the data did not include samples representative of the natural setting within interior river corridor locations.  No monitoring was done along 1.8 river kilometers along the Little Miami River Park and Recreation Area, much of which is more than 1 km from roads; (3) Data were collected on one day: one hour of monitoring conducted sequentially at each of four sites. Sound level measurements made on a single summer afternoon do not support conclusions about potential impacts on all summer afternoons, let alone on fall or spring mornings; (4) The hourly Leq (equivalent continuous noise level) summaries of decibel (dBA) measurements blend the energy

**Complaint for Declaratory and Injunctive Relief -** 27

from all sounds together, failing to distinguish sounds from natural sources (resources protected

in wild and scenic rivers) and sounds from anthropogenic sources (environmental impacts to be

managed). The presence of bird or insect sounds does not diminish the impact of roadway noise;

(5) There is no justification for using hourly Leq summaries of dBA values to represent

"background" sound levels. This metric has been used to document thresholds of annoyance in

communities. To estimate background ambient sound levels, there is substantial precedent and

scientific justification for other metrics that would yield values 10 dB or more below those

reported by ODOT; and (6) Based upon NPS guidelines for assessing noise impacts in natural

areas (NPS Natural Resource Impairment guideline), **at least 4 km of river will suffer major**

**acoustical impairment** from the proposed bridge, including much of the downstream river

section adjacent to the 115 ha Little Miami River Park and Recreation Area.  According to the

NPS, the ODOT Office of Environmental Services study does not meet the basic requirements

for sound monitoring projects, including the protocols that have been recommended and agreed

upon by the Federal Interagency Committee on Aircraft Noise when evaluating noise impacts to

natural areas.

80.    The ROD for the Eastern Corridor Transportation Project Tier I EIS was issued

June 6, 2006 by FHWA. This formal federal administrative action will initiate Tier II detailed

studies and the preliminary engineering phase for the new river crossing.

### PLAINTIFFS' CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of NEPA and its Implementing Regulations**
*(Failure to Consider Reasonable Alternatives)*

81.    Each allegation set forth in the Complaint is incorporated herein by reference.

**Complaint for Declaratory and
Injunctive Relief -** 28

82.    Defendants failed to include any alternatives which did not include a new bridge crossing the Little Miami National Wild and Scenic River in their NEPA analysis. The FEIS fails to "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed bridge crossing of the Little Miami National Wild and Scenic River, in violation of law. 40 C.F.R. 1502.14. Defendants were required to assess all reasonable alternatives in detail, allowing reviewers to evaluate their comparative merits. Defendants have improperly pre-ordained the outcome of the NEPA process by constraining themselves to the development of a project that must include a new bridge across the Little Miami National Wild and Scenic River, thereby illegally excluding reasonable alternatives from consideration.

83.    Defendants have improperly narrowed the range of alternatives to Option 1 identified in the MIS transportation assessment. Defendants have removed any analysis of Option 2 from the NEPA process. Option 2 was a reasonable alternative because it fit within the purpose and need of the Tier 1 EIS and was, therefore, to be given substantial treatment and objectively evaluated. Defendants failed to substantively analyze Option 2 in the NEPA process. The public, environmental organizations, National Park Service, U.S. Department of the Interior Office of Environmental Policy and Compliance, and the EPA all identified Option 2 as a reasonable alternative that deserved consideration in the EIS analysis.

84.    The Defendants' failure to consider an adequate range of alternatives at the Eastern Corridor Tier 1 stage is contrary to the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C) and the Council on Environmental Quality's implementing regulations, and is arbitrary, capricious, and an abuse of discretion, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

**Complaint for Declaratory and Injunctive Relief -** 29

## SECOND CLAIM FOR RELIEF
### Violation of NEPA and its Implementing Regulations
*(Failure to Consider Significant New Information and Failure to Prepare a Supplemental EIS)*

85.    Each allegation set forth in the Complaint is incorporated herein by reference.

86.    NEPA requires an agency to prepare a supplemental NEPA document if there "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii).

87.    As set forth above, NPS alerted FHWA to the fact that its own new and supplemental acoustic data collection and analysis report submitted with FHWA's May 12, 2006 letter revealed serious and significant deficiencies that invalidate the August 2005 noise impact analysis conducted for the Eastern Corridor project and relied upon in the final EIS. Furthermore, NPS's own noise report, entitled "*Analysis of 'Eastern Corridor Noise Readings,'*" which was submitted with the NPS's June 28, 2006 comments also constitutes significant new information.

88.    FHWA has not addressed this significant new information in a supplemental EIS. Accordingly, defendants have violated NEPA's implementing regulation 40 C.F.R. § 1502.9(c)(1)(ii) by unlawfully withholding or unreasonably delaying agency action, in violation of APA, 5 U.S.C. § 706(1) and/or by acting arbitrarily, capriciously, and contrary to law in violation of the APA, 5 U.S.C. § 706(2)(A).

## THIRD CLAIM FOR RELIEF
### Violation of NEPA and its Implementing Regulations
*(Failure to Take Requisite Hard Look and Provide Sufficient
Detail Concerning Mitigation Measures)*

89.    Each allegation set forth in the Complaint is incorporated herein by reference.

**Complaint for Declaratory and
Injunctive Relief -** 30

90.     NEPA requires that a NEPA document include a discussion of "any adverse

environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C.

§ 4332(2)(C)(ii) (1989). This requirement includes discussion of the extent to which steps can be

taken to mitigate adverse environmental consequences.

91.     NEPA's regulations require a discussion of the "[m]eans to mitigate adverse

environmental impacts" of the proposed action and the "conservation potential" of proposed

mitigation measures in sufficient detail to ensure that environmental consequences have been

fairly evaluated.  40 C.F.R. §§ 1502.14(f), 1502.16, 1508.25(b).

92.     An agency may not proceed based on speculative mitigation measures.  A mere

list of measures, with no analysis to support their effectiveness is insufficient under NEPA.

93.     Defendants have proposed a number of mitigation measures without discussing

the feasibility, both in terms of Defendants' ability to reduce the intensity of impacts to the

identified resource and in terms of Defendants' capability to fully implement the mitigation

measures.  Speculative mitigation measures which do not include a detailed analysis is in

violation of NEPA and is arbitrary, capricious, and an abuse of discretion, in violation of the

Administrative Procedure Act, 5 U.S.C. § 706(2).

## FOURTH CLAIM FOR RELIEF
### Violation of NEPA and its Implementing Regulations
*(Failure to Base EIS on Current and Up-To-Date Data)*

94.     Each and every allegation set forth in the Complaint is incorporated herein by

reference.

95.     NEPA's regulations require that "The information must be of high quality." 40

C.F.R. § 1500.1(b).  An agency's omission of ascertainable facts, or failure to use the up-to-date

**Complaint for Declaratory and
Injunctive Relief -** 31

information, or the inclusion of erroneous information, violates the disclosure requirements of NEPA and undermines the public's confidence in the EIS, rendering it legally defective.

96.      The Tier 1 Eastern Corridor's September 2004 Economic Analysis Report identifies gas cost at $1.13 per gallon for 2003.  This is in inaccurate assessment of gas costs for 2003 and results in a deficient and arbitrary Economic Analysis, upon which the Eastern Corridor EIS's cost-benefit analysis is based.  Consequently, the EIS is in violation of NEPA and is arbitrary, capricious, and an abuse of discretion, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

### FIFTH CLAIM FOR RELIEF
**Violation of the Transportation Act and its Implementing Regulations**
*(Failure to Find a Constructive Use, Conduct a 4(f) Analysis and Prepare a 4(f) Statement)*

97.      Each and every allegation set forth in the Complaint is incorporated herein by reference.

98.      The proposed bridge spanning the Little Miami National Wild and Scenic River is a constructive use of park space.  Defendants have violated the Transportation Act, 49 U.S.C. § 303, by finding that there is no constructive use and by failing to prepare a 4(f) statement as to whether there is a prudent and feasible alternative to the construction of a new bridge across the Little Miami National Wild and Scenic River, and if there is no such alternative to identify all measures possible to minimize harm to the River from the proposed bridge.  Defendants' determination, based on a highly criticized and faulty OES noise study report, as well as the improper classification of the River as a Class B noise receptor, that there is no constructive use because noise impacts will be marginal is arbitrary, capricious, and an abuse of discretion, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2). Defendants' failure to address

**Complaint for Declaratory and
Injunctive Relief -** 32

visual and aesthetic impacts to the scenic and recreational attributes of the Little Miami National Wild and Scenic River in its determination that there is no constructive use is arbitrary, capricious, and an abuse of discretion, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2). Defendants' failure to prepare a 4(f) statement is arbitrary, capricious, and an abuse of discretion, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

99. The project affects 15 public parks and recreation areas and three greenspaces. Defendants have improperly postponed 4(f) determinations concerning these parks to Tier 2. Tier 1 decisions may render some impacts unavoidable in these areas. Consequently, Defendants have violated the Transportation Act, 49 U.S.C. § 303, by failing to prepare a 4(f) analysis for impacts associated with these parks and greenspaces. Defendants' failure to prepare a 4(f) analysis is arbitrary, capricious, and an abuse of discretion, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

## RELIEF

WHEREFORE, plaintiffs respectfully request that this Court:

1. Issue a declaratory judgment stating that defendants have violated the National Environmental Policy Act, Section 4(f) of the Department of Transportation Act, and the Administrative Procedure Act;

2. Grant preliminary and permanent injunctive relief prohibiting Defendants from providing any funds, expending any funds, or taking, permitting, or authorizing any other action toward construction activities until Defendants have complied with the requirements of the National Environmental Policy Act and Section 4(f) of the Department of Transportation Act;

3. Order that defendant Federal Highway Administration's Record of Decision for

**Complaint for Declaratory and
Injunctive Relief -** 33

Tier 1 of the Eastern Corridor, which approves construction of the proposed new bridge across the Little Miami National Wild and Scenic River, is vacated;

4.     Enjoin the Federal Highway Administration from distributing any funds to the Ohio Department of Transportation or any other entity for the proposed Eastern Corridor pending full compliance with the National Environmental Policy Act and Section 4(f) of the Transportation Act;

5.     Issue an injunction prohibiting Defendants from taking any further action, including any activities which establish the identified corridor in the Eastern Corridor, toward the construction of the proposed new bridge across the Little Miami National Wild and Scenic River until they have complied with all of the requirements of the National Environmental Policy Act and the Transportation Act;

6.     Order defendants to pay plaintiffs' costs of this action, including reasonable attorneys' and expert witness' fees; and

7.     Grant Plaintiffs such additional relief, as the Court deems just and proper.

Respectfully submitted,

_____
Robert Ukeiley (MD 14062)
Law Office of Robert Ukeiley
433 Chestnut Street
Berea, KY  40403
Telephone:  (859) 986-5402
Facsimile:  (859) 986-1299
rukeiley@igc.org

Attorney for Plaintiffs

Date: October 17, 2006

**Complaint for Declaratory and Injunctive Relief -** 34

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Rivers Unlimited et al. | United States Department of Transportation et al. |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    88888
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Law Office of Robert Ukeiley
433 Chestnut Street
Berea KY 40403

CASE NUMBER 1:06CV01775

JUDGE: James Robertson

DECK TYPE: Administrative Agency Review

DATE STAMP: 10/17/2006

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
● 2 U.S. Government Defendant
○ 3 Federal Question (U.S. Government Not a Party)
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES

FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. Antitrust | ○ B. Personal Injury/ Malpractice | ● C. Administrative Agency Review | ○ D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>Social Security:<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>Other Statutes<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☒ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ○ E. General Civil (Other) | OR | ○ F. Pro Se General Civil |
|---|---|---|

| Real Property | Bankruptcy | Forfeiture/Penalty |  |
|---|---|---|---|
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>Prisoner Petitions<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410 |
| Personal Property<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | Property Rights<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>Federal Tax Suits<br>☐ 870 Taxes (US plaintiff or defendant)<br>☐ 871 IRS-Third Party 26 USC 7609 | Other Statutes<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| ○ G. Habeas Corpus/ 2255 | ○ H. Employment Discrimination | ○ I. FOIA/PRIVACY ACT | ○ J. Student Loan |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. Labor/ERISA (non-employment) | ○ L. Other Civil Rights (non-employment) | ○ M. Contract | ○ N. Three-Judge Court |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

5 USC§706(2) NEPA violations

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____  Check YES only if demanded in complaint
JURY DEMAND:  YES ☐  NO ☒

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☐  NO ☒  If yes, please complete related case form.

DATE 10/16/06    SIGNATURE OF ATTORNEY OF RECORD _____

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

JTC