IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

Rivers Unlimited, *et al.*,                    )
                                               )
                    Plaintiffs,                ) Civ No.: 1:06-CV-01775-JR
          v.                                   )
                                               )
United States Department of Transportation,    )
                                               )
*et al.*,                                      )
                                               )
                    Defendants.                )
                                               )
                                               )
_____        )

---

### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

---

## TABLE OF CONTENTS

TABLE OF CONTENTS        ii

TABLE OF AUTHORITIES  iii

Cases ........................................................................................................................... iii

Statutes......................................................................................................................... vi

Regulations ................................................................................................................. vii

Other .......................................................................................................................... viii

INTRODUCTION      1

LEGAL BACKGROUND      2

I.    The National Environmental Policy Act............................................................................2

II.   Section 4(f) of The Department of Transportation Act. .....................................................4

STANDARD OF REVIEWS  8

I.    Summary Judgment. ...............................................................................................8

II.   NEPA and Department of Transportation Act Claims. .......................................................9

ARGUMENT  11

I.    Violations of NEPA ...........................................................................................11

   A.   DOT Failed to Consider a Reasonable Range of Alternatives By Excluding an Option

        for No New Bridge Crossing the Wild and Scenic Little Miami River.........................11

   B.   Failure to Consider Significant New Information and Prepare a Supplemental EIS......21

   C.   Failure to Base EIS on Current and Up-To-Date Data. .................................................27

II.   The Project Constitutes a Constructive Use of the National Wild and Scenic Little Miami

      River.......................................................................................................................28

      A.   The ODOT Noise Analysis Fails to Properly Account for Noise Impacts to the

           Outstandingly Remarkable Values of the Little Miami River…………………………31

B. DOT Improperly Classified the Little Miami River as a Category B Receptor……...33

C. The Proposed Bridge's Impacts on Visual and Scenic Resources and Recreational Opportunities is a Constructive Use of the Little Miami River……………………...35

CONCLUSION        40

Table of Authorities

**Cases**

Amoco Production Co. v. Village of Gambell, Alaska,
480 U.S. 531 (1987)   10

Anderson v. Liberty Lobby,
477 U.S. 242 (1986)   8

Appalachian Power Co. v. EPA,
249 F.3d 1032 (D.C. Cir. 2001) ......................................................................27

Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,
462 U.S. 87 (1983) ......................................................................23

Brooks v. Volpe,
460 F.2d 1193 (9th Cir. 1972) ......................................................................35

Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm.,
449 F.2d 1109 (D.C. Cir. 1971) ......................................................................12

Celotex Corporation v. Catrett,
477 U.S. 317 (1986) ......................................................................9

*Citizens Against Burlington, Inc. v. Busey,
938 F.32d 190 (D.C. Cir. 1991) ......................................................9, 12, 14, 19, 30

Citizens to Preserve Overton Park, Inc. v. Volpe,
401 U.S. 402 (1971) ...................................................................... 9, 28-29

City of Alexandria v. Slater,
198 F.3d 862 (D.C. Cir. 1999) ......................................................................5

City of Olmsted Falls v. FAA,
292 F.3d 261 (D.C. Cir. 2002) ......................................................................21

City of S. Pasadena v. Slater,
56 F. Supp. 2d 1106 (C.D. Cal. 1999) ......................................................................39

Coalition Against Raised Expressway, Inc. ("CARE") v. Dole,

835 F.2d 803 (11th Cir. 1988) .......................................................................35, 38

Coalition for Responsible Regional Development v. Brinegar,
518 F.2d 522 (4th Cir. 1975) .......................................................................30, 38

Conservation Soc'y of S. Vt., Inc. v. Secretary of Transp.,
362 F. Supp. 627 (D. Vt. 1973), aff'd, 508 F.2d 927 (2nd Cir. 1974),
vacated and remanded on other grounds, 423 U.S. 809 (1975) ...................................35

*Corridor H Alternatives, Inc. v. Slater, 982 F. Supp. 24 (D.D.C. 1997)
rev'd on other grounds Corridor H Alternatives, Inc. v. Slater,
166 F.3d 368 (D.C. Cir. 1999) ...............................................................18, 19, 26, 29

*Davis v. Mineta,
302 F.3d 1104 (10th Cir. 2002) ........................................................... 15-16, 32, 29

D.C. Federation of Civic Associations v. Volpe,
459 F.2d 1231 (D.C. Cir. 1971) cert. denied, 405 U.S. 1030 (1972) .........................30

Druid Hills Civic Ass'n, Inc. v. Federal Highway Admin.,
772 F.2d 700 (11th Cir. 1985) ................................................................. 38-39

Earth Island Institute v. U.S. Forest Service,
351 F.3d 1291 (9th Cir. 2003) .......................................................................27

Friends of River v. Federal Energy Regulatory Com.,
720 F.2d 93 (D.C. Cir. 1983) .......................................................................21

Grand Canyon Trust v. FAA,
290 F.3d 339 (D.C. Cir. 2002) .......................................................................9

Hickory Neighborhood Defense League v. Skinner,
893 F.2d 58 (4th Cir. 1990) appeal on remand at 910 F.2d 159 (4th Cir. 1990) ........................29

Hughes River Watershed Council v. Glickman,
81 F.3d 437 (4th Cir. 1996) .......................................................................27

Idaho Sporting Congress v. Rittenhouse,
305 F.3d 975 (9th Cir. 2002) .......................................................................27

Johnston v. Davis,
698 F.2d 1088 (10th Cir. 1983) .......................................................................27

Marsh v. Oregon Natural Resources Council,
490 U.S. 360 (1989) .......................................................................21

Merritt Parkway Conservancy v. Mineta,
424 F. Supp. 2d 396 (D. Conn. 2006)........................................................................30

Motor Vehicle Manufacturers Association of the United States, Inc. v.
    State Farm Mutual Automobile Ins. Co., 463 U.S. 29 (1983) ..................................9

Nat'l Comm. for the New River, Inc. v. FERC,
373 F.3d 1323 (D.C. Cir. 2004) ................................................................................21

National Parks and Conservation Assn v. Babbitt,
241 F.3d 722 (9th Cir. 2001) ....................................................................................10

National Wildlife Federation v. FERC,
912 F.2d 1471 (D.C. Cir. 1990) ................................................................................14

Natural Resources Defense Council v. Hodel,
865 F.2d 288 (D.C. Cir. 1988) ........................................................................9, 13, 19

NRDC v. Callaway,
524 F.2d 79 (2nd Cir. 1975) ......................................................................................12

Natural Resources Defense Council v. Lujan,
768 F. Supp. 870 (D.D.C. 1991) .........................................................................22, 26

NRDC v. Morton,
458 F.2d 827 (D.C. Cir. 1972) ..................................................................................19

Nevada v. DOE,
457 F.3d 78 (D.C. Cir. 2006) ....................................................................................11

Robertson v. Methow Valley Citizens Council,
490 U.S. 332 (1989) ..................................................................................................20

Sierra Club v. Froehlke,
816 F.2d 205 (5th Cir. 1987) .....................................................................................22

Sierra Club v. Peterson,
717 F.2d 1409 (D.C. Cir. 1983) ..................................................................................3

Sierra Club v. United States DOT,
664 F. Supp. 1324 (N.D. Cal 1987) ....................................................................36, 37

Sierra Club v. Watkins,
808 F. Supp. 852 (D.D.C. 1991) ...............................................................................12

Simmons v. U.S. Army Corps of Engineers,
120 F.3d 664 (7th Cir. 1997) ...............................................................11, 39


Southern Utah Wilderness Alliance ("SUWA") v. Norton,
237 F. Supp. 2d 48 (D.D.C. 2002) ........................................................12, 13

State of Alaska v. Andrus,
580 F.2d 465 (D.C. Cir. 1978), *vacated in part sub nom.,*
Western Oil & Gas Ass'n v. Alaska, 439 U.S. 922 (1978) .........................................11-12, 19-20

Stewart Park and Reserve Coalition, Inc. (SPARC) v. Slater,
358 F. Supp.2d 83 (D.D.C. 2005) ..................................................................31

Stop H-4 Ass'n v. Dole,
740 F.2d 1442 (9th Cir. 1984) ........................................................................5

Tongass Conservation Soc'y. v. Cheney,
924 F.2d 1137 (D.C. Cir. 1991) .....................................................................11

Town of Matthews v. U.S. Dept. of Transp.,
527 F. Supp. 1055 (W.D. N.C. 1981) ...............................................................19

Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,
435 U.S. 519 (1978) .................................................................................19

**Statutes**

5 U.S.C. §§ 706(2)(A), (D) ...........................................................................1, 9

23 U.S.C. § 138.........................................................................................1

42 U.S.C. § 4321 ....................................................................................1-2

42 U.S.C. § 4332(2)(C)(ii) ...........................................................................3

42 U.S.C. § 4332(2)(E) ............................................................................4, 11

49 U.S.C. § 303........................................................................................1

49 U.S.C. § 303(a) ................................................................................4, 28

49 U.S.C § 303(c) .....................................................................................5

**Regulations**

23 C.F.R. 771.111(d) ................................................................................5, 26

23 C.F.R. § 771.135(b) ................................................................................8

23 C.F.R. § 771.135(l) ................................................................................8

23 C.F.R. § 771.135(o) ................................................................................29

23 C.F.R. § 771.135(p) ................................................................................5

23 C.F.R. § 771.135(p)(2) ................................................................................5, 30

23 C.F.R. § 771.135(p)(4) ................................................................................7

23 C.F.R. § 772.5(g) ................................................................................6

23 C.F.R. § 772.9(a) ................................................................................6

23 C.F.R. § 772.9(b) ................................................................................6

23 C.F.R. § 772.9(c) ................................................................................6

23 C.F.R. § 772.19 ................................................................................6

23 C.F.R. § 772, Table 1 ................................................................................23, 32, 34

40 C.F.R. § 1500 ................................................................................2

40 C.F.R. § 1500.1(b) ................................................................................3, 27

40 C.F.R. § 1500.1(c) ................................................................................3

40 C.F.R. § 1501.2 ................................................................................3

40 C.F.R. § 1502.2(g) ................................................................................4

40 C.F.R. § 1502.1    3

40 C.F.R. § 1502.5 ................................................................................4

40 C.F.R. § 1507.1 ................................................................................3

40 C.F.R. § 1508.9 ................................................................................3

40 C.F.R. § 1502.13 ...........................................................................................................4

*40 C.F.R. § 1502.14 ............................................................................... 4, 11-13, 20

40 C.F.R. § 1502.15 ...........................................................................................................4

40 C.F.R. § 1502.16 ...........................................................................................................4

40 C.F.R. § 1502.24 .........................................................................................................27


**Other**

Fed. R. Civ. P. 56(e) ........................................................................................................8

46 Fed. Reg. 18,026, 18027 (March 23, 1981) ...........................................................20

S. Rep. No. 1659, 89th Cong., 2d Sess. 5-6 (1966) ...............................................5, 28

**INTRODUCTION**

This case challenges the U.S. Department of Transportation and Federal Highway Association's (collectively "DOT") violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, et seq., the Department of Transportation Act, 23 U.S.C. § 138 and 49 U.S.C. § 303 ("Transportation Act"), and the Administrative Procedure Act, 5 U.S.C. § 706(2) ("APA"), in connection with the proposed construction of a new bridge across the Little Miami National Wild and Scenic River. The Eastern Corridor Project ("Eastern Corridor" or "Project"), of which the proposed bridge is a part, is a highway construction project located in the Cincinnati metropolitan area.

The Project includes the single-focused desire to construct a new, large, elevated, multi-lane bridge over a scenic, natural and relatively undisturbed and undeveloped portion of the Little Miami River. The stretch of the Little Miami River within the Eastern Corridor was included into the National Wild and Scenic River System in 1980 because of its scenic, aesthetic, and recreational qualities.[1] AR 47275. The proposed bridge will impact the scenic, aesthetic, peaceful and recreational attributes associated with the river, which was the very cause for the Little Miami River's inclusion in the National Wild and Scenic Rivers System. While other reasonable alternatives exist that would meet the Project's purpose and needs of improving traffic for Cincinnati commuters, the Defendants have refused to give such alternatives fair and adequate consideration. As a result, the public's interest in protecting one of the last remaining natural, quiet and scenic environments in the Cincinnati metropolitan area is at risk.

Defendants' Eastern Corridor project and the corresponding Tier 1 Final Environmental Impact Statement ("FEIS") violates NEPA and the Transportation Act because Defendants have:

---

[1] The Little Miami River was designated as a component of the National Wild and Scenic Rivers system on two separate occasions. AR 47274. A 64 mile section north of the Eastern corridor was included under scenic and recreational classifications in 1973. The 28-mile section, of which a portion is within the Eastern Corridor, was included in January of 1980 under the recreational classification. AR 47275. The entire Little Miami River is also designated as a State Scenic River. AR 47276.

(1) failed to consider all reasonable alternatives in the Tier 1 analysis; (2) failed to consider

significant new information; (3) failed to base its EIS analysis on current data; and (4) failed to

comply with the requirements of Section 4(f) of the Transportation Act.

Plaintiffs request that this Court issue: (1) a declaratory judgment that Defendants are in

violation of NEPA and Section 4(f) of the Transportation Act; (2) a mandatory injunction

directing Defendants to comply with the provisions of NEPA and Section 4(f) of the

Transportation Act; (3) an order vacating the June 6, 2006 Record of Decision approving the

FEIS and consequential approval of the construction of new bridge crossing the Little Miami

National Wild and Scenic River; and (4) an injunction prohibiting Defendants from proceeding

with site preparation, construction, the issuance of revenue bonds, right-of-way acquisitions or

any other irrevocable actions related to the building of the proposed bridge across the Little

Miami National Wild and Scenic River until the violations of NEPA and Section 4(f) of the

Transportation Act have been corrected.

## LEGAL BACKGROUND

### I.    The National Environmental Policy Act.

NEPA is the "national charter for protection of the environment."  40 C.F.R. 1500.1.

Congress enacted NEPA "[t]o declare a national policy which will encourage productive and

enjoyable harmony between man and his environment; to promote efforts which will prevent or

eliminate damage to the environment and biosphere and stimulate the health and welfare of man;

[and] to enrich the understanding of the ecological systems and natural resources important to the

Nation."  42 U.S.C. § 4321.

Specifically, NEPA has two objectives.  First, NEPA requires that a federal agency

"consider[s] every significant aspect of the environmental impact of a proposed action."

Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 97 (1983).

Second, the agency must "ensure[] that the agency will inform the public that it has indeed

considered environmental concerns in its decisionmaking process." Id.  These procedures instill upon federal agencies a "look before you leap" ethic where the agency takes a "hard look" at the environmental consequences of a propose action "*prior* to a decision, when the decisonmaker retains a maximum range of options."  Sierra Club v. Peterson, 717 F.2d 1409, 1413-14 (D.C. Cir. 1983) (emphasis in original).

To accomplish this, NEPA requires all agencies of the federal government must prepare a "detailed statement" that discusses the environmental impacts of, and reasonable alternatives to, all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); Sierra Club v. Peterson, 717 F.2d at 1415.  This statement is commonly known as an environmental impact statement ("EIS").  The EIS must describe the adverse environmental effects of the proposed action and alternatives to the proposed action.  Id.

NEPA's regulations require agencies to "integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts."  40 C.F.R. § 1501.2.  The Council on Environmental Quality ("CEQ") has promulgated regulations implementing NEPA, which are binding on all federal agencies. 40 C.F.R. § 1507.1.  The CEQ regulations establish additional requirements for environmental impact statements.  40 C.F.R. § 1508.9.

The EIS process is intended "to help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment" and to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken."  40 C.F.R. § 1500.1(b)-(c).  The EIS must "provide full and fair discussion of significant environmental impacts and shall inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.

An EIS "serve[s] as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made." 40 C.F.R. § 1502.2(g); see also, id. § 1502.5. The EIS must be clear and supported by evidence that the agency has made the necessary environmental analyses. 40 C.F.R. § 1502.1. Specifically, the EIS must properly define the proposed action and describe the existing environment affected by the proposed action and evaluate the significance of the direct and indirect environmental effects of the proposed action. 40 C.F.R. §§ 1502.4, 1502.15 and 1502.16.

Section 102(2)(E) of NEPA requires that every agency must also "study, develop, and describe alternatives to recommended courses of action ...." 42 U.S.C. § 4332(2)(E). The EIS must "rigorously explore and objectively evaluate all reasonable alternatives," including "the alternative of no action." 40 C.F.R. 1502.14. The examination of alternatives "is the heart of the environmental impact statement." 40 C.F.R. 502.14. This requires an agency to "[r]igorously explore and objectively evaluate all reasonable alternatives," 40 C.F.R. § 1502.14(a), as well as describe the "underlying purpose and need to which the Agency is responding in proposing the alternatives, including the proposed action." Id. § 1502.13.

Finally, an agency's NEPA duties are not concluded upon issuance of the EIS. The agency must prepare a supplemental NEPA document if there "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii).

## II.    Section 4(f) of The Department of Transportation Act.

It is the policy of the Federal Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. 49 U.S.C. § 303(a). Section 4(f) of the Department of Transportation Act was created to provide protection to these resources. In expressing the purpose of section 4(f) Congress noted that section 4(f) is "designed to insure that in planning

highways … and other transportation facilities, care will be taken … not to interfere with or disturb established recreational facilities and refuges." S. Rep. No. 1659, 89th Cong., 2d Sess. 5-6 (1966).

Section 4(f) mandates that the Secretary of Transportation may only approve a transportation program or project that uses any of the protected resources if: (1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the resource resulting from the use. 49 U.S.C § 303(c); 23 U.S.C. § 138. The "substantive mandate" imposed by Section 4(f) is "stringent." See City of Alexandria v. Slater, 198 F.3d 862, 871 (D.C. Cir. 1999); accord Stop H-4 Ass'n v. Dole, 740 F.2d 1442, 1447 (9th Cir. 1984).

A "use" under the Section 4(f) regulations includes: (1) when land is permanently incorporated into a transportation facility; or (2) when there is a "constructive use." 23 C.F.R. § 771.135(p). "Constructive use occurs when the project does not physically incorporate land from a Section 4(f) resource, but the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify a resource for protection under Section 4(f) are substantially impaired." Id. § 771.135(p)(2).

The Federal Highway Administration ("FHWA") March 1, 2005 Section 4(f) Policy Paper ("Policy Paper") notes that a constructive use occurs when the value of the resource in terms of its Section 4(f) significance will be meaningfully reduced or lost. AR 47048. The Policy Paper also notes that the degree of impact and impairment should be determined in consultation with the officials having jurisdiction over the resource. AR 47046; see also AR 8694 (FHWA request that National Park Service, which has oversight of the Wild and Scenic Little Miami River serve as a "Cooperating Agency" pursuant to 23 C.F.R. 771.111(d)).

The Policy Paper identifies traffic noise resulting from the project that substantially interferes with the use and enjoyment of the noise-sensitive resources as an example of a

constructive use.  AR 47048.  FHWA sets out noise study procedures and abatement measures at 23 C.F.R. Part 772.  Section 772.9 (Analysis of traffic noise impacts and abatement measures) requires the FHWA to determine and analyze expected traffic noise impacts and alternative noise abatement measures to mitigate these impacts, giving weight to the benefits and cost of abatement, and to the overall social, economic and environmental effects.  23 C.F.R. § 772.9(a). The traffic noise analysis shall include the following for each alternative under detailed study: (1) Identification of existing activities, developed lands, and undeveloped lands for which development is planned, designed and programmed, which may be affected by noise from the highway; (2) Prediction of traffic noise levels; (3) Determination of existing noise levels; (4) Determination of traffic noise impacts; and (5) Examination and evaluation of alternative noise abatement measures for reducing or eliminating the noise impacts.  23 C.F.R. § 772.9(b).  The noise analysis must be of sufficient scope to provide information needed to make the determination required by § 772.13(a).  23 C.F.R. § 772.9(c).

FHWA is required to (a) identify land uses or activities which may be affected by noise from construction of the project. The identification is to be performed during the project development studies; (b) determine the measures which are needed in the plans and specifications to minimize or eliminate adverse construction noise impacts to the community. This determination shall include a weighing of the benefits achieved and the overall adverse social, economic and environmental effects and the costs of the abatement measures; and (c) incorporate the needed abatement measures in the plans and specifications.  23 C.F.R. § 772.19.

The FHWA defines transportation noise impact as "[i]mpacts which occur when the predicted traffic noise levels approach or exceed the noise abatement criteria (Table 1), or when the predicted traffic noise levels substantially exceed the existing noise levels."  23 C.F.R. § 772.5(g).  Table 1 identifies noise criteria by category.  Category A defines the noise level as 57-60 decibels.  Category A includes lands on which serenity and quiet are of extraordinary

important public need and where the preservation of those qualities is essential if the area is to

continue to serve its intended purpose. Category B defines the noise level as 67-70 decibels.

Category B includes areas where serenity and quiet are not of extraordinary importance and

includes such areas as the following: picnic areas, recreation areas, playgrounds, active sports

areas, parks, residences, motels, hotels, schools, churches, libraries, and hospitals.

The Policy Paper recognizes that Wild and Scenic Rivers are subject to Section 4(f) and

specifically identifies recreationally designated rivers as a 4(f) resource. AR 47-55-56. FHWA

regulations set out that a constructive use occurs when:

> (i) The projected noise level increase attributable to the project substantially
> interferes with the use and enjoyment of a noise-sensitive facility of a resource
> protected by section 4(f), such as hearing the performances at an outdoor
> amphitheater, sleeping in the sleeping area of a campground, enjoyment of a
> historic site where a quiet setting is a generally recognized feature or attribute of
> the site's significance, or enjoyment of an urban park where serenity and quiet are
> significant attributes;

> (ii) The proximity of the proposed project substantially impairs esthetic features
> or attributes of a resource protected by section 4(f), where such features or
> attributes are considered important contributing elements to the value of the
> resource. Examples of substantial impairment to visual or esthetic qualities would
> be the location of a proposed transportation facility in such proximity that it
> obstructs or eliminates the primary views of an architecturally significant
> historical building, or substantially detracts from the setting of a park or historic
> site which derives its value in substantial part due to its setting; …

> (iv) The vibration impact from operation of the project substantially impairs the
> use of a section 4(f) resource, such as projected vibration levels from a rail transit
> project that are great enough to affect the structural integrity of a historic building
> or substantially diminish the utility of the building; or

> (v) The ecological intrusion of the project substantially diminishes the value of
> wildlife habitat in a wildlife or waterfowl refuge adjacent to the project or
> substantially interferes with the access to a wildlife or waterfowl refuge, when
> such access is necessary for established wildlife migration or critical life cycle
> processes.

23 C.F.R. § 771.135(p)(4).  FHWA has also set out in its regulations that a constructive

use does not occur when:

> (ii) The projected traffic noise levels of the proposed highway project do not
> exceed the FHWA noise abatement criteria as contained in Table 1, 23 CFR part
> 772 or the projected operational noise levels of the proposed transit project do not
> exceed the noise impact criteria in the FTA guidelines;

> (iii) The projected noise levels exceed the relevant threshold in paragraph
> (p)(5)(ii) of this section because of high existing noise, but the increase in the
> projected noise levels if the proposed project is constructed, when compared with
> the projected noise levels if the project is not built, is barely perceptible (3 dBA or
> less); …

> (vi) Overall (combined) proximity impacts caused by a proposed project do not
> substantially impair the activities, features, or attributes that qualify a resource for
> protection under section 4(f); …

23 C.F.R. § 771.135(p)(5).

Section 771.135(b) directs that "any use of lands from a section 4(f) property shall be

evaluated early in the development of the action when alternatives to the proposed action are

under study."  23 C.F.R. § 771.135(b).  Section 771.135(l) provides that in cases requiring the

preparation of an EIS, the agency "will make the section 4(f) approval either in its approval of

the final EIS or in the ROD."  23 C.F.R. § 771.135(l).

## <u>STANDARD OF REVIEWS</u>

**I.    Summary Judgment.**

A court shall render summary judgment when no genuine issue as to any material fact

exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

When the evidence is "so one-sided that one party must prevail as a matter of law" summary

judgment is appropriate.  <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 251-52 (1986).  Where the

moving party has demonstrated that there is no material issue of fact for trial, the "adverse party

may not just rest upon the mere allegations or denials of the adverse party's pleadings, but …

must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

Summary judgment is not treated as "a disfavored procedural shortcut" but as "an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." Celotex Corporation v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

## II.    NEPA and Department of Transportation Act Claims.

In determining the legality of the DOT's actions under NEPA and the Transportation Act, this Court applies the standards set forth in the Administrative Procedure Act ("APA").  Pursuant to the APA, courts "shall … set aside agency action" found to be  "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (D).  An agency action is "arbitrary and capricious":

> If the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decisions that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29, 43 (1983).

An agency is "entitled to judicial deference" under § 706(2)(A) for technical matters within the agency's purview so "long as the agency's decision is 'fully informed' and 'well-considered.'" Natural Resources Defense Council v. Hodel, 865 F.2d 288, 294 (D.C. Cir. 1988). However, deference is *not* afforded to DOT's interpretation and implementation of its NEPA duties.  See Grand Canyon Trust v. FAA, 290 F.3d 339, 342 (D.C. Cir. 2002).

Concerning, the Transportation Act, the D.C. Circuit has noted that while review is deferential, the Supreme Court "instructs courts to undertake 'a thorough, probing, in-depth review' of decisions under section 4(f), … and to canvass the facts of section 4(f) cases 'searching[ly] and careful[ly].'" Citizens Against Burlington, Inc. v. Busey, 938 F.32d 190, 203 (D.C. Cir. 1991) (*citing* Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 411,

415-16 28 L. Ed. 2d 136, 91 S. Ct. 814 (1971)).  Furthermore, as noted above, DOT's own

Policy Paper states that the degree of impact and impairment should be determined in

consultation with the officials having jurisdiction over the resource, which in the case of the

Little Miami River is the National Park Service.  See AR 47046.

C.    **Injunctive Relief**

The standard for determining whether to issue a permanent injunction requires a two-part

inquiry.  Amoco Production Co. v. Village of Gambell, Alaska, 480 U.S. 531, 542 (1987).  This

Court must first determine whether any statute restricts its traditional equity jurisdiction.  Id.  If

no statute restricts its equity jurisdiction, then this Court must engage in the traditional balancing

of the equities to determine whether an injunction is appropriate.  Id.  Nothing in NEPA or the

Transportation Act restricts this Court's equitable jurisdiction.  Accordingly, this Court must

consider the traditional bases for injunctive relief, which are "irreparable injury and inadequacy

of legal remedies."  Amoco Production Co., 480 U.S. at 542.

Irreparable injury is not presumed when an agency fails to evaluate the environmental

impact of a proposed action.  Id. at 545.  However:

> Environmental injury, by its nature, can seldomly be adequately remedied by
> money damages and is often permanent or at least of long duration, i.e.
> irreparable.  If such inquiry is sufficiently likely … the balance of harms will
> usually favor issuance of the injunction to protect the environment.

Id.  Thus, an injunction should issue where money damages would not remedy the underlying

injury and where a party proves that injury or harm *might* in the absence of the requested

injunction; there is no need to prove irreparable harm will in fact occur.  National Parks and

Conservation Assn v. Babbitt, 241 F.3d 722, 737 (9th Cir. 2001) (enjoining ongoing cruise ship

uses because they "might" cause irreparable harm).  Further, where a party demonstrates the

possibility of irreparable harm to the environment, and requests an injunction to prevent such

harm, any opposing party bears the burden of demonstrating that "unusual circumstances" exist that weigh against the request. Id. at 738 (citation omitted).

**ARGUMENT**[2]

I.    **Violations of NEPA**

    A.    <u>DOT Failed to Consider a Reasonable Range of Alternatives By Excluding an Option for No New Bridge Crossing the Wild and Scenic Little Miami River.</u>

NEPA directs the agency to "study, develop and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources" in the EIS. 42 U.S.C. § 4332(2)(E). At the "heart of the [EIS]" is the requirement that an agency "rigorously explore and objectively evaluate" the projected environmental impacts of all "reasonable alternatives" to the proposed action. 40 C.F.R. § 1502.14; <u>Nevada v. DOE</u>, 457 F.3d 78, 87 (D.C. Cir. 2006). Alternatives analyses should present the environmental impacts of the proposal and the alternatives in a comparative form, thus sharply defining the issues and providing a clear basis for choice among the options. 40 C.F.R. § 1502.14. "The 'detailed statement' of 'alternatives to the proposed action' called for by § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), has been aptly characterized as 'the linchpin of the entire impact statement.'" <u>State of Alaska v. Andrus</u>, 580 F.2d 465, 474 (D.C. Cir. 1978), *vacated in part sub nom.,* <u>Western Oil & Gas Ass'n v. Alaska</u>, 439 U.S. 922 (1978)) (citations omitted).

The "reasonable range of alternatives" evaluated in an EIS is dictated by the purpose and need of the proposed action and governed by a "rule of reason." <u>Tongass Conservation Soc'y. v. Cheney</u>, 924 F.2d 1137, 1140 (D.C. Cir. 1991); <u>Simmons v. U.S. Army Corps of Engineers</u>, 120 F.3d 664, 666 (7th Cir. 1997) (a purpose and need statement should not be so narrow as to

---

[2] Plaintiffs note at the outset that they meet all requisite standing elements. <u>See</u> Exhs. 1-4 (Declarations of Stephanie D. Ross, Christine P. Curran, Donovan K. Hopkins, and Marilyn Wall). Should Defendants oppose Plaintiffs' standing, Plaintiffs will provide further argument demonstrating standing in its reply brief.

"define competing 'reasonable alternatives' out of consideration (and even out of existence).").

The D.C. Circuit has noted that:

> [T]he word 'reasonable' is not self-defining. Deference, however, does not mean dormancy, and the rule of reason does not give agencies license to fulfill their own prophecies, whatever the parochial impulses that drive them. Environmental impact statements take time and cost money. Yet an agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become a foreordained formality.

Citizens Against Burlington, Inc., 938 F.2d at 196.  Furthermore, this court has noted that "an agency's consideration of environmental concerns must be more than a pro forma ritual. Considering environmental costs means **seriously considering alternative actions to avoid them**."  Southern Utah Wilderness Alliance ("SUWA") v. Norton, 237 F. Supp. 2d 48, 52 (D.D.C. 2002) (emphasis added) (*citing* Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm., 449 F.2d 1109, 1128 (D.C. Cir. 1971)).

The alternatives should be presented so as to "sharply define the issues and provide a clear basis for choice."  40 C.F.R. § 1502.14.  "This statement must not simply *list* possible alternatives; instead, it must contain a 'detailed and careful analysis of the relative environmental merits and demerits of the proposed action and possible alternatives ….'"  State of Alaska, 580 F.2d at 474 (emphasis in original).  The statement's analysis "should be sufficiently detailed to reveal the agency's comparative evaluation of the environmental benefits, costs and risks of the proposed action and each reasonable alternative."  40 C.F.R. § 1500.8(4).  The discussion of alternatives "must go beyond mere assertions" if it is to fulfill its vital role of "exposing the reasoning and data of the agency proposing the action to scrutiny by the public and by other branches of the government."  NRDC v. Callaway, 524 F.2d 79, 92-3 (2nd Cir. 1975).  An EIS should "rigorously explore and objectively evaluate all reasonable alternatives," id., and an

agency may not limit itself to only one end of the spectrum of possibilities.  See, e.g., Sierra Club v. Watkins, 808 F. Supp. 852, 872 (D.D.C. 1991).

The Eastern Corridor Tier 1 EIS fails to consider a reasonable range of alternatives.  Specifically, DOT has failed to "rigorously explore and evaluate" alternatives to the placement of a new bridge over the National Wild and Scenic Little Miami River.  Second, DOT's alternative analysis for the Eastern Corridor project is little more than an "all or nothing" approach to constructing a large, multi-lane bridge over the Wild and Scenic Little Miami River at Horseshoe Bend.  Other viable alternatives that could achieve the purpose and need of this project include the widening of existing bridge infrastructure over the Little Miami River that would not disrupt an undisturbed scenic section of the river that provides a unique recreational opportunity for citizens of the Cincinnati metropolitan area.

Thus, in the context of the Eastern Corridor, the inquiry is whether a range of alternatives as defined in terms of the Project's broadly defined purpose would, under the "rule of reason,"[3] include Option 2.[4]  Option 2 would have crossed the Little Miami River on an existing bridge by widening the Beechmont Levee crossing, or building an adjacent bridge structure (Option 2 is also referred to as the "Beechmont alignment"), rather than creating a new crossing over the Wild and Scenic Little Miami River.  AR 48019; see also AR 48021 (map of both Options).  Additionally, a "rigorous explor[ation] and objective evaluat[ion]" of Option 2 in the "reasonable range of alternatives" requires much more than the simple conclusion that Option 2 does not

---

[3] Agency compliance vel non with the requirement to consider alternatives is evaluated under the "rule of reason," meaning that "the concept of alternatives must be bounded by some notion of feasibility," and that agencies are required to deal with circumstances "as they exist and are likely to exist," but are not required to consider alternatives that are "remote and speculative." Natural Resources Defense Council, Inc. v. Hodel, 865 F.2d at 294-95 (internal citations omitted).

[4] The purpose as set out in the Tier 1 DEIS is "to implement a multi-modal transportation program consistent with the adopted long range plan for the region addressing priority needs … established during the Eastern Corridor Major Investment Study (April 2000) and subsequent metropolitan area planning actions."  AR 47119.  The need pertains to establishing an adequate transportation network  with adequate linkages and mobility to the key corridors that will accommodate future economic expansion and growth. Id.

achieve the same traffic reduction or flow as that of Option 1.  40 C.F.R. § 1502.14.  Rather, it

mandates serious and meaningful consideration of this alternative, especially given the fact that

such an alternative could avoid significant environmental impacts to the Little Miami River.  *See*

SUWA, 237 F. Supp. 2d at 52.

The Beechmont alignment was eliminated from review in the "preliminary recommended

plan" stage of the Major Investment Study ("MIS").[5]  AR 47199; see also AR 48006.  The MIS

addressed travel needs in the Eastern Corridor of the Cincinnati metropolitan area through 2020.

AR 47876.  The MIS was completed in April 2000, well before preparation of the EIS analysis

pursuant to NEPA.  AR 47867; AR 10272 (flowchart of MIS and NEPA process).  However,

selection of a recommended plan via consensus, and dismissing all other alternatives that may

still reasonably address travel demands is not consistent with the requirements of NEPA.  NEPA

requires consideration of a "reasonable range of alternatives."  This final decision goes beyond

the bounds of the MIS and is the precise type of analysis to be conducted in the NEPA review.

See AR 47200.  By eliminating reasonable alternatives at the MIS stage, in an effort to reach

consensus amongst local authorities, and as a result proceeding solely with one action alternative

into the NEPA EIS review, Defendants have utterly evaded the purpose of NEPA.  As the D.C.

Circuit noted, "an agency may not define the objectives of its action in terms so unreasonably

narrow that only one alternative from among the environmentally benign ones in the agency's

power would accomplish the goals of the agency's action," Citizens Against Burlington, Inc., 938

F.2d at 196.  In this case, DOT has reviewed only one action alternative for highway

---

[5] In the MIS process, a sub-group was specifically convened to evaluate an alternative option to the desired new crossing given the concerns to impacts on the Little Miami River.  AR 48019. The sub-group's ultimate recommendation to proceed with Option 1 was not unanimous.  AR 48024.  The recommendation was presented to a Task Force subgroup that was formed to address how to make the Little Miami River crossing more acceptable.  Id. It is difficult to imagine a how a sub-group could recommend Option 2 to the Task Force that was charged with making Option 1 "more acceptable."  This process further indicates how the MIS was not a meaningful analysis of alternatives, but rather a process set out from the start to provide the underlying support necessary to define Option 1 as the recommended plan.

improvement.  Not only is there no environmentally preferred alternative, there is simply no other highway alternative.  This "all or nothing" approach violates NEPA and must be rejected.

By only considering Option 1 in detail, DOT failed "to consider all reasonable alternatives."  National Wildlife Federation v. FERC, 912 F.2d 1471, 1485 (D.C. Cir. 1990); see also AR 47202 (DEIS discussion of Options 1 and 2).  This Court can find significant guidance from the Tenth Circuit's review of a similar transportation project in Utah.  In Davis v Mineta, 302 F.3d 1104, (10th Cir. 2002) the court found that "serious consideration" given to only the preferred alternative was inadequate.  Of relevance and direction in this case, the project involved increasing traffic capacity across the Jordan River by proposing a new bridge crossing.  Id. at 1119.  When FHWA construes the purposes and needs so narrowly as to mandate the extra capacity of the transportation project only at one crossing over the river when potentially viable alternatives exist, it has acted contrary to the mandates of NEPA.  Id.

This case involves a matching set of facts.  In Davis v. Mineta, just as in this case, the plaintiffs argued that "[DOT] should have given more detailed consideration to alternatives involving the extension or expansion of other roads that cross the Jordan River."  Id. at 1120.  In dismissing the alternatives, without given them serious consideration or a "hard look," FHWA relied on "traffic studies that purported to show that reasonable traffic volume can *only* be achieved by creating [a new crossing]."  Id.  While the studies indicated that the preferred alternative will improve traffic flows, "that is not the test for whether alternatives should be studies in a [NEPA document]."  Id.  As was the case in Davis v. Mineta, nothing in the record demonstrates that Option 2 was not a "reasonable" alternative requiring serious consideration.  However, this case is even more extreme because the Little Miami River is a federally designated Wild and Scenic River demanding consideration of alternatives that do not impair the attributes for which the river was included in the National Wild and Scenic Rivers System.

DOT recognized its deficiencies concerning adequate NEPA evaluation of Option 2.  See e.g., AR 426 (FHWA letter stating that "the documentation of data used to eliminate the Beechmont Option for the crossing of the Little Miami River is insufficient."); AR 9474 (stating need to draft language a that explains why the Beechmont alternative is not viable and acknowledging that they "could see why DOI wasn't fully convinced); AR 2073 (ODOT email calling for either data to demonstrate why Option 2 was dismissed or to evaluate Option 2 "to the same degree as Option 1 in the FEIS.").  DOT's concern is due to the fact that the A close look at MIS was not a review of reasonable alternatives of the type required under NEPA.  A close look at the DEIS reveals that the MIS process was significantly different than that required by NEPA. The DEIS states that the "MIS sub-committee reached consensus to include, in the highway component of the MIS Recommended Plan, … a new Little Miami River crossing …."  AR 47132.  This statement is quite telling as it indicates that the MIS process was not a comparative review of alternatives by an agency required to assess all reasonable ways in which the purpose and need of a project can be meet, but rather a politically influenced decision by those on the MIS committee to "reach consensus" concerning how to improve traffic flow.  Consequently, the MIS review is an entirely different review with a different objective that cannot suffice for NEPA review.

Additionally, the MIS does not qualify as a review of reasonable alternatives because the "conceptual transportation recommendations developed during the MIS phase of the project were used as **guideposts, but were not incorporated as specific recommendations or required actions of the final land use plan**."  AR 47134 (emphasis added).  Consequently, it was unlawful under NEPA to exclude Option 2, solely because the MIS identified Option 1 as a preferred course of action.

First, Option 2 meets the broad purpose and need of the Eastern Corridor project.  DOT concedes that Option 2 achieves the purpose and need, but not to the same extent that Option 1

does.[6]  See AR 47202 and AR 48020 (performance results indicated that both options produce

significant travel benefits); AR 48020 ("Option 2 **performs similarly** to the Option 1."

(emphasis added)).  While Option 1 may achieve better traffic flow or reduced travel hours for

commuters, that alone has no bearing on whether Option 2 is a reasonable alternative.[7]  See AR

47202 ("Option 1 performed more efficiently …."); cf. Davis v. Mineta, 302 F.3d at 1121.

While DOT chose Option 1 because it felt it addressed traffic needs better than Option 2, DOR

never treated option 2 as an "alternative" in the EIS analysis and therefore has not provided a

meaningful comparison of the two options to inform the decisionmaker, as required under

NEPA.  AR 47202.  Additionally, the MIS found that Option 2 "appears to provide a more

favorable overall impact scenario" and "avoids less disturbed, higher quality section of the Little

Miami River corridor."  AR 48023; AR 48020 ("Option 1 has a greater impact on the Little

Miami River Valley.").  Finally, Option 2 is a reasonable alternative because it meets the 2020

traffic volume projections.  AR 48020.  While it may approach traffic volume capacity in 2020 –

it nonetheless meets the purpose of providing traffic capacity at the 2020 estimates.[8]

---

[6] It is important to note that the purpose and need was never defined as creating a new transportation network across the Little Miami River.  Furthermore, the need was never defined as creating a new link between US 50 and SR 32.  As a result, it was improper to limit assessment of alternatives in such a narrow way when the purpose and need is to provide for greater traffic flow between the City and its eastern suburbs.  A map of the Tier 1 DEIS Study Area in fact shows that the corridor clearly cuts out the Beechmont alignment from review.  AR 47153.

[7] It is no surprise that directing traffic to the Beechmont alignment rather than a new bridge crossing the Little Miami River would result in increased traffic.  See AR 47202.  The question is not whether there would be increased traffic but rather whether widening of the Beechmont alignment is a reasonable alternative that addresses the purpose and need of the Project.  Cf., AR 400 (letter from OKI (who prepared MIS) to ODOT stating that the Beechmont option "did not perform as well in modeling…." and notably not stating that the Beechmont alignment was unreasonable).  While OKI may believe that "this level of deficiency" justifies removal of further consideration in the MIS process, it does not justify removal from consideration in the NEPA alternatives analysis.  See AR 400.  Additionally, ODOT demonstrated its bias towards moving forward without any meaningful NEPA consideration when it responded that "[r]e-opening issues in NEPA that were settled in the planning process is contrary to the intent and direction of all federal streamlining efforts."  AR 2409.  However, "streamlining" has no bearing on compliance with NEPA.

[8] However, because there is no real alternatives analysis of Option 2, the last time it was functionally considered was in 1999.  Since then DOT has applied a new and improved travel demand model ("TDM") for analysis in the NEPA stage.  See AR 47140.  This new TDM updated trip rates, revised trip distribution analysis and updated needs of travel to 2030 from 2020, amongst other updates.  AR 47140-41.  Additionally, the benefit/cost analysis was based on the new TDM analysis, which, as a result, did not consider a revised cost/benefit for Option 2.

FHWA's response to comments that it consider Option 2 in the EIS analysis is found in Section 2.5.1 of the FEIS. See AR 47741-49. This Section of the FEIS notes that "an effort has been made in the following paragraphs and illustrations to recapitulate and expand on the considerations that led to elimination of 'Option 2.'" AR 47742. While this section "recapitulate[s]" differences amongst the two options, it fails to adequately explain why Option 2 is not reasonable. AR 47742. This "recapitulation" is nothing more than a post-hoc effort to bolster the inadequate and unlawful NEPA review. There is no substantive analysis of why Option 2 is not reasonable. Everything offered and recapitulated merely indicates that the local authorities that prepared the MIS preferred a new bridge crossing.

Furthermore, the "updated planning-level comparison" is meaningless because FHWA had no intention of actually considering Option 2 as an alternative. See AR 47743. Instead the "comparison" indicates only that Option 2 was "not as well oriented," or there was "not as much benefit," or "not as many routing and river crossing options," or "not as effective for goods and services … demands." AR 47743. While Option 2 may not have "as much benefit" as Option 1, the EIS comparison provides no information as to why Option 2 is not reasonable. Additionally, the comparison's traffic volume analysis (provided in figures 6a-c) (AR 47744 and AR 47754-56) indicates that traffic volumes differed only between 5-10% between the two Options. AR 47744.[9] The MIS confirms that Option 2 was reasonable, but not as "favorable" as Option 1 from ODOT's point of view. Whether an Option is favored over another by the project proponent is not sufficient grounds for dismissing a reasonable alternative from review in a NEPA analysis. If that were the case, there would be no requirement in NEPA for consideration of alternatives.

In the transportation context, one alternative will always result in better traffic flow or

---

AR 47142. Because Option 2 wasn't considered during the EIS analysis, it has not undergone the same review with newer modeling that Option 1 has received.

[9] Absent a meaningful explanation of the contradictions offered in the FEIS from the findings in the MIS, these conclusions should be afforded no deference.

less hours in the car for some commuters.  As a result, this criterion by itself cannot limit the review of alternatives.  Rather, it beckons the agency to evaluate what costs, environmental and otherwise, are associated with the agency's preferred alternative, and in light of these considerations whether other alternatives may achieve the intended purpose, although not to the extent of the preferred alternative, but at the same time mitigate or avoid environmental or other costs that need not be sacrificed to meet the stated goals and purposes of the project.  Corridor H Alternatives, Inc. v. Slater, 166 F.3d 368, 374 (D.C. Cir. 1999) (citing 40 C.F.R. § 1502.14 (an agency must present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public)).

A side-by-side comparison of each alternative informs the decisionmaker as to whether the benefits of the preferred action outweigh the associated consequences of that decision. Because Option 2 could satisfy the broad purpose and need, it was incumbent upon FHWA to fully investigate and analyze Option 2 in the EIS in a comparative nature with Option 1.  See Citizens Against Burlington, 938 F.2d at 196 (stating that "the consideration of alternatives is to inform both the public and the agency decisionmaker, [and therefore] the discussion must be moored to 'some notion of feasibility'") (quoting Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 551 (1978)).  DOT, however, never considered Option 2 as an alternative, and thereby denied itself the ability to make a "fully-informed" and "well-considered" choice.  Vermont Yankee, 865 F.2d 288, 294.

Furthermore, DOT may not "disregard alternatives merely because they do not offer a complete solution to the problem."  Natural Resources Defense Council, 865 F.2d at 296 n.4; As one court explained, "[o]bviously, any genuine alternative to a proposed action will not fully accomplish all of the goals of the original purpose. One of the reasons that Congress has required agencies to set out and evaluate alternative actions is to give perspective on the environmental

costs, and the social necessity, of going ahead with the original purpose." Town of Matthews v. U.S. Dept. of Transp., 527 F. Supp. 1055, 1058 (W.D. N.C. 1981); see also NRDC v. Morton, 458 F.2d 827, 836 (D.C. Cir. 1972) ("Nor is it appropriate . . . to disregard alternatives merely because they do not offer a complete solution to the problem.").

DOT cannot lawfully refuse to evaluate "all possible approaches to a particular project ... which would alter the environmental impact and the cost-benefit balance." State of Alaska, 580 F.2d at 474. A more fully informed decision would have assessed the tradeoffs between ease of traffic congestion over unacceptable impacts to the environment by comparing reasonable alternatives that achieved these purposes to varying degrees. CEQ interprets its regulation requiring consideration of all reasonable alternatives, 40 C.F.R. § 1502.14, to preclude agencies from rejecting an alternative as unreasonable merely because the proponent does not like it. See Council on Environmental Quality, Forty Most Asked Questions Concerning the CEQ's NEPA Regulations, 46 Fed. Reg. 18,026, 18027 (March 23, 1981).[10]

DOT's failure to examine Option 2 and thus, "provide[] a clear basis for choice among options by the decisionmaker and the public," violates NEPA. 40 C.F.R. § 1502.14. The record flatly contradicts the DOT's approach of dismissing Option 2 prior to a full comparative analysis in the EIS. DOT was required to assess all reasonable alternatives in detail, allowing reviewers to evaluate their comparative merits. Despite the fact that Option 2 fit within the purpose and need of the Tier 1 EIS, DOT refused to give it substantial treatment and evaluate it objectively within the EIS document in a comparative nature to Option 1. As a result, the FEIS fails to "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed bridge crossing of the Little Miami National Wild and Scenic River, as required by NEPA. 40 C.F.R. § 1502.14.

---

[10] The CEQ's regulations are "entitled to substantial deference." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 355 (1989).

Furthermore, DOT removed this reasonable alternative from any meaningful analysis in the EIS in the face of significant public outcry, as well as Federal agency disapproval of this decision. Throughout the EIS preparation, the National Park Service, U.S. Department of the Interior Office of Environmental Policy and Compliance, and the EPA all identified Option 2 as a reasonable alternative that deserved consideration in the EIS analysis. See Statement of Facts ¶¶ 16, 21-23, 25-28; *see also* AR 2090 (email from NPS requesting consideration of an alternative that would not include construction of a new bridge over the Little Miami River); AR 2206, 2344-46, 7743-45 (same). DOT paid no heed to the fact that several federal agencies believed DOT was violating NEPA by failing to consider Option 2. DOT has improperly pre-ordained the outcome of the NEPA process by constraining themselves to the development of a project that must include a new bridge across the Little Miami National Wild and Scenic River, thereby illegally excluding reasonable alternatives from consideration, contrary to NEPA.

B.    Failure to Consider Significant New Information and Prepare a Supplemental EIS.

Because the primary goal of NEPA's procedural requirements is to ensure that federal agencies make informed decisions, federal regulations implementing NEPA require agencies to update an EIS by preparing a supplemental EIS ("SEIS") if there "are significant new circumstances or information relevant to the environmental consequences and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9 (c)(1)(ii); Friends of River v. Federal Energy Regulatory Comm., 720 F.2d 93, 109 (D.C. Cir. 1983). As the Supreme Court explained, "[i]t would be incongruous with [NEPA's] approach to environmental protection, and with [NEPA's] manifest concern with preventing uninformed action, for the blinders to adverse environmental effects, once unequivocally removed, to be restored prior to the completion of agency action simply because the relevant proposal has received initial approval." Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 371 (1989).

If the agency action will "affect the quality of the human environment in a significant manner or to a significant extent not already considered, a supplemental [NEPA document] must be prepared." Marsh, 490 U.S. at 374. This Court has similarly explained that "a supplemental EIS is only required where new information 'provides a seriously different picture of the environmental landscape.'" Nat'l Comm. for the New River, Inc. v. FERC, 373 F.3d 1323 (D.C. Cir. 2004) (citing City of Olmsted Falls v. FAA, 292 F.3d 261, 274 (D.C. Cir. 2002)).

A change in information, requiring NEPA supplementation "need not be strictly environmental …; the test is whether the new  information so alters the project's character that a new 'hard-look' at the environmental consequences is needed…. [I]nformation 'that does not seriously change the environmental picture, but that nevertheless affects, or could affect, the decisionmaking process, is subject to the procedural requirements of NEPA.'" Natural Resources Defense Council v. Lujan, 768 F. Supp. 870, 886-87 (D.D.C. 1991) (quoting Sierra Club v. Froehlke, 816 F.2d 205, 210, 212 (5th Cir. 1987)).

Here, DOT violated NEPA by not preparing a supplemental EA or SEIS to address the significant new circumstances and information provided by the National Park Service concerning noise associated analysis prepared during the EIS process. In May of 2006, FHWA provided requested supplemental data to NPS. AR 1945-54. However this left NPS with little time to review the information before DOT rushed out the ROD two weeks ahead of the agreed upon deadline for NPS to submit comments. AR 8150; see also AR 1945-54. On June 2, 2006, DOT signed the ROD for the Tier 1. AR 47099. Despite an agreement between DOT and NPS that NPS submit its comments on the bridge crossing by June 16, DOT made the decision to not wait for these comments and issued the ROD. See AR 9628 ("we will not wait for reply from DOI"). Based upon a review of the supplemental information provided by DOT to NPS in May of 2006, as well as NPS's own review and analysis of FHWA's "Easter Corridor Noise Readings," NPS requested that FHWA prepare  "a supplemental EIS containing a section 4(f) statement" that

"evaluate[s] and compare[s] noise and visual impacts to the [Little Miami River's Outstandingly Remarkable Values] as well as the transportation benefits associated with Option 1 and Option 2, compared to the environmental baseline, in order to confirm that all reasonable and prudent alternatives have been considered."  AR 8150.

The information contained in the post-ROD NPS comments is significant.  In those comments, NPS concluded that, despite the supplemental information provided by FHWA, it was unable to agree with FHWA's conclusions pertaining to section 4(f) impacts to the scenic and recreational outstandingly remarkable values ("ORVs").  AR 8150.  Specifically, NPS noted that "[t]he acoustic data collection and analysis report submitted with the May 12 letter **reveals serious deficiencies that invalidate the noise impact analysis** conducted for the Eastern Corridor project during the final EIS process."  AR 8151 (emphasis added).  NPS found that "there would be a significant and substantial noise impact to the recreational experiences of river users" and that "[t]he impact is such that it would impair the [outstandingly remarkable] values, which support the river's national designation, thus leading to a loss of this distinction."  AR 8152.  "[B]ased on NPS guidelines for assessing noise impacts in natural areas, a**t least 4 kilometers of river will suffer major acoustical impairment** from the proposed bridge."  AR 8156 (emphasis added).

The NPS comments and attached study by Dr. Fristrup, Senior Acoustics Specialist with the NPS, concerning the FHWA's noise analysis is significant because it indicates that the FHWA analysis is deficient and misrepresents impacts associated with the project.  AR 8156.  Dr. Fristrup identified four principal errors with the ODOT noise analysis, which was the predominant analysis used to support FHWA's finding that there is no constructive use of the river.  AR 8152-68 (problems included location and timing of data samples as well as methodologies used to account for ambient background noise).

Additionally, NPS noted that ODOT improperly classified the river as a Class B noise receptor according to FHWA's own Noise Abatement Criteria ("NAC"), 23 C.F.R. § 772.  Class B noise receptors include "picnic areas, recreation areas, playgrounds, active sports areas, [and] parks…."  23 C.F.R. § 772 Table 1.  Class A receptors include parks and other open spaces where **serenity and quiet are of extraordinary significance, and where the preservation of those qualities is essential if the area is to continue to serve its intended purpose**."  23 C.F.R. § 772, Table 1 (emphasis added).  NPS commented that ODOT and FHWA have taken "recreation area" out of context and inappropriately applied it to the Little Miami River.  See e.g., AR 42275-76; AR 8152.  "Recreation areas," under Table 1, is included with other types of activities that clearly do not involve enjoyment of quiet and are a type of recreation far different from that experienced on the river.  See AR 42273, 42276; see also Decls. of Ross at ¶¶ 7-13, Curran at ¶¶ 9-12, 17, Wall at ¶¶ 7-10 and Hopkins at ¶¶ 8-11.  While recreation was the designation criteria the National Wild and Scenic Rivers Act for this section of river, it was included in the system because it provides a recreation opportunity where one can enjoy the quiet and natural environment of the river.  AR 42276.  NPS noted that "the recreational activities and scenic values" of the Little Miami River are associated with the "attributes of quiet, serenity and solitude."  AR 42274; AR 3452.

There can be no doubt that the stretch of Little Miami river where DOT proposes to construct a multi-lane bridge is a park or open space that provides quiet, that the opportunity for serenity quiet is of extraordinary significance given the proximity of this stretch to a metropolitan area, and that the intended purpose of including this stretch in the National Wild and Scenic River System was to allow for this portion of the river to provide this natural quiet and solitude in perpetuity.  In the 1973 report from the Secretary of the Interior to Congress, the Little Miami River was recognized for providing the kinds and types of activities that require special quantities of serenity and quiet.  AR 9900.  The serenity and quiet, given the rivers

proximity to the Cincinnati metropolitan area, clearly serves an important public need and was recognized by Secretary of the Interior Andrus as "indeed one of our Nation's valuable recreation resources." AR 9926-27. Due to the presence of these factors, NPS concluded it was erroneous to not consider the Little Miami River a Class A receptor. AR 42275-76. As a result, ODOT's analysis cannot support FHWA's resulting determination that there is no constructive use and DOT erred by not considering this important information in a SEIS.

ODOT and FHWA's improper analysis was not solely limited to issues pertaining to noise impacts on the river. Defendants failed to use NPS's evaluation methodology and related recommendations to evaluate bridge impacts to the LMR's scenic outstanding remarkable value as well. AR 8149-54. Specifically, NPS noted that (1) "the large mass of [a multi-lane bridge, 55 feet above the river,] in combination with its location in a relatively unobstructed corridor with relatively few man-made intrusions would make it the **most visibly dominate feature in this segment of the river**"; (2) "the cumulative visual impacts of a massive, multi-lane bridge where there previously was not a bridge, would result in a **fundamental change** in the scenic qualities in this portion of the LMR"; and (3) "[a] massive four-lane concrete bridge cannot be hidden from view." AR 8153 (emphasis added). As a result, NPS was unable to agree with FHWA's conclusion that existing developments in the area diminish the bridge impacts and noted that "it is the *quality* of the recreational experience afforded by the scenic values and recreational opportunities within the LMR …, which Congress intended to protect." AR 8153 (emphasis in original).

Finally, NPS's comments highlighted significant concerns with the mitigation strategies proposed in the final EIS. AR 8153. NPS found that the mitigation measures, proposed back at the MIS stage, failed to disclose if these impacts were discussed in the context of the LMR's outstanding remarkable values, how the impacts were measured, and the methods used to determine if the measures would be sufficient. AR 8153.

Overall, NPS's comments regarding the FEIS analysis, as well as the FHWA post-FEIS May 12, 2006 letter supporting its FEIS, is significant new information.  The analysis of the ODOT noise study is new and significant because it identifies significant errors in the FEIS noise readings.  Additionally, the comments and concerns raised by NPS regarding the noise analysis, scenic/visual impacts analysis, and proposed mitigation raises significant controversy over the actual impacts associated with this project and highlights serious questions concerning the sufficiency of the FEIS review.

In Lujan, the court found that a SEIS is required when the new information "affects, or could affect, the decisionmaking process," and "so alters the project's character that a new 'hard-look' at the environmental consequences is needed."  768 F. Supp. at 886-87.  In light of NPS's comments and Dr. Fristrup's analysis of ODOT's Noise Readings, a "hard look" at the environmental consequences of this project, as well as a reevaluation of whether noise impacts are a constructive use is warranted.  In Lujan, the court found that a new report on oil reserves in the Alaska National Wildlife Refuge significantly changed the framework within which the Department made its decisions on management of the Refuge.  768 F. Supp. at 888.  The court noted that the new agency report was "significant new information" requiring SEIS because "the agency itself obviously considered this new information highly important."  Id. at 887.

In this case, FHWA clearly recognized the importance of NPS comments concerning FHWA's analysis of impacts to the Little Miami River because FHWA took the unusual step of providing supplemental information regarding the project to NPS after the FEIS was completed. See AR 1945-54.  If NPS's cooperation, comments and resulting analysis and critique was not important then there would be little need for FHWA to participate in such a post-FEIS exercise.[11]

---

[11] In 2002, pursuant to FHWA regulation 23 C.F.R. § 771.111(d) (which requires FHWA to request that agencies with jurisdiction become cooperating agencies), FHWA requested "the NPS to serve as a Cooperating Agency" and stated that it "will rely on your **special expertise to ensure completeness and compliance with NEPA**."  AR 8694.  Despite this acknowledgment and requirement under its own regulations, FHWA, throughout the analysis failed to recognize NPS's "special expertise" and as a result, it has failed to "ensure completeness and compliance with NEPA."

The information and analysis provide a drastically different conclusion regarding impacts to the river, and provide new detailed and comprehensive analysis of ODOT's noise study, which was the basis for the EIS's conclusion that there is no constructive use.  See generally Corridor H Alternatives, Inc. v. Slater, 982 F. Supp. 24, 30 (D.D.C. 1997) (an agency action that "cause[s] effects which are significantly different from those already studied" requires preparation of a supplemental EIS), rev'd on other grounds Corridor H Alternatives, Inc. v. Slater, 166 F.3d 368 (D.C. Cir. 1999).  In this case, the actual noise impacts on those using the river for the purposes it was included in the National Wild and Scenic River System are "significantly different" than those acknowledged in the EIS.  As a result, the comments and information provided by NPS (recognized by FHWA as the agency with "special expertise" concerning impacts to the Little Miami River) are significant and warrant preparation of a supplemental EIS.

> C.    Failure to Base EIS on Current and Up-To-Date Data.

NEPA's regulations require that "[t]he information must be of high quality."  40 C.F.R. § 1500.1(b); see also 40 C.F.R. § 1502.24 (agency shall ensure the professional and scientific integrity of its discussions and analyses).  An agency's omission of ascertainable facts, or failure to use the up-to-date information, or the inclusion of erroneous information, violates the disclosure requirements of NEPA and undermines the public's confidence in the EIS, rendering it legally defective.  See Earth Island Institute v. U.S. Forest Service, 351 F.3d 1291, 1302 (9th Cir. 2003); Idaho Sporting Congress v. Rittenhouse, 305 F.3d 975, 972 (9th Cir. 2002) (agency cannot lawfully rely upon facts which it knows, should know, or suspects are inaccurate).

The Tier 1 Eastern Corridor's September 2004 Economic Analysis Report identifies gas cost at $1.13 per gallon for 2003.  AR 607.  The defendants contend that "[w]hile this is obviously below today's prevailing price, the wild fluctuation of gasoline prices in recent weeks demonstrates the difficulty of forecasting fuel process with any degree of confidence even in the short run."  AR 506.  At best, this is a questionable statement.  Defendants were aware of the

"obvious" underestimate of gas prices and yet refused to update their analysis.  A price of $1.13 can be characterized as nothing but inaccurate and results in a deficient and arbitrary Economic Analysis, upon which the Eastern Corridor EIS's cost-benefit analysis is based.  See Johnston v. Davis, 698 F.2d 1088, 1095 (10th Cir. 1983) (requiring revision of EIS due to use of artificially low discount rate); Hughes River Watershed Council v. Glickman, 81 F.3d 437, 446 (4th Cir. 1996) ("For an EIS to serve these functions, it is essential the EIS not be based on misleading economic assumptions); Appalachian Power Co. v. EPA, 249 F.3d 1032, 1054-55 (D.C. Cir. 2001) (modeling can not be based on inconsistent data).

While defendants may be correct that gasoline prices fluctuate, there is nothing in the record to support the $1.13 figure and it is far beyond anyone's expectation that $1.13 was reasonable in 2003 or would be reasonable two, five or twenty years down the line.  Because the EIS relies on misleading economic information, or fails to include the most accurate costs associated with gas prices, the NEPA analysis is insufficient.

## II.    The Project Constitutes a Constructive Use of the National Wild and Scenic Little Miami River.

The Transportation Act acknowledges that it is the policy of the United States Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites.  49 U.S.C. § 303(a).  Section 4(f) of the Department of Transportation Act was created to provide protection to these resources.  In expressing the purpose of section 4(f), Congress noted that section 4(f) is "designed to insure that in planning highways … and other transportation facilities, care will be taken … not to interfere with or disturb established recreational facilities and refuges."  S. Rep. No. 1659, 89th Cong., 2d Sess. 5-6 (1966). To ensure that 4(f) uses are addressed in a way that such uses can be avoided or minimized, the Section 4(f) implementing regulations direct that "any use of lands from a section 4(f) property shall be evaluated early in

the development of the action when alternatives to the proposed action are under study." 23 C.F.R. § 771.135.

The Supreme Court has described the premise of Section 4(f) as "a plain and explicit bar to the use of federal funds" for highway projects that impact historic sites and parks. <u>Citizens to Preserve Overton Park</u>, 401 U.S. at 411. As the Supreme Court stated, the very existence of the statute reflects Congress' intent that the protection of park lands must be given "paramount importance" in the planning and approval of federal highway projects. <u>Id.</u> at 412-13. These areas may not be used for highway projects unless "as a matter of *sound engineering* it would not be feasible to build the highway along any other route" or that the feasible alternatives are not prudent. <u>Id.</u> at 411. In construing this second exemption, the Supreme Court pointed out that:

> The few green havens that are public parks were not to be lost unless there were truly unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reached extraordinary magnitudes. If the statutes are to have any meaning, the Secretary cannot approve the destruction of parkland unless he finds that alternative routes present unique problems.

<u>Id</u>. at 412-13. If there is a feasible and prudent alternative to the use of section 4(f) resources, the Department of Transportation must adopt that alternative. <u>Id.</u> at 411-13. <u>See</u> <u>Hickory Neighborhood Defense League v. Skinner</u>, 893 F.2d 58, 61-62 (4th Cir. 1990) (overturning lower court decision supporting DOT's conclusion that there were no feasible and prudent alternatives to proposed widening of highway), *appeal on remand at* 910 F.2d 159 (4th Cir. 1990).

As a component of the National Wild and Scenic River system, the Little Miami River is a 4(f) resource. AR 2163, 47716-17. Yet, despite the fact that it is included in the National Wild and Scenic Rivers system and identified as a 4(f) resource, DOT has failed to satisfy Congress' intent to recognize the "paramount importance" of protecting the Little Miami River from this transportation project. <u>Citizens to Preserve Overton Park,</u> 401 U.S. at 412-13; <u>see</u> <u>also</u> AR 47056.

Furthermore, DOT has failed to comply with Section 4(f) at the critical stage of planning when feasible and prudent alternatives are still available. In <u>Corridor H Alternatives, Inc.</u>, 166 F.3d at 373, the D.C. Circuit noted that 23 C.F.R. § 771.135(o) permits a preliminary, first tier 4(f) determination in circumstances where the unavailability of critical information precludes the completion of the kind of evaluation section 4(f) requires, but that in such cases, an evaluation should be made on the potential impacts that a proposed action will have on section 4(f) land and whether those impacts could have a bearing on the decision to be made. DOT has not made preliminary 4(f) determinations. Any argument that 4(f) will be complied with at Tier 2 is disingenuous given the fact that DOT will be committed to construction of a new bridge over the river. AR 47277 (DEIS stating that Section 4(f) evaluation postponed to Tier 2).

The proposed bridge spanning the Little Miami National Wild and Scenic River is a constructive use of park space, despite DOT's claims to the contrary. A "constructive use" occurs when the project's "proximity impacts are so sever that the proposed activities, features, or attributes that qualify a resource for protection … are substantially impaired." 23 C.F.R. § 771.135(p)(2); <u>see also</u> AR 47048. As identified by the Department of Interior and the National Park Service, aesthetic and noise impacts associated with the proposed bridge will constructively use the Little Miami River.[12] <u>D.C. Federation of Civic Associations v. Volpe</u>, 459 F.2d 1231, 1239 (D.C. Cir. 1971) (harm to recreational use encompasses "noise, air pollution and general unsightliness" that might "dissipate its aesthetic value, crush its wildlife [or] defoliate its vegetation") <i>cert. denied</i>, 405 U.S. 1030 (1972). As discussed in detail above in Section I.B,

---

[12] "Section 4(f) … requires FHWA to cooperate and **consult** with the Department of Interior (DOI) on transportation projects affecting natural and cultural resources." <u>Merritt Parkway Conservancy v. Mineta</u>, 424 F. Supp. 2d 396, 410 (D. Conn. 2006) (<i>citing</i> 23 U.S.C. § 138). The NPS notified Defendants on several occasions of not being included in the process. <u>See</u> AR 47735 (NPS not notified of decisions made during the MIS planning phase in violation of transportation planning regulations outlined in 23 C.F.R. § 450.316(b)(5)); AR 8153-54; AR 42278-79 (NPS not a member of MIS process); AR 3444 (NPS, as an agency with jurisdictional responsibilities would have preferred to be involved in the analysis over Option 2); AR 2159 (NPS not formally notified of key decisions made during the MIS planning process).

Defendants' have improperly based their decision that there is not a constructive use[13] of the

Little Miami on a highly criticized and faulty ODOT noise study report.  AR  8149-63.

Furthermore, Defendants improperly classified the Little Miami as a Class B noise

receptor.  AR 42275-65, AR 8152.  Finally, Defendants have failed to adequately consider the

imposition a bridge would pose — where currently one does not exist — on the visual and

aesthetic impacts to the scenic and recreational attributes of the Little Miami National River.

Basing its ultimate decision on the lacking and unsupported noise analysis, Defendants

concluded that "the activities, features, and attributes that qualify the Little Miami River for

protection under Section 4(f) are not substantially impaired, [and] therefore, constructive use

does not exist."  AR 47717.

    A.    <u>The ODOT Noise Analysis Fails to Properly Account for Noise Impacts to the
Outstandingly Remarkable Values of the Little Miami River</u>.

As discussed in Section I.B, the ODOT analysis has several deficiencies, as identified by

the NPS.[14]  Those deficiencies resulted in a faulty analysis that does not adequately assess the

actual impact the bridge will have on the scenic and recreational attributes of the river.  In

response to concerns expressed over the noise analysis, FHWA provided NPS with additional

data and methodologies used to support its "no constructive use finding."  AR 8150.  After

---

[13] Courts have found that a significant rise in noise levels can constitute a "constructive use" of a 4(f) resource.  <u>See</u> <u>Citizens Against Burlington</u>, 938 F.2d at 202-03 (FAA acknowledged that the proposed expansion of an airport would constructively "use" the Springbrook campground since flights would subject the camp to nighttime noise of up to Ldn 75 decibels, a 10 to 15 decibel increase); <u>Coalition Against Raised Expressway, Inc. v. Dole</u>, 835 F.2d 803, 811-12 (11th Cir. 1988) (significant increase in noise would adversely affect 4(f) resources).

[14] The D.C. district court has noted that it is "only obligated to conduct a thorough critique of the Defendants' 4(f) review and guarantee that 'neither the methodology employed nor the conclusions reached were arbitrary and capricious.'" <u>Stewart Park and Reserve Coalition, Inc. (SPARC) v. Slater</u>, 358 F. Supp.2d 83, 102 (D.D.C. 2005) (<i>citation omitted</i>).  NPS noted that the ODOT study "does not meet the basic requirements for sound monitoring projects, including the protocols that have been recommended and agreed upon by the Federal Interagency Committee on Aircraft Noise … when evaluating noise impacts to natural areas. These deficiencies prevent the formulation of a scientifically defensible assessment of noise impacts to the Little Miami River."  AR 8156-57.  Because the methodology is arbitrary, Defendants should not be given any deference in their constructive use determination.

reviewing the acoustic data and analysis report submitted by FHWA to NPS, NPS found that it

"reveals serious deficiencies that invalidate the noise impact analysis conducted for the Eastern

Corridor project during the final EIS process."  AR 8151.

Dr. Fristrup found four principal errors that collectively resulted in a noise analysis that

cannot support FHWA's determination that there is no constructive use.  See infra Section I.B;

AR 8152, 8156-63.  Importantly, the NPS review found that a noise assessment that properly

accounted for ambient background noise would yield values 10dB or more below that reported

by ODOT.  AR 8156, 8161-62 (finding no scientific basis for ODOT's metric for representing

background noise).  Such a result would indicate that the bridge would pose an increase of

approximately 20 dB or a quadrupling of the noise volume.  See AR 47717 (background

estimated at 51-56dBA with estimated increase up to 62dBA).[15]  Dr. Fristrup stated that "there is

no scientific basis for using [the ODOT] metric for representing background sound levels,

because it is intrinsically biased towards the loudest measurements in the sample."  AR 8161.  As

a result, the level provided by ODOT does not represent the typical noise level experienced on

the river.

The NPS's review of the ODOT study found that "there would be a significant and

substantial noise impact to the recreational experience of river users (including opportunities for

solitude, wildlife viewing, and to experience a relatively undeveloped corridor)" and that "[t]he

impact is such that it would impair the [outstandingly remarkable] values, which support the

river's national designation…."  AR 8152; see also AR 42272-76.  NPS concluded that "at least

4 kilometers of river will suffer major acoustical impairment…."  AR 8156.  NPS also found that

---

[15] In Davis v. Mineta, the court described the project area as a  "serene island of quiet with an average noise level of 57 dBA." 302 F.3d at 1124.  Once the project is constructed noise levels were expected to jump to 65 dBA. Id. at 1124-25.  A ten decibel increase is equivalent to a doubling of the noise volume.  Id.  Furthermore, "[a] noise level of 65 dBA or above will 'significantly' disturb outdoor speech."  Id. at 1125 n.14 (citation omitted).  See also NPS comments noting 7-10 dBA increase is a doubling of loudness.  AR 42276.

"[c]onstant traffic noise from the bridge in [Horseshoe] Bend would make it difficult to continue

[recreational and educational] activities in a meaningful manner." AR 42276. Due to the

numerous faults with the ODOT noise analysis, Defendants' reliance on it is arbitrary.

      B.      <u>DOT Improperly Classified the Little Miami River as a Category B Receptor</u>.

Again, as discussed in Section I.B, the NPS has provided a significant and detailed

critique of the FHWA constructive use determination and has continuously faulted the

determination, in part, for its decision that the Little Miami River is a Category B receptor. AR

42275-76; AR 8152; AR 2169. "[P]arks and other open spaces where serenity and quiet are of

extraordinary significance, and where preservation of those qualities is essential if the area is to

continue to serve its intended purpose" are Class A receptors. 23 C.F.R. § 772 Table 1. "The

diversity and harmonic nature of the river setting is critical to the scenic quality of the [Little

Miami River]. Opportunities for solitude, serenity and quiet are also plentiful and in turn,

increase recreational opportunities for viewing birds and associated riparian wildlife." AR

42273; <u>see</u> <u>also</u> AR 2170 (NPS April DEIS comments noting that the Little Miami is recognized

for providing the kinds and types of activities that require special quantities (sic?) of serenity and

quiet).

DOT's noise analysis sets the Little Miami River as a Category B receptor. AR 47717.

The FEIS states that "FHWA noise abatement criterion for recreational activity (Category B) is

67 dBA."[16] AR 47717. Because 62 dBA was the highest noise reading under the ODOT study,

FHWA concluded that there was no constructive use. AR 47717. As explained in Section I.B.,

Defendants have improperly placed the Little Miami River into Class B, based upon an

---

[16] The FEIS states that the noise modeling provided readings for 44 receiver locations. As noted by the
NPS, there are serious questions concerning the location of these receivers and the ultimate impact the noise sitings
have on the study. <u>See</u> AR 47717; AR 8149-63.

unsupportable notion that because it is a "recreation area" it is a Class B receptor.  See *infra*

Section I.B.  Parks and open spaces that provide serenity and quiet provide a unique recreational

experience.  The type of recreation that takes place on the Little Miami River is the type that

seeks out this experience.  AR 42272-76.

Class B receptors include "active sports areas," "picnic areas," and "playgrounds"

amongst other uses.  None of these uses include the serenity or quiet offered on the Little Miami

River.  It is a far cry to compare canoeing, kayaking, and wildlife/bird viewing on the National

Wild and Scenic Little Miami River to playing soccer or baseball in a city park.  Given that the

river was included in the National Wild and Scenic Rivers System it has been acknowledges as a

place that affords one the opportunity to experience a moment of serenity and quiet.[17]  NPS

commented that "Category B implies that development is present .… The purpose of the river's

national designation is commensurate to the activity category defined for Category A."  AR

42275-76.  As NPS noted:

The opportunities for solitude and wildlife/bird viewing are specific, recreational

experiences afforded to canoeists, kayakers, and anglers that qualified the river for

designation….The lower LMR is an open space where sensitivity and quiet are of extraordinary

significance and where the preservation of these qualities are essential to preserve if the lower

LMR is to continue to serve its intended purpose.   AR 42276.[18]  Were the LMR assessed under

Category A, the projected noise levels would exceed that permitted under the noise abatement

---

[17] FHWA recognizes that Category A receptors include tracts of land where quiet serves an important public need, as dedicated or recognized by appropriate local officials.  AR 47342.

[18] NPS made similar statements in its  May 2004 NPS comments on the PDEIS, stating that "[q]uiet and opportunities for solitude and enjoyment of the natural features are important elements of the [Little Miami River] and are related to the values for whit the river was include in the national system .… [T]he [Little Miami River] is recognized for providing the kinds and types of activities that require special quantities (sic) of serenity and quiet…Given its proximity to the metropolitan community of Ohio, and its national significance, clearly the serenity and quiet offered by the [Little Miami River] serves an important public need."  AR 3452

criteria and Defendants would have been forced to admit that a constructive use exists.[19]  See 23

C.F.R. § 772, Table 1, and AR 47717.

      C.      The Proposed Bridge's Impacts on Visual and Scenic Resources and
              Recreational Opportunities is a Constructive Use of the Little Miami River.

      Placing a bridge over the quiet and relatively undisturbed Horseshoe Bend section of the

Little Miami River will have significant impacts on the visual and scenic benefits of the river in

addition to noise impacts, and, as a result substantially impair the use and enjoyment of the river.

See AR 47374 (Little Miami River, associated floodplain features and adjacent parkland and

cultural resources are "visually sensitive resources"); see also AR 47343 (visually sensitive

resources include those areas where high visual quality is important for recreational reasons).

"The diversity of recreational opportunities and scenic resources contributed to the river's

superlaive recreational values and, hence, the river's national designation."  AR 42272.

      The Little Miami Rivers ORVs to be preserved and enhanced include "natural and scenic

quality…."  AR 3453; AR 9888 and 1717 (ORVs include scenic (aesthetic), recreational, and

fish and wildlife).  This portion of the river provides a unique recreational opportunity for

canoeists, kayakers, hikers, and bird and wildlife viewers, given the close proximity to a major

metropolitan area.  AR 2166; AR 42273-75.  The visual and noise impacts from the bridge

crossing will significantly and substantially impair the scenic and recreational values of the Little

Miami River and constitutes a "constructive use."  See AR 2164, 2166-67; AR 42273-76.  Due

to the associated impacts and impairment of the ORVs for the river, NPS does not concur with

the DOT's 4(f) finding.  AR 2164; AR 42275; AR 8150.

      A constructive use occurs when recreational benefits are significantly impacted,

aesthetically or otherwise.  See Brooks v. Volpe, 460 F.2d 1193 (9th Cir. 1972) (encirclement of

---

[19] An email from ODOT to the consulting company that prepared the NEPA analysis, ODOT states that since
the LMR is a public park and a public open space, by its own definition, it is a Category B receptor. AR 2514. This is
an incorrect interpretation as the words "park" and open space" are also used in the definition of Category A receptors.
The email provides no discussion of why the River is a park in the context of Category B versus Category A.

the Denny Creek Campground by the challenged freeway was a "use" of that campground);
Coalition Against Raised Expressway, Inc. ("CARE") v. Dole, 835 F.2d 803, 811-12 (11th Cir.
1988) (constructive use where project would increase air pollution in nearby park); Conservation
Soc'y of S. Vt., Inc. v. Secretary of Transp., 362 F. Supp. 627, 639 (D. Vt. 1973), aff'd, 508 F.2d
927 (2nd Cir. 1974), vacated and remanded on other grounds, 423 U.S. 809 (1975) (constructive
use for a highway located adjacent to the Lye Brook Backwoods Area, a remote roadless area
within the Green Mountain National Forest).

As "a special area set aside for those seeking solitude" and "a place where one can get
away in a near natural forest environment to enjoy nature," the court found that regardless of
whether the western boundary of the remote area coincides with the easterly boundary of the
proposed highway project, FHWA must prepare a 4(f) determination.  Id. at 638-39 (citing
Brooks, 460 F.2d at 1194).  The Little Miami River is also a "special area set aside for those
seeking solitude" and "a place where one can get away … to enjoy nature."  Because the bridge
will significantly impact recreation and the ability to enjoy the river's natural attributes, it is a
"constructive use" and requires a 4(f) analysis.

In Sierra Club v. United States DOT, 664 F. Supp. 1324, 1331 (N.D. Cal 1987)[20] the
court found that the aesthetic impacts on park visitors of a bypass placed across a mountainside
was a constructive use.  The court noted that "[i]t begs credulity to suggest that a highway
running right through the middle of such a scenic park would not constitute a 'significant adverse
aesthetic impact.' There can be no doubt that the cuts and fills, as well as the highway itself,
'substantially impair the value of the site in terms of its prior significance and enjoyment.'"  Id.
(citing Adler v. Lewis, 675 F.2d 1085, 1092 (9th Cir. 1982)).  In this case, there can be little

---

[20] This case was reversed and remanded to the district court in Sierra Club v. DOT, 948 F.2d 568 (9th Cir.
1991) to determine whether the road and park were jointly planned.  Because the park and road were jointly planned,
FHWA did not need to comply with Section 4(f).  1994 U.S. Dist. Lexis 10121 (N.D. Cal. July 12, 1994) appeal
dismissed without opinion 1997 U.S. App. Lexis 2660 (9th Cir. Feb. 13, 1997).  While the case was ultimately
dismissed, the reasoning concerning what amounts to a 4(f) constructive use is instructive.

doubt that the placement of a multi-lane bridge spanning the river will "substantially impair the value of the site in terms of its prior significance and enjoyment."

However, in <u>Sierra Club v. DOT</u>, the Court did not limit its review to just the aesthetic impacts associate with the bypass.  The Court further found that the bypass would also have significant consequences upon the recreational opportunities within the surrounding area as well.  <u>Id</u>.  The Court found that the interruption of hiking trails by the freeway, and the visibility of the changed landscape would obviously affect the hikers' recreational experiences within the park.  <u>Id</u>.  Furthermore, the court noted that noise levels in portions of the park and at the site of the proposed Green Valley campsite would increase, although the parties greatly disputed the magnitude of the increase.  <u>Id</u>.  Considering all of these consequences together, the court found that "there can be no doubt that the highway bypass amounts to a 'constructive use' of McNee Ranch State Park."  <u>Id</u>.; <u>see</u> <u>also</u> <u>Id</u>. at 1331n.4 (recognizing the significance of numerous agencies commenting on the proposed bypass and reaching similar conclusions as the court regarding the applicability of § 4(f).

This case has similar impacts as those in <u>Sierra Club v. DOT</u> to recreational experiences available on the Little Miami River.  Kayakers and canoeists who enjoy the relatively undisturbed stretch of river so close to the city will lose the quiet and solitude that draws them to this stretch.  <u>See</u> AR 2166 ("Canoeists and hikers enjoy the natural quite (sic) and solitude offered in the project area, which increases opportunities for viewing of birds and other wildlife."); AR 42273 ("canoeists, kayakers, and other outdoor enthusiasts come to this segment to enjoy the natural river setting…..").

Furthermore, just as was the case in <u>Sierra Club v. DOT</u>, the NPS has reached similar conclusions concerning the impact of this bridge on recreational use and enjoyment of the Little Miami River.  On numerous occasions, NPS alerted Defendants to its contention that the bridge would adversely impact the recreation attributes of the river and that the bridge was a

"constructive use." AR 2166-67, 2171 (April 2005 comments on DEIS and requesting that the FEIS not be completed and released until a 4(f) consultation is completed); AR 42269-80 (comments on FEIS); AR 8149-55 (supplemental comments on FEIS). NPS disagreed with FHWA's assessment on the visual and scenic benefits, finding that "the proposed new bridge would degrade the recreational experience on the LMR by creating a major new visual intrusion on the natural scene and by generating noise, and that the severity and magnitude of the visual and recreational impacts are so great that they cannot be significantly mitigated." AR 47737; AR 3454-55. FHWA countered that due to the presence of transmission lines, riparian clearing, bank disturbances from a landfill and agricultural uses, and the presence of a combined sewer overflow, the stretch "does not exhibit pristine natural conditions." AR 47737.

FHWA's response indicates that it has not listened to comments, as well as NPS concerning the visual and aesthetic nature of this stretch, instead placing its own biased perspective over that of the users of the river. See, e.g., AR 42273-76; AR 3937-38; AR 471; AR 475; AR 10964; AR 491. Additionally, while disturbances from agricultural use may appear relevant to FHWA, the proper question to ask is whether the bridge will significantly impair the visual and aesthetic nature of the river.

In CARE, 835 F.2d at 812, the Court found that the introduction of concrete pillars would eliminate the view of the city, and along with the other impacts of the project, constituted a use under 4(f). In fact, in CARE, DOT presented a similar argument that the area was not visually pristine. While the Court acknowledged that downtown Mobile is not an "unsullied area," the Court still found that imposition of the pillars disturbed the view of downtown, and as such was a constructive use. Id.; see also Coalition for Responsible Regional Development v. Brinegar, 518 F.2d at 524 (while FHWA admitted that a "use" existed, the Court noted that the construction of a new bridge posed an "inescapable physical presence" to the historic district at issue).

Second, the presence of powerlines and other man-made features does not taint the natural setting provided by this stretch of the river nor the quiet and solitude experienced on the river. See AR 47282-83 (photos of stretches of LMR at Horseshoe Bend, showing scenic and natural wooded corridor); AR 2166; AR 42273-76. As NPS noted, "[t]he large mass of the proposed bridge … in combination with its location in an unobstructed corridor with relatively few man-made intrusions would make it the most visibly dominate feature in this segment of the river. Placing a massive bridge where there previously was not one results in a fundamental change in the scenic qualities in this portion of the [Little Miami River] at the time of designation." AR 2166.

Third, FHWA poses the wrong threshold for whether the bridge will impact recreators in a way that would amount to a constructive use. The question is not whether the area is pristine—in fact the section is not designated as wild under the Wild and Scenic Rivers Act, so expectations of a pristine nature is little more than a straw man argument created by FHWA to support its position on the lack of visual and aesthetic impacts. Rather, the question is what attributes does this 4(f) resource offer and are those attributes substantially impaired. Druid Hills Civic Ass'n, Inc. v. Federal Highway Admin., 772 F.2d 700, 716 (11th Cir. 1985); see also City of S. Pasadena v. Slater, 56 F. Supp. 2d 1106, 1125 (C.D. Cal. 1999) (plaintiffs raised serious questions as to whether a constructive use exists where freeway would substantially impair aesthetic features or attributes of historic 4(f) resources).

Furthermore, NPS has greater expertise to determine whether the Little Miami River offers an aesthetic natural environment and whether such attributes will be adversely affected by the project. AR 42278. "[A] reviewing court 'may properly be skeptical as to whether an EIS's conclusions have a substantial basis in fact if the responsible agency has apparently ignored the conflicting views of other agencies having pertinent expertise.'" Davis v. Mineta, 302 F.3d at 1123 (citing Sierra Club v. United States Army Corps of Eng'rs, 701 F.2d 1011, 1030 (2nd Cir.

1983).  To that extent, NPS has continuously disagreed with DOT's conclusions that the bridge will not significantly impair the visual, scenic and aesthetic values of the river, and therefore will constructively use the Little Miami River.  See e.g., AR 42274; AR 42279; AR 8150.

NPS concluded that the noise and visual intrusions of the project will substantially impair the scenic and recreational outstandingly remarkable values and, as a result, the project constitutes a constructive use of these values.  AR 8154; AR 42273-76.  NPS further noted "these proximity impacts, despite the proposed mitigation, are severe enough to substantially diminish (impair) the activities, features, and attributes that qualified the LMR for inclusion in the System. A section 4(f) statement and supplemental EIS is necessary before proceeding with project planning (Tier 2) efforts."  AR 8154.

These impacts are real.  Defendants have avoided any meaningful assessment of these impacts by deflecting these concerns with the unsupported belief that this stretch of the river is already spoiled.  AR 47420.  However, Defendants, throughout the planning process have refused to acknowledge that this stretch of the Little Miami River was included in the National Wild and Scenic Rivers system because it had these scenic and recreational attributes.  These attributes existed when the river was included in the system and remain today.  However, this bridge will forever substantially impair these attributes and diminish the experience the river offers to those that visit.

## CONCLUSION

For all the foregoing reasons Plaintiffs respectfully requests that the Court grant its Motion for Summary Judgment.  Specifically, Plaintiffs requests that the Court declare the Defendants to be in violation of NEPA and Section 4(f) of the Transportation Act, vacate the Record of Decision, and order the agency to promptly comply with its mandatory obligations under NEPA and Section 4(f).  Plaintiffs request that Defendants and Defendant-Intervenors be enjoined from proceeding with any measures or actions taken pursuant to Tier 2 of this project

until they have fully complied with NEPA and the Transportation Act.


DATED: June 25, 2007


Respectfully submitted,

 /s/
Brian A. Litmans (AK 0111068)
*Appearing Pro Hac Vice*
Public Interest Environmental
Attorney at Law
6251 West Tree Dr.
Anchorage, AK 99507
Telephone: 503-927-5288
Facsimile: 907-276-7110
blitmans@gmail.com

Robert Ukeiley (MD14062)
Law Office of Robert Ukeiley
435R Chestnut Street, Ste. 1
Berea, KY 40403
Telephone: 859-986-5402
Facsimile: 866-618-1017
rukeiley@igc.org

Counsel for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

| | |
|---|---|
| RIVERS UNLIMITED, LITTLE MIAMI, INC., SIERRA CLUB, and MARILYN WALL<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION, MARIA CINO, FEDERAL HIGHWAY ADMINISTRATION, and J. RICHARD CAPKA<br><br>Defendants. | **Case No.:** 1:06-CV-01775 (JR) |

---

### AFFIDAVIT OF STEPHANIE D. ROSS

---

1.      My name is Stephanie Ross.

2.      I live at 6922 Gaynor Road, Goshen, Ohio.

3.      I am a dues paying member of Rivers Unlimited.  I also voluntarily serve on the organization's Board of Directors.

4.      I am 36 years old.

5.      I am an avid paddler, mountain biker, trail runner, and environmentalist.

6.      I was born and raised in Lexington, Kentucky.  I moved to the Cincinnati area in July of 2005 because of the excellent opportunities for outdoor recreation around southwest Ohio.  With a lifetime of friends and family in Lexington, it was a difficult decision to leave there.  However, Lexington is a landlocked city with no trails to speak of and little in the way of natural areas preserved for recreation.  It simply does not offer the sort of environment in which I

could pursue the outdoor lifestyle I have come to embrace. Lexington does not have the Little Miami River.

7.      I enjoy paddling various stretches of the lower Little Miami River, including the stretch over which DOT and FHWA now propose to build a bridge four to five times per month during the warm months of the year and two to three times per month during the winter. I fully intend to continue to paddle the Little Miami River on a consistent basis throughout the summer and winter in the future.

8.      The stretches of the Little Miami River that run through substantial riparian corridor are the ones that reflect the "Wild and Scenic" status bestowed upon the Little Miami River. Buffered from the noise of traffic and the visual clutter of industrial and other human activity, paddling these stretches of the Little Miami River is a pleasure and a major reason for why I paddle the river. The quiet and natural environment of the riparian corridor provide me with the opportunity to reconnect with nature and a principal reason for my move to this area. The great blue herons; the rows of ducklings in the spring; the massive, mottled trunks of the sycamores; the turtles sunning on logs; the kingfishers swooping down; the fish darting beneath my boat – all of these sights and sounds are what draw me to the Little Miami river.

9.      Of course, these peaceful and pristine stretches of the river are broken up by various intrusions, the most dramatic of which is the I-275 bridge that spans the river just downstream of Loveland. This and other bridges escort loud vehicles overhead, serve as a billboard for offensive graffiti, collect logs and other debris, interfere with the flow of the river, and strip the banks of the trees, shrubs and other greenery that are not only more aesthetically-pleasing than a concrete form, but also serve as habitat for the wildlife I appreciate on the river.

And that's only after construction.  No living organism, human or otherwise, wants to be in the vicinity of a bridge or bridge construction project.

10.    If DOT and FHWA are allowed to proceed with their plan to construct another bridge over the river, it will effectively shut down the 8.1-mile stretch of the river from the Bass Island Access to the mouth of the Little Miami at the Ohio River to recreational use throughout the duration of the project, since the next access point below Horseshoe Bend is at the Beechmont Avenue bridge, which is only two miles upstream from the Magrish Recreation Center Access, the last public take-out before the Little Miami reaches the Ohio River.  In other words, to avoid paddling through the bridge construction site (which I assume would be off-limits entirely for some period of time, due to safety concerns), I would have to put in on the water at the Beechmont Avenue bridge and then take off the water at Magrish Recreation Center Access, which would be just a two mile paddle.

11.    More importantly, the construction of another bridge over the Little Miami River would negatively impact the river forever after.  The bridge itself would be a visual blight on the scenery.  The vehicles it transports across the river would be a nuisance due to both the noise and air pollution they generate.  The loss of wildlife due to habitat destruction would be a shame to me.

12.    Summarily, the bridge proposed by DOT and FHWA would degrade the recreational and scenic characteristics for which the Little Miami River was included in the Wild and Scenic Rivers system and would reduce my enjoyment thereof.

13.    I intend to continue paddling the Little Miami River several times per year for many years to come, unless that stretch of river is effectively shut down during the proposed bridge construction project and its aesthetic quality permanently degraded thereafter.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct and was executed this 21st day of May, 2007, at Goshen, Ohio.

5/21/07_____                                    Stephanie D. Ross

Date                                             Stephanie D. Ross

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

| | |
|---|---|
| RIVERS UNLIMITED, LITTLE MIAMI, INC., SIERRA CLUB, and MARILYN WALL<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION, MARIA CINO, FEDERAL HIGHWAY ADMINISTRATION, and J. RICHARD CAPKA<br><br>Defendants. | Case No.: 1:06-CV-01775 (JR) |

---

## AFFIDAVIT OF CHRISTINE P. CURRAN

---

1.      My name is Christine Perdan Curran.

2.      I live at 1063 Bruce Avenue, Cincinnati, Ohio.

3.      I am a resident of Anderson Township, and I have lived there since 1985.

4.      I am the mother of three daughters who were raised in the township, and we all currently live within the Little Miami watershed.

5.      I have a master's of biological sciences from the University of Cincinnati, and I have been a faculty member (adjunct and visiting) in biology since 1992.

6.      I am currently a doctoral student in the University of Cincinnati's Department of Environmental Health.

7.    I am a member of the National Association of Science Writers and have worked as both a print and broadcast journalist. I have written for both the general public and educational market.

8.    I am a member of the Sierra Club and currently chair the Wild & Scenic Subcommittee of the Miami Group's Conservation Committee.

9.    I am avid hiker and enjoy canoeing as well.

10.    I am concerned that the proposed Eastern Corridor highway project with its planned bridge over the Little Miami River at Horseshoe Bend will greatly detract from its status as a national and state scenic river. In addition, I believe that the highway project will negatively impact myself as well as others who rely on the river for recreation.

11.    I frequently hike the trails along the Little Miami River and in the Little Miami River watershed and intend to continue to do so. My oldest daughter and I regularly walk our dogs on old trails that lead to the river's edge in the stretch below Milford. We enjoy detouring from the paved Little Miami trail, because those stretches of the river are quieter, farther removed from traffic, and offer more frequent opportunities to view the wildlife that call the Little Miami River home. I believe the proposed highway project will disturb the birds and animals using the river and make it much less likely that we will be able to enjoy such wildlife viewing. It is quite common to see herons, see beavers and other wildlife in this stretch of the river. These sights and sounds are less common in more heavily used areas of the river (e.g. north of Loveland), which is one reason I prefer to spend my time along the stretches of the Little Miami south of Milford to the Ohio River.

12.    Having raised three children in the area within the Little Miami watershed in the stretch that would be affected by the Eastern Corridor highway project, I appreciate the river's

contribution to the high quality of life in the area. It provides inexpensive recreation opportunities from fishing to boating and hiking. The fact that all of my adult children have chosen to remain residents of the area is evidence of their appreciation for the natural beauty of the area. I believe the proposed bridge and highway will greatly diminish the benefit of this natural resource for myself, as well as my children, and for residents in the area where we live.

13.     As a biology faculty member, my courses include sections on ecology and invasive species such as garlic mustard and the Amur honeysuckle. These species are a great threat to the native wildflowers in the Little Miami River watershed. On my hikes, it is clear that areas which are disturbed by construction are at highest risk of being overgrown by these invasive species. I have volunteered considerable time removing invasive species from the Little Miami River watershed. I believe the Eastern Corridor highway project would reduce the number of native wildflower species, including Ohio's state wildflower *Trillium*.

14.     As a science writer at the University of Cincinnati, I have written numerous articles concerning water quality, the impact of highway runoff on local waterways and specific threats to the Little Miami River such as atrazine and other non-point pollution sources. This work included reading the peer-reviewed scientific literature and reporting the results of various studies on the topics listed here. The proposed Eastern Corridor highway would bring tens of thousands of vehicles across the Little Miami River at Horseshoe Bend each day. The runoff would include toxic heavy metals and road salt during winter months. This increased pollution load would seriously impact the water quality, the value of the river to recreational enthusiasts, and the wildlife that live in and along its banks.

15.     As a doctoral student in Environmental Health, an asthmatic and the mother of three asthmatic children, I have a deep personal knowledge of the impact of air pollution on

human health. Vehicle exhaust exacerbates asthma, and infants exposed to diesel exhaust during the first year of life are at greater risk of respiratory problems later in life. The additional traffic that would be generated by the Eastern Corridor highway project and the proposed bridge at Horseshoe bend would represent an unacceptable health threat to those using the river for recreation and those living in the area. It would personally affect my enjoyment of the river, because I would need to avoid this area in the future, especially during the summer months when smog alerts are common.

16.     As a member of the Wild & Scenic subcommittee of the Miami Group's conservation committee, I have worked to help protect the Little Miami River's Wild & Scenic status. I have participated in cleanup efforts (formal and informal) along the Little Miami River, and I was the executive producer of a video documenting the Little Miami River's unique status as an urban wild & scenic river. I videotaped the river at several times during the year from Milford to the Magrish Nature Preserve where the river empties into the Ohio. It was extremely obvious during these trips that the most beautiful portions of the river are those unaffected by vehicular traffic. It was impossible to use video shot at the Beechmont Avenue river crossing. The noise and vibrations were simply too extreme. It was also obvious that bridges become magnets for litter and debris. During a recent cleanup (June 9, 2007), my youngest daughter and I could have filled our canoe with the trash we found at a single bridge. I believe a new bridge at Horseshoe Bend would suffer a similar fate, leading to further degradation of water quality and recreational opportunities along the Little Miami River.

17.     My family enjoys canoeing as a recreational activity, and my siblings and I plan a yearly 3-day canoe float down the Clarion River in Western Pennsylvania. These excursions have helped me learn how to navigate through minor rapids, even when weighed down with

camping gear and supplies. The stretch of the Little Miami River between Loveland and the Ohio River includes some of the most interesting riffles and rapids I have experienced while canoeing here in Ohio. It is a beautiful and challenging stretch of river, and I am considering purchasing my own canoe so that I can enjoy it more frequently. It is also the most accessible stretch of river for me, which makes the investment all the more worthwhile. Construction of a new bridge at Horseshoe Bend would not only degrade the river and its recreational value, but it would directly affect my recreational opportunities and my ability to engage in activities that are beneficial to my heart, lungs and general good health.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct and was executed this  25th  day of June, 2007.

_____
/s/
Christine P. Curran[1]

---

[1] Ms. Curran is currently traveling and was unable to provide a signed affidavit. Ms. Curran has prepared this statement and reviewed it and has verbally communicated that the foregoing is true and correct and has authorized that it be submitted on her behalf. A signed affidavit will be submitted to the Court upon Ms. Curran's return to Ohio.

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

| | |
|---|---|
| RIVERS UNLIMITED, LITTLE MIAMI, INC., SIERRA CLUB, and MARILYN WALL<br><br>          Plaintiffs,<br><br>        v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION, MARIA CINO, FEDERAL HIGHWAY ADMINISTRATION, and J. RICHARD CAPKA<br><br>          Defendants. | **Case No.:** 1:06-CV-01775 (JR) |

---

**AFFIDAVIT OF DONOVAN K. HOPKINS**

---

1.      My name is Donovan K. Hopkins

2.      I live at 3754 Pocahontas Ave., Mariemont, Ohio

3.      I am a dues paying member of Little Miami, Inc. I also voluntarily serve on the organization's Board of Directors.

4.      I am 79 years old.

5.      I am an avid birder, hiker, nature student and environmentalist.

6.      I was born and raised in Cincinnati, Ohio, and except for the years spent in the U.S. Army and colleges, I have lived and voted in Hamilton County, Ohio.  I have been an active resident of Mariemont for 44 years.

7.      My family and I have enjoyed the Little Miami River Corridor which was used as an outdoor classroom for my children and their friends.  My father, his friends and I fished,

hunted and camped in the Little Miami Valley for many years. I intend to continue to fish on the Little Miami River.

8.     My family and I, along with many friends, have enjoyed paddling various stretches of the Little Miami River, but primarily the stretch from Milford to the Ohio River.  A bridge and the multi-lane highway it would carry across the Lower Little Miami will greatly degrade this section of the valley and have a deleterious effect on the habitat that is just suitable for the fish, fowl, mammals and other critters which thrive there.

9.     This stretch of the Little Miami and it its riverfront forest habitat is vital to the wild, natural, quiet and scenic attributes of this nationally-recognized treasure. Preserving this beautiful river corridor from the numerous negative impacts of urban development and protecting and restoring the natural splendor is important to me and others.  I deriver great enjoyment from recreating on the Little Miami river.

10.     I have observed and enjoyed watching the 255 bird species which live and migrate through the Little Miami Valley.  My enjoyment of the Little Miami is an important part of my life and a major reason that I enjoy living here and I intend to continue to bird watch along the Little Miami river.

11.     The proposed new bridge crossing over the Little Miami in the Eastern Corridor would have a significant, permanent and serious negative impact on the Little Miami environment and upon the many values which led to its inclusion in the National Wild and Scenic River System.  Visual, noise, air pollution and other impacts from this proposed project are very detrimental to the quiet natural beauty of this natural resource. I enjoy the quiet natural beauty the Little Miami river offers.

12.     I oppose the new bridge crossing proposed in the Eastern Corridor because it will significantly impact my enjoyment of this place as well as have a significant impact to the natural environment and for others who also enjoy the quiet, natural and aesthetic attributes of the river and this portion of the river.

Pursuant to 28 U.S.C 1746, I declare under penalty of perjury that the foregoing is true and correct and was executed this 25th day of June, 2007 at Mariemont, Ohio.

Donovan K. Hopkins

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

RIVERS UNLIMITED, LITTLE MIAMI, INC.,
SIERRA CLUB, and MARILYN WALL

          Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, MARIA CINO, FEDERAL
HIGHWAY ADMINISTRATION, and J.
RICHARD CAPKA

          Defendants.

**Case No.:** 1:06-CV-01775 (JR)

---

### AFFIDAVIT OF MARILYN WALL

---

1.      My name is Marilyn Wall.

2.      I live at 816 Van Nes Drive, Cincinnati, Ohio.

3.      I am a life member of Sierra Club.  I also volunteer locally and am an elected member of the national organization's Board of Directors.

4.      I am 54 years old.

5.      I am an avid canoeist and flat-water canoe racer, hiker, photographer and environmentalist.

6.      I have lived in the Cincinnati area since 1967.  Prior to that I lived 40 miles east of Cincinnati near the east fork of the Little Miami River.  One reason I live here is because of the opportunities for outdoor recreation in the region. The Little Miami River, as a National Wild and Scenic River provides high quality recreation, quiet enjoyment, wildlife, a place to paddle

both recreationally and for the necessary experience paddling on a wild river, needed for competitive canoe racing.

7.    I have paddled almost every section of the Little Miami River, including the stretch over which DOT and FHWA now propose to build a bridge and highway. I have frequently paddled the lower stretch and also photographed it and conducted water quality testing. I have initiated and led canoe trips for others who are pleased to find such beauty and peaceful quiet so close to the city.  I fully intend to continue to paddle the Little Miami River as it is the key river locally to maintain river experience for canoe racing and at the same time provides unique, quiet enjoyment.

8.    Whenever I paddle the river I also see how important it is to people who fish the river, sit on its banks enjoying the riparian corridor shade, who bike along it for exercise and camaraderie.   Numerous others paddle the river seeking serenity and peace. Spring wildflowers, dogwoods, redbuds and autumn colors and winter snows are additional reasons I seek out the Little Miami. The National Wild and Scenic status is part of the allure that brings people to the river.  Even thru the urbanized area, the sound of traffic disappears and one truly enters 'another world'.  The Little Miami helps reduce stress and provides fitness opportunities needed by many Americans. I enjoy seeing how popular the river is with families who canoe and bike. Two my siblings and their families are visiting this region from California this summer and one of the highlights of their trip in the past is canoeing on the Little Miami and they plan to do so again this year.

9.    I have also paddled where rivers have not had the care and affection that this river has from those who seek to protect it and who love it.  Paddling Mill Creek, I encounter numbers sewer discharges, the stench of air pollution, road noise so loud you cannot hear people right

next to you, high levels of water pollution such that little lives except pollution tolerant species. If the Little Miami is not protected, it will become another Mill Creek. Millions of dollars and volunteer hours have gone into protecting the Little Miami River and destroying it piece by piece cannot be allowed. I have seen how wildlife are driven out by noise and our nation's heritage of biodiversity is greatly lessened by noise, toxics and other pollution.

10. During construction, the DOT and FHWA will effectively stop all access and enjoyment of the river in that stretch. However the river will be permanently adversely impacted by the bridge due to the air and water pollution, including noise and visual, as well as alternation to the riparian buffer. It will permanently degrade the very reasons the river was selected to be part of the National Wild and Scenic River System. Such designation is supposed to help protect and enhance our nation's natural heritage. The river, is in effect, a park. Putting a highway through it will ruin it for my and the public's enjoyment.

11. As an environmentalist, I have worked for years to protect the river and seek environmentally sound transportation alternatives. Air pollution and exhaust gas from the highway cause excess death and morbidity which adversely affect my community. The corridor study's failure to consider alternatives that would not "require" a highway, such as rail on an existing route (Wasson Paxton) which coupled with part of the I-71 light rail proposal would serve more population and business and draw more riders than this supposed multimodal bridge and this also adversely affects my community.

12. I intend to continue paddling the Little Miami River numerous times per year and the construction of this highway bridge will adversely affect my use of the river.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct and was executed this ___ day of June, 2007, at Cincinnati, Ohio.

_____

Marilyn Wall

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

RIVERS UNLIMITED, LITTLE MIAMI, INC.,
SIERRA CLUB, and MARILYN WALL

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, MARIA CINO, FEDERAL
HIGHWAY ADMINISTRATION, and J.
RICHARD CAPKA

Defendants.

**Case No.:** 1:06-CV-01775 (JR)

**[proposed] ORDER**

Before the Court is Plaintiffs' Motion for Summary Judgment ("Motion").  The Motion
has been fully briefed.  The Court finds and concludes that Defendants, United States
Department of Transportation, Maria Cino, Federal Highway Administration, and J. Richard
Capka (collectively "Defendants") have violated the National Environmental Policy Act
("NEPA"), 42 U.S.C. § 4332(C) and the Department of Transportation Act ("Transportation
Act"), 49 U.S.C § 303 in connection with the proposed construction of a new bridge across the
Little Miami National Wild and Scenic River.  The Eastern Corridor Project ("Eastern Corridor"
or "Project"), of which the proposed bridge is a part, is a highway construction project located in
the Cincinnati metropolitan area.

The Project includes the construction of a new, large, elevated, multi-lane bridge over a
scenic, natural and relatively undisturbed and undeveloped portion of the National Wild and
Scenic Little Miami River.  The stretch of the Little Miami River within the Eastern Corridor
was included into the National Wild and Scenic River System in 1980 because of its scenic,
aesthetic, and recreational qualities.  AR 47275.  The proposed bridge will impact the scenic,

aesthetic, peaceful and recreational attributes associated with the river, which was the very cause for the Little Miami River's inclusion in the National Wild and Scenic Rivers System. While other reasonable alternatives exist that would meet the Project's purpose and needs of improving traffic for Cincinnati commuters, the Defendants have refused to give such alternatives fair and adequate consideration. The Beechmont Alignment, or Option 2, which was considered by Defendant-Intervenors prior to the NEPA EIS analysis is found to serve the transportation purpose and needs of the Eastern Corridor and was supported by the United States Environmental Protection Agency and the Department of the Interior National Park Service as an alternative that should be included in the Tier 1 EIS.

Therefore it is hereby ORDERED, ADJUDGED AND DECREED that Plaintiffs' Motion for Summary Judgment be GRANTED and judgment is hereby entered in favor of Plaintiffs. The Court finds and declares that Defendants' Eastern Corridor Project and the corresponding Tier 1 Final Environmental Impact Statement ("FEIS") violates NEPA because Defendants have: (1) failed to consider all reasonable alternatives in the Tier 1 analysis; (2) failed to consider significant new information; (3) failed to base its FEIS analysis on current data. The Court vacates the June 6, 2006 Record of Decision approving the FEIS. The court further finds and declares that Defendants have also violated the Transportation Act by not finding a constructive use of the Little Miami River. The Court orders the Defendants to comply with the law forthwith by preparing an alternatives analysis that considers a reasonable range of alternatives including the Beechmont Alignment. The Court further orders Defendants to supplement the analysis by discussing and assessing the significant new information presented by the National Park Service. The Court also orders Defendants to include in its supplemental analysis a discussion of the costs and benefits based on the most up-to-date information, including the most up-to-date gasoline prices. The Court finds a constructive use does exist and orders Defendants to prepare a Section 4(f) statement. The Court enjoins Defendants and Defendant-Intervenors from Defendants from

proceeding with site preparation, construction, the issuance of revenue bonds, right-of-way

acquisitions or any other irrevocable actions related to the building of the proposed bridge across

the Little Miami National Wild and Scenic River until the violations of NEPA and Section 4(f)

of the Transportation Act have been corrected.  The Court will retain jurisdiction over this matter

until such time as Defendants have fully complied with the Court's order.  The Court awards

Plaintiffs their costs of litigation, including reasonable attorney fees.


DATED: _____    _____

JAMES ROBERTSON
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

RIVERS UNLIMITED, *et al.*,

               Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

               Defendants,

     and

OHIO DEPARTMENT OF TRANSPORTATION

               Defendant-Intervenor.

**Case No.:** 1:06-CV-01775-JR

# PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed.R.Civ.P. 56 and LR 7.1(h), Plaintiffs Rivers Unlimited, Little Miami, Inc., the Sierra Club, and Marilyn Wall respectfully submit this Statement of Material Facts as to which there is no genuine issue in support of Plaintiffs' Motion for Summary Judgment.

<u>The Little Miami National Wild And Scenic River.</u>

1.      The Little Miami River was designated as a National Wild & Scenic River under the Wild & Scenic Rivers Act ("WSRA") over a quarter century ago.  AR 187-88, 9886.

2.      The Little Miami was designated as a State Scenic river in 1969 for the entire stretch of the river.  AR 9942.  In January of 1980, the lower 28 miles of the Little Miami River,

from Foster to the Ohio River (which includes the project area), were designated a Recreational component of the National Wild and Scenic Rivers System.  AR 112-113.  The Little Miami was specifically recognized for its recreational and scenic "outstandingly remarkable values."  AR 9888.  At the time of its designation it was recognized for its contribution of "vital open space for the use and enjoyment of present and future generations in an increasingly urbanized area."  AR 8150, 42273.  The management directions for the lower portion designated in 1980 adopted the original study plan findings for the Little Miami River (conducted in the early 1970s).  AR 9886.  The management direction for all designated sections is the same.  AR 9886.

3.      Significant efforts were made by Little Miami, Inc. to rehabilitate the lower portion of the river so that it could be included in the National system.  AR 9887, 9921-23.

4.      When evaluating the State's petition for inclusion, the Secretary of the Department of Interior stated: "Considering the close proximity of the river to the large urban metropolis of Cincinnati, it is indeed one of our Nation's most valuable recreation resources."  AR 9926.  Because of this natural setting, despite the surrounding urban environment, the lower Little Miami River's designation was hailed as a vitally important step toward protecting the area from incompatible or unplanned development.  AR 42274.

5.      The Little Miami National Wild and Scenic River is a rare river amongst those designated under the Wild and Scenic Rivers Act in that it is only one of two Wild and Scenic Rivers that flows through a major metropolitan area.  AR 10968.

6.      Principle activities on the this segment of the Little Miami National Wild and Scenic River include canoeing, kayaking, fishing, bird/wildlife viewing, hiking, and biking.  AR 42273.  Approximately 86 miles of the Little Miami River are canoeable, including the reach

PLAINTIFFS' STATEMENT OF
MATERIAL FACTS  - 2 -

within the Eastern Corridor study area.  AR 47276. The river is canoeable within the detailed study area boundaries.  Id.  There is a public access point two miles upstream from the anticipated crossing and four miles downstream.  Id.  This leaves a six-mile section that is regarded for its recreational opportunities, as well as its scenic, natural quiet setting.  AR 42273.

7.      Canoeists, kayakers, hikers and outdoor enthusiasts, including Plaintiffs and their members, come to this segment to enjoy the natural river setting with its scenic wooded banks, high bluffs, broad river floodplain, sandy beaches, islands, meandering channel, wildlife, fish, solitude, peace, serenity and quiet.  AR 42273-74; see Declarations of Marilyn Wall, Christine P. Curran, Donvan K. Hopkins and Stephanie D. Ross.  The diversity and harmonic nature of the river setting is critical to the scenic quality of the Little Miami National Wild and Scenic River. Opportunities for solitude, serenity and quiet available in this segment also provide for increased opportunities for birding and viewing of associated riparian wildlife.  AR 42273.  Wildlife viewing in this segment continues to be of considerable value.  Id.  The Horseshoe Bend has an exceptionally high diversity of birds and other wildlife.  Id.  It is one of the few spots in Ohio that supports a breeding population of the prothonotary warbler, and perhaps, the hooded merganser.  Id.  Great blue herons, wood ducks and cormorants feed in this segment, as do multiple other ducks, birds and mammal species.  Id.  Of special interest to river users is the presence of beavers.  Id.  The Horseshoe Bend, including its upstream/downstream and floodplain environs is likely one of the best regional locations to view birds, mammals and other wildlife within the greater Cincinnati area.  Id.

8.      Opportunities for a range of recreational activites exist along the Little Miami River and include canoeing and kayaking, fishing, bird watching, hiking and walking.  AR 47717.  In the proposed bridge location, the primary activity is canoeing and kayaking.  Id.

9.      The Little Miami State Scenic River Management Plan states that "[p]rotection of natural, scenic and environmental values of the Little Miami Scenic River should be the major consideration in reviewing and approving or disapproving projects which may have an adverse effect upon the River."  AR 2939.

10.     The Little Miami River is also designated by Ohio Environmental Protection Agency as Exceptional Warmwater Habitat ("EWH").  AR 47278.  EWH designation is typically assigned due to the occurrence of unusual or exceptional assemblages of aquatic organisms characterized by a high species diversity, particularly those which are highly intolerant and/or rare, threatened, endangered or have special status.  Id.

### The Eastern Corridor Multi-Modal Project

11.     The Eastern Corridor study area covers approximately 14 square miles and extends from the Cincinnati Central Business District and Riverfront redevelopment area in Hamilton County, east to the I-275 outerbelt corridor in Clermont County.  AR 47130.

12.     The Project is being conducted to identify workable strategies for improving long-term travel mobility between the City of Cincinnati and its eastern suburbs.  Id.

A.      The Major Investment Study.

13.      An Eastern Corridor Major Investment Study ("MIS") was first completed in April 2000.  AR 47131.  The MIS is a separate analysis formerly required by the National Federal Aid Highway Act, 23 U.S.C. 101 *et seq.*  The MIS Recommended Plan (Option 1)

PLAINTIFFS' STATEMENT OF
MATERIAL FACTS  - 4 -

established the framework for the Tier 1 and Tier 2 NEPA analysis of the Eastern Corridor by

identifying the Option 1 Corridor as the sole Corridor to be reviewed in the NEPA process.  AR

47197.  Option 1 included a new bridge over the LMR in a new transit corridor.  AR 47202.

14.     Option 2 would have crossed the LMR on a widened existing crossing, rather than

creating a new corridor crossing.  AR 47202.  Performance results indicated that both options

provided travel benefits.  Id.  The main objective of Tier 1 was to identify a set of feasible multi-

modal alternatives for further evaluation.  AR 47118-19.

15.      The MIS process, which removed Option 2, was conducted without the

participation of the National Park Service ("NPS"), a critical stakeholder and cooperating

agency.  AR 8153-54; AR 42278-79; AR 3444; AR 2159.

B.      The Preliminary Draft EIS

16.      EPA commented on the PDEIS in a May 6, 2004 letter and alerted the Ohio

Department of Transportation that the DEIS should retain feasible options, that the PDEIS does

not demonstrate that Option 2 is not feasible, and that without a full discussion of both Options,

EPA remains unable to determine how the Options compare or why Option 2 is eliminated from

review prior to preparation and issuance of the DEIS.  AR 10604-06.  NPS also submitted

comments on the PDEIS in a letter dated May 27, 2004 and expressed similar concerns to those

presented by the EPA.  AR 3443-60.  The U.S. Fish and Wildlife Service submitted comments

on the PDEIS in a letter dated June 18, 2004 highlighting that the Little Miami River and its

riparian corridor provide habitats for a diverse fauna, including many species of bird, mammals,

reptiles, and amphibians and has a high-quality, diverse, warm-water fishery resource.  AR 8366.

PLAINTIFFS' STATEMENT OF
MATERIAL FACTS  - 5 -

C.    <u>The NEPA Analysis – A Two Tiered EIS Analysis.</u>

17.    The Eastern Corridor Multi-Modal Project has been subdivided into a two-tier

NEPA process.  AR 47686.  The Tier 1 process was completed with the completion of the FEIS

in September of 2005 (AR 47681) and the Record of Decision in June of 2006.  AR 47099.

18.    Tier 1 was intended to present information on: (1) transportation needs; (2) key

environmental resources; (3) the development and evaluation of feasible alternatives; (4) a

preliminary assessment of expected impacts; and (5) the identification of a recommended

transportation plan (set of feasible alternatives) to be carried through into more detailed study

during Tier 2.  AR 47118-19.  Feasible alternatives in Tier 1 are not specific alignment locations,

but rather alternative corridors that will be further developed during Tier 2.  AR 47119.

19.    Tier 2, to be conducted after the completion of the Tier 1 EIS and ROD, will

involve more detailed engineering and environmental analyses and a selection of a preferred

alternative from the "feasible alternatives" identified in Tier 1.  AR 47119.  The Tier 1 process

was broken down into modes (e.g. bus, rail, highway, bikeway).  <u>Id</u>.  The highway mode is the

focus of this complaint.  Tier 1 broke "New Highway capacity" into four distinct segments.  AR

47121-22.  Segment II concerns the construction of a new bridge across the Little Miami

National Wild and Scenic River.  AR 47122.  The alternatives recommended for further

evaluation in Tier 2 include: (1) 4 basic multi-lane mainline location alternatives for approaches

to and crossing of the Little Miami National Wild and Scenic River; and (2) six basic multi-lane

mainline alternatives for traversing the Little Miami National Wild and Scenic River floodplain

east of the River main channel and Clear Creek.  AR 47227-28.  Basically, the alternatives for

review include construction of either a 4-lane or six-lane bridge across the Little Miami National

PLAINTIFFS' STATEMENT OF
MATERIAL FACTS  - 6 -

Wild and Scenic River.  AR 47228.  The Tier 1 DEIS was issued on November 8, 2004.  AR 47101.

20.     The EPA provided comments on the DEIS in a letter dated December 30, 2004. AR 9198-202.  EPA noted that decisions made at the Tier 1 stage affect whether certain impacts can or cannot be avoided in the later Tier 2 projects. AR 9198.  EPA voiced concerns with respect to the proposed new bridge across the Little Miami National Wild and Scenic River.  AR 9199.  EPA also noted that the project traverses several 4(f) and 6(f) resources and that mitigation of impacts may be unavoidable absent consultation with the State historic Preservation Office and the NPS.  AR 9199.  Finally, EPA rated the DEIS an "EC-2." AR 9199 and 9202.   This means that the EPA has identified environmental impacts that should be avoided in order to fully protect the environment and suggest corrective measures which may require changes to the preferred alternative or mitigation measures that can reduce impacts.  AR 9202. The rating also means that the DEIS does not contain sufficient information to fully assess environmental impacts of the preferred alternative or other alternatives that are reasonably available to the project.  AR 9202.  EPA also strongly recommended that the impacts from the bridge be described as fully as possible in the Tier 1 EIS because the existence and placement of a new bridge is central to the overall Tier 1 multi-modal plan.  AR 9200.  EPA also requested that the Final EIS discuss the impacts associated with the Horseshoe Bend alignment, which is very likely an active meandering part of the channel.  AR 9200.  EPA's suggestions regarding this area included: (1) describing what stretches of the River are or may be active channels; (2) discuss the fate of a clear span bridge in the Horseshoe region or other potentially active channel regions; (3) discuss the potential future impacts from a bridge placed in a potentially active

PLAINTIFFS' STATEMENT OF
MATERIAL FACTS  - 7 -

channel of the Little Miami, given the River's future development within the floodplain, that is,

is the channel likely to meander and necessitate bridge maintenance that would impact the River

beyond what is contemplated in the DEIS; (4) discuss the visual impacts and mitigation in Area

#2 where scenic values are likely to be impacted by a new bridge; and (5) **include a discussion**

**of why Option 2 is not feasible** (the MIS did not explain its decision and it is not the appropriate

place for such a decision).  AR 9200-01.

      21.     In NPS's comments submitted on December 7, 2004, regarding the DEIS, NPS

identified significant concern over the proposed bridge crossing and the removal of Option 2

from the reasonable alternatives.  AR 2967.  It also expressed concerns over the incompatibility

of the "new bridge" alternative with the State of Ohio's management plan for protecting the

Little Miami National Wild and Scenic River.  AR 2968.

      22.     The U.S. Department of the Interior ("DOI"), Office of Environmental Policy and

Compliance, provided comments on the DEIS in a letter dated April 18, 2005.  AR 2158-72.  In

those comments, DOI disagreed with several conclusions in the DEIS and found it to be

inadequate in several respects.  AR 2159.  It found that removal of Option 2 from review in the

EIS process failed to meet the goals of NEPA.  AR 2160.  It also found that the proposed bridge

crossing would have a significant and substantial impact due to the visual intrusion, noise

impacts, and disruption of the natural setting and feeling of the LMR in that reach of the River.

AR 2164, 2166-67.  DOI stated that it believed FHWA's 4(f) determination that no use is

occurring was invalid.  It went on to state:

> Although a specific design is not known at this time, the proposed bridge will
> consist of multiple travel lanes, and will be elevated enough to span the river and
> the floodplain.  A four-lane bridge cannot be hidden from view.  The large mass

of the proposed bridge (length, width, height, and multiple piers) in combination with its location in an unobstructed corridor with relatively few man-made intrusions would make it the most visibly dominate feature in this segment of the river.   Placing a massive bridge where there previously was not one results in a fundamental change in the scenic qualities in this portion of the LMR at the time of designation.  Opportunities to mitigate the visual impacts are very limited.  A new multi-lane bridge crossing the river in a relatively natural and unspoiled corridor would significantly and substantially impact the scenic values of the LMR.

AR 2167.  Furthermore, DOI noted that:

> [T]he proposed new bridge crossing would degrade the recreational experience on the LMR in two primary ways: creating a major new visual intrusion on the natural scene and by generating noise.  Canoeist and hikers enjoy the natural quite and solitude offered in the project area, which increases opportunities for viewing of birds and other wildlife.  Currently, the sight of birds and other wildlife provides a unique recreational experience, particularly in such close proximity to a major metropolitan area.  Substantial noise would be produced during construction, and once in place, the bridge would be a significant source of constant noise from both traffic and vehicle-induced vibration of the bridge and commuter rail.  Recreational opportunities to enjoy solitude, or the areas scenery and to view wildlife would thus be substantially and significantly impaired.  The severity and magnitude of the visual and recreational impacts to the LMR associated with a new bridge corridor crossing are so great that they can not be significantly mitigated.   The proposal would also have substantial direct and indirect impacts to associated fish and wildlife resources and values.

AR 2166-67.

23.      Rivers Unlimited submitted comments on the DEIS in a letter dated January 6, 2005.  AR 10967-97.  Little Miami, Inc. and the Sierra Club individually submitted comments on the DEIS in letters dated January 10, 2005.  AR 470-89; 3701-3711.  Plaintiffs' comments highlighted several concerns about the Eastern Corridor DEIS including but not limited to the following: DOT and FHWA's failure to consider all reasonable alternatives, including Option 2; DOT and FHWA's failure to comply with Section 4(f) of the Transportation Act; and the

PLAINTIFFS' STATEMENT OF
MATERIAL FACTS  - 9 -

inability to mitigate impacts after DOT and FHWA have committed the Eastern Corridor to

Option 1. <u>Id</u>.

24.     Tier 1 was completed with the issuance of the Tier 1 Final Environmental

Impact Statement ("FEIS") for the Eastern Corridor Multi-Modal Projects-Hamilton and

Clermont Counties, Ohio PID 22970 on September 30, 2005.  AR 47681.

25.     Again, several agencies including the NPS and EPA provided comments, as well

as environmental organizations and members of the public.  The U.S. Department of the Interior,

Office of Environmental Policy and Compliance, submitted comments on the FEIS in a

November 28, 2005 letter.  AR 42269-80.  DOI was "troubled" by the removal of Option 2 from

review in the EIS.  AR 42270.  It also found that the comparison made between Option 1 and 2

in the final EIS uses vague and qualitative terms and that a "more rigorous analysis is

warranted."  <u>Id</u>.  DOI disagreed with the FEIS conclusion that scenic impacts to the LMR would

not be substantial.  AR 42272.  DOI noted that scenic resources were identified as outstandingly

remarkable values and remain a protected value under the Wild and Scenic Rivers Act.  <u>Id</u>.

Because of the lacking discussion concerning Option 2, DOI requested that a supplemental EIS

be prepared which included an alternative with no new river crossings, such as Option 2 from the

MIS.  AR 42271.  DOI also disagreed with the Defendants' determination that the proposed

project did not constitute a constructive use under Section 4(f) of the Transportation Act.  AR

42275-78.  DOI noted that as an agency with jurisdiction over the section 4(f) resource, it has

determined that the project may significantly and substantially diminish the attributes which

qualify for protection, and that therefore a constructive use does occur.  AR 42279.

26.     Little Miami, Inc. submitted comments on the FEIS in a letter dated November
28, 2005.  AR 1628-30.  The Sierra Club submitted comments on the FEIS in a letter dated
November 27, 2005.  AR 1631-35.  Plaintiffs' comments again expressed their concerns about
the failure to consider Option 2 as a reasonable alternative; the failure to comply with Section
4(f) of the Transportation Act; the inability to mitigate impacts after committing to Option 1
prior to an analysis of what mitigation measures may be available; and reliance upon an
economic analysis that was based on clearly outdated gas price data.  Id.

27.     The NPS submitted comments to Mr. Dennis Decker, Division Administrator,
U.S. Department of Transportation, Federal Highway Administration on June 28, 2006,
concerning the FEIS/ROD process and the FHWA noise analysis report.  AR 8149-63.  The
comments noted NPS's frustration with the lack of cooperation on the part of FHWA.  AR 8149.
NPS noted that it was disappointed that it was not contacted before FHWA released the ROD so
that it could address unresolved issues related to the data analysis and mitigation measures
associated with the project.  Id.  NPS stated that it was unable to agree with conclusions
pertaining to Section 4(f) impacts and concluded, again, that the scenic and noise impacts will
lead to a significant and substantial impact to the Little Miami River's recreational outstandingly
remarkable value and that "[t]hese proximity impacts, despite the proposed mitigation, are severe
enough to substantially diminish (impair) the activities, features, and attributes that qualified the
LMR for inclusion into the National Wild and Scenic Rivers System."  AR 8150.  NPS
concluded that a constructive use exists and requested that FHWA prepare a supplemental EIS
containing a section 4(f) statement and addressing new noise data.  AR 8154.  According to NPS,
"[t]he supplemental EIS should evaluate and compare noise and visual impacts to the [Little

PLAINTIFFS' STATEMENT OF
MATERIAL FACTS  - 11 -

Miami River's Outstanding and Remarkable Values] as well as the transportation benefits

associated with Option 1 and Option 2, as compared to the environmental baseline." AR 8150.

28.     NPS attached to its June 28, 2006 comments a detailed report entitled *Analysis of*

*Eastern Corridor Noise Readings*¸ where NPS identified several concerns and problems

regarding the August 2, 2005 Noise Analysis conducted by ODOT's Office of Environmental

Services.  AR 8156-63.  NPS raised several concerns.  Id.  First, details of the equipment setup

and operation suggest potential operational errors that compromised the accuracy of the

measurements.  AR 8156-58.  Second, data was collected at inappropriate sites: two of four sites

were much closer to the busy roadways than to the river itself; one site was further from roads,

however adjacent to a farm pump.  AR 8156, 8158.  Despite noise being raised as a concern, and

the most dramatic alteration occurring within the "interior" sites of the river, the data did not

include samples representative of the natural setting within interior river corridor locations.  AR

8156.  No monitoring was done along 1.8 river kilometers along the Little Miami River Park and

Recreation Area, much of which is more than 1 km from roads.  Id.   Third, data were collected

on one day: one hour of monitoring conducted sequentially at each of four sites. AR 8156, 8158-

60.  Sound level measurements made on a single summer afternoon do not support conclusions

about potential impacts on all summer afternoons, let alone on fall or spring mornings.  AR

8156.  Fourth, the hourly Leq (equivalent continuous noise level) summaries of decibel (dBA)

measurements blend the energy from all sounds together, failing to distinguish sounds from

natural sources (resources protected in wild and scenic rivers) and sounds from anthropogenic

sources (environmental impacts to be managed). AR 8156, 8160-61.  The presence of bird or

insect sounds does not diminish the impact of roadway noise.  AR 8156.  Fifth, there is no

PLAINTIFFS' STATEMENT OF
MATERIAL FACTS  - 12 -

justification for using hourly Leq summaries of dBA values to represent "background" sound levels. AR 8156, 8161-62. This metric has been used to document thresholds of annoyance in communities. AR 8156. To estimate background ambient sound levels, there is substantial precedent and scientific justification for other metrics that would yield values 10 dB or more below those reported by ODOT. AR 8156. Sixth, based upon NPS guidelines for assessing noise impacts in natural areas (NPS Natural Resource Impairment guideline), at least 4 km of river will suffer major acoustical impairment from the proposed bridge, including much of the downstream river section adjacent to the 115 ha Little Miami River Park and Recreation Area. AR 8162-63. According to the NPS, the ODOT Office of Environmental Services study does not meet the basic requirements for sound monitoring projects, including the protocols that have been recommended and agreed upon by the Federal Interagency Committee on Aircraft Noise when evaluating noise impacts to natural areas. AR 8156-57.

29.     The ROD for the Eastern Corridor Transportation Project Tier I EIS was issued June 6, 2006 by FHWA. AR 47074-47099. This formal federal administrative action will initiate Tier II detailed studies and the preliminary engineering phase for the new river crossing. AR 47074.

Respectfully submitted this 25th day of June, 2007.

Respectfully submitted,

  /s/

Brian A. Litmans (AK 0111068)
*Appearing Pro Hac Vice*
Public Interest Environmental
Attorney at Law
6251 West Tree Dr.
Anchorage, AK 99507

PLAINTIFFS' STATEMENT OF
MATERIAL FACTS  - 13 -

Telephone: 503-927-5288
Facsimile: 907-276-7110
blitmans@gmail.com

Robert Ukeiley (MD14062)
Law Office of Robert Ukeiley
435R Chestnut Street, Ste. 1
Berea, KY 40403
Telephone: 859-986-5402
Facsimile: 866-618-1017
rukeiley@igc.org


Counsel for Plaintiffs