**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| RIVERS UNLIMITED, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.  1:06-CV-01775-JR |
| | ) | |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al*., | ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| OHIO DEPARTMENT OF TRANSPORTATION, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

**DEFENDANT-INTERVENOR OHIO DEPARTMENT OF TRANSPORTATION'S
CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant-Intervenor Ohio

Department of Transportation ("ODOT") hereby moves for summary judgment on all counts in

Plaintiffs' Complaint.  In support of this motion, ODOT relies on the memorandum of points and

authorities attached hereto as well as the administrative record, as supplemented, previously

lodged with the Court on June 12, 2007.

Summary judgment is appropriate where there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c).  In a case

brought under the Administrative Procedure Act ("APA") such as this, the court bases its

decision on a review of the administrative record.  5 U.S.C. § 706; Florida Power & Light Co. v.

Lorion, 470 U.S. 729, 744 (1985).  When review is based upon an administrative record,

"summary judgment is especially appropriate."  Mineral Policy Ctr. v. Norton, 292 F. Supp. 2d

30, 36 (D.D.C. 2003); see also Bloch v. Powell, 227 F. Supp. 2d 25, 31 (D.D.C. 2002) (citing

Richards v. Immigration & Naturalization Serv., 554 F.2d 1173, 1177 (D.C. Cir. 1977)).

ODOT respectfully requests that its Cross-Motion for Summary Judgment be granted,

that Plaintiffs' Motion for Summary Judgment be denied, and that the Complaint be dismissed

with prejudice. The Federal Highway Administration's Final Environmental Impact Statement

and Record of Decision should be upheld as fulfilling all requirements of the National

Environmental Policy Act, the Department of Transportation Act, and those statutes'

implementing regulations. Granting ODOT's Cross-Motion will ensure that future project-

specific environmental reviews for individual elements of the project may proceed in a timely

basis. Approval of ODOT's Tier 1 analysis of the multi-modal transportation plan for the

Eastern Corridor will help fulfill the long-standing promise of improved transportation for the

citizens of Ohio.


(signature page follows)

Dated:  August 10th, 2007                    Respectfully submitted,


                                             ___s/ Frederick C. Schoch_____
                                             (signed with express permission by Fred R.
                                             Wagner)
                                             MARC DANN
                                             Attorney General of Ohio
                                             FREDERICK C. SCHOCH
                                             Trial Attorney
                                             Assistant Attorney General
                                             Transportation Section
                                             150 East Gay St., 17th Floor
                                             Columbus, Ohio 43215-3130
                                             Phone:        (614) 466-4656
                                             Fax:          (614) 466-1756
                                             fschoch@ag.state.oh.us

                                             FRED R. WAGNER
                                             Outside Counsel to Ohio Department of
                                             Transportation
                                             D.C. Bar No. 416009
                                             Beveridge & Diamond, P.C.
                                             1350 I Street, NW, Suite 700
                                             Washington, D.C. 20005-3311
                                             Phone:        (202) 789-6041
                                             Fax:          (202) 789-6190
                                             fwagner@bdlaw.com

                                             *Attorneys for Defendant-Intervenor*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RIVERS UNLIMITED, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.  1:06-CV-01775-JR |
| | ) | |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| OHIO DEPARTMENT OF TRANSPORTATION, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT-INTERVENOR OHIO DEPARTMENT OF TRANSPORTATION'S
CROSS-MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

MARC DANN
Attorney General of Ohio
FREDERICK C. SCHOCH
Trial Attorney
Assistant Attorney General
Transportation Section
150 East Gay St., 17th Floor
Columbus, Ohio 43215-3130
Phone:      (614) 466-4656
Fax:          (614) 466-1756
fschoch@ag.state.oh.us

FRED R. WAGNER
Outside Counsel to Ohio Department
of Transportation
D.C. Bar No. 416009
Beveridge & Diamond, P.C.
1350 I Street, NW, Suite 700
Washington, D.C. 20005-3311
Phone:        (202) 789-6041
Fax:            (202) 789-6190
fwagner@bdlaw.com

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... iii

GLOSSARY OF TERMS ......................................................................................... viii

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ...................................................................................... 5

I.     The Eastern Corridor ................................................................................... 5

II.    Major Investment Study ............................................................................ 7

III.   The Little Miami River................................................................................. 8

IV.   Options 1 and 2 for the River Crossing ................................................... 10

V.    NEPA Process ............................................................................................. 12

    A.    The Lead Agencies Tiered the Project for NEPA Review. .................. 12

    B.    The Early NEPA Process Was Conducted With Input From the
         Public and Cooperating Agencies. ....................................................... 14

    C.    The Tier 1 DEIS Was Drafted With Input From the Public and
         Cooperating Agencies. ........................................................................... 15

         1.    Preliminary DEIS.......................................................................... 15

         2.    DEIS................................................................................................. 16

    D.    The Tier 1 FEIS Responded to Comments Regarding the Project...................... 18

    E.    The Tier 1 EIS Record of Decision Responded to All Remaining
         Comments. ............................................................................................... 20

    F.    NPS Submitted Post-ROD Correspondence Reiterating Previously
         Raised Concerns. ..................................................................................... 20

ARGUMENT ............................................................................................................... 21

I.     THE STANDARD OF REVIEW IS NARROW AND
       DEFERENTIAL TO THE LEAD AGENCIES' DECISION................................... 21

II.    THE TIER 1 EIS PROCESS DID NOT VIOLATE NEPA. ..................................... 23

A.     The Tier 1 NEPA Process Evaluated All Reasonable Alternatives. ................... 23

B.     The Price of Gasoline Set Forth in the September 2004 Economic
       Analysis Report Did Not Negatively Impact the FEIS ........................................ 29

C.     The Post-ROD Letter Submitted by NPS Did Not Trigger the Need
       to Prepare a Supplemental EIS .......................................................................... 30

III.   THE FHWA'S ANALYSIS OF THE PROJECT'S POTENTIAL TO
       USE PUBLIC PARKLAND SATISFIED THE REQUIREMENTS OF
       SECTION 4(f) ................................................................................................... 34

A.     FHWA Properly Found No Constructive Use From Noise Impacts. ................... 36

       1.     The Little Miami River Is a "Category B" Noise Receptor .......................... 36

       2.     The Noise Study Upon Which FHWA Relied Reasonably
              Found That a New Bridge Would Not Constitute a
              Constructive Use. ........................................................................... 38

B.     FHWA Properly Found No Constructive Use From Visual
       Impacts ............................................................................................................. 39

       1.     A New Bridge Will Not Substantially Impair the Visual
              Resources or Recreational Opportunities of the Little Miami
              River. ............................................................................................. 39

       2.     A Review of Relevant Caselaw Supports the Conclusion
              That No Constructive Use of the Little Miami River Will
              Occur ............................................................................................. 41

CONCLUSION ................................................................................................... 44

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

Allison v. Dep't of Transp.,
908 F.2d 1024 (D.C. Cir. 1990) .................................................................... 35

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) ................................................................................ 22

Chritton v. Nat'l Transp. Safety Bd.,
888 F.2d 854 (D.C. Cir. 1989) ...............................................................22, 34

Citizens Against Burlington v. Busey,
938 F.2d 190 (D.C. Cir. 1991) .................................................................... 23

*City of Alexandria v. Slater,
198 F.3d 862 (D.C. Cir. 1999) ......................................................23, 25, 26, 27

City of Olmsted Falls v. Fed. Aviation Admin.,
292 F.3d 261 (D.C. Cir. 2002) ...............................................................30, 33

Cleary, Gottlieb, Steen & Hamilton v. Dep't of Health and Human Servs.,
844 F. Supp. 770 (D.D.C. 1993) .................................................................. 21

Coal. Against a Raised Expressway, Inc. v. Dole,
835 F.2d 803 (11th Cir. 1988) .................................................................... 43

Conservation Law Found. v. FHWA,
24 F.3d 1465 (1st Cir. 1994) ...................................................................... 22

Conservation Soc'y of S. Vermont v. Sec'y of Transp.,
362 F. Supp. 627 (D. Vt. 1975) ................................................................... 43

Davis v. Mineta,
302 F.3d 1104 (10th Cir. 2002) ................................................................... 29

Defenders of Wildlife v. Babbitt,
130 F. Supp. 2d 121 (D.D.C. 2001) .............................................................. 22

*Geer v. Fed. Highway Admin.,
975 F. Supp. 47 (D. Mass. 1997) .............................................................41, 42

*The Laguna Greenbelt, Inc. v. United States Dep't of Transp.,
42 F.3d 517 (9th Cir. 1994) ...............................................................24, 28, 42

Lun Kwai Tsui v. The Attorney Gen.,
445 F. Supp. 832 (D.D.C. 1978) ............................................................. 22

Mount Royal Joint Venture v. Kempthorne,
477 F.3d 745 (D.C. Cir. 2007) .............................................................. 23

Natural Res. Def. Council, Inc. v. Hodel,
865 F.2d 288 (D.C. Cir. 1988) .............................................................. 27

Natural Res. Def. Council, Inc. v. Morton,
458 F.2d 827 (D.C. Cir. 1972) .............................................................. 27

N. Buckhead Civic Ass'n v. Skinner,
903 F.2d 1533 (11th Cir. 1990)............................................................. 28

Sierra Club v. Peterson,
717 F.2d 1409 (D.C. Cir. 1983) ............................................................ 24

Sierra Club v. United States Dep't of Transp.,
753 F.2d 120 (D.C. Cir. 1985) .............................................................. 39

*Sierra Club v. United States Dep't of Transp.,
310 F. Supp. 2d 1168 (D. Nev. 2004) ..............................................27, 28

Sierra Club v. United States Dep't of Transp.,
664 F. Supp. 1324 (N.D. Cal. 1987)....................................................... 43

Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,
435 U.S. 519 (1978) ............................................................................ 24

**Statutes**

5 U.S.C. § 706(2)(A) ........................................................................... 21

16 U.S.C. §§ 1271-1287 ......................................................................... 8

16 U.S.C. § 1271 ................................................................................ 10

16 U.S.C. § 1271(b) .............................................................................. 9

16 U.S.C. § 1273(b) ............................................................................ 10

16 U.S.C. § 1274(b), (d) ...................................................................... 10

16 U.S.C. § 1276(b) .................................................................................................. 10

16 U.S.C. § 1281(a) .................................................................................................. 10

23 U.S.C. §§ 100-501 ............................................................................................... 10

42 U.S.C. §§ 4321-4347 ............................................................................................. 2

49 U.S.C. § 303 ...................................................................................................... 4, 5

49 U.S.C. § 303(c)(1) ............................................................................................... 35

**Regulations**

FHWA Metropolitan Transportation Planning

23 C.F.R. § 450.318 (amended 2007) ......................................................................... 2

FHWA Environmental Impact and Related Procedures

23 C.F.R. part 771 ................................................................................................... 13

23 C.F.R. § 771.135(p)(1)(i) .................................................................................... 35

23 C.F.R. § 771.135(p)(2) ........................................................................................ 35

23 C.F.R. § 771.135(p)(4)(ii) ................................................................................... 39

23 C.F.R. § 771.135(p)(5)(ii) ............................................................................. 38, 39

23 C.F.R. § 771.135(p)(5)(iv) .................................................................................. 36

23 C.F.R. § 771.135(p)(5)(vi)-(vii) ......................................................................... 340

23 C.F.R. § 771.136(p)(6)(i) .................................................................................... 41

23 C.F.R. § 771.135(p)(6)(ii) ................................................................................... 40

FHWA Highway Traffic Noise

23 C.F.R. § 772.5 .................................................................................................... 38

23 C.F.R. § 772.17 .................................................................................................. 38

23 C.F.R. § 772 Table 1 ...................................................................................... 37, 38

Council on Environmental Quality

40 C.F.R. part 1500 .................................................................................. 12

1501.4 ...................................................................................................... 29

40 C.F.R. § 1502.9(c)(1)(ii) ..................................................................... 31

40 C.F.R. § 1502.14(a) ..................................................................... 23, 24, 29

40 C.F.R. § 1502.20 ................................................................................. 13

1508.9 ...................................................................................................... 29

40 C.F.R. § 1508.28 ................................................................................. 13

**Other**

Statewide Transportation Planning; Metropolitan Transportation Planning,
72 Fed. Reg. 7,224 (Feb. 14, 2007) ........................................................... 2

FHWA, Noise Policy FAQs,
http://www.fhwa.dot.gov/ENVIRonment/noise/faq_nois.htm (2007) ........................................ 36

Washington State DOT, Chapter 4: Section 4(f) Evaluation, SR 509:
Corridor Completion/ I-5/South Access Road Environmental Impact
Statement 15-17, available at http://www.wsdot.wa.gov/NR/rdonlyres/
4DE5B496-D83E-4F86-A60C-F2FD12A5D2BA/0/chapter_4.pdf (2003) ............................... 37

Memorandum from Frederick Skaer, FHWA, to Allen Masuda re: Tiering
of the I-70 Project, available at http://www.environment.fhwa.dot.gov/
guidebook/i70tieringmemo.asp (June 18, 2001). ......................................................... 13

Letter from Dinah Bear, CEQ, to Harter Rupert, FHWA re: Use of Tiering
for Corridor Preservation Purposes (July 17, 1988) ...................................................... 13

Memorandum to Agencies Containing Guidance on Agency
Implementation of NEPA Regulations, 48 Fed. Reg. 34,263 (July 28,
1983) ........................................................................................................ 13

Memorandum to Agencies Containing Scoping Guidance, 46 Fed. Reg.
25,461 (May 7, 1981) ............................................................................... 13

Forty Most Asked Questions Concerning CEQ's National
Environmental Policy Act Regulations, Question 1a, 46 Fed. Reg.
18,026 (March 23, 1981) ............................................................................................. 23

# GLOSSARY OF TERMS

APA .................................................................................. Administrative Procedure Act

AR.......................................................................................... Administrative Record

CEQ ........................................................................... Council on Environmental Quality

DEIS ........................................................................ Draft Environmental Impact Statement

DOI ..................................................................................... Department of the Interior

DOT ...................................................................................... Department of Transportation

EIS ............................................................................... Environmental Impact Statement

FEIS ..................................................................... Final Environmental Impact Statement

FHWA.................................................................................. Federal Highway Administration

Leq(h) ................................... Equivalent Level of Steady-State Sound (averaged over one hour)

LMR.................................................................................................... Little Miami River

LOS ........................................................................................................ Level of Service

MIS ............................................................................................... Major Investment Study

NEPA................................................................................. National Environmental Policy Act

NPS.................................................................................................... National Park Service

ODNR ......................................................................... Ohio Department of Natural Resources

ODOT ............................................................................... Ohio Department of Transportation

OEPA.......................................................................... Ohio Environmental Protection Agency

OKI .................................................... Ohio-Kentucky-Indiana Regional Council of Governments

ORVs ..................................................................................... Outstandingly Remarkable Values

ROD.......................................................................................................... Record of Decision

USDOT ................................................................... United States Department of Transportation

USEPA........................................................... United States Environmental Protection Agency

## INTRODUCTION

The Eastern Corridor Multi-Modal Project ("Project") is a comprehensive and long-studied set of plans to improve transportation in and around the eastern Cincinnati metropolitan and suburban areas of southwestern Ohio ("Eastern Corridor" or "Corridor"). The Project was created on a bipartisan basis by federal, state, and local officials and representatives with significant input from the general public. The Final Environmental Impact Statement ("FEIS") challenged here was the culmination of a lengthy, thorough, and transparent process with the active collaboration of affected citizens, local jurisdictions, regional committees, local and national public interest groups (including Plaintiffs), and federal and state agencies.

The Eastern Corridor covers nearly 200 square miles, beginning in downtown Cincinnati and extending east through urban and suburban portions of Hamilton and Clermont Counties in Ohio and Campbell County in Kentucky. Although there has been significant residential and commercial development within the Eastern Corridor over the last 40 years, there has been little improvement to the Corridor's transportation infrastructure, resulting in severe traffic congestion. As a result, over the past decade both public and private entities have worked toward solving this problem.

Recognizing the need to improve the already over-capacity system, in 1996 the Ohio-Kentucky-Indiana Regional Council of Governments ("OKI")[1] initiated a major investment study ("MIS")[2] to examine transportation problems in the Corridor and recommend changes. After

---

[1] OKI was the entity tasked by the State of Ohio with improving transportation in the Eastern Corridor.

[2] In the mid-1990s, a MIS was required "where the need for a major metropolitan transportation investment [was] identified, and Federal funds [were] potentially involved" under

(Continued …)

four years, extensive public input, and the collaboration of federal, state, and local stakeholders, the group conducting the MIS ("MIS Task Force") recommended a multi-modal plan to improve transportation in the Corridor. This plan included improved bus transit and new bike and pedestrian routes, rail transit, and highway capacity.

Because elements of the Project relied on federal funds, the recommended transportation plan triggered review by the Federal Highway Administration ("FHWA") and the Ohio Department of Transportation ("ODOT") (collectively the "lead agencies") pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347. This review will be conducted in two tiers. Tier 1, the subject of this litigation, presents a broad, planning-level review of the transportation needs in the Corridor, the development and evaluation of a range of feasible alternatives, a preliminary assessment of expected impacts, and the identification of a recommended transportation plan. It does not commit to implementation of any particular component of the Project. By contrast, Tier 2 will involve more detailed engineering and environmental analyses and final NEPA documentation on a project-by-project basis for the feasible alternatives identified in Tier 1 at the time each one is implemented. At the end of the Tier 2 process, the appropriate agencies will likely begin formal design for permanent transportation improvements.

Out of this comprehensive review process and complex multi-modal plan to improve transportation in the Eastern Corridor, Plaintiffs have singled out one issue for this Court's review: the decision by the lead agencies to advance for further review under Tier 2 the impacts of a new, clear-span bridge over the Little Miami River. Plaintiffs contend that a new bridge

---

(Continued …)

the regulation then in effect at 23 C.F.R. § 450.318. That regulation was revised in 2007 to make such corridor studies optional. 72 Fed. Reg. 7,224, 7,261 (Feb. 14, 2007).

over the Little Miami River is not appropriate. Underlying Plaintiffs' argument is their belief
that a new bridge poses a dire threat to environmental and recreational attributes exhibited by the
Little Miami River. Plaintiffs stress the Little Miami River's classification as a National Wild
and Scenic River and do their best to depict the area around the proposed bridge crossing as
pristine and untouched. The Plaintiffs' romantic perspective of the Little Miami River, however
sincerely held, does not necessarily reflect the overall status of that resource, particularly in the
area generally proposed for a river crossing.

The section of the Little Miami River in the Eastern Corridor was initially rejected for
classification as a National Wild and Scenic River in the early 1970s because of, among other
problems, urban blight. Today, this 28-mile section of the Little Miami River is surrounded by
residential and commercial development and is already transversed by four bridges. The area
considered for a possible new bridge crossing is less than 7 miles from downtown Cincinnati,[3]
less than 3 miles from Lunken Airport, which served as Cincinnati's main airport for several
decades, and is within ear-and-eyeshot of railroads, a landfill, and other industry. To suggest this
area is pristine skews reality.

Plaintiffs' perspective on the Tier 1 and Tier 2 NEPA process is likewise skewed. At the
Tier 1 stage there is no guarantee that a new bridge will be built. Rather, the lead agencies
merely have recommended that the new bridge proposal receive further, more detailed study.
Plaintiffs' concerns regarding the impact of the new bridge will be addressed in Tier 2, during
which Plaintiffs, and any other interested parties, will have further opportunity to comment on
and provide direction to the Project.

---

[3]   As of 2006, the Cincinnati-Middletown-Wilmington Combined Statistical Area had a
population of 2,147,617 persons, making it the 20th largest metropolitan area in the country.

- 3 -

Even if a new bridge is recommended for construction and is actually built, Plaintiffs' use and enjoyment of the Little Miami River will not be substantially impaired. Any proposed bridge will clear-span the river -- there will be no pillars in the water or surrounding wetlands to interfere with people using the river or with wildlife in the wetlands. Moreover, visual impacts will be minimal because the proposed location of the bridge is in or near a horseshoe bend in the river. Anyone using the river or standing on its banks beyond the upstream and downstream bends in the river or otherwise not in the immediate vicinity of the actual crossing will not be able to see the bridge.

Plaintiffs take issue with the range of alternatives for a proposed Little Miami River bridge crossing identified in the FEIS and appear to favor extending an existing bridge crossing. Yet they devote little advocacy to explain how rejection of the new bridge alternative violates the procedural aspects of NEPA. The detailed and comprehensive analysis devoted to the topic of a potential Little Miami River bridge crossing in the MIS, Draft Environmental Impact Statement ("DEIS"), FEIS, and Record of Decision ("ROD") flatly contradicts Plaintiffs' assertion that an expanded crossing would meet the Project Purpose and Need. Plaintiffs cannot now substitute their opinion, which has been heard, vetted, and rejected, for that of the federal, state, regional, and local entities which were charged with analyzing this issue.

In their Cross-Motion for Summary Judgment, Plaintiffs weave the aforementioned themes regarding the location of the proposed bridge and its purported effect on the beneficial qualities of the Little Miami River into an argument that the Tier 1 process violates NEPA and Section 4(f) of the Department of Transportation Act ("Section 4(f)"), 49 U.S.C. § 303.[4]

---

[4]    Section 4(f) applies only to agencies of the United States Department of Transportation ("USDOT") and mandates that such agencies take "special effort ... to preserve

(Continued …)

However, in crafting their arguments Plaintiffs have improperly narrowed their focus with regard to the facts of this case and wrongly applied the law thereto. As demonstrated below, the alternatives, impacts, pluses and minuses of the Project were fully analyzed as documented in the comprehensive record which is full of give-and-take and information sifting by federal, state, regional, and local agencies as well as the general public. A decision has been rendered. Plaintiffs may disagree with the decision, but the process that led to the decision, and the decision itself, complied with the law.

## FACTUAL BACKGROUND

This section relates information from the Administrative Record ("AR")[5] regarding major procedural and substantive elements on which the parties' briefs rely.

I.    THE EASTERN CORRIDOR

The Eastern Corridor covers the 165 square mile urban and suburban eastern sector of the Cincinnati, Ohio metropolitan area and 35 square miles of neighboring Campbell County in Kentucky. AR 47130. It is an important pathway for connecting people with jobs in urbanized areas and for the movement of goods and services from areas east of Ohio into the Cincinnati metropolitan area. AR 47075. The Eastern Corridor delivers one of the highest daily commute volumes to jobs in Cincinnati and Hamilton County but has only inefficient local routes or circuitous interstate routes to service this demand. Id.

_____

(Continued …)
the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites." 49 U.S.C. § 303.

    [5] All citations are to the supplemental Administrative Record [30] lodged with this Court on June 12, 2007.

Many key routes in the Eastern Corridor's existing roadway network have current traffic volumes in excess of capacity, and projected traffic studies indicate that No Build average daily traffic volumes on interstates and main roadways in the area will increase up to 81 percent over current conditions by 2030.[6] Id. Ineffective routing and connectivity and limited capacity for current travel patterns and projected travel demand along with the limited number, capacity, and connectivity of crossings over the Little Miami River contribute to more congestion and delays internally within the Eastern Corridor network and more circumferential travel and vehicle miles traveled on the interstate network external to the Corridor. Id.

More than 80 percent of the roadway segments evaluated in the Eastern Corridor for a three-year study period (1998-2000) exceeded the statewide average vehicular crash rate, with over half of the accidents occurring on US-50 and SR-32, the two main routes through the Corridor. Id. Crashes affect system reliability and cause delays, especially in a network such as the Eastern Corridor with few alternative routes and reliance on only four bridge crossings over the Little Miami River. AR 47075-76. Many key routes in the area exhibit physical and geometric deficiencies. AR 47076. As expected traffic volumes increase and the conditions of the existing modes of transportation worsen, safety conditions are expected to decline. Id.

Transit and other non-highway travel options are limited in the Eastern Corridor. Bus transit currently occurs primarily along only four routes and is not available for many locations within the Eastern Corridor. Id. Existing bikeway facilities along Milford Road and around Lunken Airport are limited in availability and connectivity and currently do not provide a

---

[6] Level of Service ("LOS") is a measure by which transportation planners determine the quality of service on transportation devices or transportation infrastructure. The LOS system uses the letters A-F, with A being the best and F the worst, to describe conditions for a transportation device or infrastructure. LOS analyses conducted for the year 2020 indicate that many of the key local routes in the Eastern Corridor, including portions of SR 32, will be operating at a LOS of E or F. AR 47695.

functional transportation option for commuters. Id. There is currently no rail transit in the Eastern Corridor. AR 47078.

II.    MAJOR INVESTMENT STUDY

In 1991, Congress passed the Intermodal Surface Transportation Act, 23 U.S.C. §§ 100-501, which placed a new emphasis on local planning to improve transportation as well as new methods to do so, including metropolitan planning, congestion management, and major investment study requirements.[7] This regulatory change, along with the assignment of new and comprehensive transportation responsibilities to OKI, set the stage for initiating the MIS for the Eastern Corridor. AR 47898-900, 47131. Preliminary investigations conducted by OKI included traffic quality and travel surveys, AR 47901-08, followed by a definition of the problem and objectives for evaluating alternatives, which was refined by a round of public meetings. AR 47908-17. Broadly stated, the four objectives for evaluating alternatives were to identify an effective and comprehensive solution for transportation problems in the Eastern Corridor, to provide support for the regional economy, to improve transportation consistent with larger regional environmental goals, and to consider land use. AR 47917.

OKI established a 58-member Task Force for guidance and direction. AR 47910-11. The MIS Task Force was composed of representatives of 18 local governments, state and federal agencies including the Ohio Department of Natural Resources ("ODNR"), which administers Ohio's National Wild and Scenic Rivers, AR 2920, environmental interests including Plaintiffs Little Miami, Inc. and the Sierra Club, and other organizations and businesses. AR 47868, 47910-11. The Task Force employed a multi-layered process in developing its recommendations for improving transportation in the Eastern Corridor. The Task Force first developed a universe

_____

[7]    Under then-applicable regulations, the MIS process was required where federal funds were used in a major transportation project. See footnote 2 *supra*.

of 19 alternatives from which it selected 12 feasible alternatives, each focused on a single

transportation strategy (*e.g.*, rail from point A to point B). AR 47878-79. The 12 single-strategy

plans were consolidated into seven multiple-component plans. Id. After assessing these plans,

the Task Force established five mode-based plans, each focusing on a dominant mode of

transportation (*e.g.*, highway, rail). Id. From there, the Task Force came up with a preliminary

recommended plan. Id. After public comments and significant discussion, that plan was

ultimately adopted as the Recommended Plan of the Task Force ("Recommended Plan"). Id. A

public hearing on the Recommended Plan was held in March 1999. AR 15662-701. After

further consideration to discuss the comments the Task Force received regarding the

Recommended Plan, AR 9309-15, the MIS was published in April 2000. AR 47867-48204.

Early in the MIS process the Midwest office of the National Park Service ("NPS"),

concerned about OKI's decision to study new river crossings that might impair the free-flowing

nature and recreational attributes of the Little Miami River, alerted OKI to its jurisdiction over

the River pursuant to the Wild and Scenic Rivers Act. AR 8598-600. While the primary

responsibility to administer the Little Miami River as a National Wild and Scenic River is vested

in ODNR, NPS has limited jurisdiction and coordinates with ODNR to manage the River. AR

42269. NPS's interest in a river crossing was thereafter discussed at Task Force meetings. See

AR 9298.

III.    THE LITTLE MIAMI RIVER

The Little Miami River flows through southwest Ohio to the Ohio River near Cincinnati.

AR 9894 (map). Between 1973 and 1980 it was designated as a National Wild and Scenic River,

and given a management plan and limited protection from certain in-stream development, in two

stages pursuant to 16 U.S.C. §§ 1271-1287. AR 9902-04, 9922. A 64-mile section north of the

Eastern Corridor region, beginning upstream northeast of Dayton, Ohio, was designated as a

National Wild and Scenic River in 1973.  AR 9904.  At the time, the lower portion of the river

was too plagued by problems such as "urban blight" to qualify for designation.  AR 9902; see

also AR 9894 (map).  "The problem of urban blight [was] especially acute in the reach from

Milford downstream to Shademoore where the riverbanks ... [were] badly covered with litter,

bankside dumps, run-down properties, dilapidated cottages, and other such evidence of man's

careless use of the water course."  AR 9902.

Over the next several years, the lower portion of the Little Miami River underwent a

major rehabilitation effort.  AR 9922.  In 1979, despite persistent problems of urban blight,

proponents of designation argued that the lower section now qualified for inclusion in the

National Wild and Scenic Rivers system at the "recreational" level of designation.[8]  AR 9922.

Several Ohio communities expressed opposition to the designation, not wanting future

transportation development to be hindered.  AR 9924; see also AR 9101-02 (map and description

of proposed relocation of US-50 across Little Miami River).  In recommending approval of the

designation of the lower section, the United States Department of the Interior ("DOI") stated that

"while we would be reluctant to support any highway proposal which would have a severe

---

[8]   "Every wild, scenic or recreational river ... shall be classified, designated, and
administered as one of the following: (1) Wild river areas—Those rivers or sections of rivers that
are free of impoundments and generally inaccessible except by trail, with watersheds or
shorelines essentially primitive and waters unpolluted. ... (2) Scenic river areas—Those rivers or
sections of rivers that are free of impoundments, with shorelines or watersheds still largely
primitive and shorelines largely undeveloped, but accessible in places by roads. (3) Recreational
river areas—Those rivers or sections of rivers that are readily accessible by road or railroad, that
may have some development along their shorelines, and that may have undergone some
impoundment or diversion in the past."  16 U.S.C. § 1271(b).  See also AR 1384 ("Rivers in the
National System are often referred to as 'wild and scenic rivers' without regard to actual
classification.  This is acceptable when speaking of the National System in general, but the
specific legal classification is an important distinction as it has a direct effect on how the river is
administered and whether certain activities on federally owned lands within the boundaries are
permissible.").

adverse impact ... , <u>nothing in the Wild and Scenic Rivers Act precludes the construction of a bridge across a designated river</u>.  Such situations must be reviewed on a case-by-case basis."  AR 9924 (emphasis added).

The lower section of the Little Miami River was designated as a recreational component of the National Wild and Scenic Rivers system in 1980.  AR 47275.  The management plan and "outstanding remarkable values" ("ORVs")[9] for the upper portion were adopted for the lower portion.  AR 9886.  The Little Miami River's ORVs, which qualify it for inclusion in the system under 16 U.S.C. § 1271 and also help frame its management plan under 16 U.S.C. § 1281(a), include recreational, fish and wildlife, geological, and historical features dispersed along various segments of the river.  AR 47275.  The primary uses of the segment of the Little Miami River that runs through the Eastern Corridor study area are for kayaking and canoeing.  AR 47717. The Little Miami River is surrounded by private lands in the project study area.  AR 47277.  The uses of these private lands include industry, rail, utilities, and a landfill.  AR 1718, 8439, 47323, 47326.

## IV.    OPTIONS 1 AND 2 FOR THE RIVER CROSSING

Throughout the MIS process special attention was paid to the Little Miami River based largely in part on a decision of the Task Force to relocate SR 32, which is currently a two-lane highway that crosses the Little Miami River at the Beechmont Levee and is one of the main and most congested transportation arteries in the Eastern Corridor.  AR 47888-90, 47156 (map).  The

---

[9]    When a river is under consideration for classification in the Wild and Scenic Rivers Act, studies are performed that scope out the "outstanding remarkable values" of the river.  16 U.S.C. § 1273(b).  Based on these values a river may be designated as either "wild," "scenic," or "recreational" or be removed from the list of eligible rivers.  <u>Id.</u>; 16 U.S.C. §§ 1274(b), (d), 1276(b).  A wild river segment is managed with stricter environmental rules than a scenic river segment.  A recreational river segment is managed with the lowest level of environmental rules. 16 U.S.C. §§ 1273(b), 1281(a).

Task Force initially eliminated a new crossing of the Little Miami River from consideration in 1996. AR 9244-45, 23776, 22800-02. However, during 1997 and most of 1998, the Task Force asked the consultants to continue to evaluate all options for river crossings. AR 9252-53, 9270, 9272-79, 9283-88, 23776, 22800-02. During this process, two main options for relocating SR 32 were considered: Option 1, from Red Bank Road/US-50 in Fairfax across the Little Miami River on a new crossing; and Option 2, along Beechmont Avenue and across the Little Miami River on a widened existing crossing (the Beechmont Levee) several miles south of the possible locations for a new bridge. AR 9291-99, 22803, 23772 (map). The Task Force convened a subgroup, composed of members with a special interest in relocating SR 32, to evaluate and improve the two options. AR 9303, 47201-03.

In late 1998, after a series of studies and public meetings, see AR 12933, the subgroup recommended that the MIS proceed with Option 1 and that the Project provide for various mitigating conditions such as clear spanning the riparian corridor and purchasing easements to prevent secondary development. AR 9302-03. Option 1, thus modified, was then adopted by the Task Force in full, recommended to OKI, and included in the Recommended Plan. AR 9305, 9308.

Option 1 was chosen because it met the Project's objectives. Option 1 will improve air quality and reduce the impact on existing development. It not only is a direct route over the Little Miami River, but also will provide an additional route if other Little Miami River crossings are closed. In addition, Option 1 meets long-term transportation goals developed in the MIS process. AR 9303-05, 48011-25. Option 1 also was favored by the preponderance of public opinion and received letters of support from surrounding counties and towns, including Cincinnati. AR 9303.

In contrast, Option 2 does not meet the Project's objectives.  Option 2 will result in increased traffic volume on the existing Beechmont Levee, causing this facility to approach capacity by 2020 and likely requiring further, additional widening (*i.e.*, lane additions and river crossing structure extension).  AR 47202.  Increased volume on the levee would require major modifications to existing interchanges at SR 32 and US 50, resulting in substantial impacts on existing residential and commercial development located at the north end of the levee in the community of Linwood.  Id.  Option 2 will result in increased peak volumes on Beechmont, increased traffic in coterminous locations such as Mt. Lookout, and would not effectively reduce congestion in Mariemont.  Id.  In addition, Option 2 does not conform to local land use plans. AR 47745.

The potential alignments currently under consideration for the proposed new bridge over the Little Miami River are in an already impacted area.  AR 123.  Nearby forested areas are fragmented by a powerline and associated utility structures and a landfill sits within eyesight just upstream.  AR 8439 (landfill), 47282 (photograph showing powerline).  Development, including residential, commercial, and light industrial, is denser outside the floodplain, but there is significant agricultural activity adjoining the river in the study area.  See, e.g., AR 47323, 47326 (maps); AR 1718.

V.    NEPA PROCESS

A.    The Lead Agencies Tiered the Project for NEPA Review.

The Project is being conducted in two parts corresponding to a two-tiered NEPA process established in response to state and federal agency scoping input.  The use of tiering is authorized under NEPA regulations issued by the Council on Environmental Quality ("CEQ"), 40 C.F.R. part 1500, and under regulations issued jointly by FHWA and the Federal Transit

Authority, 23 C.F.R. part 771.  Tiering is also addressed in guidance documents issued by both

these agencies, including guidance issued in 1981,[10] 1983,[11] and 1988[12] by CEQ, as well as

tiering guidance outlined in a memorandum issued by FHWA dated June 18, 2001.[13]

    CEQ refers to tiering in 40 C.F.R. § 1508.28 as "the coverage of general matters in

broader environmental impact statements with subsequent narrower statements or environmental

analyses incorporating by reference the general discussions and concentrating solely on the

issues specific to the statement subsequently prepared."  In 40 C.F.R. § 1502.20, CEQ

encourages agencies "to tier their environmental impact statements to eliminate repetitive

discussions of the same issues and to focus on the actual issues ripe for decision at each level of

environmental review."

    The Project is a long-term, multi-modal plan that addresses transportation problems

affecting a number of communities in the almost 200 square mile area that makes up the Eastern

Corridor.  It warrants a tiered NEPA approach due to the complexity involved in the coordination

of multi-modal improvements, prioritization of projects, and the different construction timing

expected for the needed transportation investments identified in the MIS.  Moreover, it is

precisely the type of thorough, penetrating review for which advocates for the environment have

clamored for years.

---

[10]  Memorandum to Agencies Containing Scoping Guidance, 46 Fed. Reg. 25,461 (May 7, 1981).

[11]  Memorandum to Agencies Containing Guidance on Agency Implementation of NEPA Regulations, 48 Fed. Reg. 34,263 (July 28, 1983).

[12]  Letter from Dinah Bear, CEQ, to Harter Rupert, FHWA re: Use of Tiering for Corridor Preservation Purposes (July 17, 1988).

[13]  Memorandum from Frederick Skaer, FHWA, to Allen Masuda re: Tiering of the I-70 Project, available at http://www.environment.fhwa.dot.gov/guidebook/i70tieringmemo.asp (June 18, 2001).

B.     The Early NEPA Process Was Conducted With Input From the Public and
        Cooperating Agencies.

After several years of study through the MIS process, the lead agencies[14] began the main

elements of the Tier 1 NEPA process in early 2002 with an extensive Public Involvement

Program, AR 32581-641, the preparation of an environmental inventory, AR 4304-08

(summary), and a series of meetings.  One round of public involvement meetings was held in late

May and early June, 2002, AR 10038-40; the Sierra Club, one of the Plaintiffs, was present at

these meetings, AR 176, and comments were received regarding the Little Miami River, see AR

29049.  ODNR continued its close involvement with the Project, insisting on significant

mitigation measures before it would approve a bridge over the Little Miami River.  AR 131.

A Notice of Intent to prepare a tiered EIS was published in the Federal Register in May

2002.  AR 3977-79.  The NPS wrote a letter to FHWA and ODOT in response, saying it was

"responsible for evaluating projects and their effects on [National Wild and Scenic] designated

rivers."  AR 8757-58.  ODNR and ODOT invited NPS to an August 2002 inter-agency meeting;

an NPS representative was unable to attend, but said the NPS "would not be able to offer any

more insights" than it had in its earlier, brief letter to FHWA and ODOT.  AR 136-38.  At the

meeting, ODNR's proposed mitigation measures for the Little Miami River crossing were the

main point of discussion.  AR 9987-88.

NPS was, however, present and active at another inter-agency meeting that October

during which its concerns about Section 4(f) and the elimination of Option 2 were discussed.

AR 33140-47.  In a conference call soon after the October inter-agency meeting, NPS requested

---

[14]   The Project, while under the purview of ODOT, is overseen by a partnership of state,
county, and city governments and transportation agencies and is administratively led by the
Hamilton County Transportation Improvement District.  FHWA serves as the lead federal
agency in the NEPA process.  AR 47692.

to be a cooperating agency, but acknowledged that it would have no approval jurisdiction if the bridge did not touch the river. AR 10472-73, 1237. FHWA formally requested NPS's service as a cooperating agency soon thereafter, AR 8694, and NPS accepted, AR 8690-91.

While technical studies continued, another round of public involvement meetings was held in May 2003. AR 8304-05, 8672. In October 2003, NPS reiterated its concerns regarding the absence of a no-bridge alternative, AR 8628-30, and attended an inter-agency meeting where it again stated that it wanted the previously rejected no-new-bridge option continued and that visual impacts on the Little Miami River should be addressed. AR 10315-19. A public open house meeting to discuss the DEIS was held in December 2003. AR 3760-87.

C.    The Tier 1 DEIS Was Drafted With Input From the Public And Cooperating Agencies.

1.    Preliminary DEIS.

The preliminary Tier 1 DEIS was released for comment by the lead agencies in March 2004. AR 8615-16. The purpose and need for the Project were established in the DEIS. The overall purpose was "to implement a multi-modal transportation program consistent with the adopted long range plan for the region, addressing priority needs and furthering [the] four project goals [*i.e.*, objectives discussed *supra* at 7] established in the Major Investment Study phase." AR 47162-78. The Tier 1 DEIS did not propose specific alignment locations, but rather, "alternative corridors that will be further developed during Tier 2 of the Eastern Corridor study." AR 47119. The Tier 1 DEIS divided the feasible alternatives by mode (*e.g.*, bus, rail, highway, bikeway), and divided the proposals for the highway mode into four segments, the second of which contained a new crossing of the Little Miami River. Id.; AR 47122. The DEIS did not recommend that Option 2 be further studied.

Comments were received in May from the Ohio Environmental Protection Agency ("OEPA"), AR 8606-09, United States Environmental Protection Agency ("USEPA") Region 5, AR 10604-10, ODNR, AR 10602-03, the United States Army Corps of Engineers, AR 8601-02, and NPS, AR 8575-92. OEPA expressed a preference for design elements, such as clear-span bridges, and other mitigation efforts to minimize impacts to the Little Miami River and its tributaries. AR 8608. USEPA stated its opinion that the document did not "successfully demonstrate that Option 2 [was] not feasible." AR 10605.

NPS commented that it was "troubled" by the absence of no-bridge alternatives in the preliminary Tier 1 DEIS and criticized the MIS process. AR 8575-92. NPS requested more discussion of a bridge's impacts on the Little Miami River's ORVs, of the travel impact differences between Options 1 and 2, and of Section 4(f) issues, suggesting that there was a Section 4(f) "constructive use" of the river that would trigger statutory duties. Id. NPS also suggested that for the purpose of conducting a noise analysis, FHWA should classify the Little Miami River as a Category A noise receptor, the most sensitive category reserved for places like Arlington National Cemetery, rather than as a Category B noise receptor, the category that encompasses parks and recreation areas. AR 8584. FHWA's review of the preliminary Tier 1 DEIS was completed in October 2004 after FHWA representatives explained their acceptance of the MIS process used in the Project. AR 7787.

        2.    <u>DEIS.</u>

The Tier 1 DEIS was released for public review and comment in November 2004. AR 3510-13. The Tier 1 DEIS discussed the MIS process and the development and analysis of alternatives. AR 47196-209, 47223-31. The document also discussed the applicability of Section 4(f) to the Little Miami River. AR 47277-78, 47360-63, 47372-79, 47403.

After the Tier 1 DEIS was released, Little Miami, Inc. and the Sierra Club criticized the document in the press, AR 3729, and ran anti-Project advertisements, AR 2132. NPS was initially quick to respond before the end of the year with a presentation at an inter-agency meeting, AR 1459-62, and a letter explaining its position that Option 2, previously rejected in the four-year MIS, should nonetheless be assessed during the EIS, AR 8362-64. NPS also met and corresponded with FHWA and ODOT in January through March of 2005. AR 317, 7826, 7830-32, 10880-91, 10896-99. The three agencies discussed NPS's level of involvement and coordination with the MIS and EIS. *E.g.*, AR 10880-91.

Comments on the DEIS arrived from USEPA Region 5, AR 11003-07, Rivers Unlimited, AR 10967-97, Little Miami, Inc., AR 3639-58, the Sierra Club, AR 3701-11, the Little Miami River Partnership, AR 10962-63, and American Rivers, AR 10964-66, at the beginning of 2005. USEPA requested a more detailed discussion of impacts on the Little Miami River and exclusion of MIS Option 2. AR 1103-07. The environmental and river organizations registered additional points regarding the value of the river, the value of avoiding highways (and what they viewed as likely resulting sprawl) altogether, and purported Section 4(f) impacts of a new bridge. Individual citizens submitted comments both in favor of and opposed to the bridge proposal. AR 3904-36.

DOI requested an extension of time to comment on the DEIS, which FHWA granted, AR 8550, 8547, and eventually submitted comments in mid-April 2005. AR 2158-72. DOI noted that most of its earlier comments had been addressed in the DEIS, AR 2158, but "disagree[d] with some of the conclusions," AR 2159. It again argued that removal of Option 2 from continued consideration did not uphold the objectives of NEPA, and that there would be a Section 4(f) use in any of the potential bridge alignments due to visual and noise impacts. AR

2158-72.  Robert Ukeily, attorney for Plaintiffs, also informed FHWA in May 2005 that

disagreement about FHWA's Section 4(f) determination with respect to the Little Miami River

still remained.  AR 10775-800.

> D.     The Tier 1 FEIS Responded to Comments Regarding the Project.

The draft of the FEIS was released to FHWA for its review in June 2005.  AR 8497-98.

FHWA requested a noise analysis.  AR 7945.  ODOT performed a noise reading on August 2,

2005 at 4 locations: two on the river bank, one some yards north of the river, and one north of the

Beechmont Levee (south of the Option 1 study area) on a sandbar in the river.  AR 2362-70.

ODOT's modeling showed that "[n]o location [was] predicted to experience noise levels that

approach or exceed the FHWA noise abatement criteria" for category B noise receptors.  AR

2364.  ODOT also noted that noise would be more extensively modeled in the Tier 2 NEPA

analysis phase, when there would be more detailed information available.  AR 2365.

FHWA responded in September 2005 to DOI's April 2005 comments and subsequent

consultations regarding Section 4(f), alternatives, and other issues.  AR 1717-19.  It clarified its

finding of no Section 4(f) constructive use, explaining that: 1) "the possibility of a new crossing

did not impact the decision to designate the lower reach of the Little Miami as a component of

the National Wild and Scenic Rivers System" in 1979 when plans similar to Option 1 had been

proposed; 2) the recreational value of the river would not be impacted; 3) the visual intrusion of

the bridge would be minimal due to the winding nature of the river and due to existing

urbanization; and 4) based on ODOT's noise analysis, there would be no constructive use due to

noise.  Id.

The Tier 1 FEIS was signed at the end of September 2005, AR 3548, and mailed for

review in mid-October.  AR 3550-08, 2064.  The Tier 1 FEIS responded to comments received

regarding the Tier 1 DEIS, including comments from NPS, Plaintiffs, and others regarding the removal of Option 2 from consideration and regarding any Section 4(f) applicability to a new Little Miami River crossing.  AR 47726-51, 47760-62, 47782-84, 47788-806.

FHWA received comments on the FEIS until the end of November.  USEPA Region 5 again requested more information in the ROD or another report about the selection of alternatives during the MIS process, but expressed appreciation for the "new and significant" information already added to the FEIS regarding Options 1 and 2.  AR 9759-60.  FHWA responded in detailed fashion to USEPA's comments.  AR 1800-02, 1922-34.

The Sierra Club and Little Miami, Inc. both submitted comments on the FEIS.  AR 9743-54, 9756-57.  Plaintiffs' comments again stated their concerns about the removal of Option 2, the economic analysis, and Section 4(f) constructive use, and their general skepticism of mitigation measures.  Id.  FHWA responded to the Sierra Club and Little Miami, Inc. in a document "incorporated as part of the Tier 1 FEIS" and "constitut[ing] the FHWA's final disposition" of their comments.  AR 1636-68.  Each substantive comment by both groups was set forth verbatim with a targeted response.  Id.

FHWA also received comments from DOI.  AR 42269-80.  DOI noted that "[d]uring the last year, FHWA staff ha[d] worked closely with the NPS to resolve issues raised during the review process," but that it still had concerns about the MIS process, the FEIS recommendation of a new crossing of the Little Miami River, and the determination of no Section 4(f) constructive use.  Id.  FHWA responded in detailed fashion to DOI's comments.  AR 2917-29.  ODNR, the agency responsible for administering Ohio's National Wild and Scenic Rivers, AR 2920, commented that a new bridge can be compatible with the management plan so long as sufficient mitigation measures are undertaken, see, e.g., AR 131, 47733.

E.    The Tier 1 EIS Record of Decision Responded to All Remaining Comments.

FHWA and ODOT continued to coordinate with DOI, NPS, and USEPA in advance of issuing the ROD.  AR 2283.  FHWA, ODOT, DOI and NPS met in February 2006 to discuss the consultation, alternatives, and Section 4(f) issues in DOI's comments on the FEIS, issues which FHWA and ODOT considered resolved.  AR 1725-26, 1735, 9477-78.  FHWA met with USEPA in March 2006 and provided a more detailed written explanation of the MIS process.  AR 1800-02, 9476.  FHWA sent a letter to DOI in May 2006 regarding issues that had been presented and resolved after DOI's November 2005 comments and the February 2006 meeting with NPS.  AR 2917-29.  The letter also announced that FHWA was then in the midst of crafting the Tier 1 ROD.  AR 2925.  FHWA also wrote a letter to USEPA in May 2006 detailing further its position on the analysis of alternatives and the lack of Section 4(f) constructive use.  AR 1922-34.

The ROD for the Eastern Corridor Multi-Modal Projects Tier 1 EIS was signed by FHWA on June 2, 2006.  AR 47074-99.  This action advanced the multi-modal components and segments enumerated in the FEIS and ROD to a more detailed Tier 2 analyses.  AR 47074, 47099.  FHWA sent letters to OEPA, Little Miami, Inc., and the Sierra Club explaining that the ROD responded to all remaining issues that they had raised.  AR 8392-94.

F.    NPS Submitted Post-ROD Correspondence Reiterating Previously Raised Concerns.

More than three weeks after the ROD was signed, on June 28, 2006, NPS sent a final letter to FHWA stating that NPS would have liked FHWA to wait to sign the ROD until NPS responded to FHWA's May 2006 letter and noise analysis.  NPS restated its assertion that the Project was a constructive use of the Little Miami River and requested a supplemental Section 4(f) statement.  AR 8147-63.  NPS reiterated its earlier disagreements regarding the classification

of the Little Miami River as a Class B, rather than Class A, noise receptor; visual impacts; and the adequacy of mitigation measures.  AR 8151-54.

NPS also disagreed with technical aspects of ODOT's noise analysis.  Id.  It attached to its post-ROD letter a report entitled Analysis of Eastern Corridor Noise Readings, drafted by an NPS acoustic specialist.  AR 8156-63.  The report alleged several technical deficiencies in ODOT's noise analysis, including equipment error, site choice, sample size, model metric, and failure to use NPS or aviation-based noise guidelines.  Id.  In response, ODOT scheduled a meeting with NPS to discuss the letter and to improve its working relationship with NPS in the future.  AR 1982.

## ARGUMENT

Plaintiffs contend that the lead agencies violated NEPA in three respects: by failing to evaluate all reasonable alternatives; by relying on allegedly inaccurate data; and by declining to prepare a supplemental FEIS.[15]  Plaintiffs further contend that the Project constitutes a constructive use of the Little Miami River in violation of Section 4(f).  For the reasons set forth below, Plaintiffs' arguments fail and summary judgment should therefore be granted in the lead agencies' favor on all counts in Plaintiffs' Complaint.

I.     THE STANDARD OF REVIEW IS NARROW AND DEFERENTIAL TO THE LEAD AGENCIES' DECISION

The Administrative Procedure Act ("APA") authorizes a court to set aside agency action only if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  Under the arbitrary and capricious standard, the party challenging the agency action bears the burden of proof.  Cleary, Gottlieb, Steen & Hamilton v. Dep't of

---

[15]  The Complaint raised a fourth purported NEPA violation: failure to mitigate. Plaintiffs, however, have failed to address this argument in their brief, and summary judgment should therefore be granted in favor of the lead agencies on this count.

Health and Human Servs., 844 F. Supp. 770, 783 (D.D.C. 1993).  In deciding an administrative

record case under the "arbitrary and capricious standard," a court's role is limited:

> Under this standard, the Court "must consider whether the decision was based on
> a consideration of the relevant factors and whether there has been a clear error of
> judgment. ...  Although this inquiry into the facts is to be searching and careful,
> the ultimate standard of review is a narrow one.  The court is not empowered to
> substitute its judgment for that of the agency."  Thus, when reviewing an agency
> decision under the "arbitrary and capricious" standard, we must defer to the
> wisdom of the agency, provided its decision is reasoned and rational, and even
> "uphold a decision of less than ideal clarity if the agency's path may reasonably
> be discerned."

Chritton v. Nat'l Transp. Safety Bd., 888 F.2d 854, 856 (D.C. Cir. 1989) (citations omitted).

The "'merit of the [agency action] is to be determined exclusively on the administrative

record' ... [and] summary judgment is appropriate after a review of the administrative record."

Lun Kwai Tsui v. The Attorney Gen., 445 F. Supp. 832, 835 (D.D.C. 1978) (citations omitted);

Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121, 124 (D.D.C. 2001).  Here, there is no

dispute over the documents contained in the administrative record[16] and the parties have

submitted cross motions for summary judgment and agree that the only issues for the court to

resolve are whether the Defendants' actions were proper under law.  Therefore, the Court may

not "find" underlying facts, see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986), and summary

judgment is appropriate to resolve the issues presented in this case.

Plaintiffs challenge the ROD issued by the FHWA under NEPA and Section 4(f).  The

legal standard Plaintiffs must overcome is high.  Conservation Law Found. v. Fed. Highway

Admin., 24 F.3d 1465, 1471 (1st Cir. 1994) ("'[T]he administrative actions taken in this case

under NEPA ... [and] § 4(f) ... are subject to a highly deferential abuse of discretion standard of

---

[16]  Plaintiffs have relied on a June 28, 2006 NPS letter that, while inadvertently included
in the record, should not be considered part of the record because it was submitted after the ROD
was signed.  While the lead agencies are not obligated to address arguments based on documents
outside the record, they will nonetheless do so here.

review.").  The D.C. Circuit has explained that arbitrary and capricious agency action occurs

only when the agency "relied on factors which Congress has not intended it to consider, entirely

failed to consider an important aspect of the problem, offered an explanation for its decision that

runs counter to the evidence before the agency, or is so implausible that it could not be ascribed

to a difference in view or the product of agency expertise."  Mount Royal Joint Venture v.

Kempthorne, 477 F.3d 745, 753 (D.C. Cir. 2007).  Plaintiffs have failed to overcome this

standard.

II.     THE TIER 1 EIS PROCESS DID NOT VIOLATE NEPA

        A.      The Tier 1 NEPA Process Evaluated All Reasonable Alternatives.

        Plaintiffs allege that the lead agencies failed to consider a reasonable range of alternatives

by excluding Option 2 from NEPA review.  Given the definition of reasonable alternatives

established by the District of Columbia Circuit ("D.C. Circuit"), Plaintiffs fall far short of

establishing that the Tier 1 FEIS failed to consider a reasonable range of alternatives.  Moreover,

Plaintiffs' argument was recently rejected on a set of facts almost identical to those presented

here.

        It is well established that a consideration of alternatives is critical to the NEPA process.

However, a "rule of reason" governs an agency's selection of alternatives.  See Citizens Against

Burlington v. Busey, 938 F.2d 190, 195-96 (D.C. Cir. 1991).  Only reasonable alternatives need

be "rigorously explored" and "objectively evaluated" in an EIS, see Forty Most Asked Questions

Concerning CEQ's National Environmental Policy Act Regulations, Question 1a, 46 Fed. Reg.

18,026 (March 23, 1981); 40 C.F.R. § 1502.14(a), and they should be selected and evaluated

based on the purpose and need of the project, see City of Alexandria v. Slater, 198 F.3d 862, 867

(D.C. Cir. 1999).  The range of alternatives, however, is "bounded by some notion of feasibility,"

Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 551 (1978), and "for alternatives which were eliminated from detailed study, [the EIS should] briefly discuss the reasons for their having been eliminated," 40 C.F.R. § 1502.14(a). Neither NEPA nor its implementing regulations requires an EIS to discuss a minimum number of alternatives. The Laguna Greenbelt, Inc. v. United States Dep't of Transp., 42 F.3d 517, 524 (9th Cir. 1994).

The record confirms that the lead agencies gave a reasonable, full, and detailed consideration to a wide range of alternatives during the MIS process, "rigorously explored" and "objectively evaluated" all reasonable alternatives in the EIS that met the stated objectives for the Project, and briefly discussed the reasons for eliminating alternatives, including Option 2, from detailed study. Consequently, the lead agencies took the "hard look" required by NEPA. See Sierra Club v. Peterson, 717 F.2d 1409, 1413 (D.C. Cir. 1983). The planning process for the Project began in 1996 with the preparation of the MIS. During that four-year process, the MIS Task Force developed a universe of 19 alternatives for improving movement through the Eastern Corridor, ranging from no action to multi-modal plans, from which 12 feasible alternatives were selected. AR 47924, 47940-42. The 12 alternatives selected were consolidated into seven multiple-component plans, from which the Task Force established five mode-based plans, each focusing on a dominant mode of transportation. AR 47942-92.

During the Tier 1 NEPA process, the lead agencies selected for "rigorous[] explor[ation]" and "objective[] evaluat[ion]" only those alternatives which, after thorough vetting during the MIS process, met the Project's objectives. AR 47196-209. The DEIS devoted over 50 pages of discussion to the alternatives for the Project, addressing in detail not only the alternatives selected from the MIS process, but also alternatives that were rejected during the MIS process,

including Option 2.  AR 47196-263.  Finally, the FEIS also discussed in detail various

alternatives, including Option 2, not selected for detailed study.  AR 47741-49.

Despite this comprehensive record of the consideration of a wide range of feasible

alternatives, Plaintiffs argue that the lead agencies violated NEPA by failing to deem Option 2 a

reasonable alternative.  Option 2, however, does not meet the Project's objectives, and therefore,

is not a reasonable alternative

In City of Alexandria v. Slater, plaintiffs argued, and initially the district court agreed,

that FHWA violated NEPA by failing to consider a ten-lane bridge a reasonable alternative to the

twelve-lane options that were selected for further analysis.  198 F.3d 862 (D.C. Cir. 1999).  The

D.C. Circuit reversed, explaining that to determine whether an alternative is reasonable under

NEPA, a court must make a two-step inquiry: (1) whether an agency's objectives are reasonable,

and (2) whether the alternative is reasonable in light of those objectives.  Id. at 867.  Turning to

the merits, the appellate court criticized the district court for finding that FHWA's objectives

were improperly defined because FHWA did not sufficiently prioritize environmental goals.  Id.

The appellate court explained that "[t]he proper question to ask at the outset of a NEPA inquiry

is not whether the [Federal Highway] Administration focused on environmental goals but rather

... whether its stated objectives were reasonable."  Id.

Finding FHWA's stated goals reasonable, the appellate court next examined the

alternatives at issue, finding that FHWA had properly concluded that the ten-lane bridge

alternative did not meet the project's objectives and that the district court's opinion to the

contrary was in error.  Id. at 868-69.  The appellate court concluded its analysis of this issue by

stating that "it is simply a non sequitur to call a proposal that does not 'offer a complete solution

to the problem' a 'reasonable alternative.'"  Id. at 869.

Here, Plaintiffs do not contend that the Project's objectives were unreasonable.  Rather, Plaintiffs attempt to substitute their standards for the Project's objectives by carefully parsing the record and highlighting select attributes of Option 2 which, in Plaintiffs' opinion, qualify Option 2 as a reasonable alternative that meets the Project's objectives.  To reach this erroneous conclusion, Plaintiffs focus solely on Option 2's benefits without addressing those negative qualities which led OKI to find that Option 2 did not meet the Project's objectives.  Plaintiffs' narrow focus is improper.

Plaintiffs first argue that certain elements of Option 2 could serve to meet the Project's stated goals.  The main flaw in Plaintiff's argument, however, is that while an alternative may have some benefits and may even meet some of a project's objectives, if the alternative does not "offer a complete solution to the problem," it is not reasonable.  City of Alexandria at 868-69 (recognizing that the alternative advanced by plaintiffs partially met the project's objectives, but overall, the alternative did not offer a complete solution to the problem).

Here, OKI evaluated Option 2 in depth during the MIS process and found that it does not meet the objectives identified in the MIS process.  For example, Option 2 will result in increased traffic volume on the existing Beechmont Levee, causing this facility to approach capacity by 2020 and likely requiring further, additional widening (*i.e.*, lane additions and river crossing structure extension).  AR 47202.  Increased volume on the levee would require major modifications to existing interchanges at SR 32 and US 50, resulting in substantial impacts on existing residential and commercial development located at the north end of the levee in the community of Linwood.  Id.  Option 2 will result in increased peak volumes on Beechmont, increased traffic in coterminous locations such as Mt. Lookout, and would not effectively reduce

congestion in Mariemont.  Id.  In addition, Option 2 does not conform to local land use plans.
AR 47745.

Plaintiffs completely fail to address City of Alexandria and rely instead on two D.C.
Circuit decisions, Natural Res. Def. Council, Inc. v. Hodel, 865 F.2d 288 (D.C. Cir. 1988) and
Natural Res. Def. Council, Inc. v. Morton, 458 F.2d 827 (D.C. Cir. 1972), for the proposition
that an agency may not "disregard alternatives merely because they do not offer a complete
solution to the problem."  Plaintiffs' Brief at 19.  However, in City of Alexandria, the D.C.
Circuit questioned the continuing vitality of Morton, and specifically explained that Morton is
distinguishable because it addressed a coordinated effort to solve a problem of national scope,
rather than a discrete project within the jurisdiction of one federal agency.  City of Alexandria,
198 F.3d at 868-69.  In Hodel the court addressed the DOI's five-year schedule of offshore oil
and gas leasing, which like Morton, is an issue of national scope.  In short, Hodel and Morton are
not applicable to this case which, precisely like City of Alexandria, is concerned with a discrete
project within the jurisdiction of one federal agency.

Recent caselaw also undermines Plaintiffs' argument that the lead agencies acted in an
arbitrary and capricious manner by eliminating Option 2 from further review at the MIS stage,
and therefore, failing to "rigorously explore" and "objectively evaluate" Option 2 during the Tier
1 NEPA process.  With facts strikingly similar to our case, plaintiffs' argument was flatly
rejected by the District of Nevada in Sierra Club v. United States Dep't of Transp., 310 F. Supp.
2d 1168 (D. Nev. 2004).  In that case, plaintiffs questioned, inter alia, FHWA's decision to omit
from discussion in the EIS a particular alternative to a proposed highway improvement in Las
Vegas.  Id. at 1176-77, 1190-94.  FHWA responded that the EIS did not need to consider the
alternative at issue because the MIS process fully considered and then rejected that alternative.

Id.  After engaging in a lengthy discussion of the MIS process, the court concluded that "a federal agency does not violate NEPA by relying on prior studies and analyses performed by local and state agencies," id. at 1193 (citing Laguna Greenbelt, 42 F.3d at 524 n.6 and North Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1542-43 (11th Cir. 1990)), and that:

> FHWA's reliance on the MIS process to eliminate alternatives from the EIS was not arbitrary and capricious.  The EIS did not consider in depth [the] alternative because the MIS process evaluated that alternative and found it did not meet the project's purpose and need, was too costly, and depended upon an uncertain RCFG.  The MIS contained many of the hallmarks of the NEPA process, including various studies on project impacts, significant public involvement, and a comparison of alternatives.  FHWA's decision not to duplicate the state agencies' analyses and evaluations as to what alternatives would be feasible and meet project goals does not violate NEPA.

Id. at 1193.  In other words, the court found that because the MIS process evaluated the alternative at issue and determined that it did not meet the project's objectives, and because the MIS process was similar enough to the NEPA process, it was not arbitrary and capricious for FHWA to rely on the MIS and not go forward with a new analysis of the alternative.

Here, as discussed *supra* at 11-12, the MIS Task Force evaluated Option 2 in detail and determined that it offered an incomplete solution to the problem at hand and did not meet the Project's objectives.  In addition, the MIS process conducted in the case *sub judice* contained many of the hallmarks of the NEPA process.  The MIS contained studies on project impacts.  AR 7631-36.  Members of the public served on the Task Force that developed the MIS, and public meetings were held throughout the MIS process, including at the end of the process to address in particular the Option 1 versus Option 2 issue.  *E.g.*, AR 47868, 47910-11, 12933, 15662-702. Further, the MIS contained a lengthy and detailed comparison of alternatives.  See discussion *supra* at 7-8.  Finally, the FEIS devoted several pages of discussion to explaining why Option 2

was eliminated from detailed study, which more than meets the requirement to "briefly discuss ... reasons eliminat[ing] an alternative." 40 C.F.R. § 1502.14(a); AR 47731-33, 47741-49.

Davis v. Mineta, cited by Plaintiffs in support of their alternatives argument, is distinguishable. 302 F.3d 1104 (10th Cir. 2002). Davis addressed an environmental assessment, by its nature a very limited document,[17] as opposed to an EIS. Id. at 1109. Davis also applied a lessened standard of review than this Court must apply to this case. Id. at 1112. Finally, the Davis court found that the federal defendants did not engage in an adequate review of alternatives to a bridge crossing because alternatives other than the proposed bridge crossing were never given a "hard look." Id. at 1120. Here, Option 2 along with several other alternatives received the requisite "hard look" during the MIS process and were properly rejected because they did not meet the Project's objectives.

In sum, under controlling D.C. Circuit caselaw, it was proper for the lead agencies to reject Option 2 because it did not meet the Project's objectives, and therefore, it was *per se* not a reasonable alternative. Further, even if Option 2 were an alternative that merited consideration, the MIS process contained all the hallmarks of the NEPA process for purposes of considering alternatives to meet the Project's objectives. As a result, it was proper for the lead agencies to rely on the MIS process to eliminate Option 2 from further review during the NEPA process.

B.    The Price of Gasoline Set Forth in the September 2004 Economic Analysis Report Did Not Negatively Impact the FEIS.

The Tier 1 NEPA process took place over four years, yielded a DEIS, FEIS, and ROD, and was supported by hundreds of studies, lengthy and detailed correspondence, and significant public input. Amidst this complex and comprehensive process, Plaintiffs find fault in the cost of gasoline used in an economic analysis supporting the FEIS. This less-than-substantive argument

---

[17]    See 40 C.F.R. §§ 1508.9, 1501.4.

- 29 -

fails to demonstrate that the FEIS was flawed.  If anything, it highlights how well the Tier 1 process was conducted, for if Plaintiffs are relegated to making insignificant arguments like this, obviously there is little else in the Tier 1 process to challenge.

While the price of gasoline -- $1.13 per gallon -- used in the Economic Analysis may have been low for 2003, as explained in a November 15, 2005 letter responding to comments on this issue, the lead agencies determined that

> the use of the lower fuel price does not significantly impact the results of the study for two primary reasons: [1] Using a lower than actual fuel price understates the value of user benefits accruing to both highway and transit users from the multimodal Eastern Corridor; thus, resulting in a more conservative estimate of the user benefits and the resulting economic impacts [, and 2] The demand for transit services (*i.e.*, ridership) is relatively inelastic with regards to fuel prices. Based on ... independent research ... , a 200% increase in fuel prices ($3.39 a gallon), the maximum potential increase in transit ridership, is estimated to be 20-24 % based on the gas price elasticity research presented below.

AR 506.  In other words, if Option 2 could not meet the low projections resulting from a price of $1.13 per gallon, it certainly could not meet projections based on a higher price of gasoline. Further, as explained in the same letter, "it is widely accepted practice to hold fuel prices constant for the forecast period."  AR 506.  Accordingly, it was not error for the lead agencies to rely on a price of $1.13 per gallon for future use in the Economic Analysis.

C.    The Post-ROD Letter Submitted by NPS Did Not Trigger the Need to Prepare a Supplemental EIS.

Plaintiffs argue that NEPA requires the lead agencies to prepare a supplemental EIS based on purportedly new and significant post-ROD information.  As the D.C. Circuit has noted, "[a] supplemental EIS is only required where new information 'provides a <u>seriously</u> different picture of the environmental landscape.'"  <u>City of Olmsted Falls v. Fed. Aviation Admin.</u>, 292 F.3d 261, 274 (D.C. Cir. 2002) (citation omitted) (finding plaintiffs failed to meet their burden of showing the agency's decision not to supplement an EIS was arbitrary and capricious where the

information at issue was already known by the agency prior to the issuance of a ROD).[18]  Here,

the post-ROD information at issue was not of a nature that would compel preparation of a

supplemental EIS.  Even if it were, another EIS will be done for Option 1 at the Tier 2 stage

before any new bridge is constructed and any new information will be considered at that time.

NPS's post-ROD letter[19] ("June 2006 Letter") that purportedly includes significant new

information is divided into two sections: one contains general comments and the other contains

detailed comments.  AR 9396-97.  Almost all of these comments were raised previously in an

April 18, 2005 letter ("April 2005 Letter") from DOI to FHWA, more than a year before the

ROD was issued.  Compare June 2006 letter, AR 9394-97 with April 2005 letter, AR 10849-858.

For example, points raised in the June 2006 letter that the Project constitutes a constructive use,

AR 9394, and that the Little Miami River qualifies as a Class A noise receptor, AR 9396, were

explicitly raised in the April 2005 letter, 10853 (constructive use) and 10858 (Class A receptor).

In places, the June 2006 and April 2005 letters are very similar, compare AR 9394

("Construction of a large, elevated, multi-lane bridge where there previously was not one would

impair the scenic qualities and attributes associated with the LMR.") with AR 10853 ("A bridge

crossing the Little Miami River would significantly and substantially interfere with the scenic

and recreational values of the Little Miami River."), or the language is practically verbatim,

---

[18]  See also 40 C.F.R. § 1502.9(c)(1)(ii) ("Agencies ... [s]hall prepare supplements to
either draft or final environmental impact statements if ... [t]here are significant new
circumstances or information relevant to environmental concerns and bearing on the proposed
action or its impacts.") (emphasis added).

[19]  Plaintiffs assert that there was an "agreed upon deadline" of mid-June 2006 before
which date FHWA and ODOT were to delay issuing the ROD while waiting for NPS comments
on noise data provided in full in mid-April (though in summary earlier).  AR 8147.  However,
there is no indication in the record of such agreement except in NPS's post-ROD June 28, 2006
comments.  AR 9628 (stating in early April that there were no plans to agree to wait for NPS
comments).  There is also little indication that the lead agencies rushed the ROD -- in fact, it was
several times delayed in order to add yet more information and clarification.  AR 8130.

compare AR 9397 ("A massive four-lane concrete bridge cannot be hidden from view.") with
AR 10855 ("A four-lane bridge cannot be hidden from view.").

Further, while the June 2006 letter raises a few new comments based on correspondence
between NPS and FHWA that took place between the April 2005 and June 2006 letters, the April
2005 letter substantively addressed the same underlying concerns that led NPS to make
comments after the ROD was issued. For example, one comment in the June 2006 letter states
that "[t]he acoustic data collection and analysis report submitted with the May 12[, 2006] letter
reveals serious deficiencies that invalidate the noise impact analysis conducted for the Eastern
Corridor project during the final EIS process." AR 9395-96. The collection and analysis report,
which was drafted by ODOT and is the subject of Plaintiffs' supplemental EIS and Section 4(f)
arguments, was made available for the first time in conjunction with the May 12 letter, and thus,
was not addressed in the April 2005 letter. The April 2005 letter, however, raises the concern of
noise impacts caused by the Project on several occasions. See, e.g., AR 10852 ("Road and
commuter rail traffic would pose major noise impacts.").

Finally, the main concerns raised in the June 2006 letter -- whether there is a constructive
use of the Little Miami River, whether the river is a Category A or B noise receptor, and whether
there should be further review of Option 2 -- were raised in the various comments and
correspondence NPS and DOI provided in relation to the FEIS and DEIS. For example, in
NPS's May 2004 comments responding to the DEIS, NPS commented that it was "troubled" by
the absence of no-bridge alternatives in the preliminary Tier 1 DEIS and requested more
discussion of a bridge's impacts on the Little Miami River's ORVs, the travel impact differences
between MIS Options 1 and 2, and Section 4(f) issues, suggesting that there was a Section 4(f)
"constructive use" of the river. AR 8575-92. NPS also suggested that for the purposes of

- 32 -

conducting a noise analysis, FHWA should classify the Little Miami River as a Category A noise receptor rather than as a Category B noise receptor.  Id.  In October 2003 correspondence to FHWA, NPS raised concerns regarding the absence of a no-bridge alternative, AR 8628-30, and at an inter-agency meeting that month, NPS stated that it wanted the previously rejected no-new-bridge option reviewed and that visual impacts on the Little Miami River should be addressed. AR 10315-29.

Not only was the information in the June 2006 letter included in previous NPS correspondence, but the lead agencies assessed this information and responded to it.  For example, NPS's concern over a constructive use was addressed both before and after the FEIS. AR 47087 ("Based on continuous coordination with the NPS, and state and local officials, the level of consultation necessary to determine that the proposed project will not approach the threshold applicable to constructive use has been conducted.  Additional investigations and coordination conducted since approval of the FEIS reinforce our previous determination that Section 4(f) does not apply to the project as proposed.").  NPS's concern regarding the effect of a new bridge on the scenic qualities and attributes associated with the Little Miami River was directly addressed and responded to in the FEIS.  AR 47737-40.  The FEIS also addressed and responded to NPS's concern regarding the elimination of Option 2 as an alternative.  AR 47727-28.

In sum, the June 2006 letter submitted by NPS does not "provide a seriously different picture of the environmental landscape."  City of Olmsted Falls, 292 F.3d at 274.  To the contrary, the comments and concerns raised in that letter were substantially similar to those previously raised by NPS and DOI to the lead agencies throughout the Tier 1 process.  As a result, a supplemental EIS to address this information is not necessary.  Id.

- 33 -

III.    THE FHWA'S ANALYSIS OF THE PROJECT'S POTENTIAL TO USE PUBLIC
        PARKLAND SATISFIED THE REQUIREMENTS OF SECTION 4(f)

FHWA determined in the FEIS that a new crossing over the Little Miami River would

not constitute a "constructive use" of public parkland, as that term is defined in regulations

implementing Section 4(f). The agency concluded that the potential for noise or visual impacts

on the Little Miami River would not have impacts on the resource's recreational values severe

enough to rise to the level of a constructive use.[20] Plaintiffs preference is to remove the new

crossing alternative from further consideration in the Tier 2 EIS,  thus they dispute FHWA's no

constructive use analysis and determination. However, their disagreement with plans for a

bridge crossing does not satisfy their heavy burden of proof to show that FHWA was arbitrary or

capricious in arriving at its Section 4(f) conclusions. Indeed, the open and transparent record of

communication concerning potential Section 4(f) impacts, combined with Defendants' technical

modeling and legal analyses, demonstrate that FHWA's determinations as to both noise and

visual impacts are "reasoned and rational." Chritton v. Nat'l Transp. Safety Bd., 888 F.2d 854,

856 (D.C. Cir. 1989). Finally, Plaintiffs' preferred alternative of an expanded bridge crossing

fails to meet the area's transportation needs.[21]

_____

[20] Plaintiffs broadly assert in their introduction to this argument that the entire Project constitutes a constructive use of the Little Miami River. A review of their argument, however, reveals that the sole focus of their argument is on the area around the proposed new bridge over the Little Miami River. Accordingly, this brief will focus only on that area.

[21] Plaintiffs' Complaint also raised the issue of Defendants' postponement of Section 4(f) determinations for several public parks, recreation areas, and greenspaces until the Tier 2 EIS. Plaintiffs failed to discuss this issue in their brief. Defendants have made preliminary determinations regarding these potential uses, but have properly postponed final determinations because "[f]easible alternatives developed in Tier 1 are not specific alignment locations, but alternative corridors that will be further developed and evaluated during Tier 2 . ... Actual encroachment on these features may be avoided or impacts may be minimized once alignment location and configuration is more specifically determined . ..." AR 47395-401.

Section 4(f) prohibits the "use" of historic and cultural resources except where there is no feasible and prudent alternative and where all possible planning has been conducted to minimize harm to the protected property.  49 U.S.C. § 303(c)(1).  There are two possible types of use that must be considered in a Section 4(f) analysis: direct and constructive.  A direct use occurs "when land is permanently incorporated into a transportation facility," and a constructive use occurs when "the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify a resource for protection under section 4(f) are substantially impaired."  23 C.F.R. §§ 771.135(p)(1)(i), (p)(2).  Substantial impairment occurs when the "protected activities, features, or attributes of the resource are substantially diminished."  Id. at (p)(2).  "'[N]ot ... every change within park boundaries constitutes a use' of section 4(f) lands. ...  No 'use' will be deemed to have occurred where an action will have only an insignificant effect on the existing use of protected lands."  Allison v. Dep't of Transp., 908 F.2d 1024, 1028 (D.C. Cir. 1990).  If the project does not use protected land resources, no Section 4(f) alternatives analysis is necessary.

In this action, Plaintiffs do not allege direct use associated with Option 1.  Thus, the only issue involving the use of protected resources is whether FHWA reasonably determined that there was no constructive use.

Plaintiffs argue that FHWA's Section 4(f) analysis was deficient because it unreasonably relied on ODOT's Noise Analysis study and because the Little Miami River was improperly classified as a Category B noise receptor.  Plaintiffs further argue that FHWA failed to adequately consider the imposition a new bridge would pose on the visual and aesthetic impacts to the Little Miami River's ORVs.  As discussed below, Plaintiffs' arguments find no support in the record and the agency's reasonable determination should be upheld.

A.      FHWA Properly Found No Constructive Use From Noise Impacts.

1.      The Little Miami River Is a "Category B" Noise Receptor.

FHWA applied the correct legal standards to determine whether a potential new crossing

of the Little Miami River, as modeled, would have noise impacts substantial enough to rise to the

level of a constructive use.  No constructive use occurs from noise when "[t]he projected traffic

noise levels of the proposed highway project do not exceed the FHWA noise abatement criteria

as contained in Table 1, 23 C.F.R. part 772."  23 C.F.R. § 771.135(p)(5)(iv).[22]

The noise standards are lower for Category B resources than for Category A resources.

Category B is exemplified by land uses like the Little Miami River that benefit from relative

quiet but do not require near-silence for their utility: "[p]icnic areas, recreation areas,

playgrounds, active sports areas, parks, residences, hotels, motels, schools, churches, libraries,

and hospitals."  23 C.F.R. § 771.135(p)(5)(iv).  Category A areas, in contrast, are limited to those

"on which serenity and quiet are of extraordinary significance and serve an important public

need and where the preservation of those qualities is essential if the area is to continue to serve

its intended purpose."  Id.  "Some examples of lands that have been analyzed as Activity

Category A receivers include the Tomb of the Unknown Soldier, a monastery, an outdoor prayer

area of a facility for nuns, and an amphitheater."  FHWA, Noise Policy FAQs,

http://www.fhwa.dot.gov/ENVIRonment/noise/faq_nois.htm (2007).

Plaintiffs cite no authority to suggest that FHWA was arbitrary or capricious in finding

that an urban river used for some kayaking and canoeing, and subject to both wildlife and

human-caused sounds, is a relatively peaceful Category B "park" or "recreation area" rather than

---

[22] Table 1 of Part 772 provides the noise abatement criteria, in decibels ("dB") averaged over one hour ("Leq(h)"), for one indoor and four outdoor categories of activity (A through E). 23 C.F.R. § 772 Table 1.

an "extraordinar[ily]" "seren[e] and quiet" Category A area.  23 C.F.R. § 772 Table 1.  First, the

Little Miami River and its uses fit neatly within the language of the Category B description,

especially "parks" and "recreation areas."[23]  Plaintiffs attempt in vain to distinguish kayaking

and canoeing from "recreation" and "active sports" expressly included in the criteria for this

category.[24]

Second, "preservation" of "extraordinary" "seren[e] and quiet" are neither possible nor

necessary for the Little Miami River, and the Horseshoe Bend region in particular, "to continue

to serve its intended purpose" as part of an urban recreational refuge.  There is no extraordinary

quiet to preserve, because -- like other portions of this nearly 100-mile river -- the segment of the

Little Miami River that runs through the Eastern Corridor near Cincinnati is already subject to

development and noise.  See, e.g., AR 123, 47261, 2363.  Even if such quiet did exist, noise

modeling performed for the Project demonstrates that highway noise from a possible new bridge

would not substantially interfere with the quality of canoeing and kayaking along the river, even

in the likely segment nearest to the final bridge alignment.  AR 2362-64.

---

[23] To further illustrate the high threshold for Category A noise receptors, the "largest natural preserve of woodland environment" in the Seattle/Tacoma area in Washington State, Des Moines Creek Park, described as "secluded" and "very important," is also classified as a Category B area (though in that case the Category B average noise threshold was exceeded due to airplanes overhead).  Washington State DOT, Chapter 4: Section 4(f) Evaluation, SR 509: Corridor Completion/ I-5/South Access Road Environmental Impact Statement 15-17, available at http://www.wsdot.wa.gov/NR/rdonlyres/4DE5B496-D83E-4F86-A60C-F2FD12A5D2BA/0/ chapter_4.pdf (2003).

[24] Also, the Category B noise abatement criterion, in contrast to those of Categories C and D, does already account for the need of places like homes, churches, and libraries for low levels of sound.

2.    The Noise Study Upon Which FHWA Relied Reasonably Found That a New Bridge Would Not Constitute a Constructive Use.

Plaintiffs argue that a noise study, performed by ODOT and relied upon by FHWA in determining there was no constructive use, fails to properly account for noise impacts to the Little Miami River's ORVs. Plaintiffs are mistaken. As demonstrated below, both the noise analysis and FHWA's reliance thereon were reasonable, and therefore, the agency's decision must be upheld.

As part of the noise analysis, four ambient noise readings were taken from locations near or on the Little Miami River, using the Leq(h) metric as per FHWA procedure described at 23 C.F.R. §§ 772.5, 772 Table 1. AR 2362-64. These data were then input into the FHWA Traffic Noise Model according to 23 C.F.R. § 772.17 to model a hypothetical bridge's impacts on 44 locations, using conservative (*i.e.*, inflated) traffic estimates. AR 2362-64. The results showed ambient noise in the absence of a bridge ranging from 51.5 dB Leq(h) to 56.4 dB Leq(h), and modeled a maximum bridge traffic noise level of 62.2 dB Leq(h). AR 2362-64. The maximum Leq(h) for Category B is 67 dB Leq(h). 23 C.F.R. § 772 Table 1. Therefore, "[n]o location is predicted to experience noise levels that approach or exceed the FHWA noise abatement criteria" for Category B noise receptors, which, as discussed above, is the correct classification for the Little Miami River. AR 2364; 23 C.F.R. § 772 Table 1.

Finally, federal regulations implementing Section 4(f) state that "a constructive use does **not** occur when," *inter alia*, "[t]he projected traffic noise levels of the proposed highway project do not exceed the FHWA noise abatement criteria as contained in Table 1, 23 C.F.R. part 772." 23 C.F.R. § 771.135(p)(5)(ii). Here, the noise study found that the projected noise levels do not exceed the noise abatement criteria contained in Table 1; all are less than 67 dB Leq(h). AR

2364-65.  Accordingly, it was reasonable for FHWA to rely on the noise study in determining

that no constructive use would result from construction of the Option 1 bridge.

Plaintiffs argue that the noise study has several deficiencies, most notably with regard to

the proper assessment of ambient background noise.  The applicable regulation, 23 C.F.R. § 772,

Table 1, references only maximum Leq(h), with no consideration for ambient background noise.

Therefore, Plaintiff argument appears to be incorrect.  But even if Plaintiffs were correct, and

they are not, at most Plaintiffs' argument creates a technical dispute, in which case the Court

should defer to FHWA's expertise as the agency responsible for assessing Section 4(f) impacts.

Sierra Club v. United States Dep't of Transp., 753 F.2d 120, 129 (D.C. Cir. 1985) ("When a

court considers the sufficiency of an agency's environmental analysis, 'the court is not to rule on

the relative merits of competing scientific opinion.'").

B.    FHWA Properly Found No Constructive Use From Visual Impacts.

1.    A New Bridge Will Not Substantially Impair the Visual Resources or
Recreational Opportunities of the Little Miami River.

Plaintiffs assert that the proposed bridge's impact on visual and scenic resources and

recreational opportunities is a constructive use of the Little Miami River.  Once again, Plaintiffs

ignore the applicable regulatory standard.  A constructive use from visual impact occurs only if

> [t]he proximity of the proposed project substantially impairs esthetic features or
> attributes of a resource protected by section 4(f), where such features or attributes
> are considered important contributing elements to the value of the resource.
> Examples of substantial impairment to visual or esthetic qualities would be the
> location of a proposed transportation facility in such proximity that it obstructs or
> eliminates the primary views of an architecturally significant historical building, or
> substantially detracts from the setting of a park or historic site which derives its
> value in substantial part due to its setting.

23 C.F.R. § 771.135(p)(4)(ii).  No constructive use from visual impact occurs if "[o]verall

(combined) proximity impacts caused by a proposed project do not substantially impair the

- 39 -

activities, features, or attributes that qualify a resource for protection under section 4(f)," or if "[p]roximity impacts will be mitigated to a condition equivalent to, or better than, that which would occur under a no-build scenario."  23 C.F.R. § 771.135(p)(5)(vi)-(vii).  "If any of the proximity impacts will be mitigated, only the net impact need be considered" in determining the existence of a constructive use.  23 C.F.R. § 771.135(p)(6)(ii).  For various reasons enumerated by FHWA, a new crossing, especially with the proposed mitigation measures, would not substantially impair the aesthetic features of the Little Miami River or substantially detract from its setting.

While recognizing the existence of <u>some</u> visual impacts of a new bridge, the lead agencies have reasonably explained that under the Section 4(f) regulations, the impacts -- especially with mitigation measures -- do not significantly impair the ORVs or rise to the level of a constructive use.  AR 1717-19, 47716-17.  The lead agencies have consistently acknowledged that the Little Miami River is a visually sensitive resource, *e.g.*, AR 47374; they have also recognized that a bridge would alter the visual landscape of the area, AR 1718.  However, FHWA reasoned that "[i]n the vicinity of the proposed crossing, the views experienced by recreational users of the [Little Miami River] are primarily in the foreground, not long distance due to the winding nature of the river and are less critical to the scenic quality of the view."  <u>Id.</u>  This greatly decreases the severity of any impairment of the scenic ORVs.

Mitigation measures would also alleviate the net visual impact so that the features of the Little Miami River would not be impaired.  Since the MIS process, ODNR has demanded mitigation measures, such as purchase and preservation or reforestation of the private lands adjacent to the river and use of best management practices, that would in many ways improve this portion of the Little Miami River relative to a no-action alternative.  AR 122-23.  The FEIS

lists yet more mitigation measures, to be further developed in Tier 2.  AR 47761-62; see also AR 2920-21.  Additionally, both FHWA and ODOT invited NPS to actively participate on the bridge aesthetics team, saying "[their] input will be of value in addressing ... concerns that the proposed bridge will diminish the scenic value of the river."  AR 2924.

Plaintiffs suggest that it is the lead agencies' position that since the Little Miami River is already impacted in the study area (and is not "pristine"), another transportation project cannot cause a constructive use of that area.  Plaintiffs' Brief at 39.  The lead agencies do not argue that only "pristine" areas are subject to potential constructive use.  Instead, they have properly recognized that the existing aesthetic attributes at various segments of the nearly 100-mile-long Little Miami River differ.  AR 1718-19.  The lead agencies' discussion of current development along the river in the Eastern Corridor study area contextualizes and defines the "current activities, features, [and] attributes" for which proximity impacts must be analyzed in determining whether a constructive use would occur.  23 C.F.R. § 771.135(p)(6)(i).

All of these points and more were made to NPS, Plaintiffs, and the public by the lead agencies.  Far from ignoring the conflicting views of NPS, the lead agencies have painstakingly responded at every turn and improved their DEIS and FEIS based on their requests for more information.  *E.g.*, AR 47439-58, 47724-51, 47792-806.

> 2.    A Review of Relevant Caselaw Supports the Conclusion That No Constructive Use of the Little Miami River Will Occur.

The Project is analogous to various other cases in which no constructive use has been found.  In Geer v. Fed. Highway Admin., 975 F. Supp. 47 (D. Mass. 1997), plaintiffs challenged defendants' choice to implement a new bridge, rather than their preferred tunnel option, to improve transportation near Boston, alleging that it would cause greater uses of upstream parkland due to visual and noise impacts.  Id. at 52-53.  Defendants' constructive use analysis

utilized similar reasoning to that used by FHWA in the present case; in particular, they noted that the bridge would have a limited visual impact on the foreground views, *i.e.* the waters and banks, and that existing development provided important context for determining the existing uses and the project's impacts thereon. Id. at 73 - 74. The district court found that based on these explanations, "[i]t was within the discretion of the FHWA to conclude that the impacts found, while adversely affecting the parcels, did not reach a degree as to be considered substantial enough to constitute a constructive use." Id. at 79.

Similarly, in The Laguna Greenbelt, Inc. v. United States Dep't of Transp., 42 F.3d 517 (9th Cir. 1994) (*per curiam*), the court affirmed *de novo* the district court's grant of summary judgment in favor of the USDOT and FHWA for sufficiency of their EIS and Section 4(f) statements. The agencies concluded that a new, eight-lane, 17.5-mile highway corridor bisecting a 16,000 acre undeveloped area, "the last significant open space in Orange County" and a place with "ecological, recreational and scenic value," would not constructively use Section 4(f) properties. Id. at 521-22.[25] Although the project would involve an overpass over one Section 4(f) land (a bike trail) and location of the highway corridor adjacent to Bonita Creek public park, the court "reviewed the findings of the FH[W]A as set forth in the EIS" and agreed that "the project will not substantially impair the current features, activities and attributes of these parklands." Id. at 533. Together, these cases emphasize that relevant attributes of the Section 4(f) resource must be substantially, not minimally, impaired.

Cases cited by Plaintiffs do not support their conclusions, and instead illustrate that impacts are only "so severe" that the protected attributes are "substantially impaired" when they

---

[25] There were issues of direct use for other Section 4(f) properties, but the Court also affirmed the agency's conclusions with respect to those properties. Laguna Greenbelt, 42 F.3d at 530-33.

rise to levels significantly greater than those detailed by the lead agencies throughout the Eastern

Corridor study process.  23 C.F.R. § 772.135(p)(2).  <u>Coalition Against a Raised Expressway, Inc.</u>

<u>v. Dole</u>, 835 F.2d 803 (11th Cir. 1988), for example, was mainly grounded on noise being raised

to as much as 80 dB, significantly more than the noise level modeled for the LMR bridge, and on

<u>complete elimination</u> of views of and from the 4(f) properties at issue.[26]  <u>Id.</u> at 811-12.  In <u>Sierra</u>

<u>Club v. United States Department of Transportation</u>, 664 F. Supp. 1324 (N.D. Cal. 1987), the

proposed highway would have physically interrupted hiking trails (whereas the potential Option

1 bridge would cause no physical interruption of recreational activities like kayaking).  Visual

impacts, too, would have caused a much greater quantity of change in a vastly more pristine area.

The impacts included a large "saddle cut" between mountains, four bridges, seven "cuts" up to

2100 feet across a mountain face, and more, all of which that could be seen from a greater

number of areas of the Section 4(f) resource than the bridge impacts in the current case (in which

the bridge only would be visible for a brief stretch of the Little Miami River because of the

river's curves and overall length).  <u>Id.</u> at 1328, 1330.  Finally, the 4(f) resource at issue in

<u>Conservation Society of South Vermont v. Secretary of Transportation</u>, 362 F. Supp. 627 (D. Vt.

1973), was an undeveloped 11,000-acre area with no roads or urban development, and included

portions of the Appalachian Trail.  <u>Id.</u> at 638-39.  None of these cases describes a factual

scenario remotely similar to the record in this case.

---

[26]  This case was decided using a reasonableness, not arbitrary and capricious, standard of agency review, which Plaintiffs agree is not the law for a determination that Section 4(f) does not apply.  <u>Id.</u> at 810-11.

**CONCLUSION**

For the foregoing reasons, ODOT respectfully requests that this Court grant summary judgment in favor of the lead agencies on all counts of Plaintiffs' Complaint.

Dated:  August 10th, 2007

Respectfully submitted,


___s/ Frederick C. Schoch_____
(signed with express permission by Fred R.
Wagner)
MARC DANN
Attorney General of Ohio
FREDERICK C. SCHOCH
Trial Attorney
Assistant Attorney General
Transportation Section
150 East Gay St., 17th Floor
Columbus, Ohio  43215-3130
Phone:        (614) 466-4656
Fax:           (614) 466-1756
fschoch@ag.state.oh.us

FRED R. WAGNER
Outside Counsel to Ohio Department of
Transportation
D.C. Bar No. 416009
Beveridge & Diamond, P.C.
1350 I Street, NW, Suite 700
Washington, D.C.  20005-3311
Phone:        (202) 789-6041
Fax:           (202) 789-6190
fwagner@bdlaw.com

*Attorneys for Defendant-Intervenor*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| RIVERS UNLIMITED, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.  1:06-CV-01775-JR |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| TRANSPORTATION, *et al.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| OHIO DEPARTMENT OF TRANSPORTATION, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| _____ | ) | |

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT-INTERVENOR OHIO DEPARTMENT OF TRANSPORTATION'S
CROSS-MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

MARC DANN
Attorney General of Ohio
FREDERICK C. SCHOCH
Trial Attorney
Assistant Attorney General
Transportation Section
150 East Gay St., 17th Floor
Columbus, Ohio 43215-3130
Phone:      (614) 466-4656
Fax:        (614) 466-1756
fschoch@ag.state.oh.us

FRED R. WAGNER
Outside Counsel to Ohio Department
of Transportation
D.C. Bar No. 416009
Beveridge & Diamond, P.C.
1350 I Street, NW, Suite 700
Washington, D.C. 20005-3311
Phone:      (202) 789-6041
Fax:        (202) 789-6190
fwagner@bdlaw.com

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... iii

GLOSSARY OF TERMS .............................................................................................. viii

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND ........................................................................................... 5

I.      The Eastern Corridor ................................................................................. 5

II.     Major Investment Study ........................................................................... 7

III.    The Little Miami River.............................................................................. 8

IV.     Options 1 and 2 for the River Crossing ................................................... 10

V.      NEPA Process ........................................................................................... 12

        A.     The Lead Agencies Tiered the Project for NEPA Review. ................. 12

        B.     The Early NEPA Process Was Conducted With Input From the
               Public and Cooperating Agencies. ................................................ 14

        C.     The Tier 1 DEIS Was Drafted With Input From the Public and
               Cooperating Agencies. .................................................................. 15

               1.     Preliminary DEIS.................................................................. 15

               2.     DEIS ....................................................................................... 16

        D.     The Tier 1 FEIS Responded to Comments Regarding the Project...... 18

        E.     The Tier 1 EIS Record of Decision Responded to All Remaining
               Comments. ..................................................................................... 20

        F.     NPS Submitted Post-ROD Correspondence Reiterating Previously
               Raised Concerns. ........................................................................... 20

ARGUMENT ................................................................................................................... 21

I.      THE STANDARD OF REVIEW IS NARROW AND
        DEFERENTIAL TO THE LEAD AGENCIES' DECISION................................. 21

II.     THE TIER 1 EIS PROCESS DID NOT VIOLATE NEPA. ...................................... 23

A. The Tier 1 NEPA Process Evaluated All Reasonable Alternatives. ................... 23

B. The Price of Gasoline Set Forth in the September 2004 Economic Analysis Report Did Not Negatively Impact the FEIS........................................ 29

C. The Post-ROD Letter Submitted by NPS Did Not Trigger the Need to Prepare a Supplemental EIS............................................................................. 30

III. THE FHWA'S ANALYSIS OF THE PROJECT'S POTENTIAL TO USE PUBLIC PARKLAND SATISFIED THE REQUIREMENTS OF SECTION 4(f)................................................................................................................... 34

A. FHWA Properly Found No Constructive Use From Noise Impacts. ................... 36

1. The Little Miami River Is a "Category B" Noise Receptor. .......................... 36

2. The Noise Study Upon Which FHWA Relied Reasonably Found That a New Bridge Would Not Constitute a Constructive Use. .......................................................................................... 38

B. FHWA Properly Found No Constructive Use From Visual Impacts.................................................................................................................... 39

1. A New Bridge Will Not Substantially Impair the Visual Resources or Recreational Opportunities of the Little Miami River. ............................................................................................................ 39

2. A Review of Relevant Caselaw Supports the Conclusion That No Constructive Use of the Little Miami River Will Occur................................................................................................................ 41

CONCLUSION ....................................................................................................................... 44

# TABLE OF AUTHORITIES

**Cases**                                                                            **Page(s)**

Allison v. Dep't of Transp.,
908 F.2d 1024 (D.C. Cir. 1990) ........................................................................ 35

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) ......................................................................................... 22

Chritton v. Nat'l Transp. Safety Bd.,
888 F.2d 854 (D.C. Cir. 1989) ......................................................................22, 34

Citizens Against Burlington v. Busey,
938 F.2d 190 (D.C. Cir. 1991) .......................................................................... 23

*City of Alexandria v. Slater,
198 F.3d 862 (D.C. Cir. 1999) ...............................................................23, 25, 26, 27

City of Olmsted Falls v. Fed. Aviation Admin.,
292 F.3d 261 (D.C. Cir. 2002) ........................................................................30, 33

Cleary, Gottlieb, Steen & Hamilton v. Dep't of Health and Human Servs.,
844 F. Supp. 770 (D.D.C. 1993) ....................................................................... 21

Coal. Against a Raised Expressway, Inc. v. Dole,
835 F.2d 803 (11th Cir. 1988) .......................................................................... 43

Conservation Law Found. v. FHWA,
24 F.3d 1465 (1st Cir. 1994) ............................................................................ 22

Conservation Soc'y of S. Vermont v. Sec'y of Transp.,
362 F. Supp. 627 (D. Vt. 1975) ........................................................................ 43

Davis v. Mineta,
302 F.3d 1104 (10th Cir. 2002) ........................................................................ 29

Defenders of Wildlife v. Babbitt,
130 F. Supp. 2d 121 (D.D.C. 2001) .................................................................. 22

*Geer v. Fed. Highway Admin.,
975 F. Supp. 47 (D. Mass. 1997) .................................................................41, 42

*The Laguna Greenbelt, Inc. v. United States Dep't of Transp.,
42 F.3d 517 (9th Cir. 1994) ...........................................................................24, 28, 42

Lun Kwai Tsui v. The Attorney Gen.,
445 F. Supp. 832 (D.D.C. 1978) ................................................................. 22

Mount Royal Joint Venture v. Kempthorne,
477 F.3d 745 (D.C. Cir. 2007) ................................................................... 23

Natural Res. Def. Council, Inc. v. Hodel,
865 F.2d 288 (D.C. Cir. 1988) ................................................................... 27

Natural Res. Def. Council, Inc. v. Morton,
458 F.2d 827 (D.C. Cir. 1972) ................................................................... 27

N. Buckhead Civic Ass'n v. Skinner,
903 F.2d 1533 (11th Cir. 1990) ................................................................. 28

Sierra Club v. Peterson,
717 F.2d 1409 (D.C. Cir. 1983) ................................................................. 24

Sierra Club v. United States Dep't of Transp.,
753 F.2d 120 (D.C. Cir. 1985) ................................................................... 39

*Sierra Club v. United States Dep't of Transp.,
310 F. Supp. 2d 1168 (D. Nev. 2004) .................................................. 27, 28

Sierra Club v. United States Dep't of Transp.,
664 F. Supp. 1324 (N.D. Cal. 1987) .......................................................... 43

Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,
435 U.S. 519 (1978) ................................................................................... 24

**Statutes**

5 U.S.C. § 706(2)(A) .................................................................................. 21

16 U.S.C. §§ 1271-1287 ............................................................................... 8

16 U.S.C. § 1271 ........................................................................................ 10

16 U.S.C. § 1271(b) ..................................................................................... 9

16 U.S.C. § 1273(b) ................................................................................... 10

16 U.S.C. § 1274(b), (d) ............................................................................ 10

16 U.S.C. § 1276(b) ............................................................................................... 10

16 U.S.C. § 1281(a) ............................................................................................... 10

23 U.S.C. §§ 100-501 ........................................................................................... 10

42 U.S.C. §§ 4321-4347 ......................................................................................... 2

49 U.S.C. § 303 .................................................................................................... 4, 5

49 U.S.C. § 303(c)(1) ........................................................................................... 35

**Regulations**

FHWA Metropolitan Transportation Planning

23 C.F.R. § 450.318 (amended 2007) ..................................................................... 2

FHWA Environmental Impact and Related Procedures

23 C.F.R. part 771 ................................................................................................ 13

23 C.F.R. § 771.135(p)(1)(i) ................................................................................ 35

23 C.F.R. § 771.135(p)(2) ..................................................................................... 35

23 C.F.R. § 771.135(p)(4)(ii) ................................................................................ 39

23 C.F.R. § 771.135(p)(5)(ii) ............................................................................ 38, 39

23 C.F.R. § 771.135(p)(5)(iv) ............................................................................... 36

23 C.F.R. § 771.135(p)(5)(vi)-(vii) ..................................................................... 340

23 C.F.R. § 771.136(p)(6)(i) ................................................................................. 41

23 C.F.R. § 771.135(p)(6)(ii) ............................................................................... 40

FHWA Highway Traffic Noise

23 C.F.R. § 772.5 ................................................................................................. 38

23 C.F.R. § 772.17 ............................................................................................... 38

23 C.F.R. § 772 Table 1 ..................................................................................... 37, 38

Council on Environmental Quality

40 C.F.R. part 1500 .................................................................. 12

1501.4 ................................................................................ 29

40 C.F.R. § 1502.9(c)(1)(ii) ...................................................... 31

40 C.F.R. § 1502.14(a) .....................................................23, 24, 29

40 C.F.R. § 1502.20 ................................................................ 13

1508.9 ................................................................................ 29

40 C.F.R. § 1508.28 ................................................................ 13

**Other**

Statewide Transportation Planning; Metropolitan Transportation Planning,
72 Fed. Reg. 7,224 (Feb. 14, 2007) ............................................... 2

FHWA, Noise Policy FAQs,
http://www.fhwa.dot.gov/ENVIRonment/noise/faq_nois.htm (2007) ......... 36

Washington State DOT, Chapter 4: Section 4(f) Evaluation, SR 509:
Corridor Completion/ I-5/South Access Road Environmental Impact
Statement 15-17, available at http://www.wsdot.wa.gov/NR/rdonlyres/
4DE5B496-D83E-4F86-A60C-F2FD12A5D2BA/0/chapter_4.pdf (2003) ............... 37

Memorandum from Frederick Skaer, FHWA, to Allen Masuda re: Tiering
of the I-70 Project, available at http://www.environment.fhwa.dot.gov/
guidebook/i70tieringmemo.asp (June 18, 2001). ................................ 13

Letter from Dinah Bear, CEQ, to Harter Rupert, FHWA re: Use of Tiering
for Corridor Preservation Purposes (July 17, 1988) ........................... 13

Memorandum to Agencies Containing Guidance on Agency
Implementation of NEPA Regulations, 48 Fed. Reg. 34,263 (July 28,
1983) ................................................................................ 13

Memorandum to Agencies Containing Scoping Guidance, 46 Fed. Reg.
25,461 (May 7, 1981) ............................................................... 13

Forty Most Asked Questions Concerning CEQ's National
Environmental Policy Act Regulations, Question 1a, 46 Fed. Reg.
18,026 (March 23, 1981) ........................................................................................................ 23

# GLOSSARY OF TERMS

APA ................................................................................. Administrative Procedure Act

AR................................................................................................. Administrative Record

CEQ ............................................................................ Council on Environmental Quality

DEIS ........................................................................ Draft Environmental Impact Statement

DOI ...................................................................................... Department of the Interior

DOT ....................................................................................... Department of Transportation

EIS ...................................................................................... Environmental Impact Statement

FEIS.......................................................................Final Environmental Impact Statement

FHWA................................................................................ Federal Highway Administration

Leq(h) ...................................Equivalent Level of Steady-State Sound (averaged over one hour)

LMR................................................................................................ Little Miami River

LOS ..................................................................................................... Level of Service

MIS ............................................................................................... Major Investment Study

NEPA....................................................................... National Environmental Policy Act

NPS..................................................................................................... National Park Service

ODNR .......................................................................... Ohio Department of Natural Resources

ODOT ........................................................................... Ohio Department of Transportation

OEPA......................................................................... Ohio Environmental Protection Agency

OKI ...................................................Ohio-Kentucky-Indiana Regional Council of Governments

ORVs .................................................................................. Outstandingly Remarkable Values

ROD.............................................................................................. Record of Decision

USDOT ...................................................................United States Department of Transportation

USEPA.......................................................... United States Environmental Protection Agency

## INTRODUCTION

The Eastern Corridor Multi-Modal Project ("Project") is a comprehensive and long-studied set of plans to improve transportation in and around the eastern Cincinnati metropolitan and suburban areas of southwestern Ohio ("Eastern Corridor" or "Corridor").  The Project was created on a bipartisan basis by federal, state, and local officials and representatives with significant input from the general public.  The Final Environmental Impact Statement ("FEIS") challenged here was the culmination of a lengthy, thorough, and transparent process with the active collaboration of affected citizens, local jurisdictions, regional committees, local and national public interest groups (including Plaintiffs), and federal and state agencies.

The Eastern Corridor covers nearly 200 square miles, beginning in downtown Cincinnati and extending east through urban and suburban portions of Hamilton and Clermont Counties in Ohio and Campbell County in Kentucky.  Although there has been significant residential and commercial development within the Eastern Corridor over the last 40 years, there has been little improvement to the Corridor's transportation infrastructure, resulting in severe traffic congestion.  As a result, over the past decade both public and private entities have worked toward solving this problem.

Recognizing the need to improve the already over-capacity system, in 1996 the Ohio-Kentucky-Indiana Regional Council of Governments ("OKI")[1] initiated a major investment study ("MIS")[2] to examine transportation problems in the Corridor and recommend changes.  After

---

[1]  OKI was the entity tasked by the State of Ohio with improving transportation in the Eastern Corridor.

[2]  In the mid-1990s, a MIS was required "where the need for a major metropolitan transportation investment [was] identified, and Federal funds [were] potentially involved" under

(Continued …)

four years, extensive public input, and the collaboration of federal, state, and local stakeholders, the group conducting the MIS ("MIS Task Force") recommended a multi-modal plan to improve transportation in the Corridor. This plan included improved bus transit and new bike and pedestrian routes, rail transit, and highway capacity.

Because elements of the Project relied on federal funds, the recommended transportation plan triggered review by the Federal Highway Administration ("FHWA") and the Ohio Department of Transportation ("ODOT") (collectively the "lead agencies") pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347. This review will be conducted in two tiers. Tier 1, the subject of this litigation, presents a broad, planning-level review of the transportation needs in the Corridor, the development and evaluation of a range of feasible alternatives, a preliminary assessment of expected impacts, and the identification of a recommended transportation plan. It does not commit to implementation of any particular component of the Project. By contrast, Tier 2 will involve more detailed engineering and environmental analyses and final NEPA documentation on a project-by-project basis for the feasible alternatives identified in Tier 1 at the time each one is implemented. At the end of the Tier 2 process, the appropriate agencies will likely begin formal design for permanent transportation improvements.

Out of this comprehensive review process and complex multi-modal plan to improve transportation in the Eastern Corridor, Plaintiffs have singled out one issue for this Court's review: the decision by the lead agencies to advance for further review under Tier 2 the impacts of a new, clear-span bridge over the Little Miami River. Plaintiffs contend that a new bridge

---

(Continued …)

the regulation then in effect at 23 C.F.R. § 450.318. That regulation was revised in 2007 to make such corridor studies optional. 72 Fed. Reg. 7,224, 7,261 (Feb. 14, 2007).

over the Little Miami River is not appropriate. Underlying Plaintiffs' argument is their belief that a new bridge poses a dire threat to environmental and recreational attributes exhibited by the Little Miami River. Plaintiffs stress the Little Miami River's classification as a National Wild and Scenic River and do their best to depict the area around the proposed bridge crossing as pristine and untouched. The Plaintiffs' romantic perspective of the Little Miami River, however sincerely held, does not necessarily reflect the overall status of that resource, particularly in the area generally proposed for a river crossing.

The section of the Little Miami River in the Eastern Corridor was initially rejected for classification as a National Wild and Scenic River in the early 1970s because of, among other problems, urban blight. Today, this 28-mile section of the Little Miami River is surrounded by residential and commercial development and is already transversed by four bridges. The area considered for a possible new bridge crossing is less than 7 miles from downtown Cincinnati,[3] less than 3 miles from Lunken Airport, which served as Cincinnati's main airport for several decades, and is within ear-and-eyeshot of railroads, a landfill, and other industry. To suggest this area is pristine skews reality.

Plaintiffs' perspective on the Tier 1 and Tier 2 NEPA process is likewise skewed. At the Tier 1 stage there is no guarantee that a new bridge will be built. Rather, the lead agencies merely have recommended that the new bridge proposal receive further, more detailed study. Plaintiffs' concerns regarding the impact of the new bridge will be addressed in Tier 2, during which Plaintiffs, and any other interested parties, will have further opportunity to comment on and provide direction to the Project.

---

[3]    As of 2006, the Cincinnati-Middletown-Wilmington Combined Statistical Area had a population of 2,147,617 persons, making it the 20th largest metropolitan area in the country.

Even if a new bridge is recommended for construction and is actually built, Plaintiffs' use and enjoyment of the Little Miami River will not be substantially impaired. Any proposed bridge will clear-span the river -- there will be no pillars in the water or surrounding wetlands to interfere with people using the river or with wildlife in the wetlands. Moreover, visual impacts will be minimal because the proposed location of the bridge is in or near a horseshoe bend in the river. Anyone using the river or standing on its banks beyond the upstream and downstream bends in the river or otherwise not in the immediate vicinity of the actual crossing will not be able to see the bridge.

Plaintiffs take issue with the range of alternatives for a proposed Little Miami River bridge crossing identified in the FEIS and appear to favor extending an existing bridge crossing. Yet they devote little advocacy to explain how rejection of the new bridge alternative violates the procedural aspects of NEPA. The detailed and comprehensive analysis devoted to the topic of a potential Little Miami River bridge crossing in the MIS, Draft Environmental Impact Statement ("DEIS"), FEIS, and Record of Decision ("ROD") flatly contradicts Plaintiffs' assertion that an expanded crossing would meet the Project Purpose and Need. Plaintiffs cannot now substitute their opinion, which has been heard, vetted, and rejected, for that of the federal, state, regional, and local entities which were charged with analyzing this issue.

In their Cross-Motion for Summary Judgment, Plaintiffs weave the aforementioned themes regarding the location of the proposed bridge and its purported effect on the beneficial qualities of the Little Miami River into an argument that the Tier 1 process violates NEPA and Section 4(f) of the Department of Transportation Act ("Section 4(f)"), 49 U.S.C. § 303.[4]

---

[4]  Section 4(f) applies only to agencies of the United States Department of Transportation ("USDOT") and mandates that such agencies take "special effort ... to preserve

(Continued …)

However, in crafting their arguments Plaintiffs have improperly narrowed their focus with regard

to the facts of this case and wrongly applied the law thereto.  As demonstrated below, the

alternatives, impacts, pluses and minuses of the Project were fully analyzed as documented in the

comprehensive record which is full of give-and-take and information sifting by federal, state,

regional, and local agencies as well as the general public.  A decision has been rendered.

Plaintiffs may disagree with the decision, but the process that led to the decision, and the

decision itself, complied with the law.

## FACTUAL BACKGROUND

This section relates information from the Administrative Record ("AR")[5] regarding major

procedural and substantive elements on which the parties' briefs rely.

I.    THE EASTERN CORRIDOR

The Eastern Corridor covers the 165 square mile urban and suburban eastern sector of the

Cincinnati, Ohio metropolitan area and 35 square miles of neighboring Campbell County in

Kentucky.  AR 47130.  It is an important pathway for connecting people with jobs in urbanized

areas and for the movement of goods and services from areas east of Ohio into the Cincinnati

metropolitan area.  AR 47075.  The Eastern Corridor delivers one of the highest daily commute

volumes to jobs in Cincinnati and Hamilton County but has only inefficient local routes or

circuitous interstate routes to service this demand.  Id.

---

(Continued …)
the natural beauty of the countryside and public park and recreation lands, wildlife and
waterfowl refuges, and historic sites."  49 U.S.C. § 303.

[5] All citations are to the supplemental Administrative Record [30] lodged with this Court
on June 12, 2007.

Many key routes in the Eastern Corridor's existing roadway network have current traffic volumes in excess of capacity, and projected traffic studies indicate that No Build average daily traffic volumes on interstates and main roadways in the area will increase up to 81 percent over current conditions by 2030.[6] Id. Ineffective routing and connectivity and limited capacity for current travel patterns and projected travel demand along with the limited number, capacity, and connectivity of crossings over the Little Miami River contribute to more congestion and delays internally within the Eastern Corridor network and more circumferential travel and vehicle miles traveled on the interstate network external to the Corridor. Id.

More than 80 percent of the roadway segments evaluated in the Eastern Corridor for a three-year study period (1998-2000) exceeded the statewide average vehicular crash rate, with over half of the accidents occurring on US-50 and SR-32, the two main routes through the Corridor. Id. Crashes affect system reliability and cause delays, especially in a network such as the Eastern Corridor with few alternative routes and reliance on only four bridge crossings over the Little Miami River. AR 47075-76. Many key routes in the area exhibit physical and geometric deficiencies. AR 47076. As expected traffic volumes increase and the conditions of the existing modes of transportation worsen, safety conditions are expected to decline. Id.

Transit and other non-highway travel options are limited in the Eastern Corridor. Bus transit currently occurs primarily along only four routes and is not available for many locations within the Eastern Corridor. Id. Existing bikeway facilities along Milford Road and around Lunken Airport are limited in availability and connectivity and currently do not provide a

---

[6] Level of Service ("LOS") is a measure by which transportation planners determine the quality of service on transportation devices or transportation infrastructure. The LOS system uses the letters A-F, with A being the best and F the worst, to describe conditions for a transportation device or infrastructure. LOS analyses conducted for the year 2020 indicate that many of the key local routes in the Eastern Corridor, including portions of SR 32, will be operating at a LOS of E or F. AR 47695.

functional transportation option for commuters.  Id.  There is currently no rail transit in the Eastern Corridor.  AR 47078.

## II.    MAJOR INVESTMENT STUDY

In 1991, Congress passed the Intermodal Surface Transportation Act, 23 U.S.C. §§ 100-501, which placed a new emphasis on local planning to improve transportation as well as new methods to do so, including metropolitan planning, congestion management, and major investment study requirements.[7]  This regulatory change, along with the assignment of new and comprehensive transportation responsibilities to OKI, set the stage for initiating the MIS for the Eastern Corridor.  AR 47898-900, 47131.  Preliminary investigations conducted by OKI included traffic quality and travel surveys, AR 47901-08, followed by a definition of the problem and objectives for evaluating alternatives, which was refined by a round of public meetings.  AR 47908-17.  Broadly stated, the four objectives for evaluating alternatives were to identify an effective and comprehensive solution for transportation problems in the Eastern Corridor, to provide support for the regional economy, to improve transportation consistent with larger regional environmental goals, and to consider land use.  AR 47917.

OKI established a 58-member Task Force for guidance and direction.  AR 47910-11.  The MIS Task Force was composed of representatives of 18 local governments, state and federal agencies including the Ohio Department of Natural Resources ("ODNR"), which administers Ohio's National Wild and Scenic Rivers, AR 2920, environmental interests including Plaintiffs Little Miami, Inc. and the Sierra Club, and other organizations and businesses.  AR 47868, 47910-11.  The Task Force employed a multi-layered process in developing its recommendations for improving transportation in the Eastern Corridor.  The Task Force first developed a universe

_____

[7]    Under then-applicable regulations, the MIS process was required where federal funds were used in a major transportation project.  See footnote 2 *supra*.

of 19 alternatives from which it selected 12 feasible alternatives, each focused on a single transportation strategy (*e.g.*, rail from point A to point B).  AR 47878-79.  The 12 single-strategy plans were consolidated into seven multiple-component plans.  Id.  After assessing these plans, the Task Force established five mode-based plans, each focusing on a dominant mode of transportation (*e.g.*, highway, rail).  Id.  From there, the Task Force came up with a preliminary recommended plan.  Id.  After public comments and significant discussion, that plan was ultimately adopted as the Recommended Plan of the Task Force ("Recommended Plan").  Id.  A public hearing on the Recommended Plan was held in March 1999.  AR 15662-701.  After further consideration to discuss the comments the Task Force received regarding the Recommended Plan, AR 9309-15, the MIS was published in April 2000.  AR 47867-48204.

Early in the MIS process the Midwest office of the National Park Service ("NPS"), concerned about OKI's decision to study new river crossings that might impair the free-flowing nature and recreational attributes of the Little Miami River, alerted OKI to its jurisdiction over the River pursuant to the Wild and Scenic Rivers Act.  AR 8598-600.  While the primary responsibility to administer the Little Miami River as a National Wild and Scenic River is vested in ODNR, NPS has limited jurisdiction and coordinates with ODNR to manage the River.  AR 42269.  NPS's interest in a river crossing was thereafter discussed at Task Force meetings.  See AR 9298.

## III.    THE LITTLE MIAMI RIVER

The Little Miami River flows through southwest Ohio to the Ohio River near Cincinnati.  AR 9894 (map).  Between 1973 and 1980 it was designated as a National Wild and Scenic River, and given a management plan and limited protection from certain in-stream development, in two stages pursuant to 16 U.S.C. §§ 1271-1287.  AR 9902-04, 9922.  A 64-mile section north of the

Eastern Corridor region, beginning upstream northeast of Dayton, Ohio, was designated as a

National Wild and Scenic River in 1973. AR 9904. At the time, the lower portion of the river

was too plagued by problems such as "urban blight" to qualify for designation. AR 9902; see

also AR 9894 (map). "The problem of urban blight [was] especially acute in the reach from

Milford downstream to Shademoore where the riverbanks ... [were] badly covered with litter,

bankside dumps, run-down properties, dilapidated cottages, and other such evidence of man's

careless use of the water course." AR 9902.

    Over the next several years, the lower portion of the Little Miami River underwent a

major rehabilitation effort. AR 9922. In 1979, despite persistent problems of urban blight,

proponents of designation argued that the lower section now qualified for inclusion in the

National Wild and Scenic Rivers system at the "recreational" level of designation.[8] AR 9922.

Several Ohio communities expressed opposition to the designation, not wanting future

transportation development to be hindered. AR 9924; see also AR 9101-02 (map and description

of proposed relocation of US-50 across Little Miami River). In recommending approval of the

designation of the lower section, the United States Department of the Interior ("DOI") stated that

"while we would be reluctant to support any highway proposal which would have a severe

---

    [8] "Every wild, scenic or recreational river ... shall be classified, designated, and
administered as one of the following: (1) Wild river areas—Those rivers or sections of rivers that
are free of impoundments and generally inaccessible except by trail, with watersheds or
shorelines essentially primitive and waters unpolluted. ... (2) Scenic river areas—Those rivers or
sections of rivers that are free of impoundments, with shorelines or watersheds still largely
primitive and shorelines largely undeveloped, but accessible in places by roads. (3) Recreational
river areas—Those rivers or sections of rivers that are readily accessible by road or railroad, that
may have some development along their shorelines, and that may have undergone some
impoundment or diversion in the past." 16 U.S.C. § 1271(b). See also AR 1384 ("Rivers in the
National System are often referred to as 'wild and scenic rivers' without regard to actual
classification. This is acceptable when speaking of the National System in general, but the
specific legal classification is an important distinction as it has a direct effect on how the river is
administered and whether certain activities on federally owned lands within the boundaries are
permissible.").

adverse impact ... , <u>nothing in the Wild and Scenic Rivers Act precludes the construction of a bridge across a designated river</u>.  Such situations must be reviewed on a case-by-case basis."  AR 9924 (emphasis added).

The lower section of the Little Miami River was designated as a recreational component of the National Wild and Scenic Rivers system in 1980.  AR 47275.  The management plan and "outstanding remarkable values" ("ORVs")[9] for the upper portion were adopted for the lower portion.  AR 9886.  The Little Miami River's ORVs, which qualify it for inclusion in the system under 16 U.S.C. § 1271 and also help frame its management plan under 16 U.S.C. § 1281(a), include recreational, fish and wildlife, geological, and historical features dispersed along various segments of the river.  AR 47275.  The primary uses of the segment of the Little Miami River that runs through the Eastern Corridor study area are for kayaking and canoeing.  AR 47717.  The Little Miami River is surrounded by private lands in the project study area.  AR 47277.  The uses of these private lands include industry, rail, utilities, and a landfill.  AR 1718, 8439, 47323, 47326.

## IV.    OPTIONS 1 AND 2 FOR THE RIVER CROSSING

Throughout the MIS process special attention was paid to the Little Miami River based largely in part on a decision of the Task Force to relocate SR 32, which is currently a two-lane highway that crosses the Little Miami River at the Beechmont Levee and is one of the main and most congested transportation arteries in the Eastern Corridor.  AR 47888-90, 47156 (map).  The

---

[9]    When a river is under consideration for classification in the Wild and Scenic Rivers Act, studies are performed that scope out the "outstanding remarkable values" of the river.  16 U.S.C. § 1273(b).  Based on these values a river may be designated as either "wild," "scenic," or "recreational" or be removed from the list of eligible rivers.  <u>Id.</u>; 16 U.S.C. §§ 1274(b), (d), 1276(b).  A wild river segment is managed with stricter environmental rules than a scenic river segment.  A recreational river segment is managed with the lowest level of environmental rules.  16 U.S.C. §§ 1273(b), 1281(a).

Task Force initially eliminated a new crossing of the Little Miami River from consideration in 1996. AR 9244-45, 23776, 22800-02. However, during 1997 and most of 1998, the Task Force asked the consultants to continue to evaluate all options for river crossings. AR 9252-53, 9270, 9272-79, 9283-88, 23776, 22800-02. During this process, two main options for relocating SR 32 were considered: Option 1, from Red Bank Road/US-50 in Fairfax across the Little Miami River on a new crossing; and Option 2, along Beechmont Avenue and across the Little Miami River on a widened existing crossing (the Beechmont Levee) several miles south of the possible locations for a new bridge. AR 9291-99, 22803, 23772 (map). The Task Force convened a subgroup, composed of members with a special interest in relocating SR 32, to evaluate and improve the two options. AR 9303, 47201-03.

In late 1998, after a series of studies and public meetings, see AR 12933, the subgroup recommended that the MIS proceed with Option 1 and that the Project provide for various mitigating conditions such as clear spanning the riparian corridor and purchasing easements to prevent secondary development. AR 9302-03. Option 1, thus modified, was then adopted by the Task Force in full, recommended to OKI, and included in the Recommended Plan. AR 9305, 9308.

Option 1 was chosen because it met the Project's objectives. Option 1 will improve air quality and reduce the impact on existing development. It not only is a direct route over the Little Miami River, but also will provide an additional route if other Little Miami River crossings are closed. In addition, Option 1 meets long-term transportation goals developed in the MIS process. AR 9303-05, 48011-25. Option 1 also was favored by the preponderance of public opinion and received letters of support from surrounding counties and towns, including Cincinnati. AR 9303.

In contrast, Option 2 does not meet the Project's objectives. Option 2 will result in increased traffic volume on the existing Beechmont Levee, causing this facility to approach capacity by 2020 and likely requiring further, additional widening (*i.e.*, lane additions and river crossing structure extension). AR 47202. Increased volume on the levee would require major modifications to existing interchanges at SR 32 and US 50, resulting in substantial impacts on existing residential and commercial development located at the north end of the levee in the community of Linwood. Id. Option 2 will result in increased peak volumes on Beechmont, increased traffic in coterminous locations such as Mt. Lookout, and would not effectively reduce congestion in Mariemont. Id. In addition, Option 2 does not conform to local land use plans. AR 47745.

The potential alignments currently under consideration for the proposed new bridge over the Little Miami River are in an already impacted area. AR 123. Nearby forested areas are fragmented by a powerline and associated utility structures and a landfill sits within eyesight just upstream. AR 8439 (landfill), 47282 (photograph showing powerline). Development, including residential, commercial, and light industrial, is denser outside the floodplain, but there is significant agricultural activity adjoining the river in the study area. See, e.g., AR 47323, 47326 (maps); AR 1718.

V.    NEPA PROCESS

A.    The Lead Agencies Tiered the Project for NEPA Review.

The Project is being conducted in two parts corresponding to a two-tiered NEPA process established in response to state and federal agency scoping input. The use of tiering is authorized under NEPA regulations issued by the Council on Environmental Quality ("CEQ"), 40 C.F.R. part 1500, and under regulations issued jointly by FHWA and the Federal Transit

Authority, 23 C.F.R. part 771.  Tiering is also addressed in guidance documents issued by both

these agencies, including guidance issued in 1981,[10] 1983,[11] and 1988[12] by CEQ, as well as

tiering guidance outlined in a memorandum issued by FHWA dated June 18, 2001.[13]

CEQ refers to tiering in 40 C.F.R. § 1508.28 as "the coverage of general matters in

broader environmental impact statements with subsequent narrower statements or environmental

analyses incorporating by reference the general discussions and concentrating solely on the

issues specific to the statement subsequently prepared."  In 40 C.F.R. § 1502.20, CEQ

encourages agencies "to tier their environmental impact statements to eliminate repetitive

discussions of the same issues and to focus on the actual issues ripe for decision at each level of

environmental review."

The Project is a long-term, multi-modal plan that addresses transportation problems

affecting a number of communities in the almost 200 square mile area that makes up the Eastern

Corridor.  It warrants a tiered NEPA approach due to the complexity involved in the coordination

of multi-modal improvements, prioritization of projects, and the different construction timing

expected for the needed transportation investments identified in the MIS.  Moreover, it is

precisely the type of thorough, penetrating review for which advocates for the environment have

clamored for years.

---

[10]  Memorandum to Agencies Containing Scoping Guidance, 46 Fed. Reg. 25,461 (May 7, 1981).

[11]  Memorandum to Agencies Containing Guidance on Agency Implementation of NEPA Regulations, 48 Fed. Reg. 34,263 (July 28, 1983).

[12]  Letter from Dinah Bear, CEQ, to Harter Rupert, FHWA re: Use of Tiering for Corridor Preservation Purposes (July 17, 1988).

[13]  Memorandum from Frederick Skaer, FHWA, to Allen Masuda re: Tiering of the I-70 Project, available at http://www.environment.fhwa.dot.gov/guidebook/i70tieringmemo.asp (June 18, 2001).

B.     The Early NEPA Process Was Conducted With Input From the Public and
        Cooperating Agencies.

After several years of study through the MIS process, the lead agencies[14] began the main

elements of the Tier 1 NEPA process in early 2002 with an extensive Public Involvement

Program, AR 32581-641, the preparation of an environmental inventory, AR 4304-08

(summary), and a series of meetings.  One round of public involvement meetings was held in late

May and early June, 2002, AR 10038-40; the Sierra Club, one of the Plaintiffs, was present at

these meetings, AR 176, and comments were received regarding the Little Miami River, see AR

29049.  ODNR continued its close involvement with the Project, insisting on significant

mitigation measures before it would approve a bridge over the Little Miami River.  AR 131.

A Notice of Intent to prepare a tiered EIS was published in the Federal Register in May

2002.  AR 3977-79.  The NPS wrote a letter to FHWA and ODOT in response, saying it was

"responsible for evaluating projects and their effects on [National Wild and Scenic] designated

rivers."  AR 8757-58.  ODNR and ODOT invited NPS to an August 2002 inter-agency meeting;

an NPS representative was unable to attend, but said the NPS "would not be able to offer any

more insights" than it had in its earlier, brief letter to FHWA and ODOT.  AR 136-38.  At the

meeting, ODNR's proposed mitigation measures for the Little Miami River crossing were the

main point of discussion.  AR 9987-88.

NPS was, however, present and active at another inter-agency meeting that October

during which its concerns about Section 4(f) and the elimination of Option 2 were discussed.

AR 33140-47.  In a conference call soon after the October inter-agency meeting, NPS requested

---

[14]   The Project, while under the purview of ODOT, is overseen by a partnership of state,
county, and city governments and transportation agencies and is administratively led by the
Hamilton County Transportation Improvement District.  FHWA serves as the lead federal
agency in the NEPA process.  AR 47692.

to be a cooperating agency, but acknowledged that it would have no approval jurisdiction if the bridge did not touch the river.  AR 10472-73, 1237.  FHWA formally requested NPS's service as a cooperating agency soon thereafter, AR 8694, and NPS accepted, AR 8690-91.

While technical studies continued, another round of public involvement meetings was held in May 2003.  AR 8304-05, 8672.  In October 2003, NPS reiterated its concerns regarding the absence of a no-bridge alternative, AR 8628-30, and attended an inter-agency meeting where it again stated that it wanted the previously rejected no-new-bridge option continued and that visual impacts on the Little Miami River should be addressed.  AR 10315-19.  A public open house meeting to discuss the DEIS was held in December 2003.  AR 3760-87.

       C.      The Tier 1 DEIS Was Drafted With Input From the Public And Cooperating Agencies.

          1.      <u>Preliminary DEIS.</u>

The preliminary Tier 1 DEIS was released for comment by the lead agencies in March 2004.  AR 8615-16.  The purpose and need for the Project were established in the DEIS.  The overall purpose was "to implement a multi-modal transportation program consistent with the adopted long range plan for the region, addressing priority needs and furthering [the] four project goals [*i.e.*, objectives discussed *supra* at 7] established in the Major Investment Study phase." AR 47162-78.  The Tier 1 DEIS did not propose specific alignment locations, but rather, "alternative corridors that will be further developed during Tier 2 of the Eastern Corridor study." AR 47119.  The Tier 1 DEIS divided the feasible alternatives by mode (*e.g.*, bus, rail, highway, bikeway), and divided the proposals for the highway mode into four segments, the second of which contained a new crossing of the Little Miami River.  <u>Id.</u>; AR 47122.  The DEIS did not recommend that Option 2 be further studied.

Comments were received in May from the Ohio Environmental Protection Agency ("OEPA"), AR 8606-09, United States Environmental Protection Agency ("USEPA") Region 5, AR 10604-10, ODNR, AR 10602-03, the United States Army Corps of Engineers, AR 8601-02, and NPS, AR 8575-92. OEPA expressed a preference for design elements, such as clear-span bridges, and other mitigation efforts to minimize impacts to the Little Miami River and its tributaries. AR 8608. USEPA stated its opinion that the document did not "successfully demonstrate that Option 2 [was] not feasible." AR 10605.

NPS commented that it was "troubled" by the absence of no-bridge alternatives in the preliminary Tier 1 DEIS and criticized the MIS process. AR 8575-92. NPS requested more discussion of a bridge's impacts on the Little Miami River's ORVs, of the travel impact differences between Options 1 and 2, and of Section 4(f) issues, suggesting that there was a Section 4(f) "constructive use" of the river that would trigger statutory duties. Id. NPS also suggested that for the purpose of conducting a noise analysis, FHWA should classify the Little Miami River as a Category A noise receptor, the most sensitive category reserved for places like Arlington National Cemetery, rather than as a Category B noise receptor, the category that encompasses parks and recreation areas. AR 8584. FHWA's review of the preliminary Tier 1 DEIS was completed in October 2004 after FHWA representatives explained their acceptance of the MIS process used in the Project. AR 7787.

          2.    DEIS.

The Tier 1 DEIS was released for public review and comment in November 2004. AR 3510-13. The Tier 1 DEIS discussed the MIS process and the development and analysis of alternatives. AR 47196-209, 47223-31. The document also discussed the applicability of Section 4(f) to the Little Miami River. AR 47277-78, 47360-63, 47372-79, 47403.

After the Tier 1 DEIS was released, Little Miami, Inc. and the Sierra Club criticized the document in the press, AR 3729, and ran anti-Project advertisements, AR 2132. NPS was initially quick to respond before the end of the year with a presentation at an inter-agency meeting, AR 1459-62, and a letter explaining its position that Option 2, previously rejected in the four-year MIS, should nonetheless be assessed during the EIS, AR 8362-64. NPS also met and corresponded with FHWA and ODOT in January through March of 2005. AR 317, 7826, 7830-32, 10880-91, 10896-99. The three agencies discussed NPS's level of involvement and coordination with the MIS and EIS. *E.g.*, AR 10880-91.

Comments on the DEIS arrived from USEPA Region 5, AR 11003-07, Rivers Unlimited, AR 10967-97, Little Miami, Inc., AR 3639-58, the Sierra Club, AR 3701-11, the Little Miami River Partnership, AR 10962-63, and American Rivers, AR 10964-66, at the beginning of 2005. USEPA requested a more detailed discussion of impacts on the Little Miami River and exclusion of MIS Option 2. AR 1103-07. The environmental and river organizations registered additional points regarding the value of the river, the value of avoiding highways (and what they viewed as likely resulting sprawl) altogether, and purported Section 4(f) impacts of a new bridge. Individual citizens submitted comments both in favor of and opposed to the bridge proposal. AR 3904-36.

DOI requested an extension of time to comment on the DEIS, which FHWA granted, AR 8550, 8547, and eventually submitted comments in mid-April 2005. AR 2158-72. DOI noted that most of its earlier comments had been addressed in the DEIS, AR 2158, but "disagree[d] with some of the conclusions," AR 2159. It again argued that removal of Option 2 from continued consideration did not uphold the objectives of NEPA, and that there would be a Section 4(f) use in any of the potential bridge alignments due to visual and noise impacts. AR

2158-72.  Robert Ukeily, attorney for Plaintiffs, also informed FHWA in May 2005 that

disagreement about FHWA's Section 4(f) determination with respect to the Little Miami River

still remained.  AR 10775-800.

     D.     The Tier 1 FEIS Responded to Comments Regarding the Project.

     The draft of the FEIS was released to FHWA for its review in June 2005.  AR 8497-98.

FHWA requested a noise analysis.  AR 7945.  ODOT performed a noise reading on August 2,

2005 at 4 locations: two on the river bank, one some yards north of the river, and one north of the

Beechmont Levee (south of the Option 1 study area) on a sandbar in the river.  AR 2362-70.

ODOT's modeling showed that "[n]o location [was] predicted to experience noise levels that

approach or exceed the FHWA noise abatement criteria" for category B noise receptors.  AR

2364.  ODOT also noted that noise would be more extensively modeled in the Tier 2 NEPA

analysis phase, when there would be more detailed information available.  AR 2365.

     FHWA responded in September 2005 to DOI's April 2005 comments and subsequent

consultations regarding Section 4(f), alternatives, and other issues.  AR 1717-19.  It clarified its

finding of no Section 4(f) constructive use, explaining that: 1) "the possibility of a new crossing

did not impact the decision to designate the lower reach of the Little Miami as a component of

the National Wild and Scenic Rivers System" in 1979 when plans similar to Option 1 had been

proposed; 2) the recreational value of the river would not be impacted; 3) the visual intrusion of

the bridge would be minimal due to the winding nature of the river and due to existing

urbanization; and 4) based on ODOT's noise analysis, there would be no constructive use due to

noise.  Id.

     The Tier 1 FEIS was signed at the end of September 2005, AR 3548, and mailed for

review in mid-October.  AR 3550-08, 2064.  The Tier 1 FEIS responded to comments received

regarding the Tier 1 DEIS, including comments from NPS, Plaintiffs, and others regarding the removal of Option 2 from consideration and regarding any Section 4(f) applicability to a new Little Miami River crossing.  AR 47726-51, 47760-62, 47782-84, 47788-806.

FHWA received comments on the FEIS until the end of November.  USEPA Region 5 again requested more information in the ROD or another report about the selection of alternatives during the MIS process, but expressed appreciation for the "new and significant" information already added to the FEIS regarding Options 1 and 2.  AR 9759-60.  FHWA responded in detailed fashion to USEPA's comments.  AR 1800-02, 1922-34.

The Sierra Club and Little Miami, Inc. both submitted comments on the FEIS.  AR 9743-54, 9756-57.  Plaintiffs' comments again stated their concerns about the removal of Option 2, the economic analysis, and Section 4(f) constructive use, and their general skepticism of mitigation measures.  Id.  FHWA responded to the Sierra Club and Little Miami, Inc. in a document "incorporated as part of the Tier 1 FEIS" and "constitut[ing] the FHWA's final disposition" of their comments.  AR 1636-68.  Each substantive comment by both groups was set forth verbatim with a targeted response.  Id.

FHWA also received comments from DOI.  AR 42269-80.  DOI noted that "[d]uring the last year, FHWA staff ha[d] worked closely with the NPS to resolve issues raised during the review process," but that it still had concerns about the MIS process, the FEIS recommendation of a new crossing of the Little Miami River, and the determination of no Section 4(f) constructive use.  Id.  FHWA responded in detailed fashion to DOI's comments.  AR 2917-29. ODNR, the agency responsible for administering Ohio's National Wild and Scenic Rivers, AR 2920, commented that a new bridge can be compatible with the management plan so long as sufficient mitigation measures are undertaken, see, e.g., AR 131, 47733.

E.    The Tier 1 EIS Record of Decision Responded to All Remaining Comments.

FHWA and ODOT continued to coordinate with DOI, NPS, and USEPA in advance of

issuing the ROD.  AR 2283.  FHWA, ODOT, DOI and NPS met in February 2006 to discuss the

consultation, alternatives, and Section 4(f) issues in DOI's comments on the FEIS, issues which

FHWA and ODOT considered resolved.  AR 1725-26, 1735, 9477-78.  FHWA met with USEPA

in March 2006 and provided a more detailed written explanation of the MIS process.  AR 1800-

02, 9476.  FHWA sent a letter to DOI in May 2006 regarding issues that had been presented and

resolved after DOI's November 2005 comments and the February 2006 meeting with NPS.  AR

2917-29.  The letter also announced that FHWA was then in the midst of crafting the Tier 1

ROD.  AR 2925.  FHWA also wrote a letter to USEPA in May 2006 detailing further its position

on the analysis of alternatives and the lack of Section 4(f) constructive use.  AR 1922-34.

The ROD for the Eastern Corridor Multi-Modal Projects Tier 1 EIS was signed by

FHWA on June 2, 2006.  AR 47074-99.  This action advanced the multi-modal components and

segments enumerated in the FEIS and ROD to a more detailed Tier 2 analyses.  AR 47074,

47099.  FHWA sent letters to OEPA, Little Miami, Inc., and the Sierra Club explaining that the

ROD responded to all remaining issues that they had raised.  AR 8392-94.

F.    NPS Submitted Post-ROD Correspondence Reiterating Previously Raised
       Concerns.

More than three weeks after the ROD was signed, on June 28, 2006, NPS sent a final

letter to FHWA stating that NPS would have liked FHWA to wait to sign the ROD until NPS

responded to FHWA's May 2006 letter and noise analysis.  NPS restated its assertion that the

Project was a constructive use of the Little Miami River and requested a supplemental Section

4(f) statement.  AR 8147-63.  NPS reiterated its earlier disagreements regarding the classification

- 20 -

of the Little Miami River as a Class B, rather than Class A, noise receptor; visual impacts; and the adequacy of mitigation measures.  AR 8151-54.

NPS also disagreed with technical aspects of ODOT's noise analysis.  Id.  It attached to its post-ROD letter a report entitled Analysis of Eastern Corridor Noise Readings, drafted by an NPS acoustic specialist.  AR 8156-63.  The report alleged several technical deficiencies in ODOT's noise analysis, including equipment error, site choice, sample size, model metric, and failure to use NPS or aviation-based noise guidelines.  Id.  In response, ODOT scheduled a meeting with NPS to discuss the letter and to improve its working relationship with NPS in the future.  AR 1982.

## ARGUMENT

Plaintiffs contend that the lead agencies violated NEPA in three respects: by failing to evaluate all reasonable alternatives; by relying on allegedly inaccurate data; and by declining to prepare a supplemental FEIS.[15]  Plaintiffs further contend that the Project constitutes a constructive use of the Little Miami River in violation of Section 4(f).  For the reasons set forth below, Plaintiffs' arguments fail and summary judgment should therefore be granted in the lead agencies' favor on all counts in Plaintiffs' Complaint.

I.    THE STANDARD OF REVIEW IS NARROW AND DEFERENTIAL TO THE LEAD AGENCIES' DECISION

The Administrative Procedure Act ("APA") authorizes a court to set aside agency action only if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  Under the arbitrary and capricious standard, the party challenging the agency action bears the burden of proof.  Cleary, Gottlieb, Steen & Hamilton v. Dep't of

_____

[15]  The Complaint raised a fourth purported NEPA violation: failure to mitigate. Plaintiffs, however, have failed to address this argument in their brief, and summary judgment should therefore be granted in favor of the lead agencies on this count.

Health and Human Servs., 844 F. Supp. 770, 783 (D.D.C. 1993).  In deciding an administrative

record case under the "arbitrary and capricious standard," a court's role is limited:

> Under this standard, the Court "must consider whether the decision was based on
> a consideration of the relevant factors and whether there has been a clear error of
> judgment. ...  Although this inquiry into the facts is to be searching and careful,
> the ultimate standard of review is a narrow one.  The court is not empowered to
> substitute its judgment for that of the agency."  Thus, when reviewing an agency
> decision under the "arbitrary and capricious" standard, we must defer to the
> wisdom of the agency, provided its decision is reasoned and rational, and even
> "uphold a decision of less than ideal clarity if the agency's path may reasonably
> be discerned."

Chritton v. Nat'l Transp. Safety Bd., 888 F.2d 854, 856 (D.C. Cir. 1989) (citations omitted).

The "'merit of the [agency action] is to be determined exclusively on the administrative

record' ... [and] summary judgment is appropriate after a review of the administrative record."

Lun Kwai Tsui v. The Attorney Gen., 445 F. Supp. 832, 835 (D.D.C. 1978) (citations omitted);

Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121, 124 (D.D.C. 2001).  Here, there is no

dispute over the documents contained in the administrative record[16] and the parties have

submitted cross motions for summary judgment and agree that the only issues for the court to

resolve are whether the Defendants' actions were proper under law.  Therefore, the Court may

not "find" underlying facts, see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986), and summary

judgment is appropriate to resolve the issues presented in this case.

Plaintiffs challenge the ROD issued by the FHWA under NEPA and Section 4(f).  The

legal standard Plaintiffs must overcome is high.  Conservation Law Found. v. Fed. Highway

Admin., 24 F.3d 1465, 1471 (1st Cir. 1994) ("'[T]he administrative actions taken in this case

under NEPA ... [and] § 4(f) ... are subject to a highly deferential abuse of discretion standard of

---

[16]  Plaintiffs have relied on a June 28, 2006 NPS letter that, while inadvertently included
in the record, should not be considered part of the record because it was submitted after the ROD
was signed.  While the lead agencies are not obligated to address arguments based on documents
outside the record, they will nonetheless do so here.

- 22 -

review.").  The D.C. Circuit has explained that arbitrary and capricious agency action occurs

only when the agency "relied on factors which Congress has not intended it to consider, entirely

failed to consider an important aspect of the problem, offered an explanation for its decision that

runs counter to the evidence before the agency, or is so implausible that it could not be ascribed

to a difference in view or the product of agency expertise."  Mount Royal Joint Venture v.

Kempthorne, 477 F.3d 745, 753 (D.C. Cir. 2007).  Plaintiffs have failed to overcome this

standard.

II.    THE TIER 1 EIS PROCESS DID NOT VIOLATE NEPA

    A.    The Tier 1 NEPA Process Evaluated All Reasonable Alternatives.

Plaintiffs allege that the lead agencies failed to consider a reasonable range of alternatives

by excluding Option 2 from NEPA review.  Given the definition of reasonable alternatives

established by the District of Columbia Circuit ("D.C. Circuit"), Plaintiffs fall far short of

establishing that the Tier 1 FEIS failed to consider a reasonable range of alternatives.  Moreover,

Plaintiffs' argument was recently rejected on a set of facts almost identical to those presented

here.

It is well established that a consideration of alternatives is critical to the NEPA process.

However, a "rule of reason" governs an agency's selection of alternatives.  See Citizens Against

Burlington v. Busey, 938 F.2d 190, 195-96 (D.C. Cir. 1991).  Only reasonable alternatives need

be "rigorously explored" and "objectively evaluated" in an EIS, see Forty Most Asked Questions

Concerning CEQ's National Environmental Policy Act Regulations, Question 1a, 46 Fed. Reg.

18,026 (March 23, 1981); 40 C.F.R. § 1502.14(a), and they should be selected and evaluated

based on the purpose and need of the project, see City of Alexandria v. Slater, 198 F.3d 862, 867

(D.C. Cir. 1999).  The range of alternatives, however, is "bounded by some notion of feasibility,"

- 23 -

<u>Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.</u>, 435 U.S. 519, 551

(1978), and "for alternatives which were eliminated from detailed study, [the EIS should] briefly

discuss the reasons for their having been eliminated," 40 C.F.R. § 1502.14(a).  Neither NEPA

nor its implementing regulations requires an EIS to discuss a minimum number of alternatives.

<u>The Laguna Greenbelt, Inc. v. United States Dep't of Transp.</u>, 42 F.3d 517, 524 (9th Cir. 1994).

The record confirms that the lead agencies gave a reasonable, full, and detailed

consideration to a wide range of alternatives during the MIS process, "rigorously explored" and

"objectively evaluated" all reasonable alternatives in the EIS that met the stated objectives for

the Project, and briefly discussed the reasons for eliminating alternatives, including Option 2,

from detailed study.  Consequently, the lead agencies took the "hard look" required by NEPA.

<u>See</u> <u>Sierra Club v. Peterson</u>, 717 F.2d 1409, 1413 (D.C. Cir. 1983).  The planning process for the

Project began in 1996 with the preparation of the MIS.  During that four-year process, the MIS

Task Force developed a universe of 19 alternatives for improving movement through the Eastern

Corridor, ranging from no action to multi-modal plans, from which 12 feasible alternatives were

selected.  AR 47924, 47940-42.  The 12 alternatives selected were consolidated into seven

multiple-component plans, from which the Task Force established five mode-based plans, each

focusing on a dominant mode of transportation.  AR 47942-92.

During the Tier 1 NEPA process, the lead agencies selected for "rigorous[] explor[ation]"

and "objective[] evaluat[ion]" only those alternatives which, after thorough vetting during the

MIS process, met the Project's objectives.  AR 47196-209.  The DEIS devoted over 50 pages of

discussion to the alternatives for the Project, addressing in detail not only the alternatives

selected from the MIS process, but also alternatives that were rejected during the MIS process,

including Option 2.  AR 47196-263.  Finally, the FEIS also discussed in detail various

alternatives, including Option 2, not selected for detailed study.  AR 47741-49.

Despite this comprehensive record of the consideration of a wide range of feasible

alternatives, Plaintiffs argue that the lead agencies violated NEPA by failing to deem Option 2 a

reasonable alternative.  Option 2, however, does not meet the Project's objectives, and therefore,

is not a reasonable alternative

In City of Alexandria v. Slater, plaintiffs argued, and initially the district court agreed,

that FHWA violated NEPA by failing to consider a ten-lane bridge a reasonable alternative to the

twelve-lane options that were selected for further analysis.  198 F.3d 862 (D.C. Cir. 1999).  The

D.C. Circuit reversed, explaining that to determine whether an alternative is reasonable under

NEPA, a court must make a two-step inquiry: (1) whether an agency's objectives are reasonable,

and (2) whether the alternative is reasonable in light of those objectives.  Id. at 867.  Turning to

the merits, the appellate court criticized the district court for finding that FHWA's objectives

were improperly defined because FHWA did not sufficiently prioritize environmental goals.  Id.

The appellate court explained that "[t]he proper question to ask at the outset of a NEPA inquiry

is not whether the [Federal Highway] Administration focused on environmental goals but rather

... whether its stated objectives were reasonable."  Id.

Finding FHWA's stated goals reasonable, the appellate court next examined the

alternatives at issue, finding that FHWA had properly concluded that the ten-lane bridge

alternative did not meet the project's objectives and that the district court's opinion to the

contrary was in error.  Id. at 868-69.  The appellate court concluded its analysis of this issue by

stating that "it is simply a non sequitur to call a proposal that does not 'offer a complete solution

to the problem' a 'reasonable alternative.'"  Id. at 869.

Here, Plaintiffs do not contend that the Project's objectives were unreasonable. Rather, Plaintiffs attempt to substitute their standards for the Project's objectives by carefully parsing the record and highlighting select attributes of Option 2 which, in Plaintiffs' opinion, qualify Option 2 as a reasonable alternative that meets the Project's objectives. To reach this erroneous conclusion, Plaintiffs focus solely on Option 2's benefits without addressing those negative qualities which led OKI to find that Option 2 did not meet the Project's objectives. Plaintiffs' narrow focus is improper.

Plaintiffs first argue that certain elements of Option 2 could serve to meet the Project's stated goals. The main flaw in Plaintiff's argument, however, is that while an alternative may have some benefits and may even meet some of a project's objectives, if the alternative does not "offer a complete solution to the problem," it is not reasonable. City of Alexandria at 868-69 (recognizing that the alternative advanced by plaintiffs partially met the project's objectives, but overall, the alternative did not offer a complete solution to the problem).

Here, OKI evaluated Option 2 in depth during the MIS process and found that it does not meet the objectives identified in the MIS process. For example, Option 2 will result in increased traffic volume on the existing Beechmont Levee, causing this facility to approach capacity by 2020 and likely requiring further, additional widening (*i.e.*, lane additions and river crossing structure extension). AR 47202. Increased volume on the levee would require major modifications to existing interchanges at SR 32 and US 50, resulting in substantial impacts on existing residential and commercial development located at the north end of the levee in the community of Linwood. Id. Option 2 will result in increased peak volumes on Beechmont, increased traffic in coterminous locations such as Mt. Lookout, and would not effectively reduce

congestion in Mariemont.  Id.  In addition, Option 2 does not conform to local land use plans.
AR 47745.

Plaintiffs completely fail to address City of Alexandria and rely instead on two D.C.
Circuit decisions, Natural Res. Def. Council, Inc. v. Hodel, 865 F.2d 288 (D.C. Cir. 1988) and
Natural Res. Def. Council, Inc. v. Morton, 458 F.2d 827 (D.C. Cir. 1972), for the proposition
that an agency may not "disregard alternatives merely because they do not offer a complete
solution to the problem."  Plaintiffs' Brief at 19.  However, in City of Alexandria, the D.C.
Circuit questioned the continuing vitality of Morton, and specifically explained that Morton is
distinguishable because it addressed a coordinated effort to solve a problem of national scope,
rather than a discrete project within the jurisdiction of one federal agency.  City of Alexandria,
198 F.3d at 868-69.  In Hodel the court addressed the DOI's five-year schedule of offshore oil
and gas leasing, which like Morton, is an issue of national scope.  In short, Hodel and Morton are
not applicable to this case which, precisely like City of Alexandria, is concerned with a discrete
project within the jurisdiction of one federal agency.

Recent caselaw also undermines Plaintiffs' argument that the lead agencies acted in an
arbitrary and capricious manner by eliminating Option 2 from further review at the MIS stage,
and therefore, failing to "rigorously explore" and "objectively evaluate" Option 2 during the Tier
1 NEPA process.  With facts strikingly similar to our case, plaintiffs' argument was flatly
rejected by the District of Nevada in Sierra Club v. United States Dep't of Transp., 310 F. Supp.
2d 1168 (D. Nev. 2004).  In that case, plaintiffs questioned, inter alia, FHWA's decision to omit
from discussion in the EIS a particular alternative to a proposed highway improvement in Las
Vegas.  Id. at 1176-77, 1190-94.  FHWA responded that the EIS did not need to consider the
alternative at issue because the MIS process fully considered and then rejected that alternative.

- 27 -

Id.  After engaging in a lengthy discussion of the MIS process, the court concluded that "a federal agency does not violate NEPA by relying on prior studies and analyses performed by local and state agencies," id. at 1193 (citing Laguna Greenbelt, 42 F.3d at 524 n.6 and North Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1542-43 (11th Cir. 1990)), and that:

> FHWA's reliance on the MIS process to eliminate alternatives from the EIS was not arbitrary and capricious.  The EIS did not consider in depth [the] alternative because the MIS process evaluated that alternative and found it did not meet the project's purpose and need, was too costly, and depended upon an uncertain RCFG.  The MIS contained many of the hallmarks of the NEPA process, including various studies on project impacts, significant public involvement, and a comparison of alternatives.  FHWA's decision not to duplicate the state agencies' analyses and evaluations as to what alternatives would be feasible and meet project goals does not violate NEPA.

Id. at 1193.  In other words, the court found that because the MIS process evaluated the alternative at issue and determined that it did not meet the project's objectives, and because the MIS process was similar enough to the NEPA process, it was not arbitrary and capricious for FHWA to rely on the MIS and not go forward with a new analysis of the alternative.

Here, as discussed *supra* at 11-12, the MIS Task Force evaluated Option 2 in detail and determined that it offered an incomplete solution to the problem at hand and did not meet the Project's objectives.  In addition, the MIS process conducted in the case *sub judice* contained many of the hallmarks of the NEPA process.  The MIS contained studies on project impacts.  AR 7631-36.  Members of the public served on the Task Force that developed the MIS, and public meetings were held throughout the MIS process, including at the end of the process to address in particular the Option 1 versus Option 2 issue.  *E.g.*, AR 47868, 47910-11, 12933, 15662-702.  Further, the MIS contained a lengthy and detailed comparison of alternatives.  See discussion *supra* at 7-8.  Finally, the FEIS devoted several pages of discussion to explaining why Option 2

was eliminated from detailed study, which more than meets the requirement to "briefly discuss ... reasons eliminat[ing] an alternative." 40 C.F.R. § 1502.14(a); AR 47731-33, 47741-49.

Davis v. Mineta, cited by Plaintiffs in support of their alternatives argument, is distinguishable. 302 F.3d 1104 (10th Cir. 2002). Davis addressed an environmental assessment, by its nature a very limited document,[17] as opposed to an EIS. Id. at 1109. Davis also applied a lessened standard of review than this Court must apply to this case. Id. at 1112. Finally, the Davis court found that the federal defendants did not engage in an adequate review of alternatives to a bridge crossing because alternatives other than the proposed bridge crossing were never given a "hard look." Id. at 1120. Here, Option 2 along with several other alternatives received the requisite "hard look" during the MIS process and were properly rejected because they did not meet the Project's objectives.

In sum, under controlling D.C. Circuit caselaw, it was proper for the lead agencies to reject Option 2 because it did not meet the Project's objectives, and therefore, it was *per se* not a reasonable alternative. Further, even if Option 2 were an alternative that merited consideration, the MIS process contained all the hallmarks of the NEPA process for purposes of considering alternatives to meet the Project's objectives. As a result, it was proper for the lead agencies to rely on the MIS process to eliminate Option 2 from further review during the NEPA process.

B.    The Price of Gasoline Set Forth in the September 2004 Economic Analysis Report Did Not Negatively Impact the FEIS.

The Tier 1 NEPA process took place over four years, yielded a DEIS, FEIS, and ROD, and was supported by hundreds of studies, lengthy and detailed correspondence, and significant public input. Amidst this complex and comprehensive process, Plaintiffs find fault in the cost of gasoline used in an economic analysis supporting the FEIS. This less-than-substantive argument

---

[17]    See 40 C.F.R. §§ 1508.9, 1501.4.

- 29 -

fails to demonstrate that the FEIS was flawed.  If anything, it highlights how well the Tier 1

process was conducted, for if Plaintiffs are relegated to making insignificant arguments like this,

obviously there is little else in the Tier 1 process to challenge.

While the price of gasoline -- $1.13 per gallon -- used in the Economic Analysis may

have been low for 2003, as explained in a November 15, 2005 letter responding to comments on

this issue, the lead agencies determined that

> the use of the lower fuel price does not significantly impact the results of the
> study for two primary reasons: [1] Using a lower than actual fuel price understates
> the value of user benefits accruing to both highway and transit users from the
> multimodal Eastern Corridor; thus, resulting in a more conservative estimate of
> the user benefits and the resulting economic impacts [, and 2] The demand for
> transit services (*i.e.*, ridership) is relatively inelastic with regards to fuel prices.
> Based on ... independent research ... , a 200% increase in fuel prices ($3.39 a
> gallon), the maximum potential increase in transit ridership, is estimated to be 20-
> 24 % based on the gas price elasticity research presented below.

AR 506.  In other words, if Option 2 could not meet the low projections resulting from a price of

$1.13 per gallon, it certainly could not meet projections based on a higher price of gasoline.

Further, as explained in the same letter, "it is widely accepted practice to hold fuel prices

constant for the forecast period."  AR 506.  Accordingly, it was not error for the lead agencies to

rely on a price of $1.13 per gallon for future use in the Economic Analysis.

C.    The Post-ROD Letter Submitted by NPS Did Not Trigger the Need to Prepare a
      Supplemental EIS.

Plaintiffs argue that NEPA requires the lead agencies to prepare a supplemental EIS

based on purportedly new and significant post-ROD information.  As the D.C. Circuit has noted,

"[a] supplemental EIS is only required where new information 'provides a <u>seriously</u> different

picture of the environmental landscape.'"  <u>City of Olmsted Falls v. Fed. Aviation Admin.</u>, 292

F.3d 261, 274 (D.C. Cir. 2002) (citation omitted) (finding plaintiffs failed to meet their burden of

showing the agency's decision not to supplement an EIS was arbitrary and capricious where the

information at issue was already known by the agency prior to the issuance of a ROD).[18]  Here,

the post-ROD information at issue was not of a nature that would compel preparation of a

supplemental EIS.  Even if it were, another EIS will be done for Option 1 at the Tier 2 stage

before any new bridge is constructed and any new information will be considered at that time.

NPS's post-ROD letter[19] ("June 2006 Letter") that purportedly includes significant new

information is divided into two sections: one contains general comments and the other contains

detailed comments.  AR 9396-97.  Almost all of these comments were raised previously in an

April 18, 2005 letter ("April 2005 Letter") from DOI to FHWA, more than a year before the

ROD was issued.  <u>Compare</u> June 2006 letter, AR 9394-97 <u>with</u> April 2005 letter, AR 10849-858.

For example, points raised in the June 2006 letter that the Project constitutes a constructive use,

AR 9394, and that the Little Miami River qualifies as a Class A noise receptor, AR 9396, were

explicitly raised in the April 2005 letter, 10853 (constructive use) and 10858 (Class A receptor).

In places, the June 2006 and April 2005 letters are very similar, <u>compare</u> AR 9394

("Construction of a large, elevated, multi-lane bridge where there previously was not one would

impair the scenic qualities and attributes associated with the LMR.") <u>with</u> AR 10853 ("A bridge

crossing the Little Miami River would significantly and substantially interfere with the scenic

and recreational values of the Little Miami River."), or the language is practically verbatim,

---

[18]  <u>See</u> <u>also</u> 40 C.F.R. § 1502.9(c)(1)(ii) ("Agencies ... [s]hall prepare supplements to either draft or final environmental impact statements if ... [t]here are <u>significant</u> new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.") (emphasis added).

[19]  Plaintiffs assert that there was an "agreed upon deadline" of mid-June 2006 before which date FHWA and ODOT were to delay issuing the ROD while waiting for NPS comments on noise data provided in full in mid-April (though in summary earlier).  AR 8147.  However, there is no indication in the record of such agreement except in NPS's post-ROD June 28, 2006 comments.  AR 9628 (stating in early April that there were no plans to agree to wait for NPS comments).  There is also little indication that the lead agencies rushed the ROD -- in fact, it was several times delayed in order to add yet more information and clarification.  AR 8130.

compare AR 9397 ("A massive four-lane concrete bridge cannot be hidden from view.") with AR 10855 ("A four-lane bridge cannot be hidden from view.").

Further, while the June 2006 letter raises a few new comments based on correspondence between NPS and FHWA that took place between the April 2005 and June 2006 letters, the April 2005 letter substantively addressed the same underlying concerns that led NPS to make comments after the ROD was issued.  For example, one comment in the June 2006 letter states that "[t]he acoustic data collection and analysis report submitted with the May 12[, 2006] letter reveals serious deficiencies that invalidate the noise impact analysis conducted for the Eastern Corridor project during the final EIS process."  AR 9395-96.  The collection and analysis report, which was drafted by ODOT and is the subject of Plaintiffs' supplemental EIS and Section 4(f) arguments, was made available for the first time in conjunction with the May 12 letter, and thus, was not addressed in the April 2005 letter.  The April 2005 letter, however, raises the concern of noise impacts caused by the Project on several occasions.  See, e.g., AR 10852 ("Road and commuter rail traffic would pose major noise impacts.").

Finally, the main concerns raised in the June 2006 letter -- whether there is a constructive use of the Little Miami River, whether the river is a Category A or B noise receptor, and whether there should be further review of Option 2 -- were raised in the various comments and correspondence NPS and DOI provided in relation to the FEIS and DEIS.  For example, in NPS's May 2004 comments responding to the DEIS, NPS commented that it was "troubled" by the absence of no-bridge alternatives in the preliminary Tier 1 DEIS and requested more discussion of a bridge's impacts on the Little Miami River's ORVs, the travel impact differences between MIS Options 1 and 2, and Section 4(f) issues, suggesting that there was a Section 4(f) "constructive use" of the river.  AR 8575-92.  NPS also suggested that for the purposes of

conducting a noise analysis, FHWA should classify the Little Miami River as a Category A noise receptor rather than as a Category B noise receptor.  Id.  In October 2003 correspondence to FHWA, NPS raised concerns regarding the absence of a no-bridge alternative, AR 8628-30, and at an inter-agency meeting that month, NPS stated that it wanted the previously rejected no-new-bridge option reviewed and that visual impacts on the Little Miami River should be addressed.  AR 10315-29.

Not only was the information in the June 2006 letter included in previous NPS correspondence, but the lead agencies assessed this information and responded to it.  For example, NPS's concern over a constructive use was addressed both before and after the FEIS.  AR 47087 ("Based on continuous coordination with the NPS, and state and local officials, the level of consultation necessary to determine that the proposed project will not approach the threshold applicable to constructive use has been conducted.  Additional investigations and coordination conducted since approval of the FEIS reinforce our previous determination that Section 4(f) does not apply to the project as proposed.").  NPS's concern regarding the effect of a new bridge on the scenic qualities and attributes associated with the Little Miami River was directly addressed and responded to in the FEIS.  AR 47737-40.  The FEIS also addressed and responded to NPS's concern regarding the elimination of Option 2 as an alternative.  AR 47727-28.

In sum, the June 2006 letter submitted by NPS does not "provide a seriously different picture of the environmental landscape."  City of Olmsted Falls, 292 F.3d at 274.  To the contrary, the comments and concerns raised in that letter were substantially similar to those previously raised by NPS and DOI to the lead agencies throughout the Tier 1 process.  As a result, a supplemental EIS to address this information is not necessary.  Id.

III.    THE FHWA'S ANALYSIS OF THE PROJECT'S POTENTIAL TO USE PUBLIC
        PARKLAND SATISFIED THE REQUIREMENTS OF SECTION 4(f)

FHWA determined in the FEIS that a new crossing over the Little Miami River would

not constitute a "constructive use" of public parkland, as that term is defined in regulations

implementing Section 4(f).  The agency concluded that the potential for noise or visual impacts

on the Little Miami River would not have impacts on the resource's recreational values severe

enough to rise to the level of a constructive use.[20]  Plaintiffs preference is to remove the new

crossing alternative from further consideration in the Tier 2 EIS,  thus they dispute FHWA's no

constructive use analysis and determination.  However, their disagreement with plans for a

bridge crossing does not satisfy their heavy burden of proof to show that FHWA was arbitrary or

capricious in arriving at its Section 4(f) conclusions.  Indeed, the open and transparent record of

communication concerning potential Section 4(f) impacts, combined with Defendants' technical

modeling and legal analyses, demonstrate that FHWA's determinations as to both noise and

visual impacts are "reasoned and rational."  Chritton v. Nat'l Transp. Safety Bd., 888 F.2d 854,

856 (D.C. Cir. 1989).  Finally, Plaintiffs' preferred alternative of an expanded bridge crossing

fails to meet the area's transportation needs.[21]

---

[20]  Plaintiffs broadly assert in their introduction to this argument that the entire Project
constitutes a constructive use of the Little Miami River.  A review of their argument, however,
reveals that the sole focus of their argument is on the area around the proposed new bridge over
the Little Miami River.  Accordingly, this brief will focus only on that area.

[21]  Plaintiffs' Complaint also raised the issue of Defendants' postponement of Section
4(f) determinations for several public parks, recreation areas, and greenspaces until the Tier 2
EIS.  Plaintiffs failed to discuss this issue in their brief.  Defendants have made preliminary
determinations regarding these potential uses, but have properly postponed final determinations
because "[f]easible alternatives developed in Tier 1 are not specific alignment locations, but
alternative corridors that will be further developed and evaluated during Tier 2 . ...  Actual
encroachment on these features may be avoided or impacts may be minimized once alignment
location and configuration is more specifically determined . ..."  AR 47395-401.

Section 4(f) prohibits the "use" of historic and cultural resources except where there is no feasible and prudent alternative and where all possible planning has been conducted to minimize harm to the protected property. 49 U.S.C. § 303(c)(1). There are two possible types of use that must be considered in a Section 4(f) analysis: direct and constructive. A direct use occurs "when land is permanently incorporated into a transportation facility," and a constructive use occurs when "the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify a resource for protection under section 4(f) are substantially impaired." 23 C.F.R. §§ 771.135(p)(1)(i), (p)(2). Substantial impairment occurs when the "protected activities, features, or attributes of the resource are substantially diminished." Id. at (p)(2). "'[N]ot ... every change within park boundaries constitutes a use' of section 4(f) lands. ... No 'use' will be deemed to have occurred where an action will have only an insignificant effect on the existing use of protected lands." Allison v. Dep't of Transp., 908 F.2d 1024, 1028 (D.C. Cir. 1990). If the project does not use protected land resources, no Section 4(f) alternatives analysis is necessary.

In this action, Plaintiffs do not allege direct use associated with Option 1. Thus, the only issue involving the use of protected resources is whether FHWA reasonably determined that there was no constructive use.

Plaintiffs argue that FHWA's Section 4(f) analysis was deficient because it unreasonably relied on ODOT's Noise Analysis study and because the Little Miami River was improperly classified as a Category B noise receptor. Plaintiffs further argue that FHWA failed to adequately consider the imposition a new bridge would pose on the visual and aesthetic impacts to the Little Miami River's ORVs. As discussed below, Plaintiffs' arguments find no support in the record and the agency's reasonable determination should be upheld.

A.    FHWA Properly Found No Constructive Use From Noise Impacts.

1.    The Little Miami River Is a "Category B" Noise Receptor.

FHWA applied the correct legal standards to determine whether a potential new crossing

of the Little Miami River, as modeled, would have noise impacts substantial enough to rise to the

level of a constructive use.  No constructive use occurs from noise when "[t]he projected traffic

noise levels of the proposed highway project do not exceed the FHWA noise abatement criteria

as contained in Table 1, 23 C.F.R. part 772."  23 C.F.R. § 771.135(p)(5)(iv).[22]

The noise standards are lower for Category B resources than for Category A resources.

Category B is exemplified by land uses like the Little Miami River that benefit from relative

quiet but do not require near-silence for their utility: "[p]icnic areas, recreation areas,

playgrounds, active sports areas, parks, residences, hotels, motels, schools, churches, libraries,

and hospitals."  23 C.F.R. § 771.135(p)(5)(iv).  Category A areas, in contrast, are limited to those

"on which serenity and quiet are of extraordinary significance and serve an important public

need and where the preservation of those qualities is essential if the area is to continue to serve

its intended purpose."  Id.  "Some examples of lands that have been analyzed as Activity

Category A receivers include the Tomb of the Unknown Soldier, a monastery, an outdoor prayer

area of a facility for nuns, and an amphitheater."  FHWA, Noise Policy FAQs,

http://www.fhwa.dot.gov/ENVIRonment/noise/faq_nois.htm (2007).

Plaintiffs cite no authority to suggest that FHWA was arbitrary or capricious in finding

that an urban river used for some kayaking and canoeing, and subject to both wildlife and

human-caused sounds, is a relatively peaceful Category B "park" or "recreation area" rather than

---

[22]    Table 1 of Part 772 provides the noise abatement criteria, in decibels ("dB") averaged over one hour ("Leq(h)"), for one indoor and four outdoor categories of activity (A through E). 23 C.F.R. § 772 Table 1.

an "extraordinar[ily]" "seren[e] and quiet" Category A area.  23 C.F.R. § 772 Table 1.  First, the

Little Miami River and its uses fit neatly within the language of the Category B description,

especially "parks" and "recreation areas."[23]  Plaintiffs attempt in vain to distinguish kayaking

and canoeing from "recreation" and "active sports" expressly included in the criteria for this

category.[24]

Second, "preservation" of "extraordinary" "seren[e] and quiet" are neither possible nor

necessary for the Little Miami River, and the Horseshoe Bend region in particular, "to continue

to serve its intended purpose" as part of an urban recreational refuge.  There is no extraordinary

quiet to preserve, because -- like other portions of this nearly 100-mile river -- the segment of the

Little Miami River that runs through the Eastern Corridor near Cincinnati is already subject to

development and noise.  See, e.g., AR 123, 47261, 2363.  Even if such quiet did exist, noise

modeling performed for the Project demonstrates that highway noise from a possible new bridge

would not substantially interfere with the quality of canoeing and kayaking along the river, even

in the likely segment nearest to the final bridge alignment.  AR 2362-64.

---

[23] To further illustrate the high threshold for Category A noise receptors, the "largest natural preserve of woodland environment" in the Seattle/Tacoma area in Washington State, Des Moines Creek Park, described as "secluded" and "very important," is also classified as a Category B area (though in that case the Category B average noise threshold was exceeded due to airplanes overhead).  Washington State DOT, Chapter 4: Section 4(f) Evaluation, SR 509: Corridor Completion/ I-5/South Access Road Environmental Impact Statement 15-17, available at http://www.wsdot.wa.gov/NR/rdonlyres/4DE5B496-D83E-4F86-A60C-F2FD12A5D2BA/0/ chapter_4.pdf (2003).

[24] Also, the Category B noise abatement criterion, in contrast to those of Categories C and D, does already account for the need of places like homes, churches, and libraries for low levels of sound.

2.    The Noise Study Upon Which FHWA Relied Reasonably Found That a New Bridge Would Not Constitute a Constructive Use.

Plaintiffs argue that a noise study, performed by ODOT and relied upon by FHWA in determining there was no constructive use, fails to properly account for noise impacts to the Little Miami River's ORVs. Plaintiffs are mistaken. As demonstrated below, both the noise analysis and FHWA's reliance thereon were reasonable, and therefore, the agency's decision must be upheld.

As part of the noise analysis, four ambient noise readings were taken from locations near or on the Little Miami River, using the Leq(h) metric as per FHWA procedure described at 23 C.F.R. §§ 772.5, 772 Table 1. AR 2362-64. These data were then input into the FHWA Traffic Noise Model according to 23 C.F.R. § 772.17 to model a hypothetical bridge's impacts on 44 locations, using conservative (*i.e.*, inflated) traffic estimates. AR 2362-64. The results showed ambient noise in the absence of a bridge ranging from 51.5 dB Leq(h) to 56.4 dB Leq(h), and modeled a maximum bridge traffic noise level of 62.2 dB Leq(h). AR 2362-64. The maximum Leq(h) for Category B is 67 dB Leq(h). 23 C.F.R. § 772 Table 1. Therefore, "[n]o location is predicted to experience noise levels that approach or exceed the FHWA noise abatement criteria" for Category B noise receptors, which, as discussed above, is the correct classification for the Little Miami River. AR 2364; 23 C.F.R. § 772 Table 1.

Finally, federal regulations implementing Section 4(f) state that "a constructive use does **not** occur when," *inter alia*, "[t]he projected traffic noise levels of the proposed highway project do not exceed the FHWA noise abatement criteria as contained in Table 1, 23 C.F.R. part 772." 23 C.F.R. § 771.135(p)(5)(ii). Here, the noise study found that the projected noise levels do not exceed the noise abatement criteria contained in Table 1; all are less than 67 dB Leq(h). AR

2364-65.  Accordingly, it was reasonable for FHWA to rely on the noise study in determining

that no constructive use would result from construction of the Option 1 bridge.

Plaintiffs argue that the noise study has several deficiencies, most notably with regard to

the proper assessment of ambient background noise.  The applicable regulation, 23 C.F.R. § 772,

Table 1, references only maximum Leq(h), with no consideration for ambient background noise.

Therefore, Plaintiff argument appears to be incorrect.  But even if Plaintiffs were correct, and

they are not, at most Plaintiffs' argument creates a technical dispute, in which case the Court

should defer to FHWA's expertise as the agency responsible for assessing Section 4(f) impacts.

Sierra Club v. United States Dep't of Transp., 753 F.2d 120, 129 (D.C. Cir. 1985) ("When a

court considers the sufficiency of an agency's environmental analysis, 'the court is not to rule on

the relative merits of competing scientific opinion.'").

      B.      FHWA Properly Found No Constructive Use From Visual Impacts.

           1.      A New Bridge Will Not Substantially Impair the Visual Resources or
                 Recreational Opportunities of the Little Miami River.

Plaintiffs assert that the proposed bridge's impact on visual and scenic resources and

recreational opportunities is a constructive use of the Little Miami River.  Once again, Plaintiffs

ignore the applicable regulatory standard.  A constructive use from visual impact occurs only if

> [t]he proximity of the proposed project substantially impairs esthetic features or
> attributes of a resource protected by section 4(f), where such features or attributes
> are considered important contributing elements to the value of the resource.
> Examples of substantial impairment to visual or esthetic qualities would be the
> location of a proposed transportation facility in such proximity that it obstructs or
> eliminates the primary views of an architecturally significant historical building, or
> substantially detracts from the setting of a park or historic site which derives its
> value in substantial part due to its setting.

23 C.F.R. § 771.135(p)(4)(ii).  No constructive use from visual impact occurs if "[o]verall

(combined) proximity impacts caused by a proposed project do not substantially impair the

activities, features, or attributes that qualify a resource for protection under section 4(f)," or if

"[p]roximity impacts will be mitigated to a condition equivalent to, or better than, that which

would occur under a no-build scenario."  23 C.F.R. § 771.135(p)(5)(vi)-(vii).  "If any of the

proximity impacts will be mitigated, only the net impact need be considered" in determining the

existence of a constructive use.  23 C.F.R. § 771.135(p)(6)(ii).  For various reasons enumerated

by FHWA, a new crossing, especially with the proposed mitigation measures, would not

substantially impair the aesthetic features of the Little Miami River or substantially detract from

its setting.

  While recognizing the existence of <u>some</u> visual impacts of a new bridge, the lead

agencies have reasonably explained that under the Section 4(f) regulations, the impacts --

especially with mitigation measures -- do not significantly impair the ORVs or rise to the level of

a constructive use.  AR 1717-19, 47716-17.  The lead agencies have consistently acknowledged

that the Little Miami River is a visually sensitive resource, *e.g.*, AR 47374; they have also

recognized that a bridge would alter the visual landscape of the area, AR 1718.  However,

FHWA reasoned that "[i]n the vicinity of the proposed crossing, the views experienced by

recreational users of the [Little Miami River] are primarily in the foreground, not long distance

due to the winding nature of the river and are less critical to the scenic quality of the view."  <u>Id.</u>

This greatly decreases the severity of any impairment of the scenic ORVs.

  Mitigation measures would also alleviate the net visual impact so that the features of the

Little Miami River would not be impaired.  Since the MIS process, ODNR has demanded

mitigation measures, such as purchase and preservation or reforestation of the private lands

adjacent to the river and use of best management practices, that would in many ways improve

this portion of the Little Miami River relative to a no-action alternative.  AR 122-23.  The FEIS

lists yet more mitigation measures, to be further developed in Tier 2. AR 47761-62; see also AR 2920-21. Additionally, both FHWA and ODOT invited NPS to actively participate on the bridge aesthetics team, saying "[their] input will be of value in addressing ... concerns that the proposed bridge will diminish the scenic value of the river." AR 2924.

Plaintiffs suggest that it is the lead agencies' position that since the Little Miami River is already impacted in the study area (and is not "pristine"), another transportation project cannot cause a constructive use of that area. Plaintiffs' Brief at 39. The lead agencies do not argue that only "pristine" areas are subject to potential constructive use. Instead, they have properly recognized that the existing aesthetic attributes at various segments of the nearly 100-mile-long Little Miami River differ. AR 1718-19. The lead agencies' discussion of current development along the river in the Eastern Corridor study area contextualizes and defines the "current activities, features, [and] attributes" for which proximity impacts must be analyzed in determining whether a constructive use would occur. 23 C.F.R. § 771.135(p)(6)(i).

All of these points and more were made to NPS, Plaintiffs, and the public by the lead agencies. Far from ignoring the conflicting views of NPS, the lead agencies have painstakingly responded at every turn and improved their DEIS and FEIS based on their requests for more information. E.g., AR 47439-58, 47724-51, 47792-806.

2.    A Review of Relevant Caselaw Supports the Conclusion That No Constructive Use of the Little Miami River Will Occur.

The Project is analogous to various other cases in which no constructive use has been found. In Geer v. Fed. Highway Admin., 975 F. Supp. 47 (D. Mass. 1997), plaintiffs challenged defendants' choice to implement a new bridge, rather than their preferred tunnel option, to improve transportation near Boston, alleging that it would cause greater uses of upstream parkland due to visual and noise impacts. Id. at 52-53. Defendants' constructive use analysis

utilized similar reasoning to that used by FHWA in the present case; in particular, they noted that the bridge would have a limited visual impact on the foreground views, *i.e.* the waters and banks, and that existing development provided important context for determining the existing uses and the project's impacts thereon. Id. at 73 - 74. The district court found that based on these explanations, "[i]t was within the discretion of the FHWA to conclude that the impacts found, while adversely affecting the parcels, did not reach a degree as to be considered substantial enough to constitute a constructive use." Id. at 79.

Similarly, in The Laguna Greenbelt, Inc. v. United States Dep't of Transp., 42 F.3d 517 (9th Cir. 1994) (*per curiam*), the court affirmed *de novo* the district court's grant of summary judgment in favor of the USDOT and FHWA for sufficiency of their EIS and Section 4(f) statements. The agencies concluded that a new, eight-lane, 17.5-mile highway corridor bisecting a 16,000 acre undeveloped area, "the last significant open space in Orange County" and a place with "ecological, recreational and scenic value," would not constructively use Section 4(f) properties. Id. at 521-22.[25] Although the project would involve an overpass over one Section 4(f) land (a bike trail) and location of the highway corridor adjacent to Bonita Creek public park, the court "reviewed the findings of the FH[W]A as set forth in the EIS" and agreed that "the project will not substantially impair the current features, activities and attributes of these parklands." Id. at 533. Together, these cases emphasize that relevant attributes of the Section 4(f) resource must be substantially, not minimally, impaired.

Cases cited by Plaintiffs do not support their conclusions, and instead illustrate that impacts are only "so severe" that the protected attributes are "substantially impaired" when they

---

[25] There were issues of direct use for other Section 4(f) properties, but the Court also affirmed the agency's conclusions with respect to those properties. Laguna Greenbelt, 42 F.3d at 530-33.

rise to levels significantly greater than those detailed by the lead agencies throughout the Eastern

Corridor study process.  23 C.F.R. § 772.135(p)(2).  <u>Coalition Against a Raised Expressway, Inc.</u>

<u>v. Dole</u>, 835 F.2d 803 (11th Cir. 1988), for example, was mainly grounded on noise being raised

to as much as 80 dB, significantly more than the noise level modeled for the LMR bridge, and on

<u>complete elimination</u> of views of and from the 4(f) properties at issue.[26]  <u>Id.</u> at 811-12.  In <u>Sierra</u>

<u>Club v. United States Department of Transportation</u>, 664 F. Supp. 1324 (N.D. Cal. 1987), the

proposed highway would have physically interrupted hiking trails (whereas the potential Option

1 bridge would cause no physical interruption of recreational activities like kayaking).  Visual

impacts, too, would have caused a much greater quantity of change in a vastly more pristine area.

The impacts included a large "saddle cut" between mountains, four bridges, seven "cuts" up to

2100 feet across a mountain face, and more, all of which that could be seen from a greater

number of areas of the Section 4(f) resource than the bridge impacts in the current case (in which

the bridge only would be visible for a brief stretch of the Little Miami River because of the

river's curves and overall length).  <u>Id.</u> at 1328, 1330.  Finally, the 4(f) resource at issue in

<u>Conservation Society of South Vermont v. Secretary of Transportation</u>, 362 F. Supp. 627 (D. Vt.

1973), was an undeveloped 11,000-acre area with no roads or urban development, and included

portions of the Appalachian Trail.  <u>Id.</u> at 638-39.  None of these cases describes a factual

scenario remotely similar to the record in this case.

---

[26]  This case was decided using a reasonableness, not arbitrary and capricious, standard of agency review, which Plaintiffs agree is not the law for a determination that Section 4(f) does not apply.  <u>Id.</u> at 810-11.

**CONCLUSION**

For the foregoing reasons, ODOT respectfully requests that this Court grant summary judgment in favor of the lead agencies on all counts of Plaintiffs' Complaint.

Dated:  August 10th, 2007

Respectfully submitted,


_____s/ Frederick C. Schoch_____
(signed with express permission by Fred R.
Wagner)
MARC DANN
Attorney General of Ohio
FREDERICK C. SCHOCH
Trial Attorney
Assistant Attorney General
Transportation Section
150 East Gay St., 17th Floor
Columbus, Ohio  43215-3130
Phone:        (614) 466-4656
Fax:          (614) 466-1756
fschoch@ag.state.oh.us

FRED R. WAGNER
Outside Counsel to Ohio Department of
Transportation
D.C. Bar No. 416009
Beveridge & Diamond, P.C.
1350 I Street, NW, Suite 700
Washington, D.C.  20005-3311
Phone:        (202) 789-6041
Fax:          (202) 789-6190
fwagner@bdlaw.com

*Attorneys for Defendant-Intervenor*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RIVERS UNLIMITED, *et al.*,        ) | |
| )                                  | |
| Plaintiffs,        ) | |
| )                                  | |
| v.        ) | Case No.  1:06-CV-01775-JR |
| )                                  | |
| UNITED STATES DEPARTMENT OF        ) | |
| TRANSPORTATION, *et al.*,        ) | |
| )                                  | |
| Defendants,        ) | |
| )                                  | |
| and        ) | |
| )                                  | |
| OHIO DEPARTMENT OF TRANSPORTATION,  ) | |
| )                                  | |
| Defendant-Intervenor.        ) | |
| _____) | |

## ORDER

UPON CONSIDERATION of the Ohio Department of Transportation's ("ODOT")

Cross-Motion for Summary Judgment and memoranda submitted in support thereof, and good

cause having been shown therefor, it is this _____ day of _____, _____, hereby

ORDERED that ODOT's Motion for Summary Judgment is GRANTED and that all

counts in Plaintiffs' Complaint be dismissed with prejudice.

_____
JUDGE, UNITED STATES DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RIVERS UNLIMITED, *et al*.,            ) | |
|                              ) | |

RIVERS UNLIMITED, *et al*.,            )
                             )
        Plaintiffs,            )
                             )
v.            )     Case No.  1:06-CV-01775-JR
                             )
UNITED STATES DEPARTMENT OF            )
TRANSPORTATION, *et al*.,            )
                             )
        Defendants,            )
                             )
and            )
                             )
OHIO DEPARTMENT OF TRANSPORTATION,  )
                             )
        Defendant-Intervenor.            )
_____)

**DEFENDANT-INTERVENOR OHIO DEPARTMENT OF TRANSPORTATION'S**
**STATEMENT OF MATERIAL FACTS**
**<u>AS TO WHICH THERE IS NO GENUINE ISSUE</u>**

       The parties in this case are currently briefing cross-motions for summary judgment

pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Defendant-Intervenor Ohio

Department of Transportation ("ODOT"), pursuant to Local Rules 7(h) and 56.1, hereby submits

its Statement of Material Facts as to Which There is No Genuine Issue.

       As a preliminary matter, judicial review of final agency action on summary judgment is

different in nature from the procedures used to resolve civil actions within the original

jurisdiction of the federal district courts.  <u>See</u> <u>Defenders of Wildlife v. Babbitt</u>, 130 F. Supp.2d

121, 124 (D.D.C. 2001) ("Summary judgment is an appropriate procedure for resolving a

challenge to a federal agency's administrative decision when review is based on the

administrative record ... , even though the Court does not employ the standard of review set forth

in Rule 56, Fed. R. Civ. P.").  The scope of judicial review of final agency action on summary judgment is properly limited to the administrative record that was before the agency at the time the decision was made.  See, e.g., Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985) ("The task of the reviewing court is to apply the appropriate Administrative Procedure Act ["APA"] standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court.").  Therefore, in cases such as this, judicial review is confined to the administrative record already in existence, and does not contemplate a factual record developed *de novo* in federal district court.  Cmty. for Creative Non-Violence v. Lujan, 908 F.2d 992, 998 (D.C. Cir. 1990); see also LeBoeuf, Lamb, Greene & MacRae, LLP v. Abraham, 215 F. Supp 2d 73, 84 (D.D.C. 2002) ("As all material facts are within the administrative record, no material facts are in dispute."); Nat'l Ass'n of Home Builders v. United States Army Corps of Eng'rs, 417 F.3d 1272, 1282 (D.C. Cir. 2005) (recognizing that the D.C. Circuit has repeatedly held that claims asserting "an agency's action is arbitrary and capricious or contrary to law present purely legal issues").

Therefore, because there are no material facts for the Court to resolve in the first instance here, a Statement of Material Facts as contemplated by LCvR 7(h) and 56.1 is inapposite. Nonetheless, to ensure strict compliance with the Local Rules, ODOT submits the following Statement of Material Facts as to Which There is No Genuine Issue in support of its Cross-Motion for Summary Judgment.

1.      The Eastern Corridor covers the 165 square mile urban and suburban eastern sector of the Cincinnati metropolitan area and 35 square miles of neighboring Campbell County in Kentucky.  Administrative Record ("AR")[1] 47130.

2.      Many key highway routes in the Eastern Corridor's existing roadway network have current traffic volumes in excess of capacity.  AR 47075.

3.      Transit and other non-highway travel options are limited in the Eastern Corridor. AR 47076.

4.      The Ohio-Kentucky-Indiana Regional Council of Governments ("OKI"), which is responsible for transportation planning in the Cincinnati area, began a Major Investment Study ("MIS") in 1996 to improve transportation in the Eastern Corridor.  AR 47900, 47131.

5.      The group tasked with completing this study compiled a universe of alternative ways to improve transportation in the Eastern Corridor, and then used technical and economic studies and public input to narrow the alternatives and make a final recommendation in support of a broad multi-modal transportation plan for the Eastern Corridor.  AR 47878, 47131.

6.      The recommended plan included a recommendation for a new crossing of the Little Miami River, rather than an expanded, existing crossing.  AR 47200-03.

7.      The MIS was completed in 2000.  AR 47131.

8.      After the MIS process was completed, the Federal Highway Administration ("FHWA") and ODOT began their review of the project pursuant to the National Environmental Policy Act, 42 U.S.C. §§ 4321-47.  FHWA and ODOT divided the Environmental Impact Statement ("EIS") process into two tiers.  AR 47135-38.

_____

[1] All citations are to the supplemental Administrative Record [30] lodged with this Court on June 12, 2007.

10.     The Tier 1 EIS process began in 2002.  Over the next two years, FHWA and

ODOT developed a set of alternatives for the project based on the work done in the MIS process

as well as on inter-agency consultation and new studies.  AR 47138, 47196-203.

11.     The Tier 1 Draft EIS ("DEIS") was issued in November 2004.  AR 47101.

12.     The Tier 1 DEIS included, for further study, several feasible alternatives for a

new multi-modal crossing of the Little Miami River, but did not advance for further study

expansion of an existing crossing.  AR 47220, 47229-30.

13.     The Tier 1 DEIS also discussed the applicability of Section 4(f) of the Department

of Transportation Act, 49 U.S.C. § 303.  AR 47277-78.

14.     FHWA received comments on the Tier 1 DEIS from a variety of agencies,

organizations, and citizens.  AR 47726-41, 47776-808.

15.     The Little Miami River was designated as a Wild and Scenic River in 1980.  AR

9922.

16.     FHWA met with NPS and DOI and responded to their comments in September

2005.  AR 1717-19.

18.     The Tier 1 Final EIS ("FEIS") was signed on September 30, 2005.  AR 47681.

19.     The Tier 1 FEIS responded to comments from federal and state agencies as well

as public interest groups and the general public, AR 47726-41, 47776-808, and also included the

results of a study, performed by ODOT, modeling the potential noise effects of a new crossing

on the Little Miami River, AR 47717.

20.     The Record of Decision ("ROD") for the Eastern Corridor Multi-Modal Projects

Tier 1 EIS was signed on June 2, 2006.  AR 47099.  This action advanced the multi-modal

- 4 -

components and segments enumerated in the FEIS to more detailed Tier 2 analyses.  AR 47074, 47099.

21.    After the ROD was signed, on June 28, 2006, NPS sent a letter to FHWA again disagreeing with FHWA's decisions and findings, particularly with respect to Section 4(f).  AR 8147-54.

22.    All material facts in this action are contained in the certified administrative record filed in this action.

Dated:  August 10th, 2007                                   Respectfully submitted,


_____s/ Frederick C. Schoch_____
(signed w/ express permission by Fred R. Wagner)
MARC DANN
Attorney General of Ohio
FREDERICK C. SCHOCH
Trial Attorney
Assistant Attorney General
Transportation Section
150 East Gay St., 17th Floor
Columbus, Ohio 43215-3130
Phone:        (614) 466-4656
Fax:           (614) 466-1756
fschoch@ag.state.oh.us

FRED R. WAGNER
Outside Counsel to Ohio Department of Transportation
D.C. Bar No. 416009
Beveridge & Diamond, P.C.
1350 I Street, NW, Suite 700
Washington, D.C. 20005-3311
Phone:        (202) 789-6041
Fax:           (202) 789-6190
fwagner@bdlaw.com

*Attorneys for Defendant-Intervenor*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| RIVERS UNLIMITED, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.  1:06-CV-01775-JR |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| TRANSPORTATION, *et al.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| OHIO DEPARTMENT OF TRANSPORTATION, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| _____ | ) | |

**DEFENDANT-INTERVENOR OHIO DEPARTMENT OF TRANSPORTATION'S
RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS**

As Defendant-Intervenor Ohio Department of Transportation ("ODOT") explains in

"Defendant-Intervenor Ohio Department of Transportation's Statement of Material Facts as to

Which There Is No Genuine Issue," filed concurrently with this pleading, there are no material

facts for the Court to resolve in the first instance here.  Rather, the Court's role is limited to

applying "the appropriate [Administrative Procedure Act] standard of review, 5 U.S.C. § 706, to

the agency decision based on the record the agency presents to the reviewing court."  Florida

Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985).  Thus, a Statement of Material Facts

and response thereto, as contemplated by LCvR 7(h) and 56.1, are inapposite here.  However,

because Plaintiffs have submitted a Statement of Material Facts, and to ensure strict compliance

with the local rules, ODOT submits the following Defendant-Intervenor Ohio Department of

Transportation's Response to Plaintiffs' Statement of Material Facts.

With respect to the factual allegations in each numbered paragraph in Plaintiffs'

Statement, ODOT responds that all material facts in this action are contained in the certified

Administrative Record ("AR"), as supplemented and filed with the Court on June 12, 2007, and

that the documents in the AR speak for themselves.  The material facts should be identified by

the parties through citations to the AR in the parties' summary judgment motion and other

moving papers.  To the extent Plaintiffs' Statement of Material Facts mischaracterizes the record,

it is controverted by ODOT.  To the extent Plaintiffs' Statement of Material Facts refers to

matters outside the record, it should be disregarded by the Court.  More specific responses to

each numbered paragraph in Plaintiffs' Statement are as follows:

**Plaintiffs' Statement of Material Fact 1**:    The Little Miami River was designated as a

National Wild and Scenic River under the Wild and Scenic Rivers Act ("WSRA") over a quarter

century ago.  AR 187-88, 9886.

**ODOT's Response**:  The lower Little Miami River is designated as recreational, not wild

or scenic.  AR 9922.  According to the Interagency Wild and Scenic Rivers Coordinating

Council,

> Rivers in the National System are often referred to as "wild and scenic rivers"
> without regard to actual classification.  This is acceptable when speaking of the
> National System in general, but the specific legal classification is an important
> distinction as it has a direct effect on how the river is administered and whether
> certain activities on federally owned lands within the boundaries are permissible.

AR 1384.

**Plaintiffs' Statement of Material Fact 2**:    The Little Miami was designated as a State

Scenic river in 1969 for the entire stretch of the river.  AR 9942.  In January of 1980, the lower

28 miles of the Little Miami River, from Foster to the Ohio River (which includes the project

area), were designated a Recreational component of the National Wild and Scenic Rivers

System.  AR 112-113.  The Little Miami was specifically recognized for its recreational and scenic "outstandingly remarkable values."  AR 9888.  At the time of its designation it was recognized for its contribution of "vital open space for the use and enjoyment of present and future generations in an increasingly urbanized area."  AR 8150, 42273.  The management directions for the lower portion designated in 1980 adopted the original study plan findings for the Little Miami River (conducted in the early 1970s).  AR 9886.  The management direction for all designated sections is the same.  AR 9886.

**ODOT's Response**:  The segment of the Little Miami River from the confluence of the East Fork down to the Ohio River (including the Eastern Corridor project area) was designated as a State Scenic river on October 27, 1971.  AR 187.  The recognition that the Little Miami River contributed "vital open space for the use and enjoyment of present and future generations in an increasingly urbanized area" refers to the upper, not lower, portion of the river, as that recognition derives from the earlier designation of the upper section.  AR 8151.

**Plaintiffs' Statement of Material Fact 3**:    Significant efforts were made by Little Miami, Inc. to rehabilitate the lower portion of the river so that it could be included in the National system. AR 9887, 9921-23.

**ODOT's Response**:  No response.

**Plaintiffs' Statement of Material Fact 4**:    When evaluating the State's petition for inclusion, the Secretary of the Department of Interior stated: "Considering the close proximity of the river to the large urban metropolis of Cincinnati, it is indeed one of our Nation's most valuable recreation resources."  AR 9926.  Because of this natural setting, despite the surrounding urban environment, the lower Little Miami River's designation was hailed as a

vitally important step toward protecting the area from incompatible or unplanned development. AR 42274.

**ODOT's Response**:  To the extent Plaintiffs' Statement of Material Facts summarizes their own legal arguments relating to DOI's comments, such arguments do not qualify as material facts.  ODOT has addressed Plaintiffs' legal arguments in its Memorandum of Points and Authorities in Support of Defendant-Intervenor Ohio Department of Transportation's Cross-Motion for Summary Judgment.

**Plaintiffs' Statement of Material Fact 5**:    The Little Miami National Wild and Scenic River is a rare river amongst those designated under the Wild and Scenic Rivers Act in that it is only one of two Wild and Scenic Rivers that flows through a major metropolitan area.  AR 10968.

**ODOT's Response**:  ODOT agrees that the Little Miami River flows through a major metropolitan area, less than 7 miles from downtown Cincinnati.

**Plaintiffs' Statement of Material Fact 6**:    Principle [*sic*] activities on this segment of the Little Miami National Wild and Scenic River include canoeing, kayaking, fishing, bird/wildlife viewing, hiking, and biking.  AR 42273.  Approximately 86 miles of the Little Miami River are canoeable, including the reach within the Eastern Corridor study area.  AR 47276.  The river is canoeable within the detailed study area boundaries.  Id.  There is a public access point two miles upstream from the anticipated crossing and four miles downstream.  Id.  This leaves a six-mile section that is regarded for its recreational opportunities, as well as its scenic, natural quiet setting.  AR 42273.

**ODOT's Response**:  To the extent Plaintiffs' Statement of Material Facts summarizes their own legal arguments relating to the scenic qualities of the Little Miami River, such

arguments do not qualify as material facts. ODOT has addressed Plaintiffs' legal arguments in its Memorandum of Points and Authorities in Support of Defendant-Intervenor Ohio Department of Transportation's Cross-Motion for Summary Judgment.

**Plaintiffs' Statement of Material Fact 7**:    Canoeists, kayakers, hikers and outdoor enthusiasts, including Plaintiffs and their members, come to this segment to enjoy the natural river setting with its scenic wooded banks, high bluffs, broad river floodplain, sandy beaches, islands, meandering channel, wildlife, fish, solitude, peace, serenity and quiet. AR 42273-74; see Declarations of Marilyn Wall, Christine P. Curran, Donvan K. Hopkins and Stephanie D. Ross. The diversity and harmonic nature of the river setting is critical to the scenic quality of the Little Miami National Wild and Scenic River.  Opportunities for solitude, serenity and quiet available in this segment also provide for increased opportunities for birding and viewing of associated riparian wildlife.  AR 42273.  Wildlife viewing in this segment continues to be of considerable value.  Id.  The Horseshoe Bend has an exceptionally high diversity of birds and other wildlife. Id.  It is one of the few spots in Ohio that supports a breeding population of the prothonotary warbler, and perhaps, the hooded merganser.  Id.  Great blue herons, wood ducks and cormorants feed in this segment, as do multiple other ducks, birds and mammal species.  Id.  Of special interest to river users is the presence of beavers.  Id.  The Horseshoe Bend, including its upstream/downstream and floodplain environs is likely one of the best regional locations to view birds, mammals and other wildlife within the greater Cincinnati area.  Id.

**ODOT's Response**:  To the extent Plaintiffs' Statement of Material Facts summarizes their own legal arguments relating to the scenic qualities of the Little Miami River, such arguments do not qualify as material facts.  ODOT has addressed Plaintiffs' legal arguments in

its Memorandum of Points and Authorities in Support of Defendant-Intervenor Ohio Department

of Transportation's Cross-Motion for Summary Judgment.

**Plaintiffs' Statement of Material Fact 8**:    Opportunities for a range of recreational

activites [*sic*] exist along the Little Miami River and include canoeing and kayaking, fishing, bird

watching, hiking and walking.  AR 47717.  In the proposed bridge location, the primary activity

is canoeing and kayaking.  Id.

**ODOT's Response**:  No response.

**Plaintiffs' Statement of Material Fact 9**:    The Little Miami State Scenic River

Management Plan states that "[p]rotection of natural, scenic and environmental values of the

Little Miami Scenic River should be the major consideration in reviewing and approving or

disapproving projects which may have an adverse effect upon the River."  AR 2939.

**ODOT's Response**:  No response.

**Plaintiffs' Statement of Material Fact 10**:  The Little Miami River is also designated by

Ohio Environmental Protection Agency as Exceptional Warmwater Habitat ("EWH").  AR

47278.  EWH designation is typically assigned due to the occurrence of unusual or exceptional

assemblages of aquatic organisms characterized by a high species diversity, particularly those

which are highly intolerant and/or rare, threatened, endangered or have special status.  Id.

**ODOT's Response**:  No response.

**Plaintiffs' Statement of Material Fact 11**:  The Eastern Corridor study area covers

approximately 14 square miles and extends from the Cincinnati Central Business District and

Riverfront redevelopment area in Hamilton County, east to the I-275 outerbelt corridor in

Clermont County.  AR 47130.

**ODOT's Response**:  No response.

- 6 -

**Plaintiffs' Statement of Material Fact 12**:  The Project is being conducted to identify workable strategies for improving long term travel mobility between the City of Cincinnati and its eastern suburbs.  Id.

**ODOT's Response**:  No response.

**Plaintiffs' Statement of Material Fact 13**:  An Eastern Corridor Major Investment Study ("MIS") was first completed in April 2000.  AR 47131.  The MIS is a separate analysis formerly required by the National Federal Aid Highway Act, 23 U.S.C. 101 *et seq*.  The MIS Recommended Plan (Option 1) established the framework for the Tier 1 and Tier 2 NEPA analysis of the Eastern Corridor by identifying the Option 1 Corridor as the sole Corridor to be reviewed in the NEPA process.  AR 47197.  Option 1 included a new bridge over the LMR in a new transit corridor.  AR 47202.

**ODOT's Response**:  To the extent Plaintiffs' Statement of Material Facts summarizes their own legal arguments relating to the MIS process and NEPA, such arguments do not qualify as material facts.  ODOT has addressed Plaintiffs' legal arguments in its Memorandum of Points and Authorities in Support of Defendant-Intervenor Ohio Department of Transportation's Cross-Motion for Summary Judgment.

**Plaintiffs' Statement of Material Fact 14**:  Option 2 would have crossed the LMR on a widened existing crossing, rather than creating a new corridor crossing.  AR 47202. Performance results indicated that both options provided travel benefits.  Id.  The main objective of Tier 1 was to identify a set of feasible multi-modal alternatives for further evaluation.  AR 47118-19.

**ODOT's Response**:  No response.

**Plaintiffs' Statement of Material Fact 15**:  The MIS process, which removed Option 2, was conducted without the participation of the National Park Service ("NPS"), a critical stakeholder and cooperating agency.  AR 8153-54; AR 42278-79; AR 3444; AR 2159.

**ODOT's Response**:   To the extent Plaintiffs' Statement of Material Facts summarizes their own legal arguments relating to the involvement of NPS in the MIS process, such arguments do not qualify as material facts.  ODOT has addressed Plaintiffs' legal arguments in its Memorandum of Points and Authorities in Support of Defendant-Intervenor Ohio Department of Transportation's Cross-Motion for Summary Judgment.

**Plaintiffs' Statement of Material Fact 16**:  EPA commented on the PDEIS in a May 6, 2004 letter and alerted the Ohio Department of Transportation that the DEIS should retain feasible options, that the PDEIS does not demonstrate that Option 2 is not feasible, and that without a full discussion of both Options, EPA remains unable to determine how the Options compare or why Option 2 is eliminated from review prior to preparation and issuance of the DEIS.  AR 10604-06.  NPS also submitted comments on the PDEIS in a letter dated May 27, 2004 and expressed similar concerns to those presented by the EPA.  AR 3443-60.  The U.S. Fish and Wildlife Service submitted comments on the PDEIS in a letter dated June 18, 2004 highlighting that the Little Miami River and its riparian corridor provide habitats for a diverse fauna, including many species of bird, mammals, reptiles, and amphibians and has a high-quality, diverse, warm-water fishery resource.  AR 8366.

**ODOT's Response**:  No response.

**Plaintiffs' Statement of Material Fact 17**:  The Eastern Corridor Multi-Modal Project has been subdivided into a two-tier NEPA process.  AR 47686.  The Tier 1 process was

- 8 -

completed with the completion of the FEIS in September of 2005, AR 47681, and the Record of

Decision in June of 2006.  AR 47099.

**ODOT's Response**:  No response.

**Plaintiffs' Statement of Material Fact 18**:  Tier 1 was intended to present information

on: (1) transportation needs; (2) key environmental resources; (3) the development and

evaluation of feasible alternatives; (4) a preliminary assessment of expected impacts; and (5) the

identification of a recommended transportation plan (set of feasible alternatives) to be carried

through into more detailed study during Tier 2.  AR 47118-19.  Feasible alternatives in Tier 1 are

not specific alignment locations, but rather alternative corridors that will be further developed

during Tier 2.  AR 47119.

**ODOT's Response**:  No response.

**Plaintiffs' Statement of Material Fact 19**:  Tier 2, to be conducted after the completion

of the Tier 1 EIS and ROD, will involve more detailed engineering and environmental analyses

and a selection of a preferred alternative from the "feasible alternatives" identified in Tier 1.  AR

47119.  The Tier 1 process was broken down into modes (e.g. bus, rail, highway, bikeway).  Id.

The highway mode is the focus of this complaint.  Tier 1 broke "New Highway capacity" into

four distinct segments.  AR 47121-22.  Segment II concerns the construction of a new bridge

across the Little Miami National Wild and Scenic River.  AR 47122.  The alternatives

recommended for further evaluation in Tier 2 include: (1) 4 basic multi-lane mainline location

alternatives for approaches to and crossing of the Little Miami National Wild and Scenic River;

and (2) six basic multi-lane mainline alternatives for traversing the Little Miami National Wild

and Scenic River floodplain east of the River main channel and Clear Creek.  AR 47227-28.

Basically, the alternatives for review include construction of either a 4-lane or six-lane bridge

across the Little Miami National Wild and Scenic River.  AR 47228.  The Tier 1 DEIS was issued on November 8, 2004.  AR 47101.

**ODOT's Response**:  No six-lane bridge is under consideration.  AR 47230.  Only four-lane crossings, shared with rail and potentially other modes, are under consideration.  Id.

**Plaintiffs' Statement of Material Fact 20**:  The EPA provided comments on the DEIS in a letter dated December 30, 2004.  AR 9198-202.  EPA noted that decisions made at the Tier 1 stage affect whether certain impacts can or cannot be avoided in the later Tier 2 projects.  AR 9198.  EPA voiced concerns with respect to the proposed new bridge across the Little Miami National Wild and Scenic River.  AR 9199.  EPA also noted that the project traverses several 4(f) and 6(f) resources and that mitigation of impacts may be unavoidable absent consultation with the State historic Preservation Office and the NPS.  AR 9199.  Finally, EPA rated the DEIS an "EC-2."  AR 9199 and 9202.  This means that the EPA has identified environmental impacts that should be avoided in order to fully protect the environment and suggest corrective measures which may require changes to the preferred alternative or mitigation measures that can reduce impacts.  AR 9202.  The rating also means that the DEIS does not contain sufficient information to fully assess environmental impacts of the preferred alternative or other alternatives that are reasonably available to the project.  AR 9202.  EPA also strongly recommended that the impacts from the bridge be described as fully as possible in the Tier 1 EIS because the existence and placement of a new bridge is central to the overall Tier 1 multi-modal plan.  AR 9200.  EPA also requested that the Final EIS discuss the impacts associated with the Horseshoe Bend alignment, which is very likely an active meandering part of the channel.  AR 9200.  EPA's suggestions regarding this area included: (1) describing what stretches of the River are or may be active channels; (2) discuss the fate of a clear span bridge in the Horseshoe region or other potentially

active channel regions; (3) discuss the potential future impacts from a bridge placed in a

potentially active channel of the Little Miami, given the River's future development within the

floodplain, that is, is the channel likely to meander and necessitate bridge maintenance that

would impact the River beyond what is contemplated in the DEIS; (4) discuss the visual impacts

and mitigation in Area #2 where scenic values are likely to be impacted by a new bridge; and (5)

**include a discussion of why Option 2 is not feasible** (the MIS did not explain its decision and it

is not the appropriate place for such a decision).  AR 9200-01.

 **ODOT's Response**:  To the extent Plaintiffs' Statement of Material Facts summarizes

their own legal arguments relating to comments from EPA regarding the Project, such arguments

do not qualify as material facts.  ODOT has addressed Plaintiffs' legal arguments in its

Memorandum of Points and Authorities in Support of Defendant-Intervenor Ohio Department of

Transportation's Cross-Motion for Summary Judgment.

 **Plaintiffs' Statement of Material Fact 21**:  In NPS's comments submitted on December

7, 2004, regarding the DEIS, NPS identified significant concern over the proposed bridge

crossing and the removal of Option 2 from the reasonable alternatives.  AR 2967.  It also

expressed concerns over the incompatibility of the "new bridge" alternative with the State of

Ohio's management plan for protecting the Little Miami National Wild and Scenic River.  AR

2968.

 **ODOT's Response**:  To the extent Plaintiffs' Statement of Material Facts summarizes

their own legal arguments relating to the comments of NPS, such arguments do not qualify as

material facts.  ODOT has addressed Plaintiffs' legal arguments in its Memorandum of Points

and Authorities in Support of Defendant-Intervenor Ohio Department of Transportation's Cross-

Motion for Summary Judgment.

**Plaintiffs' Statement of Material Fact 22**:  The U.S. Department of the Interior

("DOI"), Office of Environmental Policy and Compliance, provided comments on the DEIS in a

letter dated April 18, 2005.  AR 2158-72.  In those comments, DOI disagreed with several

conclusions in the DEIS and found it to be inadequate in several respects.  AR 2159.  It found

that removal of Option 2 from review in the EIS process failed to meet the goals of NEPA.  AR

2160.  It also found that the proposed bridge crossing would have a significant and substantial

impact due to the visual intrusion, noise impacts, and disruption of the natural setting and feeling

of the LMR in that reach of the River.  AR 2164, 2166-67.  DOI stated that it believed FHWA's

4(f) determination that no use is occurring was invalid.  It went on to state:

> Although a specific design is not known at this time, the proposed bridge will
> consist of multiple travel lanes, and will be elevated enough to span the river and
> the floodplain. A four-lane bridge cannot be hidden from view. The large mass
> of the proposed bridge (length, width, height, and multiple piers) in combination
> with its location in an unobstructed corridor with relatively few man-made
> intrusions would make it the most visibly dominate feature in this segment of the
> river. Placing a massive bridge where there previously was not one results in a
> fundamental change in the scenic qualities in this portion of the LMR at the time
> of designation. Opportunities to mitigate the visual impacts are very limited. A
> new multi-lane bridge crossing the river in a relatively natural and unspoiled
> corridor would significantly and substantially impact the scenic values of the
> LMR.

AR 2167.  Furthermore, DOI noted that:

> [T]he proposed new bridge crossing would degrade the recreational experience on
> the LMR in two primary ways: creating a major new visual intrusion on the
> natural scene and by generating noise.  Canoeist and hikers enjoy the natural quite
> and solitude offered in the project area, which increases opportunities for viewing
> of birds and other wildlife.  Currently, the sight of birds and other wildlife
> provides a unique recreational experience, particularly in such close proximity to
> a major metropolitan area.  Substantial noise would be produced during
> construction, and once in place, the bridge would be a significant source of
> constant noise from both traffic and vehicle-induced vibration of the bridge and
> commuter rail.  Recreational opportunities to enjoy solitude, or the areas scenery
> and to view wildlife would thus be substantially and significantly impaired.  The
> severity and magnitude of the visual and recreational impacts to the LMR
> associated with a new bridge corridor crossing are so great that they can not be

significantly mitigated.  The proposal would also have substantial direct and indirect impacts to associated fish and wildlife resources and values.

AR 2166-67.

**ODOT's Response**:  To the extent Plaintiffs' Statement of Material Facts summarizes their own legal arguments relating to DOI's comments, such arguments do not qualify as material facts.  ODOT has addressed Plaintiffs' legal arguments in its Memorandum of Points and Authorities in Support of Defendant-Intervenor Ohio Department of Transportation's Cross-Motion for Summary Judgment.

**Plaintiffs' Statement of Material Fact 23**:  Rivers Unlimited submitted comments on the DEIS in a letter dated January 6, 2005.  AR 10967-97.  Little Miami, Inc. and the Sierra Club individually submitted comments on the DEIS in letters dated January 10, 2005.  AR 470-89; 3701-3711.  Plaintiffs' comments highlighted several concerns about the Eastern Corridor DEIS including but not limited to the following: DOT and FHWA's failure to consider all reasonable alternatives, including Option 2; DOT and FHWA's failure to comply with Section 4(f) of the Transportation Act; and the inability to mitigate impacts after DOT and FHWA have committed the Eastern Corridor to Option 1.  Id.

**ODOT's Response**:  To the extent Plaintiffs' Statement of Material Facts summarizes their own legal arguments relating to their comments to the DEIS, such arguments do not qualify as material facts.  ODOT has addressed Plaintiffs' legal arguments in its Memorandum of Points and Authorities in Support of Defendant-Intervenor Ohio Department of Transportation's Cross-Motion for Summary Judgment.

**Plaintiffs' Statement of Material Fact 24**:  Tier 1 was completed with the issuance of the Tier 1 Final Environmental Impact Statement ("FEIS") for the Eastern Corridor Multi-Modal Projects-Hamilton and Clermont Counties, Ohio PID 22970 on September 30, 2005. AR 47681.

**ODOT's Response**:  Tier 1 was completed with the issuance of the ROD, approximately 8 months after the FEIS; the ROD incorporated post-FEIS comments.

**Plaintiffs' Statement of Material Fact 25**:  Again, several agencies including the NPS and EPA provided comments, as well as environmental organizations and members of the public. The U.S. Department of the Interior, Office of Environmental Policy and Compliance, submitted comments on the FEIS in a November 28, 2005 letter.  AR 42269-80.  DOI was "troubled" by the removal of Option 2 from review in the EIS.  AR 42270.  It also found that the comparison made between Option 1 and 2 in the final EIS uses vague and qualitative terms and that a "more rigorous analysis is warranted."  Id.  DOI disagreed with the FEIS conclusion that scenic impacts to the LMR would not be substantial.  AR 42272.  DOI noted that scenic resources were identified as outstandingly remarkable values and remain a protected value under the Wild and Scenic Rivers Act.  Id.  Because of the lacking discussion concerning Option 2, DOI requested that a supplemental EIS be prepared which included an alternative with no new river crossings, such as Option 2 from the MIS.  AR 42271.  DOI also disagreed with the Defendants' determination that the proposed project did not constitute a constructive use under Section 4(f) of the Transportation Act.  AR 42275-78.  DOI noted that as an agency with jurisdiction over the section 4(f) resource, it has determined that the project may significantly and substantially diminish the attributes which qualify for protection, and that therefore a constructive use does occur.  AR 42279.

**ODOT's Response**:  To the extent Plaintiffs' Statement of Material Facts summarizes their own legal arguments relating to DOI's comments, such arguments do not qualify as material facts.  ODOT has addressed Plaintiffs' legal arguments in its Memorandum of Points

and Authorities in Support of Defendant-Intervenor Ohio Department of Transportation's Cross-Motion for Summary Judgment.

**Plaintiffs' Statement of Material Fact 26**:  Little Miami, Inc. submitted comments on the FEIS in a letter dated November 28, 2005.  AR 1628-30.  The Sierra Club submitted comments on the FEIS in a letter dated November 27, 2005.  AR 1631-35.  Plaintiffs' comments again expressed their concerns about the failure to consider Option 2 as a reasonable alternative; the failure to comply with Section 4(f) of the Transportation Act; the inability to mitigate impacts after committing to Option 1 prior to an analysis of what mitigation measures may be available; and reliance upon an economic analysis that was based on clearly outdated gas price data.  Id.

**ODOT's Response**:  To the extent Plaintiffs' Statement of Material Facts summarizes their own legal arguments relating to their comments to the FEIS, such arguments do not qualify as material facts.  ODOT has addressed Plaintiffs' legal arguments in its Memorandum of Points and Authorities in Support of Defendant-Intervenor Ohio Department of Transportation's Cross-Motion for Summary Judgment.

**Plaintiffs' Statement of Material Fact 27**:  The NPS submitted comments to Mr. Dennis Decker, Division Administrator, U.S. Department of Transportation, Federal Highway Administration on June 28, 2006, concerning the FEIS/ROD process and the FHWA noise analysis report.  AR 8149-63.  The comments noted NPS's frustration with the lack of cooperation on the part of FHWA.  AR 8149.  NPS noted that it was disappointed that it was not contacted before FHWA released the ROD so that it could address unresolved issues related to the data analysis and mitigation measures associated with the project.  Id.  NPS stated that it was unable to agree with conclusions pertaining to Section 4(f) impacts and concluded, again, that the

scenic and noise impacts will lead to a significant and substantial impact to the Little Miami

River's recreational outstandingly remarkable value and that "[t]hese proximity impacts, despite

the proposed mitigation, are severe enough to substantially diminish (impair) the activities,

features, and attributes that qualified the LMR for inclusion into the National Wild and Scenic

Rivers System." AR 8150. NPS concluded that a constructive use exists and requested that

FHWA prepare a supplemental EIS containing a section 4(f) statement and addressing new noise

data. AR 8154. According to NPS, "[t]he supplemental EIS should evaluate and compare noise

and visual impacts to the [Little Miami River's Outstanding and Remarkable Values] as well as

the transportation benefits associated with Option 1 and Option 2, as compared to the

environmental baseline." AR 8150.

**ODOT's Response**: To the extent Plaintiffs' Statement of Material Facts summarizes

their own legal arguments relating to NPS's comments, such arguments do not qualify as

material facts. ODOT has addressed Plaintiffs' legal arguments in its Memorandum of Points

and Authorities in Support of Defendant-Intervenor Ohio Department of Transportation's Cross-

Motion for Summary Judgment.

**Plaintiffs' Statement of Material Fact 28**: NPS attached to its June 28, 2006 comments

a detailed report entitled *Analysis of Eastern Corridor Noise Readings*, where NPS identified

several concerns and problems regarding the August 2, 2005 Noise Analysis conducted by

ODOT's Office of Environmental Services. AR 8156-63. NPS raised several concerns. Id.

First, details of the equipment setup and operation suggest potential operational errors that

compromised the accuracy of the measurements. AR 8156-58. Second, data was collected at

inappropriate sites: two of four sites were much closer to the busy roadways than to the river

itself; one site was further from roads, however adjacent to a farm pump. AR 8156, 8158.

Despite noise being raised as a concern, and the most dramatic alteration occurring within the "interior" sites of the river, the data did not include samples representative of the natural setting within interior river corridor locations. AR 8156. No monitoring was done along 1.8 river kilometers along the Little Miami River Park and Recreation Area, much of which is more than 1 km from roads. Id. Third, data were collected on one day: one hour of monitoring conducted sequentially at each of four sites. AR 8156, 8158-60. Sound level measurements made on a single summer afternoon do not support conclusions about potential impacts on all summer afternoons, let alone on fall or spring mornings. AR 8156. Fourth, the hourly Leq (equivalent continuous noise level) summaries of decibel (dBA) measurements blend the energy from all sounds together, failing to distinguish sounds from natural sources (resources protected in wild and scenic rivers) and sounds from anthropogenic sources (environmental impacts to be managed). AR 8156, 8160-61. The presence of bird or insect sounds does not diminish the impact of roadway noise. AR 8156. Fifth, there is no justification for using hourly Leq summaries of dBA values to represent "background" sound levels. AR 8156, 8161-62. This metric has been used to document thresholds of annoyance in communities. AR 8156. To estimate background ambient sound levels, there is substantial precedent and scientific justification for other metrics that would yield values 10 dB or more below those reported by ODOT. AR 8156. Sixth, based upon NPS guidelines for assessing noise impacts in natural areas (NPS Natural Resource Impairment guideline), at least 4 km of river will suffer major acoustical impairment from the proposed bridge, including much of the downstream river section adjacent to the 115 ha [sic] Little Miami River Park and Recreation Area. AR 8162-63. According to the NPS, the ODOT Office of Environmental Services study does not meet the basic requirements for sound monitoring projects, including the protocols that have been

recommended and agreed upon by the Federal Interagency Committee on Aircraft Noise when evaluating noise impacts to natural areas.  AR 8156-57.

**ODOT's Response**:  To the extent Plaintiffs' Statement of Material Facts summarizes their own legal arguments relating to the Noise Analysis, such arguments do not qualify as material facts.  ODOT has addressed Plaintiffs' legal arguments in its Memorandum of Points and Authorities in Support of Defendant-Intervenor Ohio Department of Transportation's Cross-Motion for Summary Judgment.

**Plaintiffs' Statement of Material Fact 29**:  The ROD for the Eastern Corridor Transportation Project Tier I EIS was issued June 6, 2006 by FHWA.  AR 47074-47099.  This formal federal administrative action will initiate Tier II detailed studies and the preliminary engineering phase for the new river crossing.  AR 47074.

**ODOT's Response**:  The ROD was issued on June 2, 2006.  AR 47099.

(signature page follows)

Dated:  August 10th, 2007

Respectfully submitted,


_____s/ Frederick C. Schoch_____
(signed w/ express permission by Fred R.
Wagner)
MARC DANN
Attorney General of Ohio
FREDERICK C. SCHOCH
Trial Attorney
Assistant Attorney General
Transportation Section
150 East Gay St., 17th Floor
Columbus, Ohio 43215-3130
Phone:         (614) 466-4656
Fax:           (614) 466-1756
fschoch@ag.state.oh.us

FRED R. WAGNER
Outside Counsel to Ohio Department of
Transportation
D.C. Bar No. 416009
Beveridge & Diamond, P.C.
1350 I Street, NW, Suite 700
Washington, D.C. 20005-3311
Phone:         (202) 789-6041
Fax:           (202) 789-6190
fwagner@bdlaw.com

*Attorneys for Defendant-Intervenor*