**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RIVERS UNLIMITED, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 1:06-CV-01775 (JR) |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| TRANSPORTATION, et al., ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| OHIO DEPARTMENT OF TRANSPORTATION, ) | |
| ) | |
| Defendant-Intervenor. ) | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

PAGE

I.      INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     FACTUAL BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.      Eastern Corridor Multi-Modern Project  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        B.      The Major Investment Study  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        C.      The NEPA Process  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    STATUTORY FRAMEWORK  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.      National Environmental Policy Act  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        B.      Department of Transportation Action Section 4(f)  . . . . . . . . . . . . . . . . . . . . . . 8

IV.     STANDARD OF REVIEW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        A.      Administrative Procedure Act  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        B.      Summary Judgment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

V.      ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        A.      FHWA Complied with NEPA  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                1.      FHWA Considered a Reasonable Range of Alternative  . . . . . . . . . . . . 11

                        a.      FHWA Was Not Required to Consider the
                                Bridge Expansion Alternative Because It
                                Does Not Meet the Purpose and Need  . . . . . . . . . . . . . . . . . . . . 11

                        b.      Elimination of the Beechmont Levee Option
                                at the MIS Stage Was Appropriate  . . . . . . . . . . . . . . . . . . . . . . 22

                        c.      The Wild and Scenic Rivers Act Does Not Preclude the
                                Construction of a New Bridge  . . . . . . . . . . . . . . . . . . . . . . . . . . 24

                2.      FHWA Was Not Required to Prepare a Supplemental EIS  . . . . . . . . . 26

i

PAGE

3.    FHWA's Reliance on an Economic Analysis Utilizing a Set Price of Gasoline Does not Render Its Entire EIS Inadequate . . . . . . . . . . . . 31

4.    FHWA Took a "Hard Look" at the Potential Environmental Impacts of the Eastern Corridor Project and Adequately Addressed Mitigation Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

B.    FHWA Complied With Department of Transportation Act Section 4(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

1.    Noise Levels Estimated During Tier 1 Indicated that a New Bridge Will Not Constitute a Constructive Use of the Little Miami River . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

2.    FHWA's Decision to Classify the Lower Little Miami River and Surrounding Areas as a Class B Noise Receptor Is Supported by the Record and Is Entitled to Deference . . . . . . . . . . . . . 38

3.    FHWA Properly Considered Whether a New Bridge Would Substantially Impair the Recreational and Scenic Values of the Lower Little Miami River . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

ii

# TABLE OF AUTHORITIES

FEDERAL CASES                                                                    PAGE

Allison v. Dep't of Transp.,
    908 F.2d 1024 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
Associations Working for Aurora's Residential Env't. ("AWARE") v. Colorado Dep't of
Transp.,
    153 F.3d 1122 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
Brooks v. Volpe,
    460 F.2d 1193 (9th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
Celotex Corp. v. Catrett,
    477 U.S. 317, 322 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 33
Citizens Against Burlington, Inc. v. Busey,
    938 F.2d 190, 194 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . 7, 12, 16, 19, 21, 33, 36, 40
Citizens for the Scenic Severn River Bridge, Inc. v. Skinner,
    802 F.Supp. 1325 (D. Md. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42,43
Citizens to Preserve Overton Park, Inc., v. Volpe, Secretary of Transportation, et al.,
    401 U.S. 405 (March 2, 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9
City of Alexandria v. Slater,
    198 F.3d 862 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17, 19
City of Grapevine, Tex. v. Dep't of Transp.,
    17 F.3d 1502 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
City of Olmsted Falls, Ohio v. FAA,
    292 F.3d 261 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 27, 30, 31
City of Williams v. Dombeck,
    151 F. Supp. 2d 9 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Coal. for Responsible Devel. v. Brinegar,
    518 F.2d 522 (4th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
Coalition Against a Raised Expressway, Inc. v. Dole,
    835 F.2d 803 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
Coalition On Sensible Transp. Inc. v. Dole,
    642 F. Supp. 573 (D.D.C. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation,
    362 F. Supp. 627, 639 (D. Vt. 1973), aff'd, 508 F.2d 927 (2d Cir.1974) vacated and
    remanded on other grounds, 423 U.S. 809 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
Custer County Action Ass'n v. Garvey,
    256 F.3d 1024 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
Davis v. Mineta,
    302 F.3d 1104 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20
Dep't of Transp. v. Public Citizen,
    541 U.S. 752 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Druid Hills Civic Ass'n v. FHWA,
    772 F.2d 700 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

FEDERAL CASES                                              PAGE

DSE, Inc. v. United States,
        169 F.3d 21 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
Geer v. FHA,
        975 F. Supp. 47 (D. Mass. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
Izaak Walton League of Am, v. Marsh,
        655 F.2d 346 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Laguna Greenbelt, Inc. v. Dep't of Transp.,
        42 F.3d 517 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 20, 42
Louisiana Ass'n of Independent Producers v. FERC,
        958 F.2d 1101 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Lujan v. National Wildlife Fed'n,
        497 U.S. 871 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Lun Kwai Tsui v. Attorney General,
        445 F. Supp. 832 (D.D.C. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Marsh v. Oregon Natural Res. Council,
        490 U.S. 360 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9, 10, 27, 38
National Trust for Historic Preservation v. Dole,
        828 F.2d 776 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
National Wildlife Fed'n v. FERC,
        912 F.2d 1471 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Nat'l Comm. for the New River, Inc. v. FERC,
        373 F.3d 1323 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 31
Nevada v. Dep't of Energy,
        457 F.3d 78 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
North Buckhead Civic Ass'n v. Skinner,
        903 F.2d 1533 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 23
NRDC v. Hodel,
        865 F.2d 288 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18, 19
NRDC v. Morton,
        458 F.2d 827 (D.C. Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19
NRDC v. Pena,
        972 F. Supp. 9 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Town of Cave Creek Arizona v. FAA,
        325 F.3d 320 (D.C. Cir. 2003); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
Robertson v. Methow Valley Citizens Council,
        490 U.S. 332 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Sierra Club v. Dep't of Transp.,
        310 F. Supp. 2d 1168 (D. Nev. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Sierra Club v. DOT,
        753 F.2d 120 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36,37
Sierra Club v. United States DOT,
        664 F.Supp. 1324 (N.D. Cal. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

FEDERAL CASES                                                                         PAGE

Stewart Park and Reserve Coalition, Inc. (SPARC) v. Slater,
        358 F. Supp.2d 83 (N.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
Strycker's Bay Neighborhood Council v. Karlen,
        444 U.S. 223 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Stop H-3 Ass'n v. Dole,
        740 F.2d 1464 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Thomas Jefferson Univ. v. Shalala,
        512 U.S. 504 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
Tongass Conservation Soc'y v. Cheney,
        924 F.2d 1137 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Vermont Yankee Nuclear Power Corp. v. NRDC,
        435 U.S. 519 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9, 12
Wilderness Watch v. U.S. Forest Serv.,
        143 F. Supp. 2d 1186, 1190 (D. Mont. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 39


FEDERAL STATUTES

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
5 U.S.C. § 706(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
5 U.S.C. 706(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9


16 U.S.C. § 1273(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
16 U.S.C. § 1273(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
16 U.S.C. § 1273(b)(1)-(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
16 U.S.C. § 1278 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
16 U.S.C. § 1281(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

23 U.S.C. § 109(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
23 U.S.C. §§ 134-35 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
23 U.S.C. § 138 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8

42 U.S.C. 4321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
42 U.S.C. § 4332(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

49 U.S.C. § 303 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8, 34
49 U.S.C. §5303-06 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

v

## FEDERAL REGULATIONS                                                                   PAGE

23 C.F.R. § 450.318 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
23 C.F.R. § 450.318(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
23 C.F.R. § 771 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
23 C.F.R. § 771.135(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
23 C.F.R. § 771.135(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
23 C.F.R. § 771.135(p)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
23 C.F.R. § 772 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35,36, 40
23 C.F.R. § 772.19(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

40 C.F.R. § 1501.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
40 C.F.R. § 1502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
40 C.F.R. § 1502.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
40 C.F.R. § 1502.14(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
40 C.F.R. § 1502.24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32
40 C.F.R. § 1502.9(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
40 C.F.R. §§ 1500.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
40 C.F.R. §§ 1502.15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
40 C.F.R. §§ 1502.16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
40 C.F.R §§ 1508.20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
40 C.F.R. §§ 15028.25(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Fed.R.Civ.P. 56(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## TABLE OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| CORPS | U.S. Army Corps of Engineers |
| DEIS | Draft Environmental Impact Statement |
| DOI | Department of Interior |
| DOT | Department of Transportation |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| FEIS | Federal Environmental Impact Study |
| FHWA | Federal Highway Administration |
| FTA | Federal Transit Administration |
| FWS | Fish and Wildlife Services |
| MIS | Major Investment Study |
| NEPA | National Environmental Policy Act |
| NPA | National Park Service |
| ODNR | Department of Natural Resources |
| ODOT | Ohio Department of Transportaion |
| OES | Office of Environmental Services |
| OKI | Ohio-Kentucky-Indiana |
| ORV | Outstanding Remarkable Values |
| PDEIS | Preliminary Draft Environmental Impact Statement |
| ROD | Record of Decision |
| SR | State Route |
| TDM | Transportation Demand Management |
| TSM | Transportation System Management |

## I.    INTRODUCTION

Plaintiffs challenge the issuance by the Federal Highway Administration ("FHWA")[1] of the record of decision ("ROD") for Tier 1 of the Eastern Corridor Multi-Modal Projects ("Eastern Corridor Project"), claiming that issuance of the ROD violated provisions of the National Environmental Policy Act, 42 U.S.C. 4321, et seq., ("NEPA"), and the Department of Transportation Act, 23 U.S.C. § 138 and 49 U.S.C. § 303, and therefore was arbitrary and capricious under the standard of the Administrative Procedure Act, 5 U.S.C. § 706(2) ("APA").

The Eastern Corridor Project is a comprehensive project designed to alleviate the substantial traffic congestion and delay problems experienced in the greater Cincinnati region.  It is a multi-modal project, meaning that the plan includes elements of highway, bus, rail, improvements to existing infrastructure, and bikeways.  Transportation hubs and travel routes are located so as to maximize connectivity of different modes of travel within the region.  Although official planning for the Eastern Corridor Project began in the late 1990s, plans for a comprehensive solution to Cincinnati's traffic problems have been in the works for decades.  The Eastern Corridor Project is the product of those decades of planning and is the direct result of a three-year planning process involving local communities, counties, the City of Cincinnati, federal officials, and environmental organizations.

FHWA has carefully considered the environmental impacts of the proposed project and, in particular, thoroughly considered issues relating to the construction of a new bridge across the Little Miami River, which will accommodate both highway and rail travel.  The location of the

---

[1]  In their lawsuit, Plaintiffs also name as defendants the U.S. Department of Transportation ("DOT") and the individual administrators of DOT and FHWA.  The federal defendants are referred to collectively herein as "FHWA".

bridge was selected to maximize the efficiency of east-west travel, reduce vehicle-miles traveled, and increase connectivity of different modes of transportation. FHWA also selected a bridge design concept – a clear-span of the river with no in-stream piers – to avoid environmental impacts to the river and to avoid disturbing the recreational activities that take place on the river.

Accordingly, as reflected in the lengthy administrative record,[2] FHWA thoroughly considered all of the potential environmental impacts at the Tier 1 stage of the Eastern Corridor Project and has, therefore, complied with NEPA and the Department of Transportation Act.

## II.    FACTUAL BACKGROUND

### A.    Eastern Corridor Multi-Modal Project

The Eastern Corridor Project is located in a 200-square mile area in the greater Cincinnati Metropolitan Area in southwestern Ohio, including Hamilton and Clermont Counties in Ohio and Campbell County in Kentucky. AR 47130. The area selected for detailed study in Tier 1 is a 14-square mile area which extends from the Cincinnati Central Business District in Hamilton County east across the Little Miami River and I-275 to Clermont County. AR 47130, 47153 (map showing detailed study area). Many of the key routes in the region are already operating in excess of capacity, and daily traffic volumes on interstates and main roads are expected to increase up to 81% by 2030. AR 47075, 47163-64. One of the key difficulties is the fact that the Little Miami River acts as a natural barrier to travel between downtown Cincinnati and Hamilton and Clermont Counties to the east. Id. Bridge crossings in the Eastern Corridor over the Little Miami River exist only on four local roads (Kellogg Avenue, Beechmont Avenue, Newtown Road, and Milford Road). AR 47074-75, 47156 (map showing existing bridge crossings). The

---

[2] References to the "AR" are references to the Administrative Record as Supplemented, lodged with the Court on June 12, 2007.

Eastern Corridor has one of the highest daily commute volumes in the region but has only

inefficient local routes to accommodate travel between the Cincinnati Business District and the

eastern suburbs.  AR 47075, 47164.  Time spent in commuter travel is expected to increase by

over 500% in the Eastern Corridor by 2030.  AR 47075, 47167.

In order to address the problems of congestion and delay and make travel within the

region more efficient and less costly, the project will involve:  transportation system

management ("TSM") (improvements to existing infrastructure and transportation demand

management ("TDM") strategies), new and expanded bus transit service, new rail service,

highway capacity improvements, and bikeways.  AR 47076-82,  47203-42, AR 47248-63 (maps

showing multi-modal alternatives).  The conceptual alternatives now under consideration are

designed to maximize inter-connectivity between the modes of travel.  AR 47203-07.  The multi-

modal connection for highway, rail, bus, and bikeway at the new Red Bank Road/US 50

interchange is an important focal point of the project.  AR 47228-29, 47257-58 (maps).  This

multi-modal connection point is located at the junction of existing roadways on the west side of

the river and directly adjacent to the new crossing of the Little Miami River, from which

relocated State Route ("SR") 32 would extend directly eastward into Hamilton and Clermont

Counties.  AR 47229-31, 47259 (map).

## B.    The Major Investment Study

The Eastern Corridor Project is largely a product of the three-year long Major Investment

Study ("MIS") undertaken by the Ohio-Kentucky-Indiana ("OKI") Regional Council of

Governments.  AR 47867.  The MIS Task Force that led the effort was comprised of 58

members, which included representatives of the city, counties, townships, local planning

commissions, the Ohio Department of Natural Resources ("ODNR"), the Ohio Department of

Transportation ("ODOT"), and FHWA. AR 47868. Representatives of the Sierra Club and

Little Miami, Inc., (two of the Plaintiff groups in this case) also served on the MIS Task Force.

Id. The purpose of the MIS was to analyze the congestion and delay issues facing the region and

come up with a consensus solution to these problems, considering performance characteristics,

cost, environmental concerns, and other factors. AR 47877-78.

The MIS process began by considering all the factors that defined the scope of the

project: population and employment, environmental conditions, the existing transportation

system, traffic conditions, traffic quality, and level of service. AR 47880-905. As noted in the

MIS, the Eastern Corridor has been the focus of detailed planning studies for over 30 years, and,

even 50 years ago, planners recognized the need for major transportation improvements in the

Eastern Corridor. AR 47898-900. The public was extensively involved throughout the process

in a series of meetings intended to engage, educate, and interact with the public about the

proposed plans. AR 47908-17.

The MIS process then proceeded in five phases. In the first phase of the study, highway

expansion as well as a number of mass transit options were evaluated. AR 47919-38. In phase

two, the broad alternatives evaluated in phase one were developed into seven specific

transportation plans. AR 47940-47. In phase three, these seven plans were more carefully

considered, including consideration of environmental factors, and the number of plans was

reduced from seven to five. AR 47949-48004. In phase four, the plans were narrowed from the

broad five plans to a preliminary recommended plan. AR 48005-35. During phase four, it was

determined that, in order to improve mobility in the corridor, there needed to be additional

4

bridge capacity over the Little Miami River, and various options were considered.  AR 48011-30.  The relocation of SR 32 extending across a new bridge over the Little Miami River and connecting with US 50 was chosen as the best option and was presented along with the other components of the preferred plan in a public meeting in October of 1998.  AR 48033-35.  In phase five, additional economic, environmental, and traffic performance analyses were conducted on the preliminary plan.  AR 48037-97.  The plan was presented to the public in a formal hearing on March 25, 1999, and those comments were considered in finalizing the plan.  AR 48034, 48100-08.  And, finally, the MIS set forth the recommended plan for the Eastern Corridor, which included the relocation of SR 32 and a new crossing of the Little Miami River near Red Bank Road.  AR 48095-97.

###     C.    The NEPA Process

The recommendations from the MIS process were carried forward to the NEPA process.  AR 47132-33.  The NEPA process then proceeded in a tiered approach, with a preliminary assessment of feasible alternatives in Tier 1 with more detailed analysis of specific project locations and alignments to be conducted in Tier 2.  AR 47135-38.  FHWA coordinated with numerous other federal and state agencies, including the U.S. Environmental Protection Agency ("EPA"), the National Park Service ("NPS"), and the U.S. Fish and Wildlife Service ("FWS") on the project beginning in January of 2002.  AR 47138.  NPS is a cooperating agency for the NEPA process.  Id.

On March 19, 2004, ODOT, on behalf of FHWA, distributed a preliminary draft environmental impact statement ("PDEIS"), AR 21795-22308, to various federal and state agencies, including EPA, NPS, and FWS.  AR 10623-29.  FHWA received comments on the

PDEIS from EPA, AR 10604-06, and NPS, AR 3443-60. FHWA considered the comments of these agencies and numerous other agencies in preparing the draft environmental impact statement ("DEIS"). AR 47440-58. On November 8, 2004, FHWA issued the DEIS and circulated it to federal and state agencies and the public for comment. AR 47101. FHWA received comments from EPA, AR 9198, FWS, AR 8365-69, NPS, AR 2967-69, and the Department of the Interior Office of Environmental Policy and Compliance ("DOI"), AR 2158-72. On September 19, 2005, FHWA responded to DOI's letter. AR 1717-19.

On September 30, 2005, FHWA issued the final environmental impact statement ("FEIS") for the Eastern Corridor Project. In the FEIS, FHWA considered and responded to all the comments received from federal and state agencies and the public. AR 47726-41, 47776-808. On November 23 and 28, 2005, following the issuance of the FEIS, FHWA received additional letters from EPA and DOI commenting on the FEIS. AR 9515-16, AR 42269-81. To discuss some of the lingering concerns of EPA and DOI, FHWA met with officials from DOI and NPS on February 24, 2006, AR 8776-77, and EPA on March 3, 2006. AR 8457. On May 12 and May 16, 2006, FHWA issued detailed responses to DOI and EPA addressing the concerns that those agencies raised in their November 2005 letters and during the meetings in February and March, 2006. AR 9517-42, AR 9446-72. On June 2, 2006, FHWA issued the ROD for the Eastern Corridor Project. AR 47099. Following the issuance of the ROD, NPS sent an additional letter to FHWA commenting on the issues raised in its previous correspondence and discussed during the February 24, 2006 meeting. AR 8149-63.

### III.    STATUTORY FRAMEWORK

#### A.    National Environmental Policy Act

NEPA focuses the attention of federal agencies and the public on the potential

environmental consequences of proposed actions so that an agency does not act without

complete information regarding the environmental harm that may occur when the action is

implemented.  Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 371 (1989); Robertson v.

Methow Valley Citizens Council, 490 U.S. 332, 349 (1989).  NEPA's mandate to agencies is

procedural, not substantive, and does not mandate particular results.  Methow Valley, 490 U.S. at

350; Strycker's Bay Neighborhood Council v. Karlen, 444 U.S. 223, 227-28 (1980); Vermont

Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558 (1978).  Courts should "enforce the

statute by ensuring that agencies comply with NEPA's procedures, and not by coaxing agency

decisionmakers to reach certain results."  Citizens Against Burlington, Inc. v. Busey, 938 F.2d

190, 194 (D.C. Cir. 1991).  A court may not require agencies "to elevate environmental concerns

over other appropriate considerations."  Strycker's Bay, 444 U.S. at 227.  "Other statutes may

impose substantive environmental obligations on federal agencies, but NEPA merely prohibits

uninformed – rather than unwise – agency action."  Methow Valley, 490 U.S. at 351.

NEPA requires the preparation of an Environmental Impact Statement ("EIS") when an

agency proposes a "major federal action[] significantly affecting the quality of the human

environment."  42 U.S.C. § 4332(2)(C).  The Council on Environmental Quality ("CEQ")

regulations implementing NEPA provide detailed guidance regarding the scope and content of an

EIS.  40 C.F.R. § 1502.  FHWA's NEPA regulations are set forth at 23 C.F.R. § 771, and

additional guidance for preparing NEPA documents is contained in Technical Advisory T

6640.8A.[3]

### B.      Department of Transportation Act Section 4(f)

Section 4(f) of the Department of Transportation Act, codified at 49 U.S.C. § 303 and 23

U.S.C. § 138, provides in pertinent part that:

> [T]he Secretary may approve a transportation program or project . . . requiring the
> use of publicly owned land of a public park, recreation area, or wildlife and
> waterfowl refuge, of national, State or local significance, or land of an historic
> site of national, State or local significance (as determined by the Federal, State, or
> local officials having jurisdiction over the park, area, refuge or site), only if –
> (1) there is no prudent and feasible alternative to using the land; and (2) the
> program or project includes all possible planning to minimize harm to the park,
> recreation area, wildlife and waterfowl refuge, or historic site resulting from the
> use.

49 U.S.C. § 303; accord 23 U.S.C. § 138; see also Overton Park, 401 U.S. at 405.

A "use" occurs when a protected resource is either:  (1) permanently incorporated into a

transportation facility, (2) when there is an adverse temporary occupancy of land that is adverse

to the statute's purpose, or (3) when there is a constructive use of land.  23 C.F.R. §

771.135(p)(1)(i)-(iii).  A constructive use occurs if the "project's proximity impacts are so severe

that the protected activities, features, or attributes that qualify a resource for protection under

Section 4(f) are substantially impaired.  23 C.F.R. § 771.135(p)(2).  If the use of a Section 4(f)

resources is unavoidable, FHWA must provide all planning to minimize the harm to the

protected Section 4(f) resources.  23 C.F.R. § 771.135(a)(1).  The FHWA is required to present

Section 4(f) evaluations in an EA or EIS.  23 C.F.R. § 771.135(i).

---

[3]      Technical Memorandum T 6640.8A is available through the USDOT website at
www.fhwa.dot.gov/legsregs/directives/techadvs.htm.

## IV.    STANDARDS OF REVIEW

### A.    Administrative Procedure Act

The substantive statutes before the Court, NEPA and the Transportation Act, do not grant an independent right of action.  Rather, Plaintiffs' challenges to FHWA's actions are brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, et seq.; see also City of Olmsted Falls, Ohio v. FAA, 292 F.3d 261, 269 (D.C. Cir. 2002) (reviewing NEPA and Section 4(f) claims under the APA standard).  In evaluating the legal sufficiency of the agency's action, the Court must apply the "arbitrary and capricious" standard of the APA, 5 U.S.C. § 706(2)(A), (C).  See Marsh, 490 U.S. at 360; Overton Park, 401 U.S. at 414; Louisiana Ass'n of Independent Producers v. FERC, 958 F.2d 1101, 1117 (D.C. Cir. 1992); National Trust for Historic Preservation v. Dole, 828 F.2d 776, 781 (D.C. Cir. 1987).

The reviewing court's only role is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Overton Park, 401 U.S. at 416.  "The ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency."  Id.; NRDC v. Pena, 972 F. Supp. 9, 15 (D.D.C. 1997) (citing Citizens Against Burlington, 938 F.2d at 194).  In considering NEPA claims, courts apply a "rule of reason" to determine whether the agency's analysis contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences."  Laguna Greenbelt, Inc. v. Dep't of Transp., 42 F.3d 517, 523 (9th Cir. 1994); see also Dep't of Transp. v. Public Citizen, 541 U.S. 752, 767 (2004).  A court's review is limited to the administrative record before the agency at the time of its decision.  Vermont Yankee, 435 U.S. at 549; Overton Park, 401 U.S. at 419-20.

9

Deference to an agency's decision is particularly warranted with respect to technical or scientific questions involving substantial agency expertise. Marsh, 490 U.S. at 377. A federal court does not sit "as a 'super professional transportation analyst' or decide which party utilized the better methodology in conducting its . . . analysis. Rather, the district court simply determine[s] whether the appellees' [FHWA] choice of methodology had a rational basis, consistently applied, taking relevant considerations into account." Druid Hills Civic Ass'n v. FHWA, 772 F.2d 700, 709 (11th Cir. 1985); see also, Stop H-3 Ass'n, 740 F.2d at 1464-5 ("[O]ur rule is not that of a 'super-planner,' and, under NEPA, we are not allowed to substitute our judgment for that of the agency concerning the wisdom of a proposed action.") (internal citation omitted).

### B.    Summary Judgment

Summary judgment is appropriate if there is no genuine issue regarding any material fact and if the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In a case seeking review of agency action under the APA, a summary judgment motion is the appropriate vehicle to bring legal claims before the Court. The "merit of the administrative decision is to be determined exclusively on the administrative record . . . [and] summary judgment is appropriate after a review of the administrative record." Lun Kwai Tsui v. Attorney General, 445 F. Supp. 832, 835 (D.D.C. 1978). As such, there are no material facts essential to the Court's resolution of the litigation, and the Court need not, indeed, may not, "find" underlying facts. Rather, the only issues presented are issues of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Lujan v. National Wildlife Fed'n, 497 U.S. 871, 883 (1990).

10

## V.    ARGUMENT

### A.    FHWA Complied with NEPA

#### 1.    FHWA Considered a Reasonable Range of Alternatives

Plaintiffs first argue that the range of alternatives considered by FHWA in Tier 1 of the Eastern Corridor Project was unreasonable.  Pls. Mem. at 11.  In support of this argument, Plaintiffs make three broad points: (1) FHWA should have considered alternatives involving the expansion of an existing bridge over the Little Miami River rather than only considering alternatives that include the construction of a new bridge, (2) exclusion of bridge expansion alternatives during the MIS phase was improper, and (3) a new bridge should not be constructed because the lower Little Miami River is designated as a recreational river under the Wild and Scenic Rivers Act.  See Pls. Mem. at 11-21.  None of these arguments is supported by the record in this case or the relevant legal authorities.  To the contrary, the record reflects that FHWA considered a reasonable range of multi-modal alternatives that would meet the objectives of the project.

##### a.    FHWA Was Not Required to Consider the Bridge Expansion Alternative Because It Does Not Meet the Purpose and Need

FHWA's rejection of the expansion of the Beechmont Levee Bridge was appropriate because that alternative would not have met the purpose and need of the Eastern Corridor Project.  In identifying the feasible alternatives in Tier 1, FHWA was required under NEPA to "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."  40 C.F.R. § 1502.14(a).  The range of alternatives to be considered must be based on the "purpose and need" of the proposed project.  40 C.F.R. § 1502.14.  FHWA was not

required to consider alternatives that would not meet the project's purpose and need. <u>Citizens Against Burlington</u>, 938 F.2d at 195. The range of alternatives to be considered is thus guided by the stated objectives for the project. <u>City of Alexandria v. Slater</u>, 198 F.3d 862, 867 (D.C. Cir. 2000). The selection of alternatives "must be bounded by some notion of feasibility." <u>Vermont Yankee</u>, 435 U.S. at 551; <u>see also City of Grapevine, Tex. v. Dep't of Transp.</u>, 17 F.3d 1502, 1506 (D.C. Cir. 1994). In addition, FHWA's selection of alternatives should be reviewed under the "rule of reason." <u>Citizens Against Burlington</u>, 938 F.2d at 196. An agency need not consider alternatives that are "remote and speculative," but should consider the circumstances of the project "as they exist and are likely to exist." <u>NRDC v. Hodel</u>, 865 F.2d 288, 295 (D.C. Cir. 1988). An agency's discussion of alternatives should be upheld "so long as the alternatives are reasonable and the agency discusses them in reasonable detail." <u>Citizens Against Burlington</u>, 938 F.2d at 196; <u>see also Nevada v. Dep't of Energy</u>, 457 F.3d 78, 87-88 (D.C. Cir. 2006); <u>Tongass Conservation Soc'y v. Cheney</u>, 924 F.2d 1137, 1140 (D.C. Cir. 1991).

FHWA fully met its obligation to consider reasonable alternatives that meet the transportation objectives of FHWA and the local communities. The purpose of the Eastern Corridor Multi-Modal Projects is to implement a multi-modal strategy for addressing long range transportation needs of the region. AR 47162. The need for transportation improvements involve three primary factors: (1) an existing infrastructure that is inadequate and is characterized by insufficient capacity, safety issues, and limited availability of alternative modes of transportation, (2) inadequate linkage between the region's key social and economic centers, and (3) expected future growth and expansion. AR 47162; <u>see also</u> 47163-94 (describing the needs by mode of travel). To meet these needs, the goal of the project in Tier 1 is to develop a

12

comprehensive multi-modal solution that will alleviate the transportation problems in the region, be consistent with future land use in the area, support and sustain the local economy, and be consistent with the environmental goals for the Eastern Corridor. AR 47162-63.

As described above, the planning process for the Eastern Corridor Project began with the preparation of the MIS by the Ohio-Kentucky-Indiana Council of Governments, pursuant to the requirements of 23 C.F.R. § 450.318. AR 47867-48204. Environmental groups, including the Sierra Club and Little Miami, Inc., participated in the MIS process. AR 47868, 47910-11. The conclusion in the MIS is that only a multi-modal project will adequately address the current and future transportation issues in the Eastern Corridor. AR 47197. Many different alternatives were considered for various transportation modes during the MIS process, including: light rail, rail, bus, highway, ferry service, high occupancy vehicle lanes, transportation system management ("TSM"), and bikeway. AR 47198-200. Although many of these alternatives were rejected during the MIS process, as described in the DEIS, the project includes feasible alternatives for each of the following transportation modes: TSM, bus, rail, highway, and bikeway. AR 47209-34.

Based on the current multi-modal plan, the new bridge across the Little Miami River will accommodate both a highway and a new rail line. AR 47215-20; 47229. The feasible alternatives under consideration in Tier 1 include four locations for the new bridge crossing and six locations for traversing the floodplain to connect to the bridge from the East. AR 47229-30; see also AR 47249 (map showing alternative locations). Design considerations include: the need to clear-span the Little Miami River, the need to accommodate both highway and rail transportation, providing for a dedicated bike path extending east to existing bike paths, and

13

consideration of floodplain issues in Newtown.  AR 47230.  These issues will be addressed and

specific bridge and approach alignments will be chosen during Tier 2.  AR 47138.

Despite the multi-modal nature of the alternatives discussed in the DEIS and FEIS,

Plaintiffs, of course, focus specifically on the project's incorporation of a new bridge across the

Little Miami River.  Plaintiffs are incorrect, however, that the Eastern Corridor multi-modal

project is merely a pretense for constructing a new bridge.  See Pls. Mem. at 13.  During the MIS

process a number of alternatives involving the expansion of existing bridges were considered

before it was determined that they would not be feasible alternatives.  The MIS considered three

options:  (1) relocating SR 32 and constructing a new bridge across the Little Miami River along

the alignment from Red Bank Road/US 50 ("Option 1"), (2) relocating SR 32 to extend from

west of Newtown to Eight Mile Road in the Eastgate area and crossing over the Little Miami

River on a widened existing structure at the Beechmont Levee bridge ("Option 2"), and (3)

widening existing Ohio River crossings going to and from Kentucky on I-275 and I-471.  AR

47200-03; see also AR 47752-54 (maps showing Options 1 and 2).

The third option was rejected during the MIS process.  Widening existing bridges on

I-275 and I-471 was rejected because, although congestion would be reduced in the Eastern

Corridor, 1-275 and I-471 would be loaded to near capacity; the existing I-471 bridge cannot be

widened because of the existing arch structure, thus limiting the ability to increase capacity;

much of the Ohio traffic would be diverted to Kentucky, merely moving the problem rather than

solving it; and relocating SR 32 would more evenly split the traffic volume between Kentucky

and Ohio.  AR 47201.  Accordingly, the MIS Task Group recommended against this proposal.

AR 47201, 48025-30.  Plaintiffs do not claim that this proposal should have been carried forward

14

to the EIS process.

The MIS also recommended Option 1 over Option 2.  AR 47203; 48044.  Among the

reasons for the recommendation were:  Option 1 performed more efficiently and addressed long-

term transportation needs; in Option 2, the Beechmont Levee crossing would approach capacity

in the year 2020; in Option 2, there would be substantial impacts on the existing residential and

commercial development; Option 2 would increase peak traffic volumes in Beechmont and

would not effectively reduce congestion in some areas.  AR 47202-03; 48017-22.  It was

determined that Option 2 had substantial performance shortcomings, would have been too costly,

and would have had substantial environmental impacts.  AR 47749.  Thus, the 58-member Task

Force guiding the MIS process concluded that Option 2 was not a reasonable response to the

transportation needs of the region.  Id.

FHWA also explained its reasons for not considering Option 2 as an alternative in

response to comments in the FEIS.  AR 47741-49.  In addition to the issues identified above,

Option 2 would add no new east-west travel route; would result in a circuitous travel route,

resulting in 500,000 additional vehicle operating hours per day when compared with Option 1;

and would not reduce congestion or delay substantially by 2020.  AR 47743-45.  In addition,

Option 2 may encroach on flight paths into Lunken Airport; would require widening of the

Beechmont Levee Bridge and new structures for directional ramps, likely requiring piers in the

river; with additional lanes and ramps, Option 2 would occupy 1200 feet of the river, as opposed

to 400 feet for Option 1; transportation corridors for Option 2 would closely parallel the river for

1,500 feet, which would not be the case in Option 1; Option 2 would have greater impacts to

parks and National Register Cultural Resources.  AR 47745-46.  In addition, Option 2 would

physically disrupt the town of Linwood and would require the displacement of 13 businesses, 81

single-family residences, 12 two-family residences, and 7 institutional properties, as opposed to

the displacement of three businesses and two single-family homes under Option 1.  AR 47747.

Option 2 provides less opportunity for green space, would be more difficult to maintain, would

cost over twice as much ($159 million to $70 million), and would cause considerable disruption

to traffic flow during its construction.  AR 47747-48.  In sum, Option 2 contains no advantages

over Option 1 and does not meet the purpose and need of the Eastern Corridor Project.  Id.

Accordingly, FHWA's decision not to carry forward Option 2 in its consideration of alternatives

during the EIS process was reasonable.  See Citizens Against Burlington, 938 F.2d at 195 ("the

proposed alternative is reasonable only if it will bring about the ends of the federal action").[4]

Despite the analysis by the MIS Task Group and FHWA in the DEIS and FEIS, Plaintiffs

argue that expanding the Beechmont Levee Bridge meets the purpose and need of the project and

should have been considered during the EIS process.  Pls. Mem. at 16-17.  In making this

argument, Plaintiffs do not even discuss the specifics of the purpose and need of the project, but

rather baldly assert that Option 2 "meets the broad purpose and need of the Eastern Corridor

project."  Pls. Mem. at 16.  FHWA's determination that Option 2 would not meet the purpose

and need was not, as Plaintiffs suggest, based solely on performance factors.  See Pls. Mem. at

17.  Certainly, the FHWA did consider the findings of the MIS Task Group, which found that,

while Option 2 would provide some benefits, these benefits would be hindered by significant

---

[4]  Plaintiffs apparently misread National Wildlife Fed'n v. FERC, 912 F.2d 1471 (D.C. Cir.
1990).  See Pls. Mem. at 15.  They cite the case for the proposition that DOT failed to consider
all reasonable alternatives.  Id.  In fact, in that case, the court concluded that FERC properly
evaluated all reasonable alternatives in its consideration of the Lee Creek dam project.  Id. at
1484-85.

performance problems associated with Option 2, including:  peak volumes on relocated SR 32 would be lower during peak periods than in Option 1, meaning less reduction in congestion and delay; the interchange of relocated SR 32 and SR 125 would strain existing capacity and therefore not ease congestion; and the projected volume on the Beechmont Levee Bridge in 2020 would be 10,200 vehicles during the peak morning commute, which would reach the capacity of the bridge and require construction of an additional lane.  AR 48020.  These factors properly played a role in FHWA's consideration of which alternatives would meet the objectives of the project in alleviating traffic delay and congestion, not just for a few years, but for the long term. See Slater, 198 F.3d at 866-69 (upholding FHWA's decision to consider only 12-lane alternatives, not 10-lane, as proposed by the plaintiffs, for the new Woodrow Wilson Memorial Bridge).

Slater is particularly instructive.  There, FHWA considered seven 12-lane bridge options, and the plaintiffs in that case claimed that bridges with fewer lanes should have been considered. Slater, 198 F.3d at 865.  In that case, the plaintiffs argued that a 10-lane bridge would be a substantial improvement over the existing 6-lane structure and, therefore, would meet the project's goals of relieving congestion and delays.  Id. at 866.  However, the Court found that, because only the 12-lane bridge would meet the 2020 traffic projections, the 10-lane option would not meet the goals of the project 20 years into the future.  Id. at 868.  Similarly, FHWA has calculated that, in this case, the Beechmont Levee option would reach capacity around the year 2020 (which is now only 13 years away).  See AR 47744.

However, FHWA considered not only performance aspects of Option 2, but other aspects as well, including: the half million additional annual driving hours when compared with Option

17

1, the 1200 feet of river that would be occupied and the likely necessity of piers in the river, the

required displacement of multiple businesses and dozens of families, and the impacts on park

land and National Register Cultural Resources.  AR 47743-48.  Moreover, the MIS Task Group

did not find, as Plaintiffs suggest, that Option 2 had clear environmental benefits over Option 1.

Pls. Mem. at 17.  Similar environmental issues were noted for both projects, e.g., impacts on

hillsides, parks, noise, aesthetics, wetlands, floodplains, and riparian zones.  AR 48022.  A

position statement prepared by the Hamilton County Engineer's office stated that:  "Option 1 is

'an environmentally responsible alternative', pointing out the new bridge will fully span the river

and total vehicle miles of travel are reduced, thus lowering emissions."  AR 48023.  Thus, while

the fact that Option 1 would address transportation needs and Option 2 would not was an

important consideration, the decision to exclude Option 2 from consideration was based on

environmental, social, and economic considerations as well.[5]

      FHWA has not rejected alternatives "merely because they do not offer a complete

solution to the problem."  Pls. Mem. at 19 (quoting NRDC v. Hodel, 865 F.2d 288, 296 n.4 (D.C.

Cir. 1988).  As discussed above, FHWA has considered and included in the adopted plan a

number of partial solutions, such as TSM and mass transit, which together comprise the multi-

modal Easter Corridor Project and are designed to be a complete solution to the region's

transportation goals.  Moreover, Plaintiffs' citation to Hodel and NRDC v. Morton, 458 F.2d 827

(D.C. Cir. 1972), to support this proposition, see Pls. Mem. at 19-20, is somewhat misleading as

---

[5]  FHWA does not contend that its comparison of Options 1 and 2 in the FEIS, AR 47743-48,
constitutes an alternatives analysis under NEPA.  However, this discussion does provide a record
of the reasons on which FHWA based its decision to exclude Option 2 from consideration.
Thus, Plaintiffs are incorrect when they say that the last time Option 2 was considered was 1999.
See Pls. Mem. at 17 n.8.

both cases arose in the context of oil and gas leasing and addressed issues specific to that context, such as the need to consider alternative sources of energy and conservation.  See Morton, 458 F.2d at 836-37; Hodel, 865 F.2d at 295-97 (upholding consideration of alternatives).  In the transportation context, the D.C. Circuit has been clear that an agency must only consider alternatives that would "bring about the ends of the federal action."  Citizens Against Burlington, 938 F.2d at 195; Slater, 198 F.3d at 867.  Option 2 simply fails to meet the objectives of the Eastern Corridor Project.

In support of their alternatives argument, Plaintiffs rely heavily on Davis v. Mineta, 302 F.3d 1104 (10th Cir. 2002), which they claim involves a "matching set of facts."  Pls. Mem. at 15.  While it is true that both cases involve a proposal to construct a bridge, Plaintiffs ignore crucial distinctions between the two cases which serve to underscore the appropriateness of FHWA's actions in this case.  In Davis, FHWA prepared only an environmental assessment ("EA"), not an EIS.  302 F.3d at 1109.  The court found that FHWA should have prepared an EIS for a project that involved putting a five-lane highway through parkland where no roads previously existed and would require the demolition of several historic structures.  302 F.3d at 1112.  Here, of course, FHWA has prepared an EIS.

Moreover the grounds for rejecting FHWA's alternatives analysis in Davis are not present here.  First, in Davis, FHWA summarily rejected piecemeal options to expand existing roadways because none, standing alone, would meet the transportation needs, rather than considering such options cumulatively.  Id. at 1120.  Here, FHWA has included in the feasible alternatives the expansion and improvement of existing roadways.  AR 47223-34.  Second, in Davis, FHWA failed to consider alternative alignments to minimize the impacts of noise and

19

other environmental effects.  302 F.3d at 1120.  Here, FHWA is considering 4 alignments for the

bridge and 6 alignments for the approach from the East, taking into consideration environmental

concerns.  AR 47229-30, 47249 (map).  Finally, in <u>Davis</u>, FHWA failed to consider mass transit

and TSM alternatives.  302 F.3d at 1121-22.  Here, FHWA has incorporated mass transit and

TSM alternatives into its multi-modal plan.  AR 47209-23, 47234.  Accordingly, Plaintiffs'

reliance on <u>Davis</u> is misplaced.

More applicable are a number of decisions from other circuits which have upheld the

FHWA's consideration in an EIS of a limited range of alternatives which have been determined

to meet the purpose and need of the respective projects.  See <u>North Buckhead Civic Ass'n v.</u>

<u>Skinner</u>, 903 F.2d 1533, 1542-43 (11th Cir. 1990) (consideration of only a six-lane tollway with

transmit median and the no-build option was appropriate because other options did not meet the

purpose and need); <u>Associations Working for Aurora's Residential Env't. ("AWARE") v.</u>

<u>Colorado Dep't of Transp.</u>, 153 F.3d 1122, 1130 (10th Cir. 1998) (consideration of only

expanded highway options, rather than mass transit, was appropriate because only those

alternatives would meet the goal of relieving congestion); <u>Laguna Greenbelt</u>, 42 F.3d at 523-25

(consideration of three tollroad alternatives and a no build option was adequate under NEPA).

Finally, the fact that EPA and NPS disagreed with FHWA's conclusion that Option 2

does not meet the purpose and need of the project does not render FHWA's decision invalid.

FHWA, as the lead agency for the project, was required to consult with other federal agencies.

40 C.F.R. § 1501.6.  As early as January of 2002, FHWA began meeting with other interested

state and federal agencies, including EPA, NPS, Federal Transit Administration ("FTA"), U.S.

Fish and Wildlife Service ("FWS"), the U.S. Army Corps of Engineers ("Corps"), ODOT, and

ODNR.  AR 47138.  FTA, the Corps, and NPS were specifically designated as cooperating agencies on the project.  AR 8694, 47138.  During that process and in comments on the PDEIS and DEIS, NPS raised the issue of considering Option 2 as an alternative.  See, e.g., AR 2206, AR 2967-69, AR 3443-60.  EPA raised similar concerns in its comments regarding the DEIS. AR 9200-01, 10604-06.  As the lead agency, FHWA was not required to "slavishly" follow the comments; rather, it was simply required to give them serious consideration.  See Citizens Against Burlington, 938 F.2d at 201; see also Custer County Action Ass'n v. Garvey, 256 F.3d 1024, 1038 (10th Cir. 2001) ("[NEPA] requires agencies preparing environmental impact statements to consider and respond to the comments of other agencies, not to agree with them"). In the FEIS, FHWA carefully considered the comments of NPS and EPA, AR 47727-742, as well as comments from the public.  AR 47782-808.  After considering NPS' and EPA's comments, FHWA rejected the Beechmont Levee option and fully explained its reasons for doing so.  AR 47741-49.  Moreover, FHWA specifically followed EPA's recommendation that it fully explain in the EIS why Option 2 was not feasible.  AR 9200-01.[6]

In sum, FHWA has thoroughly considered all reasonable alternatives for meeting the purpose and need of the Eastern Corridor Project of providing a comprehensive multi-modal approach to easing traffic congestion and delays and improving connectivity with alternate modes of transportation in the region.  Accordingly, its consideration of alternatives meets the requirements of NEPA.

---

[6] The record does not support Plaintiffs' claim that FHWA recognized the deficiencies of its evaluation of Option 2.  See Pls. Mem. at 16.  The documents referenced by Plaintiff show only that FHWA gathered information on the MIS process and coordinated with DOI and NPS as it was required to do to complete its analysis and respond to comments under NEPA.  See AR 426 2073, 9474.

**b.    Elimination of the Beechmont Levee Option at the MIS Stage Was Appropriate**

The MIS process concluded with a specific recommendation of a plan that included relocated SR32/US 50 and new bridge crossing over the Little Miami River.  AR 399-400, 48044.  Plaintiffs argue that the elimination of the Beechmont Levee option at the MIS stage, rather than during the NEPA process was somehow improper.  Pls. Mem. at 14, 16.  In fact, it is required by federal statute that the planning of new transportation projects be initiated at the local level.  See 23 U.S.C. §§ 134-35, 49 U.S.C. §5303-06.  Under federal regulations implementing these statutory provisions, local entities may undertake a multi-modal, systems-level corridor, or sub-area planning study, and the results of such a study may be integrated into the NEPA process.  23 C.F.R. § 450.318(a).  Specifically, the results of the local planning study may be used to develop a purpose and need statement, create general corridor or mode definitions, *preliminarily screen alternatives and eliminate unreasonable alternatives*, describe the environmental setting, and preliminarily identify environmental impacts and environmental mitigation.  23 C.F.R. § 450.318(a)(1)-(5) (emphasis added).  That is precisely what was done in this case.  See AR 47083, 47131-33.

A recent case from Nevada upheld the validity of FHWA's approach.  See Sierra Club v. Dep't of Transp., 310 F. Supp. 2d 1168 (D. Nev. 2004).  There, the Regional Transportation Commission and local communities initiated an MIS process, similar to the one conducted in this case, to develop and evaluate transportation improvements to relieve congestion on existing highways and accommodate the rapid growth of the community.  Id. at 1177-78.  During the MIS process, a number of alternatives were considered, including: widening US 95, double-decking US 95, installing HOV or reversible lanes on US 95, developing fixed guideway transit,

22

and creating new freeways or super arterial corridors.  Id. at 1178.  The MIS addressed three of

these alternatives in detail and recommended the US 95 improvement strategy as the "locally

preferred alternative."  Id. at 1178-79.  This option was carried forward to the NEPA process,

during which two similar highway-widening alternatives and the no build option were

considered.  Id. at 1179.

     The Sierra Club argued that the fixed guideway alternative should have been considered

during the NEPA process.  Id. at 1190.  The court rejected this argument, stating:

> FHWA's reliance on the MIS process to eliminate alternatives was not arbitrary
> and capricious.  The EIS did not consider in depth a fixed guideway alternative
> because the MIS process evaluated that alternative and found it did not met the
> project's purpose and need, was too costly, and depended upon an uncertain
> [approval for a guideway system].  The MIS contained many of the hallmarks of
> the NEPA process, including various studies on project impacts, significant public
> involvement, and a comparison of alternatives . . . .   FHWA's decision not to
> duplicate the state agencies' analyses and evaluations as to what alternatives
> would be feasible and meet project goals does not violate NEPA.

Id. at 1193; see also North Buckhead, 903 F.2d at 1542 ("The district court properly found that

federal, state and local officials complied with federally mandated regional planning procedures

in developing the need and purpose of the EIS.").

     Likewise, the MIS process conducted by the OKI Regional Council of Governments

intially compared numerous transportation options, AR 47949-48004, narrowed those options to

a set of manageable alternatives, AR 48005-48035, and concluded with a recommended plan.

AR 48036-97.  Environmental impacts were considered during the MIS process, AR 48019-23,

48084-87, 48119-28, and there was substantial opportunity for public comment.  AR 48023–25,

48100-08.  Indeed, Plaintiffs in this case provided input during the MIS process, and members of

the Sierra Club and Little Miami, Inc., also were members of the MIS Task Force.  AR 47868.

Accordingly, the local communities, ODOT, and FHWA have planned this project in accordance with the applicable statutory and regulatory requirements.

**c.    The Wild and Scenic Rivers Act Does Not Preclude the Construction of a New Bridge**

Although not presented as a separate argument, Plaintiffs imply that the Little Miami River's designation under the Wild and Scenic Rivers Act ("WSRA"), 16 U.S.C. § 1273(b)(1)-(3), should preclude the construction of a new bridge.  See, e.g., Pls. Mem. at 15 ("[T]he Little Miami River is a federally designated Wild and Scenic River demanding consideration of alternatives that do not impair the attributes for which the river was included in the National Wild and Scenic Rivers System.").  Plaintiffs' suggestion that the WSRA precludes a new bridge of the lower Little Miami River is unfounded, and, in fact, FHWA carefully considered the attributes of the river when planning the Eastern Corridor Project.

As an initial matter, Plaintiffs' characterization of the lower Little Miami River as the "Wild and Scenic Little Miami River", see, e.g., Pls. Mem. at 5, 13, 15, blurs the distinction between different classifications of rivers under the WSRA.  The WSRA sets forth three classifications for rivers, which also prescribe how the river will be administered:  wild, scenic, and recreational.  16 U.S.C. § 1273(b)(1)-(3); see also Wilderness Watch v. U.S. Forest Serv., 143 F. Supp. 2d 1186, 1190 (D. Mont. 2000).  "Wild" river areas are the least developed of the three WSRA categories and are afforded the greatest protection under the WSRA.  Wilderness Watch, 143 F. Supp. 2d at 1190.  They are "free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted."  Id. (citing 16 U.S.C. § 1273(b)(1)).  Distinguishing between wild rivers, which "'represent vestiges of primitive America,'" and "scenic" and "recreational" rivers, the court in Wilderness Watch

24

explained that the latter two categories "receive much less protection." Id. "Recreational" rivers are in areas that "are readily accessible by road or railroad, that may have some development along their shorelines, and may have undergone some impoundment or diversion in the past," and are afforded "the least protection." Id. (citing 16 U.S.C. § 1273(b)(3)).

In joint Guidelines for the WSRA issued by the DOI and the Department of Agriculture, the agencies explained "[t]he basis for classification is the degree of naturalness, or stated negatively, the degree of evidence of man's activity in the river area. The most natural rivers will be classified wild; those somewhat less natural, scenic, and those least natural, recreational." 47 Fed. Reg. 39458 (Sept. 7, 1982). As Plaintiffs concede, the lower Little Miami River is designated as a recreational river, the lowest classification under the WSRA. Pls. Mem. at 1 n.1. In fact, the upper Little Miami River, extending from Foster, Ohio to Clifton, Ohio, was designated a scenic river in 1973. AR 3001. The lower Little Miami River, from the Ohio River to Foster, Ohio was later designated as a recreational river in 1980. AR 2947-48.

In managing the river, the WSRA directs the agency, in this instance ODNR, to "protect and enhance the values which caused it to be included in said system, without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values." 16 U.S.C. § 1281(a). The construction of a new bridge will not substantially interfere with the recreational attributes for which this segment of the river was designated. AR 47086. Indeed, it was determined during the NEPA process through coordination with representatives of NPS, DOI, and ODNR that the construction of a clear span bridge would not violate Section 7 of the WSRA because the bridge would not impact the riverbed or bank. AR 47715-16; see also 16 U.S.C. § 1278. Importantly, the Little Miami

Scenic River Assistance Manual, the document that was prepared by ODNR in conjunction with the designation of the lower segment of the Little Miami River, specifically mentions relocated US 50/SR 32 in the "Project Section" of the document.  AR 9102, 42277, 47716.  The map accompanying the description of the proposed project shows a circle drawn in a dotted line at Horseshoe Bend, precisely where the new bridge would be constructed in the Eastern Corridor Project.  AR 9101.  Moreover, FHWA has coordinated with ODNR and complied with ODNR regulations throughout the project.  AR 47728; see also Ohio Rev. Code § 1517.14.  Therefore, Plaintiffs' suggestion that a new bridge is precluded by the designation of the lower Little Miami River as a recreational river under the WSRA is unfounded.

## 2.    FHWA Was Not Required to Prepare a Supplemental EIS

Plaintiffs also claim that FHWA should have prepared a supplemental EIS for the Eastern Corridor Project based on information that was provided to FHWA by NPS on June 28, 2006, which was three weeks after the issuance of the ROD and more than eight months after the issuance of the FEIS.  See Pls. Mem. at 21-27.  In particular, Plaintiffs argue that FHWA should have supplemented its EIS based upon NPS' discussion of potential Section 4(f) impacts in its letter and a noise analysis of the new bridge crossing conducted by an NPS scientist.  Id.  Plaintiffs' argument is without merit because NPS' letter did not contain any significant new information regarding the potential environmental impacts of the project.

A supplemental EIS is required when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1).  As the Supreme Court has explained,

> [A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized.  To require otherwise would render agency

26

decisionmaking intractable, always awaiting updated information only to find the
new information outdated by the time a decision is made.

Marsh, 490 U.S. at 373.  Rather, a "supplemental EIS is only required where new information
'provides a *seriously* different picture of the environmental landscape.'"  Nat'l Comm. for the
New River, Inc. v. FERC, 373 F.3d 1323, 1330 (D.C. Cir. 2004) (quoting City of Olmsted Falls,
Ohio v. FAA, 292 F.3d 261, 274 (D.C. Cir. 2002)); see also Marsh, 490 U.S. at 374 (an EIS
should be supplemented only if new information shows that the environment will be affected "in
a significant manner or to a significant extent not already considered.").  An agency's decision
not to prepare a supplemental EIS is reviewed under the arbitrary and capricious standard.
Olmsted Falls, 292 F.3d at 274.

     In making their argument that an SEIS is required, Plaintiffs entirely misrepresent the
communications and exchange of letters that occurred between FHWA and DOI, NPS, and EPA
during the NEPA process and following the issuance of the FEIS.  See Pls. Mem. at 22-23.
FHWA coordinated with EPA and NPS from the beginning of the NEPA process in 2002, and
NPS is a cooperating agency.  AR 47138.  Both EPA and NPS submitted substantial comments
on both the PDEIS, AR 10604-06 (EPA), AR 3443-60 (NPS), and DEIS.  AR 9198-202 (EPA),
AR 2967-69 (NPS).  On April 18, 2005, DOI's Office of Environmental Policy (referred to
below as "DOI") separately provided comments on the DEIS.  AR 2158-72.  DOI discussed a
number of potential environmental issues relating to the project, including the elimination of
Option 2 during the MIS process, Transportation Act Section 4(f) issues, the Little Miami
River's designation under the WSRA, potential noise impacts from a new bridge, potential visual
impacts, and the applicability of WSRA Section 7.  AR 2159-68.  On September 19, 2005,
FHWA responded by letter to DOI describing the extensive discussions held with NPS and

FHWA scientific and legal staff regarding the main issues raised in DOI's letter: the WSRA

Section 7 and Transportation Act Section 4(f).  AR 1717-19.

On November 28, 2005, following the issuance of the FEIS, and at FHWA's invitation,

DOI submitted an extensive analysis of the FEIS.  AR 42269-80.  In this letter, DOI again

discussed issues relating to: WSRA Section 7, the elimination of Option 2, the designation of the

Little Miami River under the WSRA, Department of Transportation Act Section 4(f) resources,

the outstandingly remarkable values ("ORV") of the Little Miami River, noise impacts, the

proposed river crossing identified in the 1979 Little Miami Scenic River Assistance Manual, and

other environmental impacts.  Id.  On November 23, 2005, EPA also sent a letter analyzing the

FEIS.  AR 9515-16.  NPS also communicated with FHWA regarding the FEIS by e-mail.

AR 8049, 9830-31.

In response to continued concern of DOI, NPS, and EPA regarding some of the potential

environmental impacts of the project, despite FHWA's analysis of those impacts in the FEIS,

FHWA decided not to issue the ROD immediately, but instead convened meetings with DOI,

NPS, and EPA.  On February 24, 2006, FHWA met with representatives of NPS and DOI.

AR 8776.  At the meeting, FHWA and ODOT gave an extensive presentation on the Eastern

Corridor Project.  AR 8792-835.  As notes of the meeting show, issues relating to the elimination

of Option 2, the Little Miami River's designation under the WSRA, and the river's ORVs were

discussed.  AR 8459.  Sue Jennings, who drafted many of NPS' comments during the EIS

process and Dr. Kurt Fristrup, an NPS noise expert, attended the meeting.  AR 8777.  Following

the meeting, FHWA indicated to DOI and NPS its intention to go forward with the issuance of

the ROD and that FHWA would issue a written response to DOI's November 28, 2005, letter.

28

AR 9474.  On March 3, 2006, FHWA met with representatives of EPA and gave a similar

presentation.  AR 8457, 8460-79.  On April 19, 2006, FHWA followed up the DOI/NPS meeting

by sending the detailed noise analysis conducted by ODOT for Tier 1 of the Eastern Corridor

Project to NPS.  AR 9564-81.  NPS responded by saying that it would give the information to

Dr. Fristrup in NPS' natural sounds program for review, and that it would let FHWA know if it

had further questions.  AR 9563.  FHWA continued to communicate with NPS at least until early

May.  AR 2073.  At no point did NPS indicate that FHWA should wait to issue the ROD until

Dr. Fristrup had analyzed the data and submitted an analysis to FHWA.

On May 12, 2006, FHWA sent a letter to DOI referencing the discussions at the

February 24, 2006, meeting with DOI and NPS, specifically responding to the issues raised in

DOI's November 25, 2005, letter, and attaching additional data and maps regarding the Eastern

Corridor Project.  AR 9517-42.  FHWA closed the letter by stating that, "We are currently

crafting the Tier 1 Record of Decision in a way that lays the expectations for this Tier 2

collaboration.  We invite you to provide your input during Tier 2 so that we can truly make this

project one that we can all be proud of."  AR 9525.  On May 16, 2006, FHWA sent a letter to

EPA referencing the March 3, 2006, meeting, and responding to the issues raised in EPA's

November 23, 2005, letter.  AR 9446-72.  FHWA closed the letter with the same language as in

the DOI/NPS letter.  AR 9455.  Neither DOI/NPS or EPA responded to request that FHWA

delay issuance of the ROD.  Only then, having responded to comments from DOI/NPS and EPA

following the PDEIS and DEIS and having addressed similar concerns during an eight month

period following the issuance of the FEIS, did FHWA finally issue the ROD on June 2, 2006.

AR 47099.  On June 28, 2006, after the issuance of the ROD, NPS submitted a letter to FHWA

containing additional discussion of Tier 1 and attaching a noise analysis conducted by

Dr. Fristrup.  AR 8149-63.  Thus, contrary to Plaintiffs' assertions that FHWA misled NPS, what

the record really shows is that FHWA devoted substantial effort to resolving the issues raised by

NPS, DOI, and EPA and thoroughly considered all of their input.

　　　More important to Plaintiffs' legal argument, NPS' June 28, 2006, letter does not contain

any significant new information that would require the preparation of an SEIS.  Rather, the letter

raises the very same issues – the Little Miami River's designation under the WSRA, Section

4(f), ORVs on the Little Miami River, noise impacts, visual impacts, and mitigation – which

already had been raised by DOI and other agencies multiple times and been thoroughly

addressed by FHWA during the NEPA process.  AR 8149-54, 47440-58, 47726-41, 47776-808.

Thus, as in <u>Olmsted Falls</u>, most of what Plaintiffs term "new," is not actually new at all.  292

F.3d at 274.  The only thing even arguably new is a 7-page report prepared by Dr. Fristrup

offering a critique of FHWA's noise analysis.  AR 8156-63.  Dr. Fristrup's report contains no

new data.  <u>Id.</u>  Instead, Dr. Fristrup analyzes FHWA's data based on NPS interim guidelines "for

assessing noise impacts in natural areas."  AR 8156, 8163.  These interim guidelines, which are

not law and do not apply to FHWA, do not govern FHWA's noise analysis.  Rather, FHWA

conducted its noise analysis following its own regulations.  AR 9467-69, 47087-88, 47717.  As

discussed in Section B., <u>infra</u>, FHWA's noise analyses conducted pursuant to its regulations have

been upheld by numerous courts.  Dr. Fristrup simply offers additional analysis of an issue –

noise associated with a new bridge – that already had been debated for years during the EIS

process.  Accordingly, Dr. Fristrup's report does not provide "a *seriously* different picture of the

environmental landscape" warranting the preparation of a supplemental EIS.  <u>Olmsted Falls</u>, 292

F.3d at 274 (emphasis in original); Nat'l Comm. for the New River, 373 F.3d at 1330.

### 3.    FHWA's Reliance on an Economic Analysis Utilizing a Set Price of Gasoline Does not Render Its Entire EIS Inadequate

Plaintiffs argue that FHWA's economic analysis of the benefits of the project was flawed because it utilized a price of gasoline of $1.13, AR 607, which is much lower than the price now. See Pls. Mem. at 27-28 (citing 40 C.F.R. §§ 1500.1(b), 1502.24).  Plaintiffs are correct that the price of gasoline has risen since 2004 when the report was created, but they fail to explain how this affected the scientific integrity of the model.  See 40 C.F.R. § 1502.24.  The price of gasoline, among other factors, was used in the economic model to calculate the expected savings due to:  (1) increased mass transit use, (2) time savings due to reduced congestion, (3) lower vehicle operating costs, (4) safety benefits, and (5) reduced emissions.  AR 600-07.  The price of gasoline was used in the model for purposes of calculating the vehicle operating costs.  AR 604-07.  The dollar figures for the price of gas, as well as the prices of oil, tires, maintenance and repair, and depreciation, were taken from the Highway Economic Requirement System, FHWA's standard model for evaluating the relationship between national investment and highway performance,[7] and adjusted to 2003 dollars using consumer price indices.  AR 607.  These numbers were used to calculate the dollar value of the expected benefits of the project.  AR 615.

As explained in a November 15, 2005 letter regarding this issue, it is common practice to hold fuel prices constant when doing economic analyses for transportation projects for the very reason that prices can fluctuate substantially.  AR 506.  In addition, the benefits from the Eastern Corridor Project – greater mass transit use and fewer vehicle miles traveled – will be even

---

[7]  FHWA uses the model to estimate future investment required to either maintain or improve the Nation's highway system.  FHWA provides this information to the U.S. Congress on a biennial basis.  See www.fhwa.dot.gov/infrastructure/asstmgmt/hersfact.cfm.

greater if the price of fuel continues to rise.  Id.  Finally, the demand for mass transit is fairly

inelastic, meaning that, even if fuel prices rise drastically, only a certain small percentage of

drivers will switch to mass transit.  AR 506-09.  Accordingly, Plaintiffs have failed to show that

the use of a constant price of $1.13 for gasoline in the economic model was improper or that the

use of $1.13 unfairly inflated the economic benefits of the project.  Therefore, Plaintiffs'

criticism of the model on that basis is unfounded, and FHWA's economic analysis of the project

should be upheld.  See Izaak Walton League of Am, v. Marsh, 655 F.2d 346, 378 (D.C. Cir.

1981) (stating that an agency's balancing of the costs and benefits of a project under NEPA

should not be overturned unless they are arbitrary or "clearly gave insufficient weight to

environmental values" and upholding Corps of Engineers' analysis); City of Williams v.

Dombeck, 151 F. Supp. 2d 9 (D.D.C. 2001) (upholding Forest Service's economic analysis of a

land exchange).

> **4.    FHWA Took a "Hard Look" at the Potential Environmental Impacts
> of the Eastern Corridor Project and Adequately Addressed
> Mitigation Measures**

In their Complaint, Plaintiffs raised a claim alleging that FHWA failed to take a "hard

look" at the potential environmental impacts of the project and failed to adequately discuss

mitigation measures to address these potential harms.  See Complaint ¶¶ 89-93 (Third Claim for

Relief).  Because Plaintiffs did not raise this claim in their motion for summary judgment and,

therefore, have failed to come forward with facts supporting their claim, FHWA is entitled to

summary judgment on this claim.  See Celotex, 477 U.S. at 322 (summary judgment should be

granted against a party "who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at

trial").

Moreover, FHWA thoroughly analyzed the potential environmental impacts from the proposed project, including impacts to soils, floodplains, groundwater, surface water, wetlands, wildlife habitat, parks, and air quality. AR 47264-430. FHWA included and examined extensive mitigation measures to ameliorate those potential harms. See id. For example, FHWA considered a number of mitigation measures with respect to the Little Miami River to avoid environmental impacts. These mitigation measures include: a clear span of the Little Miami River to avoid in-stream impacts, stream restoration and preservation, controlled access to this portion of the river, design measures to allow for unimpeded river flow considering a 100-year flood event, construction practices to avoid soil erosion and runoff, and the development of a special committee to further develop mitigation measures in Tier 2. AR 47378-79. Accordingly, FHWA has taken a hard look at the potential environmental impacts of the project and has employed adequate mitigation measures to minimize environmental harm. 40 C.F.R. §§ 1502.15, 1502.16, 1508.20, 1508.25(b); see Citizens Against Burlington, 938 F.2d at 206.

Accordingly, as the record demonstrates, FHWA considered reasonable alternatives, conducted proper economic modeling, and took a hard look at the environmental impacts of the proposed project and proposed reasonable mitigation measures. And, there is no information that Plaintiffs have provided that requires the preparation of a supplemental EIS. Therefore, FHWA has complied with NEPA.

## B.    FHWA Complied With Department of Transportation Act Section 4(f)

Plaintiffs argue that the construction of a new bridge across the Little Miami River as part of the Eastern Corridor Project constitutes a constructive use of a protected resource under

33

Department of Transportation Act Section 4(f) ("Section 4(f)"), 49 U.S.C. § 303. Pls. Mem. at

28. Plaintiffs initially argue that FHWA failed to conduct a preliminary Section 4(f) evaluation.

This argument fails because FHWA did conduct a Section 4(f) analysis and made a preliminary

determination during Tier 1 that a bridge constructed so as to clear span the riverbed and banks

would not constitute an actual, temporary, or constructive use of the river. AR 47403, 47717.

Plaintiffs then make three main arguments: (1) noise from a new bridge will constitute a

constructive use of the Little Miami River, (2) FHWA improperly characterized the Little Miami

River as a category B, rather than a category A, noise receptor under FHWA's regulations for

analyzing noise impacts, and (3) visual impacts from a new bridge over the Little Miami River

constitute a constructive use of the river. Id. As shown below, none of these arguments has

merit, and FHWA has fully complied with its obligations under Section 4(f).

> **1.    Noise Levels Estimated During Tier 1 Indicated that a New Bridge Will Not Constitute a Constructive Use of the Little Miami River**

Contrary to Plaintiffs' assertions, FHWA properly analyzed potential noise impacts under

the applicable regulations and found that there would be no constructive use due to noise. A

constructive use due to increased noise levels occurs if:

> The projected noise level increase attributable to the proejct *substantially interferes* with the use and enjoyment of a noise-sensitive facility of a resource protected by section 4(f), such as hearing the performances at an outdoor amphitheater, sleeping in the sleeping area of a campground, enjoyment of a historic site where a quiet setting is a generally recognized feature or attribute of the site's significance, or enjoyment of an urban park where serenity and quiet are significant attributes.

23 C.F.R. § 771.135(p)(4)(i) (emphasis added). A constructive use does *not* occur if "[t]he

projected noise levels of the proposed highway project do not exceed the FHWA noise

abatement criteria as contained in Table 1, 23 C.F.R. part 772." 23 C.F.R. § 771.135(p)(5)(ii).

During Tier 1, FHWA conducted noise analyses of potentially noise-sensitive receptors in the Eastern Corridor. AR 47302-05. To specifically address potential noise impacts under Section 4(f), FHWA directed ODOT's Office of Environmental Services ("OES") to conduct ambient noise readings in the project study area at several locations along the Little Miami River. AR 9524. Three of those locations were near the proposed new crossing of the Little Miami River, and the other was located on a sandbar near the Beechmont Levee. Id. Noise readings from these locations ranged from 51.5 dB to 56.4. Id. OES noted a consistent background noise. Id. OES also modeled the potential future noise levels from the proposed new bridge crossing using a procedures established by FHWA regulations. Id. Noise modeling is usually conducted based on detailed designs and traffic data, and, therefore, OES was required to make certain assumptions regarding the new bridge. Id. The model assumed two 12' lanes in each direction, 10' shoulders, a 20' shoulder/bike lane, and a bridge height of 55'. Id. The model examined noise levels at 50' and 100' from the roadway and every 100' thereafter up to 1000'. Id. Receivers were placed in 44 locations on the river and on land north and south of the roadway. AR 9524, 9533-35. The model indicated that the highest predicted noise level, at a location north of the bridge, was 62 dBA, and that no location was expected to experience noise levels that would meet or exceed the noise abatement criteria of 67 dBA. AR 9524. Accordingly, FHWA found in the FEIS that the potential noise impacts from a new river crossing would not constitute a constructive use under Section 4(f). AR 9524, 47717.[8]

---

[8] FHWA also thoroughly considered potential Section 4(f) impacts to public parks, recreation areas, and wildlife refuges. AR 47395-402. Although, Plaintiffs raised this issue in their Complaint, see Complaint ¶ 99, they did not address it in their Motion for Summary Judgment..

FHWA's noise analyses for the Eastern Corridor Project were conducted entirely in accordance with its regulations, promulgated pursuant to 23 U.S.C. § 109(i) and set forth at 23 C.F.R. § 772, and also with FHWA guidance:  "FHWA Highway Traffic Noise Analysis and Abatement Policy and Guidance" (June 1995) ("FHWA Noise Guidance").[9]  FHWA's noise standards and procedures are complex and capture traffic volume and speed, variations in vehicle noise, terrain conditions, natural and man-made obstacles, and other traffic-related factors. FHWA Noise Guidance at 5.  The District of Columbia Circuit has consistently deferred to the agency's expertise in choosing the most appropriate way to measure noise.  Town of Cave Creek Arizona v. FAA, 325 F.3d 320, 332 (D.C. Cir. 2003); Sierra Club v. DOT, 753 F.2d 120, 128 (D.C. Cir. 1985) ("It is clearly within the expertise and discretion of the agency to determine proper testing methods"); Citizens Against Burlington, 938 F.2d at 200-01 ("In examining the impacts of noise on the environment, the FAA relies on wisdom and experience peculiar to the agency and alien to the judges on this court.").

Accordingly, because the increase in noise impacts will not be severe and are not expected to exceed the noise abatement criteria set forth in FHWA's regulations, FHWA's noise analysis for purposes of Section 4(f) was not arbitrary or capricious and should be upheld. Allison v. Dep't of Transp., 908 F.2d 1024, 1031 (D.C. Cir. 1990) (holding that a new airport would not result in a significant increase in noise levels at a state park and therefore would not use the protected land); Sierra Club, 753 F.2d at 130 (holding that allowing commercial jets to land at an existing airport was not a constructive use of parklands); Coalition On Sensible Transp. Inc. v. Dole, 642 F. Supp. 573, 596 (D.D.C. 1986) (holding that an interstate-widening

---

[9]  This guidance is available at http://www.fhwa.dot.gov/environment/polguid.pdf.

project was not a constructive use where only permanent effects would "be slightly increased noise levels in some areas and potential visual impairment through construction of off-site noise barriers and retaining walls"); Stewart Park and Reserve Coalition, Inc. (SPARC) v. Slater, 358 F. Supp.2d 83, 102 (N.D.N.Y. 2005) (upholding FHWA's finding that noise impacts did not constitute a constructive use because the noise abatement criteria were not exceeded).[10]

Plaintiffs' argument that FHWA's noise analysis was improper rests solely on Dr. Fristrup's critique of FHWA's noise analysis and NPS' discussion of that analysis. Pls. Mem. at 23-25, 31-33; AR 8149-63. In his critique, Dr. Fristrup raises a number of criticisms of FHWA's noise analysis, including: the equipment setup and operation should have been conducted differently, data should have been collected at different sites, sound monitoring should have been conducted for a longer period, and different filters should have been used. AR 8156-63. Without collecting any data, Dr. Fristrup also asserts that his methods would show ambient noise levels 10 dB below what FHWA found. AR 8156.

For a number of reasons, Dr. Fristrup's late-submitted critique fails to demonstrate that FHWA's Section 4(f) noise analysis was improper. First, the standards and methods discussed by Dr. Fristrup are not applicable to FHWA. See AR 8162-63. FHWA has complied with its own directly applicable regulations, and this Court should defer to those regulations and FHWA's expertise. See, e.g., Marsh, 490 U.S. at 378 ("When specialists express conflicting

_____

[10] The cases cited by Plaintiffs in support of their arguments regarding noise, Pls. Mem. at 30-31, are readily distinguishable on their facts. See Brooks v. Volpe, 460 F.2d 1193, 1194 (9th Cir. 1972) (encirclement of a campground and creek near a mountain summit pass by the construction of an interstate highway constituted a use of Section 4(f) resources); Coalition Against a Raised Expressway, Inc. v. Dole, 835 F.2d 803, 811-12 (11th Cir. 1988) (hereinafter "CARE") (impacts from a raised expressway directly adjacent to several designated historic sites and park constituted a constructive use under Section 4(f) where noise levels would rise to 75 or 80 dB).

views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."). Second, Dr. Fristrup does not offer any competing data. Therefore, even if the Court were inclined to adopt Dr. Fristrup's analysis, there is no data to support any conclusion other than the one FHWA reached. Finally, even if Dr. Fristrup is correct that his analysis would show that ambient noise levels are 10 dB below what FHWA reported, AR 8156, this does not demonstrate that a new bridge will exceed FHWA's noise abatement criteria. Moreover, Dr. Fristrup does not offer any critique of ODOT's modeling of the potential noise of a new bridge.

In sum, ODOT properly considered noise data available at the Tier 1 stage before alignment of the bridge has been finalized. AR 47717. Additional analyses will be conducted at the Tier 2 stage to confirm that there will be no constructive use of the river and adjacent areas due to noise. AR 47088, 47717.

> **2.      FHWA's Decision to Classify the Lower Little Miami River and Surrounding Areas as a Class B Noise Receptor Is Supported by the Record and Is Entitled to Deference**

Plaintiffs argue that FHWA improperly classified the lower Little Miami River and adjacent areas as a Category B noise receptor, rather than Category A, for purposes of conducting its noise analysis. Pls. Mem. at 33. In fact, FHWA properly characterized the Little Miami River and adjacent parkland as a Category B receptor under its noise abatement regulations regarding traffic noise impacts, 23 C.F.R. § 772.19(c), Table 1. AR 47303. The regulations establish threshold sound levels by categories for different activities and places. Category A is the highest category and is defined as: "Lands on which serenity and quite are of extraordinary significance and serve an important public need and where the preservation of

those qualities is essential if the area is to continue to serve its intended purpose."  23 C.F.R. §

772.19(c), Table 1.  Category B is the second-highest category and is defined as:  "Picnic areas,

recreation areas, playgrounds, active sports areas, parks, residences, motels, hotels, schools,

churches, libraries, and hospitals."  Id.

      While Categories A and B both include parkland, FHWA was well within its discretion

in interpreting its regulations to mean that the lower Little Miami River fits in Category B, and

not Category A.  AR 47717.  The lower Little Miami River is classified as recreational, the

lowest designation under the WSRA.  AR 112-13.  Recreational rivers are those that "are readily

accessible by road or railroad, that may have some development along their shorelines, and that

may have undergone some impoundment or diversion in the past," and are afforded "the least

protection."  Wilderness Watch, 143 F. Supp. 2d at 1190 (citing 16 U.S.C. § 1273(b)(3)).

Contrary to Plaintiffs' characterization, see Pls. Mem. at 35-36, the proposed study area is not an

undisturbed wilderness area where "serenity and quite are of extraordinary significance and

serve an important public need."  23 C.F.R. § 772, Table 1.  Development along the lower Little

Miami River includes utility towers adjacent to river, gabion structures, manmade outlets,

landfill operations, urban debris, and residential and commercial development.  AR 47708,

47865.  The urbanization surround the river generates a significant amount of background noise.

AR 9524.  A new bridge is consistent with the current land uses and is, indeed, specifically

referenced as a potential new project in the Little Miami Scenic River Assistance Manual.  AR

9101-02, 42277, 47716.

      Moreover, the recreational attributes for which the lower Little Miami River was

designated will be protected if a new bridge is constructed.  The Little Miami Scenic River

Assistance Manual recognizes the recreational attributes of the river and designates a number of

sites along the riverbank where recreational opportunities should be preserved.  AR 9040-95.

None of the existing or proposed recreational sites mentioned in the manual are in the Horseshoe

Bend area.  See id.  However, as FHWA recognized in the FEIS, even though there is no public

access to the river in that area, it is used for canoeing and kayaking.  AR 47717.  These uses will

not be disturbed by a bridge that clear-spans the Little Miami River.  AR 47086-87, 47717.

FHWA recognizes that NPS disagrees with its determination.  AR 42269-80.  However,

FHWA fully considered NPS' analyses and, having done so, is not obligated to follow NPS'

recommendation.  Citizens Against Burlington, 938 F.2d at 201.  The Court should defer to

DOT's interpretation and application of its own regulations.  See Wyoming Outdoor Council v.

United States Forest Service, 165 F.3d 43, 52 (D.C. Cir. 1999) ("agency's interpretation of its

own regulations is entitled to substantial deference . . . [and] [t]hat 'broad deference is all the

more warranted when . . . the regulation concerns a complex and highly technical regulatory

program.'") (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504 (1994) (internal

quotations omitted)); see also DSE, Inc. v. United States, 169 F.3d 21, 28 (D.C. Cir. 1999)

("agency's interpretation and application of its own regulations does merit our deference.").

Accordingly, FHWA's decision to classify the lower Little Miami River as a Category B noise

receptor for purposes of its noise abatement analysis was not arbitrary or capricious.

### 3.     FHWA Properly Considered Whether a New Bridge Would Substantially Impair the Recreational and Scenic Values of the Lower Little Miami River

Plaintiffs also argue that putting a new bridge over the lower Little Miami River in the

Horseshoe Bend area will impair the visual and scenic qualities of the river.  Pls. Mem. at 35.

40

To the contrary, FHWA analyzed the potential visual impacts of a putting a new bridge over the

lower Little Miami River and properly found that a new bridge would not substantially impair

the use and enjoyment of the river.  The applicable regulations state as follows:

> The proximity of the proposed project substantially impairs esthetic features or
> attributes of a resource protected by section 4(f), where such features or attributes are
> considered important contributing elements to the value of the resource.  Examples
> of substantial impairment to visual or esthetic qualities would be the location of a
> proposed transportation facility in such proximity that it obstructs or eliminates the
> primary views of an architecturally significant historical building, or substantially
> detracts from the setting of a park or historic site which derives its value in
> substantial part due to its setting . . . .

23 C.F.R. § 771.135(p)(4)(ii).  A constructive use due to visual impacts does *not* occur if

"[o]verall (combined) proximity impacts caused by a proposed project do not substantially

impair the activities, features, or attributes that qualify a resource for protection under section

4(f)."  23 C.F.R. § 771.135(p)(5)(vi).

FHWA considered visual impacts to the lower Little Miami River, and appropriately

concluded that a new bridge would not substantially impair these attributes.  AR 47086-89,

47717.  The visual and scenic attributes of the river should be viewed through the lens of the

WSRA, under which the lower Little Miami River was classified was recognized for its

recreational attributes.  AR 112-13.  As FHWA noted, there is no public access to the river in the

Horseshoe Bend area and the Little Miami River flows through a densely populated,

industrialized area.  AR 47087, 47717.  The primary uses of the river are canoeing and kayaking

and a clear-span bridge will not interfere with those uses.  AR 47717.  As FHWA explained in

response to comments from NPS, a new bridge would not affect the visual and scenic attributes

experienced by boaters on the river because views of the bridge from the water would be limited

from the boater's perspective on the water surface, and the bridge would be raised above the

41

banks and would be obscured by bends in the river.  AR 1718.  Moreover, recreational users would only be impacted for a short time due to the bend in the river before the proposed bridge location.  Id.

This case is, in fact, very similar to another case in which FHWA's Section 4(f) determination regarding visual impacts was upheld.  See Geer v. FHA, 975 F. Supp. 47, 73 (D. Mass. 1997) (finding that proposed bridges would "not obscure the primary views from boats using the park, which are of the water surface, the other boats on the river, and recreational activity on the banks, all of which are in the foreground with the bridges and ramps in the background."); see also Laguna Greenbelt, 42 F.3d at 533 (holding that the construction of a highway bridge over a bike trail and adjacent to a park would not substantially interfere with the features, activities, and attributes of parklands); Citizens for the Scenic Severn River Bridge, Inc. v. Skinner, 802 F.Supp. 1325, 1334-5 (D. Md. 1991) (upholding the official's determination that a bridge would not substantially impair a scenic overlook).  Accordingly, based on the existing uses of the area and the current visual impairments, FHWA's determination that there would be no substantial impairment to visual or aesthetic qualities was justified and is entitled to deference.  See, e.g., Wyoming Outdoor Council, 165 F.3d at 52.

Moreover, a new bridge would not substantially impair the visual and scenic attributes of the Horseshoe Bend area because substantial urban blight already exists along the banks of the river.  Plaintiffs' characterization of the lower Little Miami River as "a relatively undisturbed stretch of river" ignores the development along the river.  See Pls. Mem. at 37.  FHWA identified a number of current undesirable land uses along the Little Miami River in the project area, such as the Hafner landfill and a sewer line combined with a sewer overflow outfall along

42

the west bank.  AR 47708.  The study area also includes riparian clearing for agricultural

activities, a high-tension electrical transmission line aerial crossing, and a railroad bridge

crossing.  AR 47707.  Plaintiffs strain credulity when they argue:  "the presence of powerlines

and other manmade features does not taint the natural setting provided by this stretch of river nor

the quiet and solitude experienced on the river."  Pls. Mem. at 39.  The fact is that this stretch of

the river is highly developed, and the construction of a new bridge will not substantially impair

the scenic value of Horseshoe Bend in comparison to the land uses that already exist.  Moreover,

as already mentioned, the assistance manual for the lower Little Miami River specifically

contemplates a new bridge crossing in this precise area.  AR 9101-02.  Accordingly, FHWA

followed its regulations and found that the scenic value of the Little Miami River would not be

substantially impaired.  23 C.F.R. § 771.135(p)(4)(i); AR 47717.

The cases cited by Plaintiffs are easily distinguished.  See Pls. Mem. at 36.  The proposed

bridge over the lower Little Miami River is not similar to putting a new highway in "a remote

area with no permanent roads and includes Bourne Pond and a portion of the Appalachian Trail."

Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, 362 F. Supp.

627, 639 (D. Vt. 1973), aff'd, 508 F.2d 927 (2d Cir.1974)), vacated and remanded on other

grounds, 423 U.S. 809 (1975).  Nor can the proposed area be compared with a massive highway

project that would have required deep cuts and fill slopes in an "unspoiled wilderness" area.  See

Sierra Club v. United States DOT, 664 F.Supp. 1324, 1330 (N.D. Cal. 1987) (holding that cuts

through a mountain up to 2,100 feet long with fill slopes up to 250 high was a constructive

use).[11]

---

[11]  Moreover, unlike CARE, the bridge would not block protected resources from view.  835 F.2d
at 812.  In Brinegar, there was no dispute that a proposed bridge would be directly located in a

Accordingly, FHWA properly characterized the lower Little Miami River and adjacent parkland as a category B noise receptor and conducted thorough analysis of the potential noise impacts of a new bridge pursuant to FHWA's noise abatement regulations. FHWA also thoroughly considered the potential visual and scenic impacts of placing a new bridge across the lower Little Miami River and appropriately found that a new bridge would not be inconsistent with the development along the river and would not interfere with the recreational use and enjoyment of the river.

---

parkland and therefore constitute an actual use of a Section 4(f) resource. <u>Coal. for Responsible Devel. v. Brinegar</u>, 518 F.2d 522, 524 (4th Cir. 1975).

**VI.    CONCLUSION**

FHWA has fully complied with the requirements of NEPA and Section 4(f) of the

Department of Transportation Act.  Accordingly, FHWA requests that summary judgment be

granted in its favor and that Plaintiffs' request for summary judgment be denied.

Dated: August 10, 2007                     Respectfully submitted,

                                           RONALD J. TENPAS
                                           Assistant Attorney General
                                           Environment and Natural Resources Division

                                           /s/ Luther L. Hajek_____
                                           LUTHER L. HAJEK
                                           United States Department of Justice
                                           Environment and Natural Resources Division
                                           Natural Resources Section
                                           P.O. Box 663
                                           Washington, D.C. 20044-0663
                                           Tel: (202) 305-0492
                                           Fax: (202) 305-0274

OF COUNSEL:

GLENN HARRIS
Federal Highway Administration
Assistant Midwest Counsel
19900 Governors Drive
Suite 301
Olympia Fields, IL 60461
Tel.: (708) 283-3561
Fax: (708) 283-3508

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RIVERS UNLIMITED, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:06-CV-01775 (JR) |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| TRANSPORTATION, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| OHIO DEPARTMENT OF TRANSPORTATION, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
## OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

PAGE

I.    INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   FACTUAL BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   A.    Eastern Corridor Multi-Modern Project  . . . . . . . . . . . . . . . . . . . . . . . . . 2

   B.    The Major Investment Study  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   C.    The NEPA Process  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.  STATUTORY FRAMEWORK  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

   A.    National Environmental Policy Act  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

   B.    Department of Transportation Action Section 4(f)  . . . . . . . . . . . . . . . . . 8

IV.   STANDARD OF REVIEW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

   A.    Administrative Procedure Act  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

   B.    Summary Judgment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

V.    ARGUMENT

   A.    FHWA Complied with NEPA  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      1.    FHWA Considered a Reasonable Range of Alternative  . . . . . . . . . . . . 11

         a.    FHWA Was Not Required to Consider the
               Bridge Expansion Alternative Because It
               Does Not Meet the Purpose and Need  . . . . . . . . . . . . . . . . . . 11

         b.    Elimination of the Beechmont Levee Option
               at the MIS Stage Was Appropriate  . . . . . . . . . . . . . . . . . . . . 22

         c.    The Wild and Scenic Rivers Act Does Not Preclude the
               Construction of a New Bridge  . . . . . . . . . . . . . . . . . . . . . . . . 24

      2.    FHWA Was Not Required to Prepare a Supplemental EIS  . . . . . . . . . 26

i

PAGE

3.    FHWA's Reliance on an Economic Analysis Utilizing a Set Price of Gasoline Does not Render Its Entire EIS Inadequate . . . . . . . . . . . . 31

4.    FHWA Took a "Hard Look" at the Potential Environmental Impacts of the Eastern Corridor Project and Adequately Addressed Mitigation Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

B.    FHWA Complied With Department of Transportation Act Section 4(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

1.    Noise Levels Estimated During Tier 1 Indicated that a New Bridge Will Not Constitute a Constructive Use of the Little Miami River . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

2.    FHWA's Decision to Classify the Lower Little Miami River and Surrounding Areas as a Class B Noise Receptor Is Supported by the Record and Is Entitled to Deference . . . . . . . . . . . . . 38

3.    FHWA Properly Considered Whether a New Bridge Would Substantially Impair the Recreational and Scenic Values of the Lower Little Miami River . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

ii

# TABLE OF AUTHORITIES

FEDERAL CASES                                                          PAGE

Allison v. Dep't of Transp.,
    908 F.2d 1024 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
Associations Working for Aurora's Residential Env't. ("AWARE") v. Colorado Dep't of
Transp.,
    153 F.3d 1122 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
Brooks v. Volpe,
    460 F.2d 1193 (9th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
Celotex Corp. v. Catrett,
    477 U.S. 317, 322 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 33
Citizens Against Burlington, Inc. v. Busey,
    938 F.2d 190, 194 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . 7, 12, 16, 19, 21, 33, 36, 40
Citizens for the Scenic Severn River Bridge, Inc. v. Skinner,
    802 F.Supp. 1325 (D. Md. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42,43
Citizens to Preserve Overton Park, Inc., v. Volpe, Secretary of Transportation, et al.,
    401 U.S. 405 (March 2, 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9
City of Alexandria v. Slater,
    198 F.3d 862 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17, 19
City of Grapevine, Tex. v. Dep't of Transp.,
    17 F.3d 1502 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
City of Olmsted Falls, Ohio v. FAA,
    292 F.3d 261 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 27, 30, 31
City of Williams v. Dombeck,
    151 F. Supp. 2d 9 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Coal. for Responsible Devel. v. Brinegar,
    518 F.2d 522 (4th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
Coalition Against a Raised Expressway, Inc. v. Dole,
    835 F.2d 803 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
Coalition On Sensible Transp. Inc. v. Dole,
    642 F. Supp. 573 (D.D.C. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation,
    362 F. Supp. 627, 639 (D. Vt. 1973), aff'd, 508 F.2d 927 (2d Cir.1974) vacated and
    remanded on other grounds, 423 U.S. 809 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
Custer County Action Ass'n v. Garvey,
    256 F.3d 1024 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
Davis v. Mineta,
    302 F.3d 1104 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20
Dep't of Transp. v. Public Citizen,
    541 U.S. 752 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Druid Hills Civic Ass'n v. FHWA,
    772 F.2d 700 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

FEDERAL CASES                                                    PAGE

DSE, Inc. v. United States,
    169 F.3d 21 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
Geer v. FHA,
    975 F. Supp. 47 (D. Mass. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
Izaak Walton League of Am, v. Marsh,
    655 F.2d 346 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Laguna Greenbelt, Inc. v. Dep't of Transp.,
    42 F.3d 517 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 20, 42
Louisiana Ass'n of Independent Producers v. FERC,
    958 F.2d 1101 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Lujan v. National Wildlife Fed'n,
    497 U.S. 871 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Lun Kwai Tsui v. Attorney General,
    445 F. Supp. 832 (D.D.C. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Marsh v. Oregon Natural Res. Council,
    490 U.S. 360 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9, 10, 27, 38
National Trust for Historic Preservation v. Dole,
    828 F.2d 776 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
National Wildlife Fed'n v. FERC,
    912 F.2d 1471 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Nat'l Comm. for the New River, Inc. v. FERC,
    373 F.3d 1323 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 31
Nevada v. Dep't of Energy,
    457 F.3d 78 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
North Buckhead Civic Ass'n v. Skinner,
    903 F.2d 1533 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 23
NRDC v. Hodel,
    865 F.2d 288 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18, 19
NRDC v. Morton,
    458 F.2d 827 (D.C. Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19
NRDC v. Pena,
    972 F. Supp. 9 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Town of Cave Creek Arizona v. FAA,
    325 F.3d 320 (D.C. Cir. 2003); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
Robertson v. Methow Valley Citizens Council,
    490 U.S. 332 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Sierra Club v. Dep't of Transp.,
    310 F. Supp. 2d 1168 (D. Nev. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Sierra Club v. DOT,
    753 F.2d 120 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36,37
Sierra Club v. United States DOT,
    664 F.Supp. 1324 (N.D. Cal. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

FEDERAL CASES                                                              PAGE

Stewart Park and Reserve Coalition, Inc. (SPARC) v. Slater,
    358 F. Supp.2d 83 (N.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
Strycker's Bay Neighborhood Council v. Karlen,
    444 U.S. 223 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Stop H-3 Ass'n v. Dole,
    740 F.2d 1464 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Thomas Jefferson Univ. v. Shalala,
    512 U.S. 504 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
Tongass Conservation Soc'y v. Cheney,
    924 F.2d 1137 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Vermont Yankee Nuclear Power Corp. v. NRDC,
    435 U.S. 519 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9, 12
Wilderness Watch v. U.S. Forest Serv.,
    143 F. Supp. 2d 1186, 1190 (D. Mont. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 39


FEDERAL STATUTES

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
5 U.S.C. § 706(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
5 U.S.C. 706(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9


16 U.S.C. § 1273(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
16 U.S.C. § 1273(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
16 U.S.C. § 1273(b)(1)-(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
16 U.S.C. § 1278 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
16 U.S.C. § 1281(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25


23 U.S.C. § 109(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
23 U.S.C. §§ 134-35 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
23 U.S.C. § 138 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8


42 U.S.C. 4321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
42 U.S.C. § 4332(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7


49 U.S.C. § 303 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8, 34
49 U.S.C. §5303-06 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

FEDERAL REGULATIONS                                                    PAGE

23 C.F.R. § 450.318 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
23 C.F.R. § 450.318(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
23 C.F.R. § 771 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
23 C.F.R. § 771.135(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
23 C.F.R. § 771.135(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
23 C.F.R. § 771.135(p)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
23 C.F.R. § 772 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35,36, 40
23 C.F.R. § 772.19(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

40 C.F.R. § 1501.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
40 C.F.R. § 1502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
40 C.F.R. § 1502.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
40 C.F.R. § 1502.14(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
40 C.F.R. § 1502.24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32
40 C.F.R. § 1502.9(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
40 C.F.R. §§ 1500.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
40 C.F.R. §§ 1502.15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
40 C.F.R. §§ 1502.16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
40 C.F.R §§ 1508.20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
40 C.F.R. §§ 15028.25(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Fed.R.Civ.P. 56(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## TABLE OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| CORPS | U.S. Army Corps of Engineers |
| DEIS | Draft Environmental Impact Statement |
| DOI | Department of Interior |
| DOT | Department of Transportation |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| FEIS | Federal Environmental Impact Study |
| FHWA | Federal Highway Administration |
| FTA | Federal Transit Administration |
| FWS | Fish and Wildlife Services |
| MIS | Major Investment Study |
| NEPA | National Environmental Policy Act |
| NPA | National Park Service |
| ODNR | Department of Natural Resources |
| ODOT | Ohio Department of Transportaion |
| OES | Office of Environmental Services |
| OKI | Ohio-Kentucky-Indiana |
| ORV | Outstanding Remarkable Values |
| PDEIS | Preliminary Draft Environmental Impact Statement |
| ROD | Record of Decision |
| SR | State Route |
| TDM | Transportation Demand Management |
| TSM | Transportation System Management |

## I.     INTRODUCTION

Plaintiffs challenge the issuance by the Federal Highway Administration ("FHWA")[1] of the record of decision ("ROD") for Tier 1 of the Eastern Corridor Multi-Modal Projects ("Eastern Corridor Project"), claiming that issuance of the ROD violated provisions of the National Environmental Policy Act, 42 U.S.C. 4321, et seq., ("NEPA"), and the Department of Transportation Act, 23 U.S.C. § 138 and 49 U.S.C. § 303, and therefore was arbitrary and capricious under the standard of the Administrative Procedure Act, 5 U.S.C. § 706(2) ("APA").

The Eastern Corridor Project is a comprehensive project designed to alleviate the substantial traffic congestion and delay problems experienced in the greater Cincinnati region.  It is a multi-modal project, meaning that the plan includes elements of highway, bus, rail, improvements to existing infrastructure, and bikeways.  Transportation hubs and travel routes are located so as to maximize connectivity of different modes of travel within the region.  Although official planning for the Eastern Corridor Project began in the late 1990s, plans for a comprehensive solution to Cincinnati's traffic problems have been in the works for decades.  The Eastern Corridor Project is the product of those decades of planning and is the direct result of a three-year planning process involving local communities, counties, the City of Cincinnati, federal officials, and environmental organizations.

FHWA has carefully considered the environmental impacts of the proposed project and, in particular, thoroughly considered issues relating to the construction of a new bridge across the Little Miami River, which will accommodate both highway and rail travel.  The location of the

---

[1]  In their lawsuit, Plaintiffs also name as defendants the U.S. Department of Transportation ("DOT") and the individual administrators of DOT and FHWA.  The federal defendants are referred to collectively herein as "FHWA".

1

bridge was selected to maximize the efficiency of east-west travel, reduce vehicle-miles traveled, and increase connectivity of different modes of transportation. FHWA also selected a bridge design concept – a clear-span of the river with no in-stream piers – to avoid environmental impacts to the river and to avoid disturbing the recreational activities that take place on the river.

Accordingly, as reflected in the lengthy administrative record,[2] FHWA thoroughly considered all of the potential environmental impacts at the Tier 1 stage of the Eastern Corridor Project and has, therefore, complied with NEPA and the Department of Transportation Act.

## II.    FACTUAL BACKGROUND

### A.    Eastern Corridor Multi-Modal Project

The Eastern Corridor Project is located in a 200-square mile area in the greater Cincinnati Metropolitan Area in southwestern Ohio, including Hamilton and Clermont Counties in Ohio and Campbell County in Kentucky. AR 47130. The area selected for detailed study in Tier 1 is a 14-square mile area which extends from the Cincinnati Central Business District in Hamilton County east across the Little Miami River and I-275 to Clermont County. AR 47130, 47153 (map showing detailed study area). Many of the key routes in the region are already operating in excess of capacity, and daily traffic volumes on interstates and main roads are expected to increase up to 81% by 2030. AR 47075, 47163-64. One of the key difficulties is the fact that the Little Miami River acts as a natural barrier to travel between downtown Cincinnati and Hamilton and Clermont Counties to the east. Id. Bridge crossings in the Eastern Corridor over the Little Miami River exist only on four local roads (Kellogg Avenue, Beechmont Avenue, Newtown Road, and Milford Road). AR 47074-75, 47156 (map showing existing bridge crossings). The

---

[2]  References to the "AR" are references to the Administrative Record as Supplemented, lodged with the Court on June 12, 2007.

Eastern Corridor has one of the highest daily commute volumes in the region but has only inefficient local routes to accommodate travel between the Cincinnati Business District and the eastern suburbs.  AR 47075, 47164.  Time spent in commuter travel is expected to increase by over 500% in the Eastern Corridor by 2030.  AR 47075, 47167.

In order to address the problems of congestion and delay and make travel within the region more efficient and less costly, the project will involve:  transportation system management ("TSM") (improvements to existing infrastructure and transportation demand management ("TDM") strategies), new and expanded bus transit service, new rail service, highway capacity improvements, and bikeways.  AR 47076-82,  47203-42, AR 47248-63 (maps showing multi-modal alternatives).  The conceptual alternatives now under consideration are designed to maximize inter-connectivity between the modes of travel.  AR 47203-07.  The multi-modal connection for highway, rail, bus, and bikeway at the new Red Bank Road/US 50 interchange is an important focal point of the project.  AR 47228-29, 47257-58 (maps).  This multi-modal connection point is located at the junction of existing roadways on the west side of the river and directly adjacent to the new crossing of the Little Miami River, from which relocated State Route ("SR") 32 would extend directly eastward into Hamilton and Clermont Counties.  AR 47229-31, 47259 (map).

### B.    The Major Investment Study

The Eastern Corridor Project is largely a product of the three-year long Major Investment Study ("MIS") undertaken by the Ohio-Kentucky-Indiana ("OKI") Regional Council of Governments.  AR 47867.  The MIS Task Force that led the effort was comprised of 58 members, which included representatives of the city, counties, townships, local planning

commissions, the Ohio Department of Natural Resources ("ODNR"), the Ohio Department of

Transportation ("ODOT"), and FHWA.  AR 47868.  Representatives of the Sierra Club and

Little Miami, Inc., (two of the Plaintiff groups in this case) also served on the MIS Task Force.

Id.  The purpose of the MIS was to analyze the congestion and delay issues facing the region and

come up with a consensus solution to these problems, considering performance characteristics,

cost, environmental concerns, and other factors.  AR 47877-78.

The MIS process began by considering all the factors that defined the scope of the

project: population and employment, environmental conditions, the existing transportation

system, traffic conditions, traffic quality, and level of service.  AR 47880-905.  As noted in the

MIS, the Eastern Corridor has been the focus of detailed planning studies for over 30 years, and,

even 50 years ago, planners recognized the need for major transportation improvements in the

Eastern Corridor.  AR 47898-900.  The public was extensively involved throughout the process

in a series of meetings intended to engage, educate, and interact with the public about the

proposed plans.  AR 47908-17.

The MIS process then proceeded in five phases.  In the first phase of the study, highway

expansion as well as a number of mass transit options were evaluated.  AR 47919-38.  In phase

two, the broad alternatives evaluated in phase one were developed into seven specific

transportation plans.  AR 47940-47.  In phase three, these seven plans were more carefully

considered, including consideration of environmental factors, and the number of plans was

reduced from seven to five.  AR 47949-48004.  In phase four, the plans were narrowed from the

broad five plans to a preliminary recommended plan.  AR 48005-35.  During phase four, it was

determined that, in order to improve mobility in the corridor, there needed to be additional

4

bridge capacity over the Little Miami River, and various options were considered.  AR 48011-30.  The relocation of SR 32 extending across a new bridge over the Little Miami River and connecting with US 50 was chosen as the best option and was presented along with the other components of the preferred plan in a public meeting in October of 1998.  AR 48033-35.  In phase five, additional economic, environmental, and traffic performance analyses were conducted on the preliminary plan.  AR 48037-97.  The plan was presented to the public in a formal hearing on March 25, 1999, and those comments were considered in finalizing the plan.  AR 48034, 48100-08.  And, finally, the MIS set forth the recommended plan for the Eastern Corridor, which included the relocation of SR 32 and a new crossing of the Little Miami River near Red Bank Road.  AR 48095-97.

  C. **The NEPA Process**

  The recommendations from the MIS process were carried forward to the NEPA process.  AR 47132-33.  The NEPA process then proceeded in a tiered approach, with a preliminary assessment of feasible alternatives in Tier 1 with more detailed analysis of specific project locations and alignments to be conducted in Tier 2.  AR 47135-38.  FHWA coordinated with numerous other federal and state agencies, including the U.S. Environmental Protection Agency ("EPA"), the National Park Service ("NPS"), and the U.S. Fish and Wildlife Service ("FWS") on the project beginning in January of 2002.  AR 47138.  NPS is a cooperating agency for the NEPA process.  Id.

  On March 19, 2004, ODOT, on behalf of FHWA, distributed a preliminary draft environmental impact statement ("PDEIS"), AR 21795-22308, to various federal and state agencies, including EPA, NPS, and FWS.  AR 10623-29.  FHWA received comments on the

PDEIS from EPA, AR 10604-06, and NPS, AR 3443-60. FHWA considered the comments of these agencies and numerous other agencies in preparing the draft environmental impact statement ("DEIS"). AR 47440-58. On November 8, 2004, FHWA issued the DEIS and circulated it to federal and state agencies and the public for comment. AR 47101. FHWA received comments from EPA, AR 9198, FWS, AR 8365-69, NPS, AR 2967-69, and the Department of the Interior Office of Environmental Policy and Compliance ("DOI"), AR 2158-72. On September 19, 2005, FHWA responded to DOI's letter. AR 1717-19.

On September 30, 2005, FHWA issued the final environmental impact statement ("FEIS") for the Eastern Corridor Project. In the FEIS, FHWA considered and responded to all the comments received from federal and state agencies and the public. AR 47726-41, 47776-808. On November 23 and 28, 2005, following the issuance of the FEIS, FHWA received additional letters from EPA and DOI commenting on the FEIS. AR 9515-16, AR 42269-81. To discuss some of the lingering concerns of EPA and DOI, FHWA met with officials from DOI and NPS on February 24, 2006, AR 8776-77, and EPA on March 3, 2006. AR 8457. On May 12 and May 16, 2006, FHWA issued detailed responses to DOI and EPA addressing the concerns that those agencies raised in their November 2005 letters and during the meetings in February and March, 2006. AR 9517-42, AR 9446-72. On June 2, 2006, FHWA issued the ROD for the Eastern Corridor Project. AR 47099. Following the issuance of the ROD, NPS sent an additional letter to FHWA commenting on the issues raised in its previous correspondence and discussed during the February 24, 2006 meeting. AR 8149-63.

### III.     STATUTORY FRAMEWORK

#### A.     National Environmental Policy Act

NEPA focuses the attention of federal agencies and the public on the potential

environmental consequences of proposed actions so that an agency does not act without

complete information regarding the environmental harm that may occur when the action is

implemented. Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 371 (1989); Robertson v.

Methow Valley Citizens Council, 490 U.S. 332, 349 (1989). NEPA's mandate to agencies is

procedural, not substantive, and does not mandate particular results. Methow Valley, 490 U.S. at

350; Strycker's Bay Neighborhood Council v. Karlen, 444 U.S. 223, 227-28 (1980); Vermont

Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558 (1978). Courts should "enforce the

statute by ensuring that agencies comply with NEPA's procedures, and not by coaxing agency

decisionmakers to reach certain results." Citizens Against Burlington, Inc. v. Busey, 938 F.2d

190, 194 (D.C. Cir. 1991). A court may not require agencies "to elevate environmental concerns

over other appropriate considerations." Strycker's Bay, 444 U.S. at 227. "Other statutes may

impose substantive environmental obligations on federal agencies, but NEPA merely prohibits

uninformed – rather than unwise – agency action." Methow Valley, 490 U.S. at 351.

NEPA requires the preparation of an Environmental Impact Statement ("EIS") when an

agency proposes a "major federal action[] significantly affecting the quality of the human

environment." 42 U.S.C. § 4332(2)(C). The Council on Environmental Quality ("CEQ")

regulations implementing NEPA provide detailed guidance regarding the scope and content of an

EIS. 40 C.F.R. § 1502. FHWA's NEPA regulations are set forth at 23 C.F.R. § 771, and

additional guidance for preparing NEPA documents is contained in Technical Advisory T

6640.8A.[3]

### B.    Department of Transportation Act Section 4(f)

Section 4(f) of the Department of Transportation Act, codified at 49 U.S.C. § 303 and 23

U.S.C. § 138, provides in pertinent part that:

> [T]he Secretary may approve a transportation program or project . . . requiring the
> use of publicly owned land of a public park, recreation area, or wildlife and
> waterfowl refuge, of national, State or local significance, or land of an historic
> site of national, State or local significance (as determined by the Federal, State, or
> local officials having jurisdiction over the park, area, refuge or site), only if –
> (1) there is no prudent and feasible alternative to using the land; and (2) the
> program or project includes all possible planning to minimize harm to the park,
> recreation area, wildlife and waterfowl refuge, or historic site resulting from the
> use.

49 U.S.C. § 303; accord 23 U.S.C. § 138; see also Overton Park, 401 U.S. at 405.

A "use" occurs when a protected resource is either:  (1) permanently incorporated into a

transportation facility, (2) when there is an adverse temporary occupancy of land that is adverse

to the statute's purpose, or (3) when there is a constructive use of land.  23 C.F.R. §

771.135(p)(1)(i)-(iii).  A constructive use occurs if the "project's proximity impacts are so severe

that the protected activities, features, or attributes that qualify a resource for protection under

Section 4(f) are substantially impaired.  23 C.F.R. § 771.135(p)(2).  If the use of a Section 4(f)

resources is unavoidable, FHWA must provide all planning to minimize the harm to the

protected Section 4(f) resources.  23 C.F.R. § 771.135(a)(1).  The FHWA is required to present

Section 4(f) evaluations in an EA or EIS.  23 C.F.R. § 771.135(i).

---

[3]    Technical Memorandum T 6640.8A is available through the USDOT website at
www.fhwa.dot.gov/legsregs/directives/techadvs.htm.

## IV.    STANDARDS OF REVIEW

### A.    Administrative Procedure Act

The substantive statutes before the Court, NEPA and the Transportation Act, do not grant an independent right of action.  Rather, Plaintiffs' challenges to FHWA's actions are brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, et seq.; see also City of Olmsted Falls, Ohio v. FAA, 292 F.3d 261, 269 (D.C. Cir. 2002) (reviewing NEPA and Section 4(f) claims under the APA standard).  In evaluating the legal sufficiency of the agency's action, the Court must apply the "arbitrary and capricious" standard of the APA, 5 U.S.C. § 706(2)(A), (C).  See Marsh, 490 U.S. at 360; Overton Park, 401 U.S. at 414; Louisiana Ass'n of Independent Producers v. FERC, 958 F.2d 1101, 1117 (D.C. Cir. 1992); National Trust for Historic Preservation v. Dole, 828 F.2d 776, 781 (D.C. Cir. 1987).

The reviewing court's only role is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Overton Park, 401 U.S. at 416.  "The ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency."  Id.; NRDC v. Pena, 972 F. Supp. 9, 15 (D.D.C. 1997) (citing Citizens Against Burlington, 938 F.2d at 194).  In considering NEPA claims, courts apply a "rule of reason" to determine whether the agency's analysis contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences."  Laguna Greenbelt, Inc. v. Dep't of Transp., 42 F.3d 517, 523 (9th Cir. 1994); see also Dep't of Transp. v. Public Citizen, 541 U.S. 752, 767 (2004).  A court's review is limited to the administrative record before the agency at the time of its decision.  Vermont Yankee, 435 U.S. at 549; Overton Park, 401 U.S. at 419-20.

9

Deference to an agency's decision is particularly warranted with respect to technical or scientific questions involving substantial agency expertise. Marsh, 490 U.S. at 377. A federal court does not sit "as a 'super professional transportation analyst' or decide which party utilized the better methodology in conducting its . . . analysis. Rather, the district court simply determine[s] whether the appellees' [FHWA] choice of methodology had a rational basis, consistently applied, taking relevant considerations into account." Druid Hills Civic Ass'n v. FHWA, 772 F.2d 700, 709 (11th Cir. 1985); see also, Stop H-3 Ass'n, 740 F.2d at 1464-5 ("[O]ur rule is not that of a 'super-planner,' and, under NEPA, we are not allowed to substitute our judgment for that of the agency concerning the wisdom of a proposed action.") (internal citation omitted).

### B.    Summary Judgment

Summary judgment is appropriate if there is no genuine issue regarding any material fact and if the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In a case seeking review of agency action under the APA, a summary judgment motion is the appropriate vehicle to bring legal claims before the Court. The "merit of the administrative decision is to be determined exclusively on the administrative record . . . [and] summary judgment is appropriate after a review of the administrative record." Lun Kwai Tsui v. Attorney General, 445 F. Supp. 832, 835 (D.D.C. 1978). As such, there are no material facts essential to the Court's resolution of the litigation, and the Court need not, indeed, may not, "find" underlying facts. Rather, the only issues presented are issues of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Lujan v. National Wildlife Fed'n, 497 U.S. 871, 883 (1990).

## V.    ARGUMENT

### A.    FHWA Complied with NEPA

#### 1.    FHWA Considered a Reasonable Range of Alternatives

Plaintiffs first argue that the range of alternatives considered by FHWA in Tier 1 of the Eastern Corridor Project was unreasonable.  Pls. Mem. at 11.  In support of this argument, Plaintiffs make three broad points: (1) FHWA should have considered alternatives involving the expansion of an existing bridge over the Little Miami River rather than only considering alternatives that include the construction of a new bridge, (2) exclusion of bridge expansion alternatives during the MIS phase was improper, and (3) a new bridge should not be constructed because the lower Little Miami River is designated as a recreational river under the Wild and Scenic Rivers Act.  See Pls. Mem. at 11-21.  None of these arguments is supported by the record in this case or the relevant legal authorities.  To the contrary, the record reflects that FHWA considered a reasonable range of multi-modal alternatives that would meet the objectives of the project.

##### a.    FHWA Was Not Required to Consider the Bridge Expansion Alternative Because It Does Not Meet the Purpose and Need

FHWA's rejection of the expansion of the Beechmont Levee Bridge was appropriate because that alternative would not have met the purpose and need of the Eastern Corridor Project.  In identifying the feasible alternatives in Tier 1, FHWA was required under NEPA to "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."  40 C.F.R. § 1502.14(a).  The range of alternatives to be considered must be based on the "purpose and need" of the proposed project.  40 C.F.R. § 1502.14.  FHWA was not

11

required to consider alternatives that would not meet the project's purpose and need. <u>Citizens Against Burlington</u>, 938 F.2d at 195. The range of alternatives to be considered is thus guided by the stated objectives for the project. <u>City of Alexandria v. Slater</u>, 198 F.3d 862, 867 (D.C. Cir. 2000). The selection of alternatives "must be bounded by some notion of feasibility." <u>Vermont Yankee</u>, 435 U.S. at 551; <u>see</u> <u>also</u> <u>City of Grapevine, Tex. v. Dep't of Transp.</u>, 17 F.3d 1502, 1506 (D.C. Cir. 1994). In addition, FHWA's selection of alternatives should be reviewed under the "rule of reason." <u>Citizens Against Burlington</u>, 938 F.2d at 196. An agency need not consider alternatives that are "remote and speculative," but should consider the circumstances of the project "as they exist and are likely to exist." <u>NRDC v. Hodel</u>, 865 F.2d 288, 295 (D.C. Cir. 1988). An agency's discussion of alternatives should be upheld "so long as the alternatives are reasonable and the agency discusses them in reasonable detail." <u>Citizens Against Burlington</u>, 938 F.2d at 196; <u>see</u> <u>also</u> <u>Nevada v. Dep't of Energy</u>, 457 F.3d 78, 87-88 (D.C. Cir. 2006); <u>Tongass Conservation Soc'y v. Cheney</u>, 924 F.2d 1137, 1140 (D.C. Cir. 1991).

FHWA fully met its obligation to consider reasonable alternatives that meet the transportation objectives of FHWA and the local communities. The purpose of the Eastern Corridor Multi-Modal Projects is to implement a multi-modal strategy for addressing long range transportation needs of the region. AR 47162. The need for transportation improvements involve three primary factors: (1) an existing infrastructure that is inadequate and is characterized by insufficient capacity, safety issues, and limited availability of alternative modes of transportation, (2) inadequate linkage between the region's key social and economic centers, and (3) expected future growth and expansion. AR 47162; <u>see</u> <u>also</u> 47163-94 (describing the needs by mode of travel). To meet these needs, the goal of the project in Tier 1 is to develop a

comprehensive multi-modal solution that will alleviate the transportation problems in the region, be consistent with future land use in the area, support and sustain the local economy, and be consistent with the environmental goals for the Eastern Corridor. AR 47162-63.

As described above, the planning process for the Eastern Corridor Project began with the preparation of the MIS by the Ohio-Kentucky-Indiana Council of Governments, pursuant to the requirements of 23 C.F.R. § 450.318. AR 47867-48204. Environmental groups, including the Sierra Club and Little Miami, Inc., participated in the MIS process. AR 47868, 47910-11. The conclusion in the MIS is that only a multi-modal project will adequately address the current and future transportation issues in the Eastern Corridor. AR 47197. Many different alternatives were considered for various transportation modes during the MIS process, including: light rail, rail, bus, highway, ferry service, high occupancy vehicle lanes, transportation system management ("TSM"), and bikeway. AR 47198-200. Although many of these alternatives were rejected during the MIS process, as described in the DEIS, the project includes feasible alternatives for each of the following transportation modes: TSM, bus, rail, highway, and bikeway. AR 47209-34.

Based on the current multi-modal plan, the new bridge across the Little Miami River will accommodate both a highway and a new rail line. AR 47215-20; 47229. The feasible alternatives under consideration in Tier 1 include four locations for the new bridge crossing and six locations for traversing the floodplain to connect to the bridge from the East. AR 47229-30; see also AR 47249 (map showing alternative locations). Design considerations include: the need to clear-span the Little Miami River, the need to accommodate both highway and rail transportation, providing for a dedicated bike path extending east to existing bike paths, and

consideration of floodplain issues in Newtown.  AR 47230.  These issues will be addressed and

specific bridge and approach alignments will be chosen during Tier 2.  AR 47138.

Despite the multi-modal nature of the alternatives discussed in the DEIS and FEIS,

Plaintiffs, of course, focus specifically on the project's incorporation of a new bridge across the

Little Miami River.  Plaintiffs are incorrect, however, that the Eastern Corridor multi-modal

project is merely a pretense for constructing a new bridge.  See Pls. Mem. at 13.  During the MIS

process a number of alternatives involving the expansion of existing bridges were considered

before it was determined that they would not be feasible alternatives.  The MIS considered three

options:  (1) relocating SR 32 and constructing a new bridge across the Little Miami River along

the alignment from Red Bank Road/US 50 ("Option 1"), (2) relocating SR 32 to extend from

west of Newtown to Eight Mile Road in the Eastgate area and crossing over the Little Miami

River on a widened existing structure at the Beechmont Levee bridge ("Option 2"), and (3)

widening existing Ohio River crossings going to and from Kentucky on I-275 and I-471.  AR

47200-03; see also AR 47752-54 (maps showing Options 1 and 2).

The third option was rejected during the MIS process.  Widening existing bridges on

I-275 and I-471 was rejected because, although congestion would be reduced in the Eastern

Corridor, 1-275 and I-471 would be loaded to near capacity; the existing I-471 bridge cannot be

widened because of the existing arch structure, thus limiting the ability to increase capacity;

much of the Ohio traffic would be diverted to Kentucky, merely moving the problem rather than

solving it; and relocating SR 32 would more evenly split the traffic volume between Kentucky

and Ohio.  AR 47201.  Accordingly, the MIS Task Group recommended against this proposal.

AR 47201, 48025-30.  Plaintiffs do not claim that this proposal should have been carried forward

to the EIS process.

The MIS also recommended Option 1 over Option 2. AR 47203; 48044. Among the reasons for the recommendation were: Option 1 performed more efficiently and addressed long-term transportation needs; in Option 2, the Beechmont Levee crossing would approach capacity in the year 2020; in Option 2, there would be substantial impacts on the existing residential and commercial development; Option 2 would increase peak traffic volumes in Beechmont and would not effectively reduce congestion in some areas. AR 47202-03; 48017-22. It was determined that Option 2 had substantial performance shortcomings, would have been too costly, and would have had substantial environmental impacts. AR 47749. Thus, the 58-member Task Force guiding the MIS process concluded that Option 2 was not a reasonable response to the transportation needs of the region. Id.

FHWA also explained its reasons for not considering Option 2 as an alternative in response to comments in the FEIS. AR 47741-49. In addition to the issues identified above, Option 2 would add no new east-west travel route; would result in a circuitous travel route, resulting in 500,000 additional vehicle operating hours per day when compared with Option 1; and would not reduce congestion or delay substantially by 2020. AR 47743-45. In addition, Option 2 may encroach on flight paths into Lunken Airport; would require widening of the Beechmont Levee Bridge and new structures for directional ramps, likely requiring piers in the river; with additional lanes and ramps, Option 2 would occupy 1200 feet of the river, as opposed to 400 feet for Option 1; transportation corridors for Option 2 would closely parallel the river for 1,500 feet, which would not be the case in Option 1; Option 2 would have greater impacts to parks and National Register Cultural Resources. AR 47745-46. In addition, Option 2 would

15

physically disrupt the town of Linwood and would require the displacement of 13 businesses, 81

single-family residences, 12 two-family residences, and 7 institutional properties, as opposed to

the displacement of three businesses and two single-family homes under Option 1. AR 47747.

Option 2 provides less opportunity for green space, would be more difficult to maintain, would

cost over twice as much ($159 million to $70 million), and would cause considerable disruption

to traffic flow during its construction. AR 47747-48. In sum, Option 2 contains no advantages

over Option 1 and does not meet the purpose and need of the Eastern Corridor Project. Id.

Accordingly, FHWA's decision not to carry forward Option 2 in its consideration of alternatives

during the EIS process was reasonable. See Citizens Against Burlington, 938 F.2d at 195 ("the

proposed alternative is reasonable only if it will bring about the ends of the federal action").[4]

Despite the analysis by the MIS Task Group and FHWA in the DEIS and FEIS, Plaintiffs

argue that expanding the Beechmont Levee Bridge meets the purpose and need of the project and

should have been considered during the EIS process. Pls. Mem. at 16-17. In making this

argument, Plaintiffs do not even discuss the specifics of the purpose and need of the project, but

rather baldly assert that Option 2 "meets the broad purpose and need of the Eastern Corridor

project." Pls. Mem. at 16. FHWA's determination that Option 2 would not meet the purpose

and need was not, as Plaintiffs suggest, based solely on performance factors. See Pls. Mem. at

17. Certainly, the FHWA did consider the findings of the MIS Task Group, which found that,

while Option 2 would provide some benefits, these benefits would be hindered by significant

---

[4] Plaintiffs apparently misread National Wildlife Fed'n v. FERC, 912 F.2d 1471 (D.C. Cir. 1990). See Pls. Mem. at 15. They cite the case for the proposition that DOT failed to consider all reasonable alternatives. Id. In fact, in that case, the court concluded that FERC properly evaluated all reasonable alternatives in its consideration of the Lee Creek dam project. Id. at 1484-85.

performance problems associated with Option 2, including:  peak volumes on relocated SR 32 would be lower during peak periods than in Option 1, meaning less reduction in congestion and delay; the interchange of relocated SR 32 and SR 125 would strain existing capacity and therefore not ease congestion; and the projected volume on the Beechmont Levee Bridge in 2020 would be 10,200 vehicles during the peak morning commute, which would reach the capacity of the bridge and require construction of an additional lane.  AR 48020.  These factors properly played a role in FHWA's consideration of which alternatives would meet the objectives of the project in alleviating traffic delay and congestion, not just for a few years, but for the long term. See Slater, 198 F.3d at 866-69 (upholding FHWA's decision to consider only 12-lane alternatives, not 10-lane, as proposed by the plaintiffs, for the new Woodrow Wilson Memorial Bridge).

Slater is particularly instructive.  There, FHWA considered seven 12-lane bridge options, and the plaintiffs in that case claimed that bridges with fewer lanes should have been considered. Slater, 198 F.3d at 865.  In that case, the plaintiffs argued that a 10-lane bridge would be a substantial improvement over the existing 6-lane structure and, therefore, would meet the project's goals of relieving congestion and delays.  Id. at 866.  However, the Court found that, because only the 12-lane bridge would meet the 2020 traffic projections, the 10-lane option would not meet the goals of the project 20 years into the future.  Id. at 868.  Similarly, FHWA has calculated that, in this case, the Beechmont Levee option would reach capacity around the year 2020 (which is now only 13 years away).  See AR 47744.

However, FHWA considered not only performance aspects of Option 2, but other aspects as well, including: the half million additional annual driving hours when compared with Option

17

1, the 1200 feet of river that would be occupied and the likely necessity of piers in the river, the

required displacement of multiple businesses and dozens of families, and the impacts on park

land and National Register Cultural Resources.  AR 47743-48.  Moreover, the MIS Task Group

did not find, as Plaintiffs suggest, that Option 2 had clear environmental benefits over Option 1.

Pls. Mem. at 17.  Similar environmental issues were noted for both projects, e.g., impacts on

hillsides, parks, noise, aesthetics, wetlands, floodplains, and riparian zones.  AR 48022.  A

position statement prepared by the Hamilton County Engineer's office stated that:  "Option 1 is

'an environmentally responsible alternative', pointing out the new bridge will fully span the river

and total vehicle miles of travel are reduced, thus lowering emissions."  AR 48023.  Thus, while

the fact that Option 1 would address transportation needs and Option 2 would not was an

important consideration, the decision to exclude Option 2 from consideration was based on

environmental, social, and economic considerations as well.[5]

FHWA has not rejected alternatives "merely because they do not offer a complete

solution to the problem."  Pls. Mem. at 19 (quoting NRDC v. Hodel, 865 F.2d 288, 296 n.4 (D.C.

Cir. 1988).  As discussed above, FHWA has considered and included in the adopted plan a

number of partial solutions, such as TSM and mass transit, which together comprise the multi-

modal Easter Corridor Project and are designed to be a complete solution to the region's

transportation goals.  Moreover, Plaintiffs' citation to Hodel and NRDC v. Morton, 458 F.2d 827

(D.C. Cir. 1972), to support this proposition, see Pls. Mem. at 19-20, is somewhat misleading as

---

[5]  FHWA does not contend that its comparison of Options 1 and 2 in the FEIS, AR 47743-48,
constitutes an alternatives analysis under NEPA.  However, this discussion does provide a record
of the reasons on which FHWA based its decision to exclude Option 2 from consideration.
Thus, Plaintiffs are incorrect when they say that the last time Option 2 was considered was 1999.
See Pls. Mem. at 17 n.8.

18

both cases arose in the context of oil and gas leasing and addressed issues specific to that

context, such as the need to consider alternative sources of energy and conservation.  See

Morton, 458 F.2d at 836-37; Hodel, 865 F.2d at 295-97 (upholding consideration of

alternatives).  In the transportation context, the D.C. Circuit has been clear that an agency must

only consider alternatives that would "bring about the ends of the federal action."  Citizens

Against Burlington, 938 F.2d at 195; Slater, 198 F.3d at 867.  Option 2 simply fails to meet the

objectives of the Eastern Corridor Project.

 In support of their alternatives argument, Plaintiffs rely heavily on Davis v. Mineta, 302

F.3d 1104 (10th Cir. 2002), which they claim involves a "matching set of facts."  Pls. Mem.

at 15.  While it is true that both cases involve a proposal to construct a bridge, Plaintiffs ignore

crucial distinctions between the two cases which serve to underscore the appropriateness of

FHWA's actions in this case.  In Davis, FHWA prepared only an environmental assessment

("EA"), not an EIS.  302 F.3d at 1109.  The court found that FHWA should have prepared an

EIS for a project that involved putting a five-lane highway through parkland where no roads

previously existed and would require the demolition of several historic structures.  302 F.3d at

1112.  Here, of course, FHWA has prepared an EIS.

 Moreover the grounds for rejecting FHWA's alternatives analysis in Davis are not

present here.  First, in Davis, FHWA summarily rejected piecemeal options to expand existing

roadways because none, standing alone, would meet the transportation needs, rather than

considering such options cumulatively.  Id. at 1120.  Here, FHWA has included in the feasible

alternatives the expansion and improvement of existing roadways.  AR 47223-34.  Second, in

Davis, FHWA failed to consider alternative alignments to minimize the impacts of noise and

19

other environmental effects. 302 F.3d at 1120. Here, FHWA is considering 4 alignments for the

bridge and 6 alignments for the approach from the East, taking into consideration environmental

concerns. AR 47229-30, 47249 (map). Finally, in <u>Davis</u>, FHWA failed to consider mass transit

and TSM alternatives. 302 F.3d at 1121-22. Here, FHWA has incorporated mass transit and

TSM alternatives into its multi-modal plan. AR 47209-23, 47234. Accordingly, Plaintiffs'

reliance on <u>Davis</u> is misplaced.

More applicable are a number of decisions from other circuits which have upheld the

FHWA's consideration in an EIS of a limited range of alternatives which have been determined

to meet the purpose and need of the respective projects. <u>See</u> <u>North Buckhead Civic Ass'n v.</u>

<u>Skinner</u>, 903 F.2d 1533, 1542-43 (11th Cir. 1990) (consideration of only a six-lane tollway with

transmit median and the no-build option was appropriate because other options did not meet the

purpose and need); <u>Associations Working for Aurora's Residential Env't. ("AWARE") v.</u>

<u>Colorado Dep't of Transp.</u>, 153 F.3d 1122, 1130 (10th Cir. 1998) (consideration of only

expanded highway options, rather than mass transit, was appropriate because only those

alternatives would meet the goal of relieving congestion); <u>Laguna Greenbelt</u>, 42 F.3d at 523-25

(consideration of three tollroad alternatives and a no build option was adequate under NEPA).

Finally, the fact that EPA and NPS disagreed with FHWA's conclusion that Option 2

does not meet the purpose and need of the project does not render FHWA's decision invalid.

FHWA, as the lead agency for the project, was required to consult with other federal agencies.

40 C.F.R. § 1501.6. As early as January of 2002, FHWA began meeting with other interested

state and federal agencies, including EPA, NPS, Federal Transit Administration ("FTA"), U.S.

Fish and Wildlife Service ("FWS"), the U.S. Army Corps of Engineers ("Corps"), ODOT, and

ODNR.  AR 47138.  FTA, the Corps, and NPS were specifically designated as cooperating agencies on the project.  AR 8694, 47138.  During that process and in comments on the PDEIS and DEIS, NPS raised the issue of considering Option 2 as an alternative.  See, e.g., AR 2206, AR 2967-69, AR 3443-60.  EPA raised similar concerns in its comments regarding the DEIS.  AR 9200-01, 10604-06.  As the lead agency, FHWA was not required to "slavishly" follow the comments; rather, it was simply required to give them serious consideration.  See Citizens Against Burlington, 938 F.2d at 201; see also Custer County Action Ass'n v. Garvey, 256 F.3d 1024, 1038 (10th Cir. 2001) ("[NEPA] requires agencies preparing environmental impact statements to consider and respond to the comments of other agencies, not to agree with them").  In the FEIS, FHWA carefully considered the comments of NPS and EPA, AR 47727-742, as well as comments from the public.  AR 47782-808.  After considering NPS' and EPA's comments, FHWA rejected the Beechmont Levee option and fully explained its reasons for doing so.  AR 47741-49.  Moreover, FHWA specifically followed EPA's recommendation that it fully explain in the EIS why Option 2 was not feasible.  AR 9200-01.[6]

In sum, FHWA has thoroughly considered all reasonable alternatives for meeting the purpose and need of the Eastern Corridor Project of providing a comprehensive multi-modal approach to easing traffic congestion and delays and improving connectivity with alternate modes of transportation in the region.  Accordingly, its consideration of alternatives meets the requirements of NEPA.

---

[6]  The record does not support Plaintiffs' claim that FHWA recognized the deficiencies of its evaluation of Option 2.  See Pls. Mem. at 16.  The documents referenced by Plaintiff show only that FHWA gathered information on the MIS process and coordinated with DOI and NPS as it was required to do to complete its analysis and respond to comments under NEPA.  See AR 426 2073, 9474.

### b.    Elimination of the Beechmont Levee Option at the MIS Stage Was Appropriate

The MIS process concluded with a specific recommendation of a plan that included relocated SR32/US 50 and new bridge crossing over the Little Miami River.  AR 399-400, 48044.  Plaintiffs argue that the elimination of the Beechmont Levee option at the MIS stage, rather than during the NEPA process was somehow improper.  Pls. Mem. at 14, 16.  In fact, it is required by federal statute that the planning of new transportation projects be initiated at the local level.  See 23 U.S.C. §§ 134-35, 49 U.S.C. §5303-06.  Under federal regulations implementing these statutory provisions, local entities may undertake a multi-modal, systems-level corridor, or sub-area planning study, and the results of such a study may be integrated into the NEPA process.  23 C.F.R. § 450.318(a).  Specifically, the results of the local planning study may be used to develop a purpose and need statement, create general corridor or mode definitions, *preliminarily screen alternatives and eliminate unreasonable alternatives*, describe the environmental setting, and preliminarily identify environmental impacts and environmental mitigation.  23 C.F.R. § 450.318(a)(1)-(5) (emphasis added).  That is precisely what was done in this case.  See AR 47083, 47131-33.

A recent case from Nevada upheld the validity of FHWA's approach.  See Sierra Club v. Dep't of Transp., 310 F. Supp. 2d 1168 (D. Nev. 2004).  There, the Regional Transportation Commission and local communities initiated an MIS process, similar to the one conducted in this case, to develop and evaluate transportation improvements to relieve congestion on existing highways and accommodate the rapid growth of the community.  Id. at 1177-78.  During the MIS process, a number of alternatives were considered, including: widening US 95, double-decking US 95, installing HOV or reversible lanes on US 95, developing fixed guideway transit,

and creating new freeways or super arterial corridors.  <u>Id.</u> at 1178.  The MIS addressed three of

these alternatives in detail and recommended the US 95 improvement strategy as the "locally

preferred alternative."  <u>Id.</u> at 1178-79.  This option was carried forward to the NEPA process,

during which two similar highway-widening alternatives and the no build option were

considered.  <u>Id.</u> at 1179.

     The Sierra Club argued that the fixed guideway alternative should have been considered

during the NEPA process.  <u>Id.</u> at 1190.  The court rejected this argument, stating:

> FHWA's reliance on the MIS process to eliminate alternatives was not arbitrary
> and capricious.  The EIS did not consider in depth a fixed guideway alternative
> because the MIS process evaluated that alternative and found it did not met the
> project's purpose and need, was too costly, and depended upon an uncertain
> [approval for a guideway system].  The MIS contained many of the hallmarks of
> the NEPA process, including various studies on project impacts, significant public
> involvement, and a comparison of alternatives . . . .   FHWA's decision not to
> duplicate the state agencies' analyses and evaluations as to what alternatives
> would be feasible and meet project goals does not violate NEPA.

<u>Id.</u> at 1193; <u>see</u> <u>also</u> <u>North Buckhead</u>, 903 F.2d at 1542 ("The district court properly found that

federal, state and local officials complied with federally mandated regional planning procedures

in developing the need and purpose of the EIS.").

     Likewise, the MIS process conducted by the OKI Regional Council of Governments

intially compared numerous transportation options, AR 47949-48004, narrowed those options to

a set of manageable alternatives, AR 48005-48035, and concluded with a recommended plan.

AR 48036-97.  Environmental impacts were considered during the MIS process, AR 48019-23,

48084-87, 48119-28, and there was substantial opportunity for public comment.  AR 48023–25,

48100-08.  Indeed, Plaintiffs in this case provided input during the MIS process, and members of

the Sierra Club and Little Miami, Inc., also were members of the MIS Task Force.  AR 47868.

Accordingly, the local communities, ODOT, and FHWA have planned this project in accordance with the applicable statutory and regulatory requirements.

### c. The Wild and Scenic Rivers Act Does Not Preclude the Construction of a New Bridge

Although not presented as a separate argument, Plaintiffs imply that the Little Miami River's designation under the Wild and Scenic Rivers Act ("WSRA"), 16 U.S.C. § 1273(b)(1)-(3), should preclude the construction of a new bridge. See, e.g., Pls. Mem. at 15 ("[T]he Little Miami River is a federally designated Wild and Scenic River demanding consideration of alternatives that do not impair the attributes for which the river was included in the National Wild and Scenic Rivers System."). Plaintiffs' suggestion that the WSRA precludes a new bridge of the lower Little Miami River is unfounded, and, in fact, FHWA carefully considered the attributes of the river when planning the Eastern Corridor Project.

As an initial matter, Plaintiffs' characterization of the lower Little Miami River as the "Wild and Scenic Little Miami River", see, e.g., Pls. Mem. at 5, 13, 15, blurs the distinction between different classifications of rivers under the WSRA. The WSRA sets forth three classifications for rivers, which also prescribe how the river will be administered: wild, scenic, and recreational. 16 U.S.C. § 1273(b)(1)-(3); see also Wilderness Watch v. U.S. Forest Serv., 143 F. Supp. 2d 1186, 1190 (D. Mont. 2000). "Wild" river areas are the least developed of the three WSRA categories and are afforded the greatest protection under the WSRA. Wilderness Watch, 143 F. Supp. 2d at 1190. They are "free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted." Id. (citing 16 U.S.C. § 1273(b)(1)). Distinguishing between wild rivers, which "'represent vestiges of primitive America,'" and "scenic" and "recreational" rivers, the court in Wilderness Watch

explained that the latter two categories "receive much less protection." Id. "Recreational" rivers are in areas that "are readily accessible by road or railroad, that may have some development along their shorelines, and may have undergone some impoundment or diversion in the past," and are afforded "the least protection." Id. (citing 16 U.S.C. § 1273(b)(3)).

In joint Guidelines for the WSRA issued by the DOI and the Department of Agriculture, the agencies explained "[t]he basis for classification is the degree of naturalness, or stated negatively, the degree of evidence of man's activity in the river area. The most natural rivers will be classified wild; those somewhat less natural, scenic, and those least natural, recreational." 47 Fed. Reg. 39458 (Sept. 7, 1982). As Plaintiffs concede, the lower Little Miami River is designated as a recreational river, the lowest classification under the WSRA. Pls. Mem. at 1 n.1. In fact, the upper Little Miami River, extending from Foster, Ohio to Clifton, Ohio, was designated a scenic river in 1973. AR 3001. The lower Little Miami River, from the Ohio River to Foster, Ohio was later designated as a recreational river in 1980. AR 2947-48.

In managing the river, the WSRA directs the agency, in this instance ODNR, to "protect and enhance the values which caused it to be included in said system, without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values." 16 U.S.C. § 1281(a). The construction of a new bridge will not substantially interfere with the recreational attributes for which this segment of the river was designated. AR 47086. Indeed, it was determined during the NEPA process through coordination with representatives of NPS, DOI, and ODNR that the construction of a clear span bridge would not violate Section 7 of the WSRA because the bridge would not impact the riverbed or bank. AR 47715-16; see also 16 U.S.C. § 1278. Importantly, the Little Miami

Scenic River Assistance Manual, the document that was prepared by ODNR in conjunction with the designation of the lower segment of the Little Miami River, specifically mentions relocated US 50/SR 32 in the "Project Section" of the document.  AR 9102, 42277, 47716.  The map accompanying the description of the proposed project shows a circle drawn in a dotted line at Horseshoe Bend, precisely where the new bridge would be constructed in the Eastern Corridor Project.  AR 9101.  Moreover, FHWA has coordinated with ODNR and complied with ODNR regulations throughout the project.  AR 47728; see also Ohio Rev. Code § 1517.14.  Therefore, Plaintiffs' suggestion that a new bridge is precluded by the designation of the lower Little Miami River as a recreational river under the WSRA is unfounded.

## 2.    FHWA Was Not Required to Prepare a Supplemental EIS

Plaintiffs also claim that FHWA should have prepared a supplemental EIS for the Eastern Corridor Project based on information that was provided to FHWA by NPS on June 28, 2006, which was three weeks after the issuance of the ROD and more than eight months after the issuance of the FEIS.  See Pls. Mem. at 21-27.  In particular, Plaintiffs argue that FHWA should have supplemented its EIS based upon NPS' discussion of potential Section 4(f) impacts in its letter and a noise analysis of the new bridge crossing conducted by an NPS scientist.  Id. Plaintiffs' argument is without merit because NPS' letter did not contain any significant new information regarding the potential environmental impacts of the project.

A supplemental EIS is required when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1).  As the Supreme Court has explained,

> [A]n agency need not supplement an EIS every time new information comes to
> light after the EIS is finalized.  To require otherwise would render agency

26

decisionmaking intractable, always awaiting updated information only to find the
new information outdated by the time a decision is made.

Marsh, 490 U.S. at 373.  Rather, a "supplemental EIS is only required where new information
'provides a *seriously* different picture of the environmental landscape.'" Nat'l Comm. for the
New River, Inc. v. FERC, 373 F.3d 1323, 1330 (D.C. Cir. 2004) (quoting City of Olmsted Falls,
Ohio v. FAA, 292 F.3d 261, 274 (D.C. Cir. 2002)); see also Marsh, 490 U.S. at 374 (an EIS
should be supplemented only if new information shows that the environment will be affected "in
a significant manner or to a significant extent not already considered.").  An agency's decision
not to prepare a supplemental EIS is reviewed under the arbitrary and capricious standard.
Olmsted Falls, 292 F.3d at 274.

    In making their argument that an SEIS is required, Plaintiffs entirely misrepresent the
communications and exchange of letters that occurred between FHWA and DOI, NPS, and EPA
during the NEPA process and following the issuance of the FEIS.  See Pls. Mem. at 22-23.
FHWA coordinated with EPA and NPS from the beginning of the NEPA process in 2002, and
NPS is a cooperating agency.  AR 47138.  Both EPA and NPS submitted substantial comments
on both the PDEIS, AR 10604-06 (EPA), AR 3443-60 (NPS), and DEIS.  AR 9198-202 (EPA),
AR 2967-69 (NPS).  On April 18, 2005, DOI's Office of Environmental Policy (referred to
below as "DOI") separately provided comments on the DEIS.  AR 2158-72.  DOI discussed a
number of potential environmental issues relating to the project, including the elimination of
Option 2 during the MIS process, Transportation Act Section 4(f) issues, the Little Miami
River's designation under the WSRA, potential noise impacts from a new bridge, potential visual
impacts, and the applicability of WSRA Section 7.  AR 2159-68.  On September 19, 2005,
FHWA responded by letter to DOI describing the extensive discussions held with NPS and

27

FHWA scientific and legal staff regarding the main issues raised in DOI's letter: the WSRA

Section 7 and Transportation Act Section 4(f).  AR 1717-19.

On November 28, 2005, following the issuance of the FEIS, and at FHWA's invitation,

DOI submitted an extensive analysis of the FEIS.  AR 42269-80.  In this letter, DOI again

discussed issues relating to: WSRA Section 7, the elimination of Option 2, the designation of the

Little Miami River under the WSRA, Department of Transportation Act Section 4(f) resources,

the outstandingly remarkable values ("ORV") of the Little Miami River, noise impacts, the

proposed river crossing identified in the 1979 Little Miami Scenic River Assistance Manual, and

other environmental impacts.  Id.  On November 23, 2005, EPA also sent a letter analyzing the

FEIS.  AR 9515-16.  NPS also communicated with FHWA regarding the FEIS by e-mail.

AR 8049, 9830-31.

In response to continued concern of DOI, NPS, and EPA regarding some of the potential

environmental impacts of the project, despite FHWA's analysis of those impacts in the FEIS,

FHWA decided not to issue the ROD immediately, but instead convened meetings with DOI,

NPS, and EPA.  On February 24, 2006, FHWA met with representatives of NPS and DOI.

AR 8776.  At the meeting, FHWA and ODOT gave an extensive presentation on the Eastern

Corridor Project.  AR 8792-835.  As notes of the meeting show, issues relating to the elimination

of Option 2, the Little Miami River's designation under the WSRA, and the river's ORVs were

discussed.  AR 8459.  Sue Jennings, who drafted many of NPS' comments during the EIS

process and Dr. Kurt Fristrup, an NPS noise expert, attended the meeting.  AR 8777.  Following

the meeting, FHWA indicated to DOI and NPS its intention to go forward with the issuance of

the ROD and that FHWA would issue a written response to DOI's November 28, 2005, letter.

AR 9474.  On March 3, 2006, FHWA met with representatives of EPA and gave a similar

presentation.  AR 8457, 8460-79.  On April 19, 2006, FHWA followed up the DOI/NPS meeting

by sending the detailed noise analysis conducted by ODOT for Tier 1 of the Eastern Corridor

Project to NPS.  AR 9564-81.  NPS responded by saying that it would give the information to

Dr. Fristrup in NPS' natural sounds program for review, and that it would let FHWA know if it

had further questions.  AR 9563.  FHWA continued to communicate with NPS at least until early

May.  AR 2073.  At no point did NPS indicate that FHWA should wait to issue the ROD until

Dr. Fristrup had analyzed the data and submitted an analysis to FHWA.

On May 12, 2006, FHWA sent a letter to DOI referencing the discussions at the

February 24, 2006, meeting with DOI and NPS, specifically responding to the issues raised in

DOI's November 25, 2005, letter, and attaching additional data and maps regarding the Eastern

Corridor Project.  AR 9517-42.  FHWA closed the letter by stating that, "We are currently

crafting the Tier 1 Record of Decision in a way that lays the expectations for this Tier 2

collaboration.  We invite you to provide your input during Tier 2 so that we can truly make this

project one that we can all be proud of."  AR 9525.  On May 16, 2006, FHWA sent a letter to

EPA referencing the March 3, 2006, meeting, and responding to the issues raised in EPA's

November 23, 2005, letter.  AR 9446-72.  FHWA closed the letter with the same language as in

the DOI/NPS letter.  AR 9455.  Neither DOI/NPS or EPA responded to request that FHWA

delay issuance of the ROD.  Only then, having responded to comments from DOI/NPS and EPA

following the PDEIS and DEIS and having addressed similar concerns during an eight month

period following the issuance of the FEIS, did FHWA finally issue the ROD on June 2, 2006.

AR 47099.  On June 28, 2006, after the issuance of the ROD, NPS submitted a letter to FHWA

containing additional discussion of Tier 1 and attaching a noise analysis conducted by

Dr. Fristrup. AR 8149-63. Thus, contrary to Plaintiffs' assertions that FHWA misled NPS, what

the record really shows is that FHWA devoted substantial effort to resolving the issues raised by

NPS, DOI, and EPA and thoroughly considered all of their input.

More important to Plaintiffs' legal argument, NPS' June 28, 2006, letter does not contain

any significant new information that would require the preparation of an SEIS. Rather, the letter

raises the very same issues – the Little Miami River's designation under the WSRA, Section

4(f), ORVs on the Little Miami River, noise impacts, visual impacts, and mitigation – which

already had been raised by DOI and other agencies multiple times and been thoroughly

addressed by FHWA during the NEPA process. AR 8149-54, 47440-58, 47726-41, 47776-808.

Thus, as in Olmsted Falls, most of what Plaintiffs term "new," is not actually new at all. 292

F.3d at 274. The only thing even arguably new is a 7-page report prepared by Dr. Fristrup

offering a critique of FHWA's noise analysis. AR 8156-63. Dr. Fristrup's report contains no

new data. Id. Instead, Dr. Fristrup analyzes FHWA's data based on NPS interim guidelines "for

assessing noise impacts in natural areas." AR 8156, 8163. These interim guidelines, which are

not law and do not apply to FHWA, do not govern FHWA's noise analysis. Rather, FHWA

conducted its noise analysis following its own regulations. AR 9467-69, 47087-88, 47717. As

discussed in Section B., infra, FHWA's noise analyses conducted pursuant to its regulations have

been upheld by numerous courts. Dr. Fristrup simply offers additional analysis of an issue –

noise associated with a new bridge – that already had been debated for years during the EIS

process. Accordingly, Dr. Fristrup's report does not provide "a *seriously* different picture of the

environmental landscape" warranting the preparation of a supplemental EIS. Olmsted Falls, 292

F.3d at 274 (emphasis in original); Nat'l Comm. for the New River, 373 F.3d at 1330.

### 3.    FHWA's Reliance on an Economic Analysis Utilizing a Set Price of Gasoline Does not Render Its Entire EIS Inadequate

Plaintiffs argue that FHWA's economic analysis of the benefits of the project was flawed because it utilized a price of gasoline of $1.13, AR 607, which is much lower than the price now. See Pls. Mem. at 27-28 (citing 40 C.F.R. §§ 1500.1(b), 1502.24).  Plaintiffs are correct that the price of gasoline has risen since 2004 when the report was created, but they fail to explain how this affected the scientific integrity of the model.  See 40 C.F.R. § 1502.24.  The price of gasoline, among other factors, was used in the economic model to calculate the expected savings due to:  (1) increased mass transit use, (2) time savings due to reduced congestion, (3) lower vehicle operating costs, (4) safety benefits, and (5) reduced emissions.  AR 600-07.  The price of gasoline was used in the model for purposes of calculating the vehicle operating costs.  AR 604-07.  The dollar figures for the price of gas, as well as the prices of oil, tires, maintenance and repair, and depreciation, were taken from the Highway Economic Requirement System, FHWA's standard model for evaluating the relationship between national investment and highway performance,[7] and adjusted to 2003 dollars using consumer price indices.  AR 607.  These numbers were used to calculate the dollar value of the expected benefits of the project.  AR 615.

As explained in a November 15, 2005 letter regarding this issue, it is common practice to hold fuel prices constant when doing economic analyses for transportation projects for the very reason that prices can fluctuate substantially.  AR 506.  In addition, the benefits from the Eastern Corridor Project – greater mass transit use and fewer vehicle miles traveled – will be even

---

[7]  FHWA uses the model to estimate future investment required to either maintain or improve the Nation's highway system.  FHWA provides this information to the U.S. Congress on a biennial basis.  See www.fhwa.dot.gov/infrastructure/asstmgmt/hersfact.cfm.

greater if the price of fuel continues to rise.  Id.  Finally, the demand for mass transit is fairly

inelastic, meaning that, even if fuel prices rise drastically, only a certain small percentage of

drivers will switch to mass transit.  AR 506-09.  Accordingly, Plaintiffs have failed to show that

the use of a constant price of $1.13 for gasoline in the economic model was improper or that the

use of $1.13 unfairly inflated the economic benefits of the project.  Therefore, Plaintiffs'

criticism of the model on that basis is unfounded, and FHWA's economic analysis of the project

should be upheld.  See Izaak Walton League of Am, v. Marsh, 655 F.2d 346, 378 (D.C. Cir.

1981) (stating that an agency's balancing of the costs and benefits of a project under NEPA

should not be overturned unless they are arbitrary or "clearly gave insufficient weight to

environmental values" and upholding Corps of Engineers' analysis); City of Williams v.

Dombeck, 151 F. Supp. 2d 9 (D.D.C. 2001) (upholding Forest Service's economic analysis of a

land exchange).

    4.    **FHWA Took a "Hard Look" at the Potential Environmental Impacts
          of the Eastern Corridor Project and Adequately Addressed
          Mitigation Measures**

        In their Complaint, Plaintiffs raised a claim alleging that FHWA failed to take a "hard

look" at the potential environmental impacts of the project and failed to adequately discuss

mitigation measures to address these potential harms.  See Complaint ¶¶ 89-93 (Third Claim for

Relief).  Because Plaintiffs did not raise this claim in their motion for summary judgment and,

therefore, have failed to come forward with facts supporting their claim, FHWA is entitled to

summary judgment on this claim.  See Celotex, 477 U.S. at 322 (summary judgment should be

granted against a party "who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at

trial").

Moreover, FHWA thoroughly analyzed the potential environmental impacts from the proposed project, including impacts to soils, floodplains, groundwater, surface water, wetlands, wildlife habitat, parks, and air quality. AR 47264-430. FHWA included and examined extensive mitigation measures to ameliorate those potential harms. See id. For example, FHWA considered a number of mitigation measures with respect to the Little Miami River to avoid environmental impacts. These mitigation measures include: a clear span of the Little Miami River to avoid in-stream impacts, stream restoration and preservation, controlled access to this portion of the river, design measures to allow for unimpeded river flow considering a 100-year flood event, construction practices to avoid soil erosion and runoff, and the development of a special committee to further develop mitigation measures in Tier 2. AR 47378-79. Accordingly, FHWA has taken a hard look at the potential environmental impacts of the project and has employed adequate mitigation measures to minimize environmental harm. 40 C.F.R. §§ 1502.15, 1502.16, 1508.20, 1508.25(b); see Citizens Against Burlington, 938 F.2d at 206.

Accordingly, as the record demonstrates, FHWA considered reasonable alternatives, conducted proper economic modeling, and took a hard look at the environmental impacts of the proposed project and proposed reasonable mitigation measures. And, there is no information that Plaintiffs have provided that requires the preparation of a supplemental EIS. Therefore, FHWA has complied with NEPA.

## B. FHWA Complied With Department of Transportation Act Section 4(f)

Plaintiffs argue that the construction of a new bridge across the Little Miami River as part of the Eastern Corridor Project constitutes a constructive use of a protected resource under

33

Department of Transportation Act Section 4(f) ("Section 4(f)"), 49 U.S.C. § 303.  Pls. Mem. at

28.  Plaintiffs initially argue that FHWA failed to conduct a preliminary Section 4(f) evaluation.

This argument fails because FHWA did conduct a Section 4(f) analysis and made a preliminary

determination during Tier 1 that a bridge constructed so as to clear span the riverbed and banks

would not constitute an actual, temporary, or constructive use of the river.  AR 47403, 47717.

Plaintiffs then make three main arguments: (1) noise from a new bridge will constitute a

constructive use of the Little Miami River, (2) FHWA improperly characterized the Little Miami

River as a category B, rather than a category A, noise receptor under FHWA's regulations for

analyzing noise impacts, and (3) visual impacts from a new bridge over the Little Miami River

constitute a constructive use of the river.  Id.  As shown below, none of these arguments has

merit, and FHWA has fully complied with its obligations under Section 4(f).

> **1.  Noise Levels Estimated During Tier 1 Indicated that a New Bridge Will Not Constitute a Constructive Use of the Little Miami River**

Contrary to Plaintiffs' assertions, FHWA properly analyzed potential noise impacts under

the applicable regulations and found that there would be no constructive use due to noise.  A

constructive use due to increased noise levels occurs if:

> The projected noise level increase attributable to the proejct *substantially interferes* with the use and enjoyment of a noise-sensitive facility of a resource protected by section 4(f), such as hearing the performances at an outdoor amphitheater, sleeping in the sleeping area of a campground, enjoyment of a historic site where a quiet setting is a generally recognized feature or attribute of the site's significance, or enjoyment of an urban park where serenity and quiet are significant attributes.

23 C.F.R. § 771.135(p)(4)(i) (emphasis added).  A constructive use does *not* occur if "[t]he

projected noise levels of the proposed highway project do not exceed the FHWA noise

abatement criteria as contained in Table 1, 23 C.F.R. part 772." 23 C.F.R. § 771.135(p)(5)(ii).

During Tier 1, FHWA conducted noise analyses of potentially noise-sensitive receptors in the Eastern Corridor. AR 47302-05. To specifically address potential noise impacts under Section 4(f), FHWA directed ODOT's Office of Environmental Services ("OES") to conduct ambient noise readings in the project study area at several locations along the Little Miami River. AR 9524. Three of those locations were near the proposed new crossing of the Little Miami River, and the other was located on a sandbar near the Beechmont Levee. Id. Noise readings from these locations ranged from 51.5 dB to 56.4. Id. OES noted a consistent background noise. Id. OES also modeled the potential future noise levels from the proposed new bridge crossing using a procedures established by FHWA regulations. Id. Noise modeling is usually conducted based on detailed designs and traffic data, and, therefore, OES was required to make certain assumptions regarding the new bridge. Id. The model assumed two 12' lanes in each direction, 10' shoulders, a 20' shoulder/bike lane, and a bridge height of 55'. Id. The model examined noise levels at 50' and 100' from the roadway and every 100' thereafter up to 1000'. Id. Receivers were placed in 44 locations on the river and on land north and south of the roadway. AR 9524, 9533-35. The model indicated that the highest predicted noise level, at a location north of the bridge, was 62 dBA, and that no location was expected to experience noise levels that would meet or exceed the noise abatement criteria of 67 dBA. AR 9524. Accordingly, FHWA found in the FEIS that the potential noise impacts from a new river crossing would not constitute a constructive use under Section 4(f). AR 9524, 47717.[8]

---

[8] FHWA also thoroughly considered potential Section 4(f) impacts to public parks, recreation areas, and wildlife refuges. AR 47395-402. Although, Plaintiffs raised this issue in their Complaint, see Complaint ¶ 99, they did not address it in their Motion for Summary Judgment..

FHWA's noise analyses for the Eastern Corridor Project were conducted entirely in accordance with its regulations, promulgated pursuant to 23 U.S.C. § 109(i) and set forth at 23 C.F.R. § 772, and also with FHWA guidance: "FHWA Highway Traffic Noise Analysis and Abatement Policy and Guidance" (June 1995) ("FHWA Noise Guidance").[9] FHWA's noise standards and procedures are complex and capture traffic volume and speed, variations in vehicle noise, terrain conditions, natural and man-made obstacles, and other traffic-related factors. FHWA Noise Guidance at 5. The District of Columbia Circuit has consistently deferred to the agency's expertise in choosing the most appropriate way to measure noise. Town of Cave Creek Arizona v. FAA, 325 F.3d 320, 332 (D.C. Cir. 2003); Sierra Club v. DOT, 753 F.2d 120, 128 (D.C. Cir. 1985) ("It is clearly within the expertise and discretion of the agency to determine proper testing methods"); Citizens Against Burlington, 938 F.2d at 200-01 ("In examining the impacts of noise on the environment, the FAA relies on wisdom and experience peculiar to the agency and alien to the judges on this court.").

Accordingly, because the increase in noise impacts will not be severe and are not expected to exceed the noise abatement criteria set forth in FHWA's regulations, FHWA's noise analysis for purposes of Section 4(f) was not arbitrary or capricious and should be upheld. Allison v. Dep't of Transp., 908 F.2d 1024, 1031 (D.C. Cir. 1990) (holding that a new airport would not result in a significant increase in noise levels at a state park and therefore would not use the protected land); Sierra Club, 753 F.2d at 130 (holding that allowing commercial jets to land at an existing airport was not a constructive use of parklands); Coalition On Sensible Transp. Inc. v. Dole, 642 F. Supp. 573, 596 (D.D.C. 1986) (holding that an interstate-widening

---

[9] This guidance is available at http://www.fhwa.dot.gov/environment/polguid.pdf.

36

project was not a constructive use where only permanent effects would "be slightly increased

noise levels in some areas and potential visual impairment through construction of off-site noise

barriers and retaining walls"); Stewart Park and Reserve Coalition, Inc. (SPARC) v. Slater, 358

F. Supp.2d 83, 102 (N.D.N.Y. 2005) (upholding FHWA's finding that noise impacts did not

constitute a constructive use because the noise abatement criteria were not exceeded).[10]

Plaintiffs' argument that FHWA's noise analysis was improper rests solely on

Dr. Fristrup's critique of FHWA's noise analysis and NPS' discussion of that analysis.  Pls.

Mem. at 23-25, 31-33; AR 8149-63.  In his critique, Dr. Fristrup raises a number of criticisms of

FHWA's noise analysis, including:  the equipment setup and operation should have been

conducted differently, data should have been collected at different sites, sound monitoring

should have been conducted for a longer period, and different filters should have been used.  AR

8156-63.  Without collecting any data, Dr. Fristrup also asserts that his methods would show

ambient noise levels 10 dB below what FHWA found.  AR 8156.

For a number of reasons, Dr. Fristrup's late-submitted critique fails to demonstrate that

FHWA's Section 4(f) noise analysis was improper.  First, the standards and methods discussed

by Dr. Fristrup are not applicable to FHWA.  See AR 8162-63.  FHWA has complied with its

own directly applicable regulations, and this Court should defer to those regulations and

FHWA's expertise.  See, e.g., Marsh, 490 U.S. at 378 ("When specialists express conflicting

---

[10]  The cases cited by Plaintiffs in support of their arguments regarding noise, Pls. Mem. at 30-31, are readily distinguishable on their facts.  See Brooks v. Volpe, 460 F.2d 1193, 1194 (9th Cir. 1972) (encirclement of a campground and creek near a mountain summit pass by the construction of an interstate highway constituted a use of Section 4(f) resources); Coalition Against a Raised Expressway, Inc. v. Dole, 835 F.2d 803, 811-12 (11th Cir. 1988) (hereinafter "CARE") (impacts from a raised expressway directly adjacent to several designated historic sites and park constituted a constructive use under Section 4(f) where noise levels would rise to 75 or 80 dB).

views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."). Second, Dr. Fristrup does not offer any competing data. Therefore, even if the Court were inclined to adopt Dr. Fristrup's analysis, there is no data to support any conclusion other than the one FHWA reached. Finally, even if Dr. Fristrup is correct that his analysis would show that ambient noise levels are 10 dB below what FHWA reported, AR 8156, this does not demonstrate that a new bridge will exceed FHWA's noise abatement criteria. Moreover, Dr. Fristrup does not offer any critique of ODOT's modeling of the potential noise of a new bridge.

In sum, ODOT properly considered noise data available at the Tier 1 stage before alignment of the bridge has been finalized. AR 47717. Additional analyses will be conducted at the Tier 2 stage to confirm that there will be no constructive use of the river and adjacent areas due to noise. AR 47088, 47717.

> **2.      FHWA's Decision to Classify the Lower Little Miami River and Surrounding Areas as a Class B Noise Receptor Is Supported by the Record and Is Entitled to Deference**

Plaintiffs argue that FHWA improperly classified the lower Little Miami River and adjacent areas as a Category B noise receptor, rather than Category A, for purposes of conducting its noise analysis. Pls. Mem. at 33. In fact, FHWA properly characterized the Little Miami River and adjacent parkland as a Category B receptor under its noise abatement regulations regarding traffic noise impacts, 23 C.F.R. § 772.19(c), Table 1. AR 47303. The regulations establish threshold sound levels by categories for different activities and places. Category A is the highest category and is defined as: "Lands on which serenity and quite are of extraordinary significance and serve an important public need and where the preservation of

38

those qualities is essential if the area is to continue to serve its intended purpose."  23 C.F.R. §

772.19(c), Table 1.  Category B is the second-highest category and is defined as:  "Picnic areas,

recreation areas, playgrounds, active sports areas, parks, residences, motels, hotels, schools,

churches, libraries, and hospitals."  Id.

While Categories A and B both include parkland, FHWA was well within its discretion

in interpreting its regulations to mean that the lower Little Miami River fits in Category B, and

not Category A.  AR 47717.  The lower Little Miami River is classified as recreational, the

lowest designation under the WSRA.  AR 112-13.  Recreational rivers are those that "are readily

accessible by road or railroad, that may have some development along their shorelines, and that

may have undergone some impoundment or diversion in the past," and are afforded "the least

protection." Wilderness Watch, 143 F. Supp. 2d at 1190 (citing 16 U.S.C. § 1273(b)(3)).

Contrary to Plaintiffs' characterization, see Pls. Mem. at 35-36, the proposed study area is not an

undisturbed wilderness area where "serenity and quite are of extraordinary significance and

serve an important public need."  23 C.F.R. § 772, Table 1.  Development along the lower Little

Miami River includes utility towers adjacent to river, gabion structures, manmade outlets,

landfill operations, urban debris, and residential and commercial development.  AR 47708,

47865.  The urbanization surround the river generates a significant amount of background noise.

AR 9524.  A new bridge is consistent with the current land uses and is, indeed, specifically

referenced as a potential new project in the Little Miami Scenic River Assistance Manual.  AR

9101-02, 42277, 47716.

Moreover, the recreational attributes for which the lower Little Miami River was

designated will be protected if a new bridge is constructed.  The Little Miami Scenic River

Assistance Manual recognizes the recreational attributes of the river and designates a number of

sites along the riverbank where recreational opportunities should be preserved.  AR 9040-95.

None of the existing or proposed recreational sites mentioned in the manual are in the Horseshoe

Bend area.  See id.  However, as FHWA recognized in the FEIS, even though there is no public

access to the river in that area, it is used for canoeing and kayaking.  AR 47717.  These uses will

not be disturbed by a bridge that clear-spans the Little Miami River.  AR 47086-87, 47717.

FHWA recognizes that NPS disagrees with its determination.  AR 42269-80.  However,

FHWA fully considered NPS' analyses and, having done so, is not obligated to follow NPS'

recommendation.  Citizens Against Burlington, 938 F.2d at 201.  The Court should defer to

DOT's interpretation and application of its own regulations.  See Wyoming Outdoor Council v.

United States Forest Service, 165 F.3d 43, 52 (D.C. Cir. 1999) ("agency's interpretation of its

own regulations is entitled to substantial deference . . . [and] [t]hat 'broad deference is all the

more warranted when . . . the regulation concerns a complex and highly technical regulatory

program.'") (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504 (1994) (internal

quotations omitted)); see also DSE, Inc. v. United States, 169 F.3d 21, 28 (D.C. Cir. 1999)

("agency's interpretation and application of its own regulations does merit our deference.").

Accordingly, FHWA's decision to classify the lower Little Miami River as a Category B noise

receptor for purposes of its noise abatement analysis was not arbitrary or capricious.

      **3.**      **FHWA Properly Considered Whether a New Bridge Would Substantially Impair the Recreational and Scenic Values of the Lower Little Miami River**

Plaintiffs also argue that putting a new bridge over the lower Little Miami River in the

Horseshoe Bend area will impair the visual and scenic qualities of the river.  Pls. Mem. at 35.

To the contrary, FHWA analyzed the potential visual impacts of a putting a new bridge over the lower Little Miami River and properly found that a new bridge would not substantially impair the use and enjoyment of the river.  The applicable regulations state as follows:

> The proximity of the proposed project substantially impairs esthetic features or attributes of a resource protected by section 4(f), where such features or attributes are considered important contributing elements to the value of the resource.  Examples of substantial impairment to visual or esthetic qualities would be the location of a proposed transportation facility in such proximity that it obstructs or eliminates the primary views of an architecturally significant historical building, or substantially detracts from the setting of a park or historic site which derives its value in substantial part due to its setting . . . .

23 C.F.R. § 771.135(p)(4)(ii).  A constructive use due to visual impacts does *not* occur if "[o]verall (combined) proximity impacts caused by a proposed project do not substantially impair the activities, features, or attributes that qualify a resource for protection under section 4(f)."  23 C.F.R. § 771.135(p)(5)(vi).

FHWA considered visual impacts to the lower Little Miami River, and appropriately concluded that a new bridge would not substantially impair these attributes.  AR 47086-89, 47717.  The visual and scenic attributes of the river should be viewed through the lens of the WSRA, under which the lower Little Miami River was classified was recognized for its recreational attributes.  AR 112-13.  As FHWA noted, there is no public access to the river in the Horseshoe Bend area and the Little Miami River flows through a densely populated, industrialized area.  AR 47087, 47717.  The primary uses of the river are canoeing and kayaking and a clear-span bridge will not interfere with those uses.  AR 47717.  As FHWA explained in response to comments from NPS, a new bridge would not affect the visual and scenic attributes experienced by boaters on the river because views of the bridge from the water would be limited from the boater's perspective on the water surface, and the bridge would be raised above the

41

banks and would be obscured by bends in the river.  AR 1718.  Moreover, recreational users would only be impacted for a short time due to the bend in the river before the proposed bridge location.  Id.

This case is, in fact, very similar to another case in which FHWA's Section 4(f) determination regarding visual impacts was upheld.  See Geer v. FHA, 975 F. Supp. 47, 73 (D. Mass. 1997) (finding that proposed bridges would "not obscure the primary views from boats using the park, which are of the water surface, the other boats on the river, and recreational activity on the banks, all of which are in the foreground with the bridges and ramps in the background."); see also Laguna Greenbelt, 42 F.3d at 533 (holding that the construction of a highway bridge over a bike trail and adjacent to a park would not substantially interfere with the features, activities, and attributes of parklands); Citizens for the Scenic Severn River Bridge, Inc. v. Skinner, 802 F.Supp. 1325, 1334-5 (D. Md. 1991) (upholding the official's determination that a bridge would not substantially impair a scenic overlook).  Accordingly, based on the existing uses of the area and the current visual impairments, FHWA's determination that there would be no substantial impairment to visual or aesthetic qualities was justified and is entitled to deference.  See, e.g., Wyoming Outdoor Council, 165 F.3d at 52.

Moreover, a new bridge would not substantially impair the visual and scenic attributes of the Horseshoe Bend area because substantial urban blight already exists along the banks of the river.  Plaintiffs' characterization of the lower Little Miami River as "a relatively undisturbed stretch of river" ignores the development along the river.  See Pls. Mem. at 37.  FHWA identified a number of current undesirable land uses along the Little Miami River in the project area, such as the Hafner landfill and a sewer line combined with a sewer overflow outfall along

42

the west bank.  AR 47708.  The study area also includes riparian clearing for agricultural

activities, a high-tension electrical transmission line aerial crossing, and a railroad bridge

crossing.  AR 47707.  Plaintiffs strain credulity when they argue:  "the presence of powerlines

and other manmade features does not taint the natural setting provided by this stretch of river nor

the quiet and solitude experienced on the river."  Pls. Mem. at 39.  The fact is that this stretch of

the river is highly developed, and the construction of a new bridge will not substantially impair

the scenic value of Horseshoe Bend in comparison to the land uses that already exist.  Moreover,

as already mentioned, the assistance manual for the lower Little Miami River specifically

contemplates a new bridge crossing in this precise area.  AR 9101-02.  Accordingly, FHWA

followed its regulations and found that the scenic value of the Little Miami River would not be

substantially impaired.  23 C.F.R. § 771.135(p)(4)(i); AR 47717.

The cases cited by Plaintiffs are easily distinguished.  See Pls. Mem. at 36.  The proposed

bridge over the lower Little Miami River is not similar to putting a new highway in "a remote

area with no permanent roads and includes Bourne Pond and a portion of the Appalachian Trail."

Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, 362 F. Supp.

627, 639 (D. Vt. 1973), aff'd, 508 F.2d 927 (2d Cir.1974)), vacated and remanded on other

grounds, 423 U.S. 809 (1975).  Nor can the proposed area be compared with a massive highway

project that would have required deep cuts and fill slopes in an "unspoiled wilderness" area.  See

Sierra Club v. United States DOT, 664 F.Supp. 1324, 1330 (N.D. Cal. 1987) (holding that cuts

through a mountain up to 2,100 feet long with fill slopes up to 250 high was a constructive

use).[11]

---

[11]  Moreover, unlike CARE, the bridge would not block protected resources from view.  835 F.2d
at 812.  In Brinegar, there was no dispute that a proposed bridge would be directly located in a

43

Accordingly, FHWA properly characterized the lower Little Miami River and adjacent parkland as a category B noise receptor and conducted thorough analysis of the potential noise impacts of a new bridge pursuant to FHWA's noise abatement regulations.  FHWA also thoroughly considered the potential visual and scenic impacts of placing a new bridge across the lower Little Miami River and appropriately found that a new bridge would not be inconsistent with the development along the river and would not interfere with the recreational use and enjoyment of the river.

---

parkland and therefore constitute an actual use of a Section 4(f) resource.  Coal. for Responsible Devel. v. Brinegar, 518 F.2d 522, 524 (4th Cir. 1975).

## VI.    CONCLUSION

FHWA has fully complied with the requirements of NEPA and Section 4(f) of the

Department of Transportation Act.  Accordingly, FHWA requests that summary judgment be

granted in its favor and that Plaintiffs' request for summary judgment be denied.

Dated: August 10, 2007                              Respectfully submitted,

                                                    RONALD J. TENPAS
                                                    Assistant Attorney General
                                                    Environment and Natural Resources Division

                                                    /s/ Luther L. Hajek_____
                                                    LUTHER L. HAJEK
                                                    United States Department of Justice
                                                    Environment and Natural Resources Division
                                                    Natural Resources Section
                                                    P.O. Box 663
                                                    Washington, D.C. 20044-0663
                                                    Tel: (202) 305-0492
                                                    Fax: (202) 305-0274

OF COUNSEL:

GLENN HARRIS
Federal Highway Administration
Assistant Midwest Counsel
19900 Governors Drive
Suite 301
Olympia Fields, IL 60461
Tel.: (708) 283-3561
Fax: (708) 283-3508

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

RIVERS UNLIMITED, et al.,        )
        )
        Plaintiffs,        )
        )
        v.        )        Case No. 1:06-CV-01775 (JR)
        )
UNITED STATES DEPARTMENT OF        )
TRANSPORTATION, et al.,        )
        )
        Defendants,        )
        )
and        )
        )
OHIO DEPARTMENT OF TRANSPORTATION,  )
        )
        Defendant-Intervenor.        )

## DEFENDANTS' STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE ISSUE

The parties in this case are currently briefing cross-motions for summary judgment under Federal Rule of Civil Procedure 56. Local Rules 7(h) and 56.1 require the submission of a statement of material facts as to which the moving party contends that there is no genuine issue. For the reasons explained below, however, such a Statement is unnecessary in this case.

It is well established that, in cases such as this one – where Plaintiffs seek judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 – the scope of that judicial review is properly limited to the administrative record that was before the agencies at the time the decisions were made. See, e.g., Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743 (1985); Camp v. Pitts, 411 U.S. 138, 142 (1973). "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record

the agency presents to the reviewing court." Florida Power & Light Co., 470 U.S. at 743-44.

Accordingly, judicial review of final agency action on summary judgment is different in nature from the procedures used to resolve civil actions within the original jurisdiction of the federal district courts. See Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121, 124 (D.D.C. 2001) ("Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based on the administrative record . . . , even though the Court does not employ the standard of review set forth in Rule 56, Fed. R. Civ. P."). In APA cases, the district court sits as an appellate tribunal. University Medical Center of Southern Nevada v. Shalala, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999) (citing Marshall County Health Care Auth. v. Shalala, 988 F.2d 1221, 1225-26 (D.C.Cir.1993). Thus, judicial review is confined to the administrative record already in existence, and does not contemplate a factual record developed *de novo* in federal district court. Community for Creative Non-Violence v. Lujan, 908 F.2d 992, 998 (D.C. Cir. 1990). "As all material facts are within the administrative record, no material facts are in dispute." LeBoeuf, Lamb, Greene & MacRae, LLP v. Abraham, 215 F. Supp. 2d 73, 84 (D.D.C. 2002); see also National Ass'n of Home Builders v. U.S. Army Corps of Engineers, 417 F.3d 1272, 1282 (D.C. Cir. 2005) (recognizing that the D.C. Circuit has repeatedly held that claims asserting "an agency's action is arbitrary and capricious or contrary to law present purely legal issues").

Because there are no material facts for the Court to resolve in the first instance here, a Statement of Material Facts as contemplated by LCvR 7(h) and 56.1 is inapposite. The Court should confine its review of FHWA's actions to the certified Administrative Record as Supplemented, lodged with the Court on June 12, 2006 (referred to herein as "AR").

2

Nonetheless, to ensure strict compliance with the local rules, the Defendants submit the following Statement of Material Facts As To Which There is No Genuine Issue in support of their Motion for Summary Judgment:

1.     The Ohio-Kentucky-Indiana Regional Council of Governments ("OKI") completed a Major Investment Study ("MIS") to investigate a multi-modal solution to traffic congestion and delay in the greater Cincinnati area.  AR 47867.  The MIS was completed in April 2000.  Id.

2.     The recommended multi-modal plan developed during the MIS process was carried forward for consideration by the Federal Highway Administration ("FHWA") working in conjunction with the Ohio Department of Transportation ("ODOT") in Tier 1 of the Eastern Corridor Multi-Modal Projects ("Eastern Corridor Project").  AR 47131-34.

3.     On January 17, 2002, FHWA initiated the National Environmental Policy Act ("NEPA") process for the Eastern Corridor Project by meeting with interested federal and state agencies, including ODOT, the Ohio Department of Natural Resources ("ODNR"), the Ohio Environmental Protection Agency ("OEPA"), the U.S. Environmental Protection Agency ("EPA"), and the U.S. Fish and Wildlife Service ("FWS").  AR 47138.  The National Park Service ("NPS") is a cooperating agency under NEPA.  Id.

4.     On March 19, 2004, FHWA distributed a preliminary draft environmental impact statement for the Eastern Corridor Project to interested federal and state agencies, including those listed directly above.  AR 21795.

5.     On November 8, 2004, after considering the agency comments and incorporating them, FHWA released a draft environmental impact statement for the Eastern Corridor Project,

3

which it distributed to interested federal and state agencies and the public.  AR 47100.

      6.      On September 30, 2005, after considering comments from agencies and the public

and incorporating them, FHWA released its final environmental impact statement for the Eastern

Corridor Project.  AR 47680.

      7.      On June 2, 2006, after further consultation with EPA, NPS, and the Department of

the Interior, FHWA released the record of decision for the Eastern Corridor Project.  AR 47074.

      8.      All material facts in this action are contained in the AR.

Dated: August 10, 2007                  Respectfully submitted,
                                        RONALD J. TENPAS
                                        Assistant Attorney General
                                        Environment and Natural Resources Division

                                        /s/ Luther L. Hajek
                                        LUTHER L. HAJEK
                                        United States Department of Justice
                                        Environment and Natural Resources Division
                                        Natural Resources Section
                                        P.O. Box 663
                                        Washington, D.C. 20044-0663
                                        Tel: (202) 305-0492
                                        Fax: (202) 305-0274

OF COUNSEL:

GLENN HARRIS
Federal Highway Administration
Assistant Midwest Counsel
19900 Governors Drive
Suite 301
Olympia Fields, IL 60461
Tel.: (708) 283-3561
Fax: (708) 283-3508

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RIVERS UNLIMITED, et al.,      ) | |
|      ) | |
|         Plaintiffs,      ) | |
|      ) | |
|     v.      ) | Case No. 1:06-CV-01775 (JR) |
|      ) | |
| UNITED STATES DEPARTMENT OF      ) | |
| TRANSPORTATION, et al.,      ) | |
|      ) | |
|         Defendants,      ) | |
|      ) | |
| and      ) | |
|      ) | |
| OHIO DEPARTMENT OF TRANSPORTATION,   ) | |
|      ) | |
|         Defendant-Intervenor.      ) | |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

As Defendants explain in "Defendants' Statement of Material Facts as to Which There is no Genuine Issue," filed concurrently with this pleading, there are no material facts for the Court to resolve in the first instance here. Rather, the Court's role is limited to applying "the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985). Thus, a Statement of Material Facts and Statement of Genuine Issues as contemplated by LcvR 7(h) and 56.1 are inapposite here. However, because Plaintiffs have submitted a Statement of Material Facts, and to ensure strict compliance with the local rules, Defendants submit the following Response to Plaintiffs' Statement of Material Facts in Support of Plaintiffs' Motion for Summary Judgment ("Plaintiffs' SOF").

With respect to the factual allegations in each numbered paragraph in Plaintiffs'
Statements, Defendants respond that all material facts in this action are contained in the
certified Administrative Record as Supplemented, lodged with the Court on June 12, 2006
(referred to herein as "AR").  The documents in the AR speak for themselves.  The material facts
should be identified by the parties through citations to the AR in the parties' summary judgment
motions and responses.  To the extent Plaintiffs' Statement of Material Facts mischaracterizes
documents in the AR, it should be disregarded by the Court.  Likewise, to the extent Plaintiffs'
SOF refers to matters outside the AR, those statements also should be disregarded by the Court.

Below, Defendants respond to Plaintiffs' SOF, paragraph by paragraph as follows.  Any
statements not explicitly addressed or qualified are not conceded by Defendants to be a true and
accurate reflection of the record documents:

1.    The lower Little Miami River from the Ohio River to Foster, which is the segment
within the Eastern Corridor Project study area, was designated as a recreational river under the
Wild and Scenic Rivers Act ("WSRA") in 1980.  AR 2947-48.  The recreational designation is
the lowest classification under WSRA, falling below wild and scenic.  16 U.S.C. § 1273(b)(1)-
(3).  Rivers receiving the recreational classification are:  "Those rivers or sections of rivers that
are readily accessible by road or railroad, that may have some development along their
shorelines, and that may have undergone some impoundment or diversion in the past."  16
U.S.C. § 1273(b)(3)).  The upper Little Miami River, extending from Foster, Ohio to Clifton,
Ohio, was designated as a scenic river in 1973.  AR 3001.

2.    Defendants do not dispute that the Little Miami River from the confluence of East
Fork to the Ohio River was designated as State Scenic River on October 27, 1971.  AR 187.  The

2

outstandingly remarkable values referenced by Plaintiffs are described in materials relating to the designation of the upper reaches of the Little Miami River as a scenic river under the WSRA. AR 8151, 42270. The designation of the lower Little Miami River as a recreational river under the WSRA, AR 112-13, and the Assistance Manual for the lower Little Miami River, AR 8836-9165, do not discuss the outstanding remarkable values referenced by Plaintiffs. The documents designating the lower Little Miami River do not make clear whether the upper and lower reaches of the river should be included under one management plan. AR 112-12, 8836-9156.

3.      Defendants do not dispute this statement.

4.      The first sentence accurately quotes the letter designating the lower Little Miami River as a recreational river under the Wild and Scenic Rivers Act. AR 9926. The second sentence contains the National Park Service's ("NPS") later characterization of the lower Little Miami River in comments on the final environmental impact statement ("FEIS"). AR 42274. The actual designation documents do not prohibit development along the river. AR 112-12, 8836-9156.

5.      Plaintiffs cite to their own letter for this statement. AR 10968. Without any further documentation to rely upon, Defendants do not concede that this statement is accurate.

6.      Defendants agree that canoeing, kayaking, fishing, bird/wildlife viewing, hiking, and biking occur along river segments north of the study area. However, all of these activities do not currently occur and did not occur at the time of designation in the area of the proposed new river crossing. The Horseshoe Bend area (the location of the proposed new bridge) is in private ownership, and public access to the river is not permitted. Thus, the only public recreational uses in this area are those activities that take place on the water, *i.e.*, canoeing and

3

kayaking. Weather in Ohio typically limits the recreational season for these activities from May to October. The Hamilton County Park Department ("HCPD") confirmed that canoeing in this area of the river has always been extremely limited. AR 9522-23, 47086-87.

7.      Defendants agree that there are areas along the lower Little Miami River where there are opportunities for solitude, serenity, and quiet, but dispute that these opportunities for solitude, serenity, and quiet exist along the segment of the river in the study area. It should be noted that, within the study area, the lower Little Miami River is primarily urban with industrialized activities occurring along the banks. The DEIS describes the urban and previously disturbed nature of the river crossing area. AR 47281-82.

8.      Defendants do not dispute these statements.

9.      Defendants do not dispute this statement.

10.     Defendants do not dispute these statements, with the proviso that the DEIS states that "the Little Miami and East Fork are designated by OEPA for *most of their lengths* as Exceptional Warmwater Habitats." AR 47279 (emphasis added). Defendants also add that FHWA and the Ohio Department of Transportation ("ODOT") have committed to a bridge design that clear-spans the river in order to avoid direct impacts to the Little Miami River. AR 9525, 47278. No federally listed threatened or endangered species were located during environmental investigations for this project. AR 47291-95.

11.     Defendants do not dispute this statement.

12.     Defendants do not dispute this statement.

13.     Defendants do not dispute these statements, but add that, pursuant to FHWA guidance on Linking the Transportation Planning and National Environmental Policy Act

("NEPA"), dated February 22 2005, FHWA review the Major Investment Study ("MIS") and determined that it provided a solid foundation for the Tier 1 analysis.  AR 9518-19.

14.     Defendants do not dispute that, in Tier 1, FHWA identifies a set of feasible multi-modal alternatives for further evaluation, AR 47118-19, but add that the purpose and need of the project is fully set forth in the DEIS.  AR 47162-94.  FHWA analyzed the Beechmont Levee option (Option 2) and found that it did not meet the long term regional transportation need for the Eastern Corridor.  AR 9518-19, 47680.

15.     Although NPS was not on the Major Investment Study Task Force, it provided input on the Eastern Corridor Project as early as 1997.  AR 8598.  Seeking approval from NPS for a potential new bridge crossing also was raised during an MIS Task Force meeting. AR 9298.  The Ohio Department of Natural Resources ("ODNR"), NPS' state-counterpart and the agency responsible for managing the Little Miami River, was a member of the MIS Task Force.  AR 47868.

16.     Defendants do not dispute these statements.

17.     Defendants agree that the NEPA process for the Eastern Corridor Multi-Modal Project has been tiered.  AR 47135-39.  Tier 1 was completed with the issuance of the record of decision ("ROD") on June 2, 2006.  AR 47099.

18.     Defendants do not dispute these statements.

19.     Plaintiffs' description of the alternatives under consideration is, for the most part, accurate, although it is only a partial description of the multi-modal alternatives being considered.  AR 47209-34.  However, it should be noted that only a four-lane bridge is being considered, not a six-lane bridge.  AR 47230.

20.    FHWA agrees that the U.S. Environmental Protection Agency ("EPA") provided comments on the DEIS on December 30, 2004.  AR 9198-202.  The letter speaks for itself, and, to the extent that Plaintiffs' description is inconsistent with the letter, the Court should disregard Plaintiffs' statements.  FHWA devoted substantial effort to addressing the issues raised by EPA and documented those efforts in the FEIS.  AR 47730-34.  EPA provided further comments on the FEIS by letter dated November 23, 2005, stating that most of their concerns had been addressed or resolved.  AR 9515-16.  FHWA and ODOT also met with EPA on March 3, 2006 to further discuss issues relating to the Eastern Corridor Project.  AR 8457, 8460-79.  One of EPA's requests in the November 23, 2005 letter, was that FHWA include in the FEIS further explanation as to why Option 2 was not given consideration as an alternative in the NEPA process.  AR 9201.  FHWA provided further description of the decision to remove Option 2 from consideration in the FEIS.  AR 47741-49.   Further explanation is provided in FHWA's May 16, 2006 response to the EPA's comments on the FEIS. AR 9446-55, 47074.

21.    Defendants do not dispute that NPS submitted a letter commenting on the DEIS.  AR 2967-68.  The letter speaks for itself, and, to the extent that Plaintiffs' description is inconsistent with the letter, the Court should disregard Plaintiffs' statements.  NPS has acknowledged on many occasions that the State of Ohio has the responsibility to maintain the river in accordance with the river's management plan. AR 2967.  As the administering agency for the State of Ohio, ODNR decided in its June 7, 2002 letter that the construction of a new bridge over the lower Little Miami River would be acceptable if substantial mitigation measures were included in the project.  AR 122-23.

22.     Defendants do not dispute that the U.S. Department of the Interior Office of

Environmental Policy and Compliance ("DOI") submitted a letter commenting on the FEIS.

AR 2158-72.  The letter speaks for itself, and, to the extent that Plaintiffs' description is

inconsistent with the letter, the Court should disregard Plaintiffs' statements.  FHWA devoted

substantial effort to addressing DOI's comments and concerns regarding the DEIS and

documenting them in the FEIS.  AR 47737-38.  FHWA and ODOT also met with the NPS on

January 31, 2005, AR 47734-35, and with DOI and NPS on February 24, 2006.  AR 8776, 8792-

835.  Additionally, these efforts are summarized in FHWA's letters to DOI dated September 19,

2005, AR 47864-66, and May 12, 2006.  AR 9517.

23.     Defendants do not dispute that Rivers Unlimited, Little Miami, Inc., and the

Sierra Club submitted comment letters regarding the DEIS.  AR 470-89, 3701-11, 10967-97.

The letters speak for themselves, and, to the extent that Plaintiffs' description is inconsistent

with the letters, the Court should disregard Plaintiffs' statements.  All of these comments were

thoroughly addressed in the FEIS.  AR 47792-806.  Defendants dispute that these entities ever

specifically commented on FHWA's compliance with Transportation Act Section 4(f) in these

letters.

24.     Tier 1 of the Eastern Corridor Project was completed with the issuance of the

ROD on June 2, 2006.  AR 47099.

25.     Defendants do not dispute that, following the issuance of the FEIS, EPA

submitted a comment letter to FHWA on November 23, 2005, AR 9515-16, and NPS submitted a

comment letter on November 28, 2005.  AR 42269-80.  The letters speak for themselves, and, to

the extent that Plaintiffs' description is inconsistent with the letters, the Court should disregard

Plaintiffs' statements.  The efforts to resolve DOI's concerns regarding the Eastern Corridor

Project are referenced in Paragraph 22, above.

26.    Defendants do not dispute that Little Miami, Inc., and the Sierra Club submitted

comments on the FEIS.  AR 1628-30, 1631-35.  The letters speak for themselves, and, to the

extent that Plaintiffs' description is inconsistent with the letters, the Court should disregard

Plaintiffs' statements.  FHWA responded to these comments and incorporated the comments and

responses into the ROD.  AR 1636-68.

27.    Defendants do not dispute that DOI sent a letter to FHWA on June 28, 2006, after

the ROD issued.  AR 8149-63.  The letter speaks for itself, and, to the extent that Plaintiffs'

description is inconsistent with the letter, the Court should disregard Plaintiffs' statements.

Defendants dispute that the issuance of the ROD came as a surprise to DOI.  On May 12, 2006,

FHWA followed its February 24, 2006 meeting with DOI and NPS with a letter which also

responded to DOI's November 28, 2005 letter.  AR 9525.  In the letter, FHWA clearly indicated

its intent to move forward to Tier 2 of the project.  Id.

28.    Defendants do not dispute that DOI attached to its June 28, 2006 letter a noise

report created by Dr. Fristrup.  AR 8156-63.  The report speaks for itself and, to the extent that

Plaintiffs' description is inconsistent with the report, the Court should disregard Plaintiffs'

statements.  Defendants also note that FHWA's noise analysis was conducted in accordance with

FHWA regulations set forth at 23 C.F.R. § 772.

29.    The ROD was issued on June 2, 2006.  AR 47099.  Defendants do not dispute that

the issuance of the ROD initiates more detailed studies and analysis to be conducted in Tier 2.

Id.

Dated: August 10, 2007                        Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources Division

/s/ Luther L. Hajek
LUTHER L. HAJEK
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 305-0492
Fax: (202) 305-0274

OF COUNSEL:

GLENN HARRIS
Federal Highway Administration
Assistant Midwest Counsel
19900 Governors Drive
Suite 301
Olympia Fields, IL 60461
Tel.: (708) 283-3561
Fax: (708) 283-3508

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| RIVERS UNLIMITED, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:06-CV-01775 (JR) |
| | ) | |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| OHIO DEPARTMENT OF TRANSPORTATION, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

## [PROPOSED] ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Before the Court are Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Motion")
and Defendants' Motion for Summary Judgment and Opposition to Plaintiffs' Motion for
Summary Judgment ("Defendants' Motion") and replies filed in support of those motions.

Upon consideration of the briefs filed in support of Plaintiffs' Motion and Defendants'
Motion, including briefs filed by Defendant-Intervenor Ohio Department of Transportation, the
Court finds and concludes that Defendants, United States Department of Transportation, Mary
Peters,[1] Federal Highway Administration, and J. Richard Capka (collectively "Defendants")
have complied with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(C), and

---

[1]  Mary Peters was substituted for Maria Cino pursuant to Fed. R. Civ. P. 25(d)(1), in
Defendants' Answer.

the Department of Transportation Act ("Transportation Act"), 49 U.S.C § 303, in the planning of

Tier 1 of the Eastern Corridor Multi-Modal Projects.  Specifically, the Court finds that FHWA's

draft environmental impact statement ("DEIS") and final environmental impact statement

("FEIS") prepared for the project meet the requirements of NEPA.  The Court also finds that

FHWA's consideration of parks, recreation areas, including the Little Miami River, wildlife

refuges, and historic and archeological resources in the DEIS and FEIS meets the requirements

of Section 4(f) of the Department of Transportation Act.

Therefore it is hereby ORDERED, ADJUDGED AND DECREED that Plaintiffs' Motion

is DENIED and Defendants' Motion is GRANTED and judgment is hereby entered in favor of

Defendants.


DATED: _____          _____
                                      JAMES ROBERTSON
                                      UNITED STATES DISTRICT JUDGE

2