IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

Rivers Unlimited, *et al.*,         )
                                     )
               Plaintiffs,     )  Civ No.: 1:06-CV-01775-JR
       v.                  )
                                     )
United States Department of Transportation, *et*)
                                     )
*al.*,                                   )
                                   )
               Defendants.    )
                                   )
_____)

---

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................. ii

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION AND SUMMARY .........................................................................1

ARGUMENT ..............................................................................................................3

    I.    The Eastern Corridor Project Violates the National Environmental Policy Act. ...............3

        A.   Option 2 Meets the Purpose and Need of the Project and is a Reasonable Alternative That Must be Evaluated in the Tier 1 EIS...................................................................3

        B.   The NPS Noise Analysis is Significant New Information.................................................9

        C.   FHWA Failed to Base EIS on Current and Up-To-Date Data.......................................12

    II.   The Project Constitutes a Constructive Use of the National Wild and Scenic Little Miami River. .................................................................................................................14

        A.   FHWA Has Not Properly Analyzed Potential Noise Impacts. .....................................15

        B.   The Little Miami River is a Category A Receptor.........................................................18

        C.   Impacts to the Visual and Scenic Resources Are Also a Constructive Use...................19

CONCLUSION ..........................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

Appalachian Power Co. v. EPA,
249 F.3d 1032 (D.C. Cir. 2001) ...................................................................................12

Associations Working for Aurora's Residential Env't. v. Colorado Dep't of Transp.,
153 F.3d 1122 (10th Cir. 1998) ....................................................................................5

Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm.,
449 F.2d 1109 (D.C. Cir. 1971) .....................................................................................4

*Citizens Against Burlington, Inc. v. Busey,
938 F.32d 190 (D.C. Cir. 1991) ...............................................................................4, 15

Citizens to Preserve Overton Park, Inc. v. Volpe,
401 U.S. 402 (1971) .....................................................................................................14

City of Alexandria v. Slater,
198 F.3d 862 (D.C. Cir. 1999) ...............................................................................6, 7, 8

City of Olmsted Falls v. FAA,
292 F.3d 261 (D.C. Cir. 2002) ................................................................................9, 10

*Corridor H Alternatives, Inc. v. Slater, 982 F. Supp. 24 (D.D.C. 1997)
*rev'd on other grounds* Corridor H Alternatives, Inc. v. Slater,
166 F.3d 368 (D.C. Cir. 1999) ....................................................................................12

*Davis v. Mineta,
302 F.3d 1104 (10th Cir. 2002) .......................................................... 2, 7-9, 16, 24

D.C. Federation of Civic Associations v. Volpe,
459 F.2d 1231 (D.C. Cir.  1971) *cert. denied*, 405 U.S. 1030 (1972) ..........................15

Druid Hills Civic Ass'n, Inc. v. Federal Highway Admin.,
772 F.2d 700 (11th Cir. 1985) .....................................................................................24

Geer v. Federal Highway Administration,
975 F. Supp. 47 (D. Mass. 1997) ...........................................................................22, 23

Hickory Neighborhood Defense League v. Skinner,
893 F.2d 58 (4th Cir. 1990) *appeal on remand at* 910 F.2d 159 (4th Cir. 1990) .........................14

Hughes River Watershed Council v. Glickman,
81 F.3d 437 (4th Cir. 1996) ..................................................................................12

Idaho Sporting Congress v. Rittenhouse,
305 F.3d 975 (9th Cir. 2002) ...........................................................................12, 13

Johnston v. Davis,
698 F.2d 1088 (10th Cir. 1983) ...........................................................................12

Laguna Greenbelt, Inc. v. Dep't of Transp.,
42 F.3d 517 (9th Cir. 1994) ..............................................................................5, 23

Nat'l Comm. for the New River, Inc. v. FERC,
373 F.3d 1323 (D.C. Cir. 2004) .............................................................................9

National Wildlife Federation v. FERC,
912 F.2d 1471 (D.C. Cir. 1990) .............................................................................3

Natural Resources Defense Council v. Lujan,
768 F. Supp. 870 (D.D.C. 1991) ..........................................................................10

North Buckhead Civic Ass'n v. Skinner,
903 F.2d 1533 (11th Cir.1990) ...............................................................................5

NRDC v. Callaway,
524 F.2d 79 (2nd Cir. 1975)....................................................................................4

Pension Benefit Guaranty Corp. v. LTV Corp.,
496 U.S. 633 (1990)...............................................................................................11

Sierra Club v. DOT,
753 F.2d 120 (D.C. Cir. 1985) ........................................................................15, 16

Sierra Club v. Froehlke,
816 F.2d 205 (5th Cir. 1987) ................................................................................10

Sierra Club v. Marsh,
816 F.2d 1376 (9th Cir. 1987) ..............................................................................11

Sierra Club v. United States Dep't of Transp.,
310 F. Supp. 2d 1168 (D. Nev. 2004).....................................................................7

Sierra Club v. Watkins,
808 F. Supp. 852 (D.D.C. 1991) .............................................................................4

Simmons v. U.S. Army Corps of Engineers,

120 F.3d 664 (7th Cir. 1997) ...................................................................................3

Southern Utah Wilderness Alliance ("SUWA") v. Norton,
237 F. Supp. 2d 48 (D.D.C. 2002) ...........................................................................4

Stewart Park and Reserve Coalition, Inc. (SPARC) v. Slater,
358 F. Supp.2d 83 (D.D.C. 2005) ...........................................................................15

Tongass Conservation Soc'y. v. Cheney,
924 F.2d 1137 (D.C. Cir. 1991) ..............................................................................3

Town of Cave Creek Arizona v. FAA,
325 F.3d 320, 332 (D.C. Cir. 2003) ........................................................................15

**Statutes**

5 U.S.C. §§ 706(2) ....................................................................................................1

23 U.S.C. § 138 ..........................................................................................................1

42 U.S.C. §§ 4321 et seq ...........................................................................................1

49 U.S.C. § 303 ..........................................................................................................1

49 U.S.C. § 303(a) ....................................................................................................14

**Regulations**

23 C.F.R. § 771.135(p)(2) ........................................................................................15

23 C.F.R. § 771.135(p)(4) ........................................................................................20

23 C.F.R. § 772, Table 1 ....................................................................................18, 19

**Other**

S. Rep. No. 1659, 89th Cong., 2d Sess. 5-6 (1966) ...............................................14

## INTRODUCTION AND SUMMARY

This case challenges a proposed highway project in the Cincinnati metropolitan area. Of particular concern to Plaintiffs is the inclusion, within the project, of a new large, elevated, multi-lane bridge to be placed across a scenic, natural and relatively undisturbed and undeveloped portion of the Little Miami River. This stretch of the river was included into the National Wild and Scenic River System in 1980 because of its scenic, aesthetic, and recreational qualities.[1] AR 47275. The proposed bridge will impact the scenic, aesthetic, peaceful and recreational attributes associated with the river, which were the very cause for the Little Miami River's inclusion in the National Wild and Scenic Rivers System. Specifically, the proposed placement of a new bridge over this section of the river will sacrifice one of the last remaining natural, quiet and scenic environments in the Cincinnati metropolitan area that is used for kayaking, canoeing, and wildlife watching. The Eastern Corridor Project ("Eastern Corridor" or "Project") violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, et seq., the Department of Transportation Act, 23 U.S.C. § 138 and 49 U.S.C. § 303 ("Transportation Act"), and the Administrative Procedure Act, 5 U.S.C. § 706(2) ("APA"). Specifically, the Eastern Corridor project and the corresponding Tier 1 Final Environmental Impact Statement ("FEIS") violate NEPA and the Transportation Act because Defendants have: (1) failed to consider all reasonable alternatives in the Tier 1 analysis; (2) failed to consider significant new information; (3) failed to base their EIS analysis on current data; and (4) failed to comply with the requirements of Section 4(f) of the Transportation Act.

Both the Federal Defendants ("FHWA") and the Defendant-Intervenor ("ODOT") make several misrepresentations, both pertaining to the facts, as well as the arguments presented by Plaintiffs. First and foremost, Defendants attempt to paint a picture of a highly developed river.

---

[1] The 28-mile section, of which a portion is within the Eastern Corridor, was included in January of 1980 under the recreational classification. AR 47275. The entire Little Miami River is also designated as a State Scenic River. AR 47276.

Beyond mischaracterizing the nature of the river, ODOT further asserts that Plaintiffs have characterized the Little Miami River as "pristine or untouched."  See ODOT Mem. (Doc. No. 33-2) at 3 (while ODOT makes this assertion it provides no citation to Plaintiffs' briefing in support because Plaintiffs have never made such characterizations).  This case is not, as ODOT contends, about "Plaintiffs' romantic perspective of the Little Miami River."  Further, it is not about whether the river is pristine or urban.  Rather, this case is about whether FHWA properly assessed the impacts of a transportation project that poses to eradicate one of two stretches of natural and undisturbed river segments, amongst the entire Wild and Scenic Rivers Act system, that flows through a major metropolitan area (AR 10968), and whether the project will impair the attributes that supported the river's inclusion in the system.

FHWA and ODOT's efforts to diminish the natural qualities that supported the river's designation must be seen for what they are – a thinly veiled attempt to avoid meaningful analysis of the impacts a new multi-lane bridge will have on a river included in the Wild and Scenic Rivers Act system.  Defendants' unsupported perspective of the river fails to comport with the characterization of the river that qualified it for designation as a Wild and Scenic River.

ODOT maintains that Plaintiffs' skewed perspective is not limited to the nature of the river, stating that Plaintiffs' perspective of the tiered NEPA approach is also skewed because identification of the Eastern Corridor in Tier 1 does not guarantee that a new bridge will be built. ODOT Mem. at 3.  This too is nothing more than another thinly veiled attempt to avoid meaningful review and analysis by delaying any substantive review to a point where it will have no bearing on the outcome of the project.  Such analysis violates the intent of NEPA.  Davis v. Mineta, 302 F.3d 1104, 1112 (10th Cir. 2002) (rejecting highway project decision where "defendants prejudged the NEPA issues").  Because there is only one alternative proposed to alleviate traffic and that alternative includes a new bridge, the question of whether a bridge is or is not constructed becomes the same question as whether the project moves forward or not and

such a question is not for the purpose of Tier 2. AR 47681 and 47119. It borders on the absurd to think that ODOT or FHWA could consider the bridge as merely a "recommendation" that may not come to fruition or that the project could proceed in some manner without the new bridge now that FHWA has chosen the project corridor. ODOT Mem. at 3. Additionally, providing "further opportunity to comment" will not provide plaintiffs with the opportunity to divert this project from the selected corridor, which is dependent upon a new bridge. See ODOT Mem. at 3.

Finally, FHWA and ODOT are unable to support their finding that the bridge will not substantially impair the natural, visual, scenic, and recreational attributes of the River that were the cause of its inclusion in the Wild and Scenic Rivers Act system. While FHWA and ODOT may believe that because the river is not pristine any negative impacts from the bridge are insubstantial, they have failed to address or adequately respond to the concerns and points raised by the National Park Service ("NPS"), plaintiffs and others. As further discussed below, Defendants have failed to adequately respond to Plaintiffs' demonstration that the project does not complies with NEPA and Section 4(f) of the Transportation Act.

## ARGUMENT

### I.    The Eastern Corridor Project Violates the National Environmental Policy Act.

A.    Option 2 Meets the Purpose and Need of the Project and is a Reasonable Alternative That Must be Evaluated in the Tier 1 EIS.

The "reasonable range of alternatives" evaluated in an EIS is dictated by the purpose and need of the proposed action and governed by a "rule of reason." Tongass Conservation Soc'y. v. Cheney, 924 F.2d 1137, 1140 (D.C. Cir. 1991); Simmons v. U.S. Army Corps of Engineers, 120 F.3d 664, 666 (7th Cir. 1997) (a purpose and need statement should not be so narrow as to "define competing 'reasonable alternatives' out of consideration (and even out of existence).").[2] The D.C. Circuit has noted that:

---

[2] FHWA asserts Plaintiffs misread NWF v FERC, 912 F.2d 1471 (D.C. Cir. 1990). See FHWA Mem. at 16 n.4. However, Plaintiffs only cited this case for the proposition that an agency must consider reasonable alternatives and

> the rule of reason does not give agencies license to fulfill their own prophecies, whatever the parochial impulses that drive them. Environmental impact statements take time and cost money. Yet an agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become a foreordained formality.

Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 196 (D.C. Cir. 1991).  Furthermore,

this Court has noted that "an agency's consideration of environmental concerns must be more

than a pro forma ritual. Considering environmental costs means **seriously considering**

**alternative actions to avoid them**."  Southern Utah Wilderness Alliance ("SUWA") v. Norton,

237 F. Supp. 2d 48, 52 (D.D.C. 2002) (emphasis added) (*citing* Calvert Cliffs' Coordinating

Comm., Inc. v. U.S. Atomic Energy Comm., 449 F.2d 1109, 1128 (D.C. Cir. 1971)).

Furthermore, the discussion of alternatives "must go beyond mere assertions" if it is to fulfill its

vital role of "exposing the reasoning and data of the agency proposing the action to scrutiny by

the public and by other branches of the government."  NRDC v. Callaway, 524 F.2d 79, 92-3

(2nd Cir. 1975).  An EIS must "rigorously explore and objectively evaluate all reasonable

alternatives[.]" id.  An agency may not limit itself to only one end of the spectrum of

possibilities.  See, e.g., Sierra Club v. Watkins, 808 F. Supp. 852, 872 (D.D.C. 1991).

While FHWA and ODOT contend that Option 2 does not meet the purpose and need of

the project, they are unable to provide support in the record for this proposition.  First, the MIS

selected its preferred alternative by consensus among a variety of people with different interests

and did not make substantive findings indicating that Option 2 does not, in fact, meet the purpose

and need.  See AR 47878.  Rather, the MIS compared the Options and found, in its opinion, that

Option 1 outperformed Option 2.  See AR 48019-23 (no finding in MIS that Option 2 does not

meet purpose and need); AR 47743-49 (FEIS post-hoc comparison that finds Option 1

---

not for whether the facts of that case are applicable to the case at hand.  As a result, Plaintiffs have neither misread nor misapplied the findings of that case.  See Plaintiffs' Opening Mem. at 15.

outperforms Option 2 but does not demonstrate how Option 2 does not meet purpose and need).

Second, the DEIS does not state that Option 2 was eliminated because it does not meet the

purpose and need. AR 47201-03 (finding Option 1 performed better than Option 2 but again no

statement that demonstrates how Option 2 does not meet purpose and need). Additionally, the

conclusion that "only a multi-modal project will adequately address the current and future

transportation issues in the Eastern Corridor" neither precludes nor excuses FHWA from

conducting an assessment of all reasonable alternatives that address the highway component of

the Corridor project. FHWA Mem. at 13 (citing AR 47197).

    The purpose of the Eastern Corridor is to "address long range transportation needs of the

region." FHWA Mem. at 12 (citing AR 47162-63). However, neither FHWA nor ODOT are

able to point to a place in the MIS that supports the finding that Option 2 does not meet the

purpose and need of the project.[3] See FHWA Mem. at 15 (citing AR 47202-03; 48017-22 but as

noted above these portions of the record only compare the Options and do not conclude that

Option 2 does not meet the purpose and need). Rather, FHWA simply points to statements that

identify negative attributes of Option 2. It was only in the final EIS that FHWA stated that

Option 2 was not a feasible strategy. See AR 47748-47749 . However, this new position

concerning Option 2 is not supported by the findings of the MIS. For example, Option 1 will

only provide a 5% impact on congestion reduction over Option 2. AR 47744 (DEIS comparison

of alternatives).

    Furthermore, in a post-hoc effort to dismiss Option 2, FHWA claims Option 2 contains

"no advantages over Option 1." See FHWA Mem. at 16 (citing AR 477747). However, such a

---

[3] FHWA cites to several cases stating that an agency need not consider an alternative that does not meet the purpose and need. For example FHWA cites North Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1541-43 (11th Cir. 1990) (an infeasible rail-only alternative did not need to be considered); Associations Working for Aurora's Residential Env't. v. Colorado Dep't of Transp., 153 F.3d 1122, 1130 (10th Cir. 1998) (alternatives must meet goal of relieving congestion); Laguna Greenbelt, Inc. v. Dep't of Transp., 42 F.3d 517, 523-24 (9th Cir. 1994) (DOT appropriately rejected alternatives that were either infeasible or did not reduce congestion). FHWA Mem. at 20. As discussed above, Plaintiffs do not contend that alternatives that do not meet the objectives of the project need be considered.

position is not supported by the record, and is contrary to findings in the MIS.  For example, the MIS explicitly states that "Option 1 has greater adverse impacts on the Little Miami River Valley."  AR 48020 (notably, FHWA, itself, cites this page of the MIS for the proposition that the MIS task group did not find that Option 2 has environmental benefits (FHWA Mem. at 17-18; see also ODOT Mem. at 12 and 25); see also AR 48023 ("Although both options present considerable environmental constraints, in general, Option 2 … appears to provide a more favorable overall impact scenario.  Option 2 avoids the less disturbed, higher quality section of the Little Miami River corridor….").

FHWA and ODOT's unsupported contention that Option 2 does not meet the purpose and need of the project is also flawed because even Option 1 is not a "complete" solution.  There is no silver bullet, nor one complete solution to addressing traffic needs for the Cincinnati metropolitan area.  The goal is broad and as a result there is a wide range of alternatives that can achieve the objective to varying degrees.

FHWA and ODOT rely on City of Alexandra v. Slater, 198 F. 3d 862 (D.C. Cir. 1999) for the finding that an alternative must provide a "complete solution" to the problem.  See FHWA Mem. at 17; ODOT Mem. at 25-27.  However, City of Alexandria provides little direction in this case because its purpose was extremely narrow — to increase capacity over the Woodrow Wilson bridge, along D.C.'s Beltway, to meet traffic needs twenty years after the project's approval.  198 F.3d at 868.  The Department of Transportation found that a ten-lane wide bridge simply would not meet the traffic numbers.  Id.  As a result there was no need to consider the alternative proffered by the plaintiffs in that case because it did not meet the purpose and need of the project.

Further, Plaintiffs have not, as ODOT asserts, "carefully pars[ed]" the record in an attempt to qualify Option 2 as reasonable.  ODOT Mem. at 26.  This is yet another post-hoc effort by ODOT to diminish the findings in the MIS concerning Option 2 in order to characterize

the alternative as not meeting the purpose and need of the project.  Rather, Option 2, as

demonstrated through numerous references in the record, was viewed as meeting the purpose and

need.[4]  See AR 47202 and AR 48020 (performance results indicated that both options produce

significant travel benefits); AR 48020 ("Option 2 **performs similarly** to the Option 1."

(emphasis added)).  Instead, it is ODOT who is unable to cite to any portion of the record that

fully dismisses Option 2.  See ODOT Mem. at 26.  Option 2 is a solution with positive and

negative attributes, just like Option 1.  Consideration of the positive and negative attributes of

varying alternatives is the purpose of NEPA.  Davis, 302 F.3d at 1112.

     While ODOT cites City of Alexandria for the proposition that the alternative must offer a

complete solution, the facts at issue here are significantly distinguishable.  In City of Alexandria,

the court found that there was no need to consider a 10-lane wide bridge when it would not

alleviate or meet traffic projections.  198 F.3d at 868-89.  There is a significant difference

between the proposed alternatives in this case and those in City of Alexandria.  The proposed

construction of a new massive multilane bridge over a scenic and natural setting of the Little

Miami River versus an alignment that widens an existing route is incomparable to the two

alternatives that simply differ based on the number of lanes.

     Further, while it was clear that a 10-lane bridge would not meet traffic demands in City

of Alexandria , Option 2 does not have the same limitations.  Although FHWA is quick to point

---

[4] Defendants also rely upon Sierra Club v. United States Dep't of Transp., 310 F. Supp. 2d 1168 (D. Nev. 2004) for
the finding that an agency can dismiss alternatives at the MIS stage.  First, Plaintiffs question whether an agency can
appropriately rely on an MIS to fully dismiss an alternative from consideration.  While the MIS may invite opinion
from stakeholders, there is no formal public comment process which is required by NEPA.  Second, the MIS
identifies only one preferred alternative by consensus.  This approach is significantly different than the NEPA
review and should not be considered as a proxy.  NEPA analysis requires an agency to identify the purpose and
need, review alternatives in the draft stage, select a preferred alternative in the draft or final stage and allow the
public to comment on the selection.  The MIS process does not provide for notice and comment, and consequently,
an agency can dismiss an alternative that indeed meets the purpose and need without ever having to respond to the
public.  In arguendo, even were the court to agree with the findings of the District of Nevada court, the case's
finding is inapplicable to the facts present here because the finding is limited to dismissing alternatives that do not
meet the purpose and need.  Id. at 1193.  As discussed above, Option 2 meets the purpose and need of the project,
and therefore, cannot be eliminated from review in the MIS stage simply because it was not the consensus winner
amongst a group of stakeholders that had little concern for the fate of the Little Miami River.

out that Option 2 would approach traffic capacity in 2020, it is unable to provide anything in the MIS that squarely says that Option 2 does not meet the purpose and need of the project. See FHWA Mem. at 17 (citing AR 47744). Additionally, as discussed above, unlike the 12-lane versus 10-lane alternatives in City of Alexandria, Option 2 performs similarly to Option 1 with varying degrees of traffic enhancement. AR 48020. Furthermore, unlike the directly comparable traffic dimensions of widening a bridge between 10 to 12 lanes, the two Options will have varying impacts on traffic flow that can not be directly correlated because they utilize different corridors, thereby relieving traffic in different areas of the metropolitan area. Further, Option 1 will only provide a 5% greater delay reduction than Option 2. AR 47744. Unable to cite to the record for support of its position, ODOT highlights the ways in which Option 2 provides for increased traffic volume compared to Option 1. ODOT Mem. at 26. Again, while Option 2 may not perform as well as Option 1, there is no indication that it will not meet the purpose and need.

FHWA and ODOT fail to provide convincing reasons for why Davis v. Mineta, 302 F.3d 1104 (10th Cir. 2002), is not instructive. First, it is irrelevant that Davis involved an EA because regardless of whether an EA or EIS is at issue, the agency must still evaluate all reasonable alternatives. FHWA Mem. at 19; ODOT Mem. at 29. FHWA next asserts that Davis is distinguishable from the present case because "[i]n Davis, FHWA failed to consider alternative alignments to minimize the impacts of noise and other environmental effects." FHWA Mem. at 19-20. However, analysis of alternatives that would not involve noise, visual and other environmental effects on the Little Miami River and its users is precisely the issue present here. Plaintiffs have, from the beginning contended that an analysis of alternatives (i.e. Option 2) is necessary because it is an "alignment" that does not pose noise and other environment effects to LMR users in the Horseshoe Bend area (which as described in opening brief is highly valued for the recreation opportunities it provides – specifically due to the natural environs and quiet.).

FHWA's efforts to distinguish <u>Davis</u> on mass transit grounds is inapposite because issues pertaining to mass transit alternatives are not at issues in this case. <u>See</u> FHWA Mem. at 20. FHWA finally attempts to distinguish <u>Davis</u> on the grounds that it is considering four different alignments for the bridge and that consequently there are several alternatives. <u>Id</u>. This is a misleading characterization and comparison to <u>Davis</u> because all four alignments are in the exact area plaintiffs remain concerned about, and as a result, there is no alternative that does not include a new bridge across the Little Miami River in the Horseshoe Bend segment. While FHWA maintains that Plaintiffs' reliance is "misplaced" it is clear from the facts of <u>Davis</u> and those present here that the finding is directly relevant and indicates that FHWA's failure to consider an option that does not impose the environmental impacts that are present here is inadequate under NEPA.

Finally, both EPA and NPS have commented that Option 2 should have been considered as a reasonable alternative. AR 10604-06; 9200-01; 2967; 2160; 42270-71. While their determinations do not render FHWA's failure to consider Option 2 as an alternative arbitrary and capricious, in and of themselves, they are significantly relevant in demonstrating that FHWA's determination is not supported by the record. Neither NPS, EPA nor plaintiffs, have ever maintained that FHWA must "slavishly" follow comments. <u>See</u> FHWA Mem. at 21. Rather, due to the significant concerns raised and the fact that Option 2 meets the purpose and need and is reasonable, FHWA was required to fully analyze Option 2.

B.    <u>The NPS Noise Analysis is Significant New Information.</u>

"[A] supplemental EIS is only required where new information 'provides a seriously different picture of the environmental landscape.'" <u>Nat'l Comm. for the New River, Inc. v. FERC</u>, 373 F.3d 1323 (D.C. Cir. 2004) (<u>citing</u> <u>City of Olmsted Falls v. FAA</u>, 292 F.3d 261, 274 (D.C. Cir. 2002)). Here, FHWA violated NEPA by not preparing a supplemental EA or SEIS to address the significant new circumstances and information provided by NPS concerning noise

associated analysis prepared during the EIS process.  Defendants assert that that "FHWA devoted substantial efforts to resolving the issues raised by NPS, DOI and EPA and thoroughly considered all of their input" and that any of the information presented by the NPS – through its noise analysis of the ODOT noise study – is not new.  FHWA Mem. at 30.  While the issues presented by NPS are certainly not new – the information and data is.[5]  Specifically, NPS has provided substantive information and analysis of the ODOT noise analysis that finds significant fault with the underlying methodology and the findings made.[6]

The NPS study need not contain "new data" in order for its critique to qualify as significant new information.  "[I]nformation 'that does not seriously change the environmental picture, but that nevertheless affects, or could affect, the decisionmaking process, is subject to the procedural requirements of NEPA.'"  Natural Resources Defense Council v. Lujan, 768 F. Supp. 870, 886-87 (D.D.C. 1991) (quoting Sierra Club v. Froehlke, 816 F.2d 205, 210, 212 (5th Cir. 1987)).  Because the analysis indicates that a constructive use is taking place, "the decisionmaking process" could be affected.[7]  Further, additional analysis is significant new

---

[5] NPS also presented new information pertaining to the visual impacts associated with the bridge, noting that (1) "the large mass of [a multi-lane bridge, 55 feet above the river,] in combination with its location in a relatively unobstructed corridor with relatively few man-made intrusions would make it the **most visibly dominate feature in this segment of the river**"; (2) "the cumulative visual impacts of a massive, multi-lane bridge where there previously was not a bridge, would result in a **fundamental change** in the scenic qualities in this portion of the LMR"; and (3) "[a] massive four-lane concrete bridge cannot be hidden from view."  AR 8153 (emphasis added).  As a result, NPS was unable to agree with FHWA's conclusion that existing developments in the area diminish the bridge impacts and noted that "it is the *quality* of the recreational experience afforded by the scenic values and recreational opportunities within the LMR …, which Congress intended to protect."  AR 8153 (emphasis in original).

[6] NPS noted that "[t]he acoustic data collection and analysis report submitted with the May 12 letter **reveals serious deficiencies that invalidate the noise impact analysis** conducted for the Eastern Corridor project during the final EIS process."  AR 8151 (emphasis added).  NPS found that "there would be a significant and substantial noise impact to the recreational experiences of river users" and that "[t]he impact is such that it would impair the [outstandingly remarkable] values, which support the river's national designation, thus leading to a loss of this distinction."  AR 8152.  "[B]ased on NPS guidelines for assessing noise impacts in natural areas, at **least 4 kilometers of river will suffer major acoustical impairment** from the proposed bridge."  AR 8156 (emphasis added).

[7] NPS noted that the river was included in the system because it provides a recreation opportunity where one can enjoy the quiet and natural environment of the river and that "the recreational activities and scenic values" of the Little Miami River are associated with the "attributes of quiet, serenity and solitude."  AR 42274, 42276; see also AR 3452.

information requiring supplemental review when the information paints a "seriously different picture of the environmental landscape." See City of Olmsted Falls, 292 F.3d at 274.

While ODOT continues to maintain that there are no substantial noise impacts, the landscape has indeed changed because the critique of the noise analysis indicates all the ODOT assumptions are faulty and as a result FHWA's finding that there is no constructive use is not supported. The NPS study calls into question the environmental impacts associated with this project. According to the NPS study, the impacts are far greater than that assumed by ODOT. As a result, the "environmental landscape" is different than that discussed or assessed in the EIS. This new information criticizes and rejects the predominant study used to support the agency's decision that there is no constructive use. Because there is now more information finding fault with ODOT's analysis and its findings, and more information confirming that there is a constructive use – the environmental landscape is indeed significantly different than that presented in the EIS and warrants supplemental analysis.

ODOT contends that simply because the NPS study involves the same issues discussed in the EIS, it is automatically not new information. ODOT Mem. at 31-33. First, ODOT fails to cite any case that supports the contention that simply because new information involves the same issues as those previously presented before the agency, it does not require any supplemental NEPA analysis. Second, the point of contention is not whether new issues are raised but rather whether new information concerning the project is identified. As explained in Plaintiffs' opening brief, the information presented is new (an analysis of an ODOT noise study conducted after the FEIS) and significant because it indicates that significant environmental impacts were overlooked or mis-analyzed by ODOT and FHWA. Further, because the NPS study comes from another federal agency with considerable expertise pertaining to the precise issues it was

commenting on, ODOT's post-EIS decision to simply refute NPS's findings should not be entitled to deference.[8]

In light of NPS's comments and the NPS study's analysis of ODOT's Noise Readings, a "hard look" at the environmental consequences of this project, as well as a reevaluation of whether noise impacts are a constructive use is warranted.  The information and analysis provide a drastically different conclusion regarding impacts to the river, and provide new detailed and comprehensive analysis of ODOT's noise study, which was the basis for the EIS's conclusion that there is no constructive use.   See generally Corridor H Alternatives, Inc. v. Slater, 982 F. Supp. 24, 30 (D.D.C. 1997) (an agency action that "cause[s] effects which are significantly different from those already studied" requires preparation of a supplemental EIS), rev'd on other grounds Corridor H Alternatives, Inc. v. Slater, 166 F.3d 368 (D.C. Cir. 1999).  In this case, the actual noise impacts on those using the river for the purposes it was included in the National Wild and Scenic Rivers Act system are "significantly different" than those acknowledged in the EIS.  As a result, the comments and information provided by NPS (recognized by FHWA as the agency with "special expertise" concerning impacts to the Little Miami River) are significant and warrant preparation of a supplemental EIS.

C.     FHWA Failed to Base EIS on Current and Up-To-Date Data.

An agency's omission of ascertainable facts, or failure to use up-to-date information, or the inclusion of erroneous information, violates the disclosure requirements of NEPA and undermines the public's confidence in the EIS, rendering it legally defective.  See e.g. Johnston v. Davis, 698 F.2d 1088, 1095 (10th Cir. 1983) (requiring revision of EIS due to use of artificially low discount rate); Hughes River Watershed Council v. Glickman, 81 F.3d 437, 446 (4th Cir.

---

[8] "[P]ractical agency expertise is one of the principle justifications behind [administrative review] deference." Pension Benefit Guaranty Corp. v. LTV Corp., 496 U.S. 633, 655 (1990); see also Sierra Club v. Marsh, 816 F.2d 1376, 1388 (9th Cir. 1987) (the Court "defer[red] to the agency with the more appropriate expertise.").  NPS has significant agency expertise in ascertaining impacts to outstandingly remarkable values for Wild and Scenic Rivers and determining whether actions will impair those attributes.

1996) ("For an EIS to serve these functions, it is essential the EIS not be based on misleading

economic assumptions); <u>Appalachian Power Co. v. EPA</u>, 249 F.3d 1032, 1054-55 (D.C. Cir.

2001) (modeling can not be based on inconsistent data); <u>Idaho Sporting Congress v. Rittenhouse</u>,

305 F.3d 975, 972 (9th Cir. 2002) (agency cannot lawfully rely upon facts which it knows,

should know, or suspects are inaccurate).

The Tier 1 Eastern Corridor's September 2004 Economic Analysis Report identifies gas

cost at $1.13 per gallon for 2003.[9]  AR 607.  FHWA asserts that benefits will be even greater if

price of fuel rises from that assessed in its analysis.  FHWA Mem. at 31-32.  First, while the cost

to certain drivers may be greater based on higher gas prices, the analysis does not provide a fair

and accurate picture of how drivers will adjust their driving or transportation decisions based on

actual prices.  FHWA fails to refute that this estimate was ever an accurate presentation of gas

prices – either back in 2003 or now.  Further, were FHWA correct that it is acceptable to base its

economic analyses on outdated inaccurate figures, there would be no limit to how low they could

estimate gas prices.  Certainly if gas prices were $1.00 per gallon the economic analysis will look

substantially different than if actual prices are evaluated.

While FHWA asserts that rising cost only means greater cost to drivers, it fails to

recognize the impact rising costs of gas have on the decision to drive.  Basing a study on

inaccurate data cannot be permitted simply because "only a certain small percentage of drivers

will switch to mass transit."  FHWA Mem. at 32.  FHWA has acknowledged that if gas prices

were to reach $3.39 per gallon, mass transit usage will go up over between 20% - 24%. AR 506.  It

is not for Defense counsel to decide if a 24% change in mass transit usage is substantial.  Rather,

accurate gasoline prices and accurate analysis of the impacts of these prices must be included in the

EIS that is subject to public review and comment.  Despite this possible dramatic change in predicted

traffic demand, FHWA has refused to take a "hard look" at traffic demand flows under this more

---

[9] First, while it may be common practice to hold fuel prices constant when doing an economic analysis (<u>see</u> FHWA Mem. at 31) the price was far below the average 2003 cost.

realistic gas price scenario to determine how traffic demands would look under Option 2.  Because the EIS relies on misleading economic information, or fails to include the most accurate costs associated with gas prices, the NEPA analysis is insufficient.

## II.    The Project Constitutes a Constructive Use of the National Wild and Scenic Little Miami River.

Section 4(f) of the Department of Transportation Act was established to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites from transportation projects.  49 U.S.C. § 303(a).  Congress noted that section 4(f) is "designed to insure that in planning highways … and other transportation facilities, care will be taken … not to interfere with or disturb established recreational facilities and refuges."  S. Rep. No. 1659, 89th Cong., 2d Sess. 5-6 (1966).  The Supreme Court stated that the very existence of the statute reflects Congress' intent that the protection of park lands must be given "paramount importance" in the planning and approval of federal highway projects.  Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S.402, 412-13 (1971).  If there is a feasible and prudent alternative to the use of section 4(f) resources, the Department of Transportation must adopt that alternative.  Id. at 411-13; see Hickory Neighborhood Defense League v. Skinner, 893 F.2d 58, 61-62 (4th Cir. 1990) (overturning lower court decision supporting DOT's conclusion that there were no feasible and prudent alternatives to proposed widening of highway), *appeal on remand at* 910 F.2d 159 (4th Cir. 1990).

As a component of the National Wild and Scenic Rivers Act system, the Little Miami River is a 4(f) resource.  AR 2163, 47716-17.  Yet, despite the fact that it is included in the National Wild and Scenic Rivers system and identified as a 4(f) resource, FHWA has failed to satisfy Congress' intent to recognize the "paramount importance" of protecting the Little Miami River from this transportation project.  Citizens to Preserve Overton Park, 401 U.S. at 412-13; see also AR 47056.

A "constructive use" of a 4(f) resource occurs when the project's "proximity impacts are so sever that the proposed activities, features, or attributes that qualify a resource for protection … are substantially impaired."  23 C.F.R. § 771.135(p)(2); see also AR 47048.  As identified by the Department of Interior and NPS, aesthetic and noise impacts associated with the proposed bridge will constructively use the Little Miami River.  D.C. Federation of Civic Associations v. Volpe, 459 F.2d 1231, 1239 (D.C. Cir.  1971) (harm to recreational use encompasses "noise, air pollution and general unsightliness" that might "dissipate its aesthetic value, crush its wildlife [or] defoliate its vegetation") cert. denied, 405 U.S. 1030 (1972).

A.     FHWA Has Not Properly Analyzed Potential Noise Impacts.

FHWA has improperly relied upon a faulty ODOT noise study report to support its no constructive use finding.  FHWA Mem. at 36.  This report, as detailed in Plaintiffs' opening brief as well as above, has been heavily criticized by NPS.  AR 8149-63.  FHWA attempts to hide behind the veil of "agency deference" to support its decision.  See FHWA Mem. at 36 (citing Town of Cave Creek Arizona v. FAA, 325 F.3d 320, 332 (D.C. Cir. 2003); Sierra Club v. DOT, 753 F.2d 120, 128 (D.C. Cir. 1985); Citizens Against Burlington, 938 F.2d at 200-01).

The D.C. district court has noted that it is "only obligated to conduct a thorough critique of the Defendants' 4(f) review and guarantee that 'neither the methodology employed nor the conclusions reached were arbitrary and capricious.'"  Stewart Park and Reserve Coalition, Inc. (SPARC) v. Slater, 358 F. Supp.2d 83, 102 (D.D.C. 2005) (citation omitted).  NPS noted that the ODOT study "does not meet the basic requirements for sound monitoring projects, including the protocols that have been recommended and agreed upon by the Federal Interagency Committee on Aircraft Noise … when evaluating noise impacts to natural areas. These deficiencies prevent the formulation of a scientifically defensible assessment of noise impacts to the Little Miami River."  AR 8156-57.  Because the methodology is arbitrary, Defendants should not be given any deference in their constructive use determination.

Further, and of paramount relevance to this case, none of the cases cited by FHWA regarding the degree of deference provided involve the critique of a noise analysis by another expert agency. For example, in <u>Sierra Club</u>, the court found that there was no abuse of discretion when FAA used a cumulative noise level analysis rather than an individual noise analysis methodology. 753 F.2d at 128-29 (plaintiff's based the claim on concerns presented in a study that the Court found were already accounted for in the FEIS). However, in this case, the numerous inadequacies found by the NPS study indicate that there was indeed an abuse of discretion and these inadequacies have not been properly addressed or accounted for in the EIS. While FHWA may be entitled to some degree of deference, it must nonetheless be able to support its analysis. It is unable to do so in this case.

While FHWA would like the court to believe that it can simply defer to its own analyses, FHWA may not issue a faulty report, and then claim that as the lead agency it is entitled to deference to this faulty report. Additionally, because the NPS is also a federal agency charged with administering parks and wild and scenic rivers, and is also responsible for analyzing impacts to resources under its management, its analysis is just as entitled to deference as that prepared by FHWA although in this case, the original faulty analysis was not prepared by FHWA but rather by ODOT, to whom the Court owns no deference. ODOT cannot adequately explain the deficiencies found by NPS and, as a result, regardless of agency deference, the report cannot support the agency's arbitrary decision. Further, if there is a technical dispute on the predicted noise levels, that dispute has to be revealed in EIS or SEIS. <u>See</u> FHWA Mem. at 37 (stating that the "noise impacts will not be severe" while NPS has made findings to the contrary).

FHWA next argues that the NPS study' analysis is lacking. First, FHWA asserts that NPS provides no ambient noise level data indicating that levels should be approximately 10 dB below what ODOT found.[10] <u>See</u> FHWA Mem. at 37. As discussed in its critique, there is no

---

[10] In <u>Davis v. Mineta</u>, the court described the project area as a "serene island of quiet with an average noise level of 57 dBA." 302 F.3d at 1124. Once the project is constructed noise levels were expected to jump to 65 dBA. <u>Id</u>. at

scientific basis for ODOT's metric for representing background noise. AR 8161-62. Because FHWA cannot refute that there is a scientific basis, it simply asserts that there is no data for the critique. NPS explained that "there is no scientific basis for using [the ODOT] metric for representing background sound levels, because it is intrinsically biased towards the loudest measurements in the sample." AR 8161. Because the critique focuses on the sampling and its biases, there is no need for NPS to get out on the river and conduct its own studies.

Second, FHWA argues that the use of NPS's Natural Resource Impairment Guidelines are not applicable to FHWA. FHWA Mem. at 37-38. The guidelines provide an estimate of the noise impairment in relation to distance from the bridge. See AR 8162. The NPS study found that there would be major impairment from 2 to 3.5 km up and downstream of the proposed bridge. AR 8163. The Study bases this "major impairment" on the percentage of time that the noise source exceeds ambient levels. Id. In this case, FHWA asserts that it need only follow its own regulations. Regardless, it has failed to address how its analysis results in significant underestimates of noise impairment because it does not take into consideration the amount of time ambient noise is exceeded, rendering its own analysis insufficient in fully evaluating the impact to users. Furthermore, while FHWA may believe that assessing impacts of noise over ambient sound in natural areas is unnecessary, basic monitoring which includes such analysis has been adopted by the Federal Interagency Committee of Aircraft Noise. AR 8156-57. Given that this protocol is widely used, NPS asserted that the ODOT noise report is not "a scientifically defensible assessment of noise impacts to the Little Miami River." AR 8157. While FHWA may use its own methodology, that methodology must be sound and not arbitrary or capricious. Failure to assess impairment based on noise exceedance over ambient sounds in this natural area of the Little Miami River renders the ODOT study arbitrary.

---

1124-25. A ten decibel increase is equivalent to a doubling of the noise volume. Id. Furthermore, "[a] noise level of 65 dBA or above will 'significantly' disturb outdoor speech." Id. at 1125 n.14 (citation omitted). See also NPS comments noting 7-10 dBA increase is a doubling of loudness. AR 42276.

B.    The Little Miami River is a Category A Receptor.

"[P]arks and other open spaces where serenity and quiet are of extraordinary significance, and where preservation of those qualities is essential if the area is to continue to serve its intended purpose" are Class A receptors. 23 C.F.R. § 772 Table 1. While FHWA again argues that deference should be given to its decision that the Little Miami River is a Category B receptor,[11] it is unable to rebut the numerous points in the record that identify the river as a place of serenity and quiet or able to provide any adequate justification for why it makes any logical sense to consider it a Category B receptor. See FHWA Mem. at 39-40. For example, FHWA provides no retort to statements from NPS. NPS noted that "[t]he diversity and harmonic nature of the river setting is critical to the scenic quality of the [Little Miami River]. Opportunities for solitude, serenity and quiet are also plentiful and in turn, increase recreational opportunities for viewing birds and associated riparian wildlife." AR 42273; see also AR 2170 (NPS April DEIS comments noting that the Little Miami is recognized for providing the kinds and types of activities that require special quantities (sic) of serenity and quiet).

Nor can Defendants respond to the fact that parks and open spaces are the precise type of places that provide serenity and quiet, and unique recreational experiences. The type of recreation that takes place on the Little Miami River is the type that seeks out this quiet and serene experience. AR 42272-76, 9900, 9926-27. FHWA can only provide the simple, but unpersuasive, argument that because the river is designated as a "recreational" river under the Wild and Scenic Rivers Act that it must be a Category B receptor. A river, park, or other open space need not be "wilderness" in order to qualify as a Category A receptor. Just because there are powerlines, a combined sewer overflow pipe, or agricultural lands in the middle of the Cincinnati metropolitan area, the presence of these imprints of humans does not mean that the opportunity for a serene and quiet experience does not exist. The question is not whether the

---

[11] NPS, the agency responsible for administration of Wild and Scenic Rivers, is an expert with respect to noise and visual impacts to the river.

signs of humans are present, but rather what types of attributes are present and how does this project affect them.  Because FHWA has known of the significant concern about impacting this rare stretch of the river, they have taken every opportunity to mischaracterize the river as nothing special.  Were the river nothing special, and tainted by humans to the extent FHWA makes out, there would be no reason to include it as a part of the Wild and Scenic Rivers Act system and it would not be frequented by recreators who specifically seek out quiet and serenity.  See AR 42276, 3452, 9900, and 9926-27.  FHWA's interpretation, which it maintains must be entitled to agency discretion, is simply counter to the river's inherent qualities and the reasons for which it was designated under the Act.  Additionally, it is contrary to FHWA's own previous statements that found that the bridge would pose a new noise source in this fairly undisturbed segment of Little Miami River Valley.  AR 48022.

Additionally, FHWA has no basis for the assertion that the recreational attributes will be protected if a new bridge is constructed.  FHWA Mem. at 39.  This bald assertion shows the callus attempts by FHWA to dismiss the ongoing concerns expressed by plaintiffs, NPS, EPA and others.  Further, FHWA cannot support the finding that canoe and kayak use will not be disturbed simply because the bridge will clear-span the river.  FHWA Mem. at 40.  This fact merely addresses navigability and provides no relief as to noise impacts on the recreator's experience.  Were the LMR assessed under Category A, the projected noise levels would exceed that permitted under the noise abatement criteria and Defendants would have been forced to admit that a constructive use exists.[12]  See 23 C.F.R. § 772, Table 1, and AR 47717.

C.    Impacts to the Visual and Scenic Resources Are Also a Constructive Use.

Placing a bridge over the quiet and relatively undisturbed Horseshoe Bend section of the

---

[12] In an email from ODOT to the consulting company that prepared the NEPA analysis, ODOT stated that since the LMR is a public park and a public open space, by its own definition, it is a Category B receptor. AR 2514. This is an incorrect interpretation as the words "park" and open space" are also used in the definition of Category A receptors. The email provides no discussion of why the River is a park in the context of Category B versus Category A.

Little Miami River will have significant impacts on the visual and scenic benefits of the river in addition to noise impacts, and, as a result substantially impair the use and enjoyment of the river. See AR 47374 (Little Miami River, associated floodplain features and adjacent parkland and cultural resources are "visually sensitive resources"); see also AR 47343 (visually sensitive resources include those areas where high visual quality is important for recreational reasons); AR 3453; AR 9888 and 1717 (river's Outstandingly Remarkable Values identified for protection under the Wild and Scenic Rivers Act include scenic (aesthetic), recreational, and fish and wildlife).

While FHWA asserts that it has properly analyzed and determined that the new bridge would not have visual impacts that may substantially impair the use of the river, it is unable to point to a place in the record for this analysis. See FHWA Mem. at 41 (citing to AR 47086-89, 47717 for its discussion of visual impacts but there is no discussion of visual impacts there).

NPS believes the project will impair the Outstanding and Remarkable Values for the river, including scenic and aesthetic values. AR 2164-67; AR 42273-76; AR 8150. 23 C.F.R. § 771.135(p)(4)(ii) notes that "[e]xamples of substantial impairment to visual or esthetic qualities would be the location of a proposed transportation facility in such proximity that it … substantially detracts from the setting of a park … which derives its value in substantial part due to its setting …." The bridge will substantially detract from the setting of the river, which derivers all of its value solely due to its setting. FHWA mistakenly asserts that "a clear-span bridge will not interfere with [canoeing and kayaking]." FHWA Mem. at 41.

Impairment of the visual and scenic attributes of the river will, in turn, substantially impair recreational enjoyment. Kayakers and canoeists who enjoy the relatively undisturbed stretch of river so close to the city will lose the quiet and solitude that draws them to this stretch. See AR 2166 ("Canoeists and hikers enjoy the natural quite (sic) and solitude offered in the project area, which increases opportunities for viewing of birds and other wildlife."); AR 42273

("canoeists, kayakers, and other outdoor enthusiasts come to this segment to enjoy the natural river setting…."); AR 9926-27 (Secretary of Interior Andrus recognized that the existence of such a natural setting in such close proximity to the Cincinnati metropolitan area rendered the river "one of our Nation's valuable recreation resources.").  NPS continuously alerted FHWA that the project would impact the recreation attributes of the river and that the bridge was a "constructive use."  AR 2166-67, 2171 (comments on DEIS); AR 42269-80 (comments on FEIS); AR 8149-55 (supplemental comments on FEIS).  NPS noted that "the severity and magnitude of the visual and recreational impacts are so great that they cannot be significantly mitigated."  AR 47737; AR 3454-55.

FHWA has not responded to NPS comments and relies simply upon the presence of such things as powelines, riparian clearings, a combined sewer overflow and riparian clearings to assert that a bridge will not have visual impacts.  FHWA Mem. at 42-43.  This perception is at odds with not only NPS, but also the predominant users of the river.  See e.g., AR 42273-76; AR 3937-38; AR 471; AR 475; AR 10964; AR 491; AR 2166.

Additionally, FHWA states that a "new bridge would not affect the visual and scenic attributes experienced by boaters on the river because views of the bridge from the water would be limited form the boater's perspective on the water surface, and the bridge would be raised above the banks and would be obscured by bends in the river."  FHWA Mem. at 41-42 (citing AR 1718); see also ODOT Mem. at 40.  While the visual intrusion may be limited to a shorter portion of the river (which at this point is impossible to determine since the exact placement has yet to be decided), the short time the boater is impacted, as well as the fact that it would be far above the water fail to address the visual impacts.  Such findings are not supported by the fact that FHWA is proposing a massive multilane bridge over a scenic and relatively undisturbed portion of the river.  Simply because FHWA says the impacts will be minimal does not make it so.  Further, such unsupported conclusions are completely inconsistent with comments from

NPS, EPA and plaintiffs.  FHWA appears to be the only one to believe the impacts will be minimal.

While ODOT recognizes that the Little Miami River is a visually sensitive resource and that a bridge would alter the visual landscape, it asserts that the impacts are not substantial.  ODOT Mem. at 40 (citing AR 47374 and 1718).  However, the reasons for diminishing the impacts to the visual resources are lacking.  First, that the views experienced by recreational users are primarily in the foreground is of little consequence when a massive multilane bridge will tower overhead.  See id.  As such, there is no decrease in the severity of impairment to the scenic Outstanding and Remarkable Values and ODOT cites nothing in its brief for this opposition.  Id.  Further, mitigation, such as purchase and preservation or reforestation of the private lands adjacent to the river will do nothing to mitigate the presence of a multilane massive bridge overhead.  ODOT cites nothing to support how these mitigation measures alleviate the impairment the bridge itself will pose.

Both FHWA and ODOT rely on Geer v. Federal Highway Administration, 975 F. Supp. 47 (D. Mass. 1997) for contention that there is no constructive use.  While the court in Geer did find that there was no constructive use of several parks, ODOT and FHWA fail to acknowledge "the urban context" of the parks.  975 F. Supp. at 74.  At issue in Geer was whether the construction of bridges over the Charles River in Boston, Massachusetts constituted a constructive use.  Importantly, the Charles River in Boston is not part of the Wild and Scenic River Act system.  Furthermore, as specified in the FEIS at issue in Geer, "in an urban park, the contrast between the values of the immediately surrounding park elements such as water surface and landscape banks seen against large urban backgrounds elements is not necessarily adverse and may even be viewed as positive, depending on the merits of the bridge design and the personal tastes of each user."  Id. at 73.  In fact, ultimately the court found that "although there were noise and visual impacts those impacts were not substantial **given the urban context of the**

**project**…."  Id. at 74 (emphasis added).  Further, recreational uses were "predominately by small motorcraft, which are themselves noise sources" and as a result "highway noise would not significantly affect recreational boating."  Id. at 73.

ODOT and FHWA also rely upon Laguna Greenbelt, 42 F.3d at 533, in support of FHWA's finding that there is no constructive use.  See ODOT Mem. at 42 and FHWA Mem. at 42.  The facts supporting the no constructive use finding at issue in Laguna are easily distinguishable from this case.  In Laguna, plaintiffs challenged the FHA's "no use" determination for four properties: three bike trails and a public park.  The impacts included: construction of an overpass over one bike trail; widening of an existing highway bridge over one bike trail; relocation of one bike path within the designated right of way for the bike path; and location of the corridor adjacent to the park. Although the court did not provide an explanation for why it found no impacts, the facts of Laguna are significantly different than those present here.  Unlike Laguna, the construction of a new bridge over the scenic and undisturbed portion of the Little Miami River is substantially different and far more severe than the impacts at issue in Laguna.  See 42 F.3d at 533 (The new bridge over a Wild and Scenic River can not be compared to an overpass over a bike path, or widening of a highway along a bike path or rerouting a bike path).  As a result, the finding that there was no constructive use, given the context of the impacts, in Laguna has no bearing on this case.

Finally, FHWA asserts that the area suffers from "substantial urban blight already" and therefore the imposition of a massive multilane bridge will not have any impacts on the visual and scenic qualities.  See FHWA Mem. at 42-43.  As discussed above and in Plaintiffs' opening brief (Plaintiffs' Mem. at 38-39), FHWA makes extensive efforts to mischaracterize the Horseshoe Bend as no place special; an industrial urban blight, heavily impacted by the hands of humans.  While the area is not a wilderness, it is a rare and unique place found in a large metropolitan area in this day and age, and as such was included in the Wild and Scenic Rivers

Act system.  AR 10968.  The area provides a natural setting, with trees and farmland lining the

section of the river.  It is a major stretch to characterize a rural landscape as "industrialized."

Additionally the presence of a sewer overflow pipe or even a landfill located in the vicinity of

the river, does not make the area "industrialized."   See FHWA Mem. at 42-43; cf. AR 47282-83

(photos indicating natural setting of Horseshoe Bend), AR 42273-76, AR 2166.

　　　FHWA would like to limit the question to simply whether the area is or is not pristine.

However, the proper question is whether the present attributes of this river, despite the presence

of these human-made features, are impaired.  See Druid Hills Civic Ass'n, Inc. v. Federal

Highway Admin., 772 F.2d 700, 716 (11th Cir. 1985).  As evidenced by NPS, plaintiffs, and

others, they are, and consequently, FHWA's efforts to paint the river as "industrialized" should

be rejected and not influence whether the project substantially impairs the visual, scenic and

recreational attributes of the river.  See AR 47282-83 (photos of stretches of LMR at Horseshoe

Bend, showing scenic and natural wooded corridor); AR 2166; AR 42273-76.  As NPS noted,

"[t]he large mass of the proposed bridge … in combination with its location in an unobstructed

corridor with relatively few man-made intrusions would make it the most visibly dominate

feature in this segment of the river. Placing a massive bridge where there previously was not one

results in a fundamental change in the scenic qualities in this portion of the [Little Miami River]

at the time of designation."  AR 2166.

　　　While FHWA maintains that plaintiffs "strain credulity" by arguing that powerlines do

not taint the natural setting nor the quiet and solitude, FHWA provides nothing to indicate how

powerlines provide any noise impacts to the area nor does FHWA attempt to deny NPS's

findings regarding the attributes of the river, perhaps because FHWA would wholly be out of

place by asserting that it has greater expertise in determining the attributes of a Wild and Scenic

Rivers Act river.  See Davis v. Mineta, 302 F.3d at 1123 ("[A] reviewing court 'may properly be

skeptical as to whether an EIS's conclusions have a substantial basis in fact if the responsible

agency has apparently ignored the conflicting views of other agencies having pertinent expertise.'" (citation omitted).

FHWA ultimately asserts that because the area is not remote and is "highly developed" the visual and scenic qualities cannot be disturbed. Yet there is no meaningful analysis in the FEIS to support this position. Further, while again FHWA may characterize the area as industrialized and highly disturbed, NPS – an agency responsible for the administration of parks has consistently commented about the impacts this bridge will pose in the visual and scenic qualities of the river, which lead to its inclusion in the Wild and Scenic Rivers system. Given that NPS is far more experienced with management of places that provide quiet and solitude and harbor visual and scenic attributes, it is FHWA who strains credulity to assert that the area is tainted and a massive multi-lane bridge will have no impacts on the visual and scenic qualities.

NPS concluded that the noise and visual intrusions of the project will substantially impair the scenic and recreational outstandingly remarkable values and, as a result, the project constitutes a constructive use of these values. AR 8154; AR 42273-76. FHWA has failed to support its finding that the visual impacts are not substantial, rendering its 4(f) analysis arbitrary and capricious.

## CONCLUSION

For all the foregoing reasons Plaintiffs respectfully requests that the Court grant its Motion for Summary Judgment.

DATED: August 31, 2007                              Respectfully submitted,

                                                    _/s/_____
                                                    Brian A. Litmans (AK 0111068)
                                                    *Appearing Pro Hac Vice*
                                                    Public Interest Environmental
                                                    Attorney at Law
                                                    6251 West Tree Dr.
                                                    Anchorage, AK 99507
                                                    Telephone: 503-927-5288
                                                    Facsimile: 907-276-7110

blitmans@gmail.com

Robert Ukeiley (MD14062)
Law Office of Robert Ukeiley
435R Chestnut Street, Ste. 1
Berea, KY 40403
Telephone: 859-986-5402
Facsimile: 866-618-1017
rukeiley@igc.org

Counsel for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RIVERS UNLIMITED, *et al.*,<br><br>          Plaintiffs,<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*,<br><br>          Defendants,<br><br>     and<br><br>OHIO DEPARTMENT OF TRANSPORTATION<br><br>          Defendant-Intervenor. | **Case No.:** 1:06-CV-01775-JR |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

As stated in Plaintiffs Statement of Material Facts (Docket No. 31-5), as well as in Defendants' and Defendant-Intervenors' Statements of Facts and Responses to Plaintiffs Statement of Facts (Docket Nos. 34-3, 34-4, 33-5, 33-6), there are no material facts for the Court to resolve in the first instance here.  Pursuant to Fed. R. Civ. P. 56 and LR 7.1(h), Plaintiffs Rivers Unlimited, Little Miami, Inc., the Sierra Club, and Marilyn Wall respectfully submit this Response to Defendants' Statement of Material Facts as to Which There is No Genuine Issue.

    1.       Plaintiffs do not dispute paragraph one.

    2.       Plaintiffs do not dispute paragraph two.

3.      Plaintiffs do not dispute paragraph three.

4.      Plaintiffs do not dispute paragraph four.

5.      Plaintiffs do not dispute paragraph five.

6.      Plaintiffs do not dispute paragraph six.

7.      Plaintiffs do not dispute paragraph seven.

8.      Plaintiffs do not dispute paragraph eight.

Respectfully submitted this 31st day of August, 2007.

Respectfully submitted,

  /s/                    
Brian A. Litmans (AK 0111068)
*Appearing Pro Hac Vice*
Public Interest Environmental
Attorney at Law
6251 West Tree Dr.
Anchorage, AK 99507
Telephone: 503-927-5288
Facsimile: 907-276-7110
blitmans@gmail.com

Robert Ukeiley (MD14062)
Law Office of Robert Ukeiley
435R Chestnut Street, Ste. 1
Berea, KY 40403
Telephone: 859-986-5402
Facsimile: 866-618-1017
rukeiley@igc.org

Counsel for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RIVERS UNLIMITED, *et al.*,<br><br>             Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*,<br><br>             Defendants,<br><br>      and<br><br>OHIO DEPARTMENT OF TRANSPORTATION<br><br>             Defendant-Intervenor. | **Case No.:** 1:06-CV-01775-JR |

**PLAINTIFFS' RESPONSE TO DEFENDANT-INTERVENOR'S STATEMENT OF FACTS AS TO WHICH THERE IS NO GENUINE ISSUE**

As stated in Plaintiffs Statement of Material Facts (Docket No. 31-5), as well as in Defendants' and Defendant-Intervenors' Statements of Facts and Responses to Plaintiffs Statement of Facts (Docket Nos. 34-3, 34-4, 33-5, 33-6), there are no material facts for the Court to resolve in the first instance here. Pursuant to Fed. R. Civ. P. 56 and LR 7.1(h), Plaintiffs Rivers Unlimited, Little Miami, Inc., the Sierra Club, and Marilyn Wall respectfully submit this Response to Defendants-Intervenor Ohio Department of Transportation's ("ODOT") Statement of Material Facts as to Which There is No Genuine Issue.

1. Plaintiffs do not dispute paragraph one.

2.    Plaintiffs do not dispute paragraph two.

3.    Plaintiffs do not dispute paragraph three.

4.    Plaintiffs do not dispute paragraph four.

5.    Plaintiffs do not dispute paragraph fiver.

6.    Plaintiffs do not dispute paragraph six.

7.    Plaintiffs do not dispute paragraph seven

8.    Plaintiffs do not dispute paragraph eight.

9.    ODOT's Statement of Material Facts does not include a paragraph nine.

10.   Plaintiffs do not dispute paragraph ten.

11.   Plaintiffs do not dispute paragraph eleven.

12.   Plaintiffs do not dispute paragraph twelve.

13.   Plaintiffs do not dispute paragraph thirteen.  The Tier 1 DEIS did discuss

"Preliminary Section 4(f) Applicability" on AR 47277-78 as cited by Defendant-Intervenor.  The

DEIS "Preliminary Section 4(f) Applicability" portion of the DEIS found that "Section 4(f) may

apply to the Little Miami River in the project vicinity."  AR 47278.  The DEIS noted that

"Section 4(f) applicability will be further evaluated during Tier 2 of the Eastern Corridor

project…."  AR 47278.

14.   Plaintiffs do not dispute paragraph fourteen.

15.   Plaintiffs do not dispute paragraph fifteen.

16.   Plaintiffs do not dispute paragraph sixteen.

17.   ODOT's Statement of Material Facts does not include a paragraph seventeen.

18.     Plaintiffs do not dispute paragraph eighteen.

19.     Plaintiffs do not dispute paragraph nineteen.

20.     Plaintiffs do not dispute paragraph twenty.

21.     Plaintiffs do not dispute paragraph twenty-one.

22.     Plaintiffs do not dispute paragraph twenty-two.

Respectfully submitted this 31st day of August, 2007.

Respectfully submitted,


   /s/
Brian A. Litmans (AK 0111068)
*Appearing Pro Hac Vice*
Public Interest Environmental
Attorney at Law
6251 West Tree Dr.
Anchorage, AK 99507
Telephone: 503-927-5288
Facsimile: 907-276-7110
blitmans@gmail.com

Robert Ukeiley (MD14062)
Law Office of Robert Ukeiley
435R Chestnut Street, Ste. 1
Berea, KY 40403
Telephone: 859-986-5402
Facsimile: 866-618-1017
rukeiley@igc.org


Counsel for Plaintiffs

PLAINTIFFS' RESPONSE TO
DEFENDANT-INTERVENOR'S
STATEMENT OF MATERIAL FACTS  - 3 -